Bradley S. Schrager (Nevada Bar # 10217)
Don Springmeyer (Nevada Bar # 1021)
**WOLF, RIFKIN, SHAPIRO,**
**SCHULMAN & RABKIN, LLP**
3556 East Russell Road
Las Vegas, NV 89120
(702) 341-5200
Fax #: (702) 341-5300

Marc E. Elias
*Pro Hac Vice pending, will comply with LR*
*IA 11-2 within 3 days*
**PERKINS COIE LLP**
700 13th Street, N.W.
Washington, DC 20005
(202) 654-6200
Fax #: (202) 654-9126

*Attorneys of Record for Plaintiff*

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF NEVADA

|  |  |
|---|---|
| NEVADA STATE DEMOCRATIC PARTY,<br><br>                     Plaintiff,<br><br>      v.<br><br>NEVADA REPUBLICAN PARTY,<br>DONALD J. TRUMP FOR PRESIDENT, INC.,<br>ROGER J. STONE, JR., and STOP THE<br>STEAL INC.,<br><br>                     Defendants. | No. 1:16-cv-_____<br><br><br>**VOTER INTIMIDATION**<br>**COMPLAINT PURSUANT TO**<br>**THE VOTING RIGHTS ACT OF**<br>**1965 AND THE KU KLUX KLAN**<br>**ACT OF 1871** |

Plaintiff Nevada State Democratic Party hereby alleges as follows:

## INTRODUCTION

1.      The campaign of Donald J. Trump, Trump's close advisor Roger J. Stone, Jr., Stone's organization Stop the Steal Inc., the Nevada Republican Party ("NRP"), and others are conspiring to threaten, intimidate, and thereby prevent minority voters in urban neighborhoods from voting in the 2016 election.   The presently stated goal of the Trump Campaign, as explained by an unnamed official to Bloomberg News on October 27, is to depress voter turnout—in the official's words: "We have three major voter suppression operations under way" that target African Americans and other groups of voters. While the official discussed communications strategies designed to decrease interest in voting, it has also become clear in recent weeks that Trump has sought to advance his campaign's goal of "voter suppression" by using the loudest microphone in the nation to implore his supporters to engage in unlawful intimidation at Nevada polling places.  Trump's exhortations have been amplified by direct and tacit assistance from the NRP and Stone, who helped pioneer similar tactics in the 1980s before those efforts were blocked by the federal courts.  All have sought to organize, fund, and assist Trump's supporters to carry out the Trump Campaign's goals.  And Trump's supporters have responded with pledges to descend upon polling places in "certain areas" where many minority voters live in order to interfere with their efforts to exercise the franchise.

2.      In the aftermath of previous voter suppression efforts in our history, Congress responded forcefully by enacting laws that unequivocally prohibit voter intimidation.  In the 1870s, in response to threats of political violence and harassment against former slaves and their white supporters by the newly formed Ku Klux Klan, Congress banned private conspiracies to intimidate or threaten voters.  In the 1960s, in response to the menacing of African Americans who sought their full rights at the ballot box, Congress prohibited any threats or intimidation against any and all persons engaged in the democratic process.  Through these actions, Congress

created tools in federal law to ensure that our elections will be free from harassment and intimidation at the polls.

3.     Voter intimidation is especially pernicious when it is condoned or encouraged by a candidate or political party.  The Republican National Committee ("RNC") recognized the dangers and illegality of party-sponsored efforts to intimidate voters in resolving a 1981 lawsuit alleging that it "enlisted the help of off-duty sheriffs and police officers to intimidate voters by standing at polling places in minority precincts during voting with 'National Ballot Security Task Force' armbands" and visible firearms, in violation of the Voting Rights Act of 1965. *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 673 F.3d 192, 196 (3d Cir. 2012).  In a 1982 Consent Decree settling that lawsuit, the RNC and the New Jersey Republican State Committee agreed, *inter alia*, to:

a.   "as a first resort, use established statutory procedures for challenging unqualified voters";

b.   "comply with all applicable state and federal laws protecting the rights of duly qualified citizens to vote for the candidate(s) of their choice";

c.   "refrain from giving any directions to or permitting their employees to campaign within restricted polling areas or to interrogate prospective voters as to their qualifications to vote prior to their entry to a polling place";

d.   "refrain from undertaking any ballot security activities in polling places or election districts where the racial or ethnic composition of such districts is a factor in the decision to conduct, or the actual conduct of, such activities there and where a purpose or significant effect of such activities is to deter qualified voters from voting"; and

> e. "refrain from having private personnel deputized as law enforcement personnel in connection with ballot security activities."

*Id.* at 196-97 (internal citations and quotation marks omitted).

4. The Consent Decree has been updated, affirmed against challenge, and enforced by several courts, including the U.S. Court of Appeals for the Third Circuit. *See id.* at 220. In rejecting the RNC's 2009 request that the Consent Decree be set aside, the District Court for the District of New Jersey held that "[v]oter intimidation presents an ongoing threat to the participation of minority individuals in the political process, and continues to pose a far greater danger to the integrity of that process than the type of voter fraud the RNC is prevented from addressing by the Decree." *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 671 F. Supp. 2d 575, 578-79 (D.N.J. 2009), *aff'd*, 673 F.3d 192 (3d Cir. 2012). On October 26, 2016, citing the RNC's coordination with the Trump Campaign's voter intimidation efforts, the Democratic National Committee moved to hold the RNC in contempt of the Consent Decree. *See Democratic Nat'l Comm. v. Republican Nat'l Comm.*, No. 81-cv-3876 (JMV), Dkt. No. 95 (D.N.J. Oct. 26, 2016).

5. In this action, Plaintiff alleges Defendants' coordinated campaign of vigilante voter intimidation also violates the Ku Klux Klan Act of 1871 and the Voting Rights Act of 1965.

6. Immediate relief is necessary. There are only 8 days left until Election Day, and early in-person voting in Nevada is well underway. Trump's calls for unlawful intimidation have grown louder and louder, and the conspiracy to harass and threaten voters on Election Day has already resulted in numerous acts that threaten to interfere with the voting rights of registered Nevada voters. The Nevada State Democratic Party, and untold numbers of Nevada voters, will

suffer irreparable harm if the right to vote is imperiled by the same forms of virulent harassment that federal law has prohibited since shortly after the Civil War.

## PARTIES

7.     Plaintiff Nevada State Democratic Party is a state party organization affiliated with the Democratic Party, headquartered in Las Vegas, Nevada. The Nevada State Democratic Party is working "to elect Hillary Clinton to the White House" and other "Democrats up and down the ballot."  *See* http://nvdems.com/victory-2016/.

8.     Defendant Nevada Republican Party ("NRP") is a political organization affiliated with the Republican Party with its principal place of business in Las Vegas, Nevada.  The NRP is working to elect Donald J. Trump as President of the United States.  *See* http://nevadagop.org/#.

9.     Defendant Roger J. Stone, Jr., is a resident of Florida.  Stone is a Republican political operative and longtime associate of Trump's.  He is currently an operative for Trump and his campaign.  Stone is a vocal proselytizer of Trump's false voter fraud claims and his calls for vigilante action, including through Stone's "super PAC" Stop the Steal Inc., its website stopthesteal.org, and many forms of social media.  Stone has encouraged Trump supporters to wear red shirts on Election Day, in large part to menace voters.  Stone was a key advisor to the 1981 campaign of former New Jersey Governor Thomas Kean, in which a "ballot security" force wearing black armbands engaged in widespread voter intimidation in Democratic areas of the state, leading to a nationwide federal consent decree barring supposed ballot security efforts by the Republican Party.

10.     Defendant Stop the Steal Inc. is a "super PAC" formed by Stone on April 6, 2016, under Section 527 of the Internal Revenue Code.  Stop the Steal Inc. is devoted to promoting Stone's conspiracy theories regarding voter fraud, and to using fears of a "rigged" election to

organize and recruit poll watchers to harass and intimidate perceived Democratic voters on Election Day.  Stop the Steal Inc. is headquartered at 3843 South Bristol Street, Suite 312, Santa Ana, California.

11.     Defendant Donald J. Trump for President, Inc. (the "Trump Campaign") is the campaign of Donald J. Trump for the presidency of the United States.  The Trump Campaign is headquartered at 725 Fifth Avenue, New York, New York.

## JURISDICTION AND VENUE

12.     The Court has subject matter jurisdiction over this action under 28 U.S.C. § 1331 because this action arises under federal law, specifically Section 2 of the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3), and Section 11(b) of the Voting Rights Act of 1965, 52 U.S.C. § 10307(b).

13.     Specific personal jurisdiction exists over the Trump Campaign, Stone, and Stop the Steal Inc.  Nevada "provid[es] its courts jurisdiction to the fullest extent permitted by the due process clause."  *James Malinchak Int'l, Inc. v. Suzanne Evans Coaching, LLC*, No. 16-cv-89 JCM (CWH), 2016 WL 5796854, at *1 (D. Nev. Sept. 30, 2016).  Defendants purposefully directed their activities toward Nevada, this Complaint relates to Defendants' Nevada-related activities, and jurisdiction here is reasonable.  *See id.* at *3.

14.     The Nevada State Democratic Party has standing in this action because it is supporting many candidates for office in the election to be held on November 8, 2016, including Democratic candidates in the Presidential, Senate, House, and numerous statewide elections. The Party is threatened with immediate and irreparable injury if the vigilante voter intimidation campaign by Trump, Stone, and their co-conspirators succeeds in disrupting or changing the results of the election by means of an unlawful conspiracy.  The Nevada State Democratic Party has standing on behalf of itself and its supporters.

15.     Venue is proper in this district under 28 U.S.C. § 1391(e) because significant events giving rise to this action occurred in this district.

16.     The allegations herein justify immediate temporary relief in order to prevent irreparable harm.  An injunction against the Trump Campaign and its co-conspirators' planned intimidation tactics is the only way to protect thousands of Nevada voters from harassment, threats, or intimidation that could discourage them from voting in the upcoming election.

## FACTUAL ALLEGATIONS

**I.     CONGRESS REGULATES VOTER INTIMIDATION FOR OVER A CENTURY IN RESPONSE TO POLLING PLACE VIGILANTISM**

17.     The Ku Klux Klan Act of 1871 (the "Klan Act") was the last of the Enforcement Acts—legislation passed during Reconstruction to protect the suffrage rights of newly freed slaves, including by protecting them and their supporters from violence and harassment. President Grant requested the legislation in order to empower him to stamp out the first generation of the Ku Klux Klan, which Congress granted within a month of the request.

18.     The Klan Act, as currently codified in 42 U.S.C. § 1985(3), provides for damages and equitable relief "if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of . . . an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy."  The Act further provides that an action will lie against the conspirators so long as "one or more persons engaged" in the conspiracy "do, or cause to be done, any act in furtherance of the object of such conspiracy."  As the Supreme Court made clear in *Ex parte Yarbrough*, 110 U.S. 651 (1884), the constitutional basis for this broad provision—whose text

requires no showing of racial intent or animus, only a conspiracy to intimidate voters—is the Constitution's Elections Clause.

19. Nearly a century later, in 1965, Congress again invoked its broad Elections Clause power to protect the franchise. Responding to numerous instances of intimidation in both elections and registration efforts in the Jim Crow South, including the killing of black and white activists seeking to register African Americans to vote, Congress passed Section 11(b) of the Voting Rights Act. Section 11(b) prohibits actual or attempted "intimidation," "threats," or "coercion" against a person, either "for voting or attempting to vote" or "for urging or aiding any person to vote or attempt to vote." Section 11(b) authorizes private suits against private actors, even in the absence of any action by a state or state official.

20. Congress has thus enacted two broad statutes to prevent voter intimidation. As courts have made clear, it violates Section 11(b) to follow voters around, stand behind them taking notes, follow them into the parking lot, or loudly discuss voter fraud laws in their presence. *See, e.g.*, Temporary Restraining Order, *Daschle v. Thune*, No. 04-cv-4177, Dkt. No. 6 (D.S.D. Nov. 2, 2004) (entering a Temporary Restraining Order prohibiting a Republican Senate candidate and his supporters from continuing to "follow[] Native Americans from the polling places," "copy the license plates of Native Americans driving to the polling places" and record "the license plates of Native Americans driving away from the polling places"). Invasions of physical space and intimations of possible future violence, prosecution, or legal action based on a voter's presence at the polls constitute unlawful voter intimidation. And even as to those persons who do not directly participate in those activities, the Klan Act makes it unlawful to conspire with others to promote, organize, and facilitate those efforts.

## II.   TRUMP AND STONE ISSUE A CALL TO INTIMIDATE VOTERS IN THE 2016 ELECTION ON THE BASIS OF BOGUS CLAIMS OF VOTER FRAUD

21.     In the months leading up to the 2016 election, Trump has made an escalating series of statements, often racially tinged, suggesting that his supporters should go to particular precincts on Election Day and intimidate voters—and that if they do not do so, he will lose the election because certain people, in certain precincts, will vote "15 times" for Secretary Hillary Rodham Clinton.

22.     For example, Trump told a crowd in Altoona, Pennsylvania, in August that

"I hope you people can . . . not just vote on the 8th, [but also] go around and look and watch other polling places and make sure that it's 100-percent fine.  We're going to watch Pennsylvania—go down to certain areas and watch and study—[and] make sure other people don't come in and vote five times. . . .  The only way we can lose, in my opinion—and I really mean this, Pennsylvania—is if cheating goes on."

23.     In a speech ten days later in Ohio, Trump explained that he did not just mean that supporters should "watch":

"You've got to get everybody to go out and watch, and go out and vote," Trump said. "And when [I] say 'watch,' you know what I'm talking about, right?"

Trump has explained that his "watchers" should act in a capacity similar to law enforcement, even though they will not in fact be acting in a law-enforcement capacity.  In other words, Trump is encouraging his supporters to act as vigilantes.

24.     In the midst of these comments, the Trump Campaign rolled out a form on its website for supporters to sign up to be "Trump Election Observers" in order to "Stop Crooked Hillary From Rigging This Election!"

25.     Trump has specifically encouraged his supporters who work in law enforcement to use their official authority to assist in "watching" Democratic-leaning communities.  For example, he stated at the Altoona rally in August that to protect against supposed voter fraud,

"[w]e have to call up law enforcement" and "we have to have the sheriffs and the police chiefs and everybody watching."

26.      Trump's exhortations have grown more ominous and specific as the election draws closer.   At an October 1 rally in Manheim, Pennsylvania, for example, Trump instructed his supporters to "go check out [other] areas because a lot of bad things happen, and we don't want to lose for that reason."   Trump and Trump Campaign surrogates have told supporters that voters of color should be suspected of fraud.   Trump has suggested that Latino voters are undocumented immigrants whom the federal government has allowed to "pour into this country" specifically to vote in the election.   And in a nationally televised interview on October 16, former New York City Mayor and Trump surrogate Rudy Giuliani expressed that voter fraud is concentrated in predominantly minority communities in "inner cities" that support "Democrats," like "Philadelphia and Chicago."

27.      While speaking in Ambridge, Pennsylvania, on October 11, Trump warned that it is "[s]o important that you watch other communities"—which, he clarified, meant Philadelphia—"because we don't want this election stolen from us . . . .   And everybody knows what I'm talking about."   Trump was referring in particular to stories he had circulated earlier in the summer about Philadelphia precincts comprised nearly exclusively of African-American voters in which Mitt Romney received no votes in 2012.   At that same rally, a prominent Trump supporter, U.S. Representative Bill Shuster, made clear that Trump supporters should focus their voter intimidation in Philadelphia, stating:   "The people in Western and Central Pennsylvania have to overcome what goes on down in Philadelphia—the cheating."   Another prominent Trump supporter, former Speaker of the House Newt Gingrich, has similarly stated that the

election might be "stolen" because of voter fraud in Philadelphia and other Democratic-leaning communities:

> "You look at Philadelphia, you look at St. Louis, you look at Chicago, I mean, again, I'm old enough, I remember when Richard Nixon had the election stolen in 1960 . . . . So to suggest that we have—that you don't have theft in Philadelphia is to deny reality."

28.     Trump's vice presidential running mate, Indiana Governor Mike Pence, has joined in calling for Trump supporters to engage in voter intimidation, stating that "we're encouraging all our supporters . . . to be involved" in monitoring polling places for voter fraud.

29.     Trump now asserts at rallies that the presence of fraud at the polls will prevent him from winning the November 8 election.   His comments are consistently directed at Democratic-leaning communities with large minority populations in states like Nevada, Ohio, and Pennsylvania.   For example, at an October 18 rally in Colorado Springs, Colorado, Trump warned his supporters about voter fraud:

> "[T]ake a look at Philadelphia, what's been going on, take a look at Chicago, take a look at St. Louis.   Take a look at some of these cities, where you see things happening that are horrendous."

30.     At an October 20 rally in Delaware, Ohio, Trump told the crowd that Secretary Clinton is "truly capable of anything, including voter fraud."   At the same rally, Trump repeated what he called "terrible, frightening statistics" (which also happen to be false), like the claim that "fourteen percent of non-citizens are registered to vote," or that

> "1.8 million people are dead, but they're registered to vote, some of whom voted even though they're dead.   Which is really a hard thing to do.   But it's easy, if fraud is involved. . . .   One was a Republican, and after death, became a Democrat.   It's true!"

31.     At an October 22 rally in Cleveland, Ohio, Trump repeated his claims that the election is "rigged" and claimed that this is being accomplished by persons impersonating dead

people and illegal immigrants voting for Secretary Clinton.  Trump also expressed that voter

fraud is "okay" if "they'll vote for Trump."

32.     At a rally in Golden, Colorado on October 29, 2016, Trump accused postal

workers of throwing out ballots that they don't "like."  Trump told the crowd,

> "I have real problems with ballots being sent.  Does that make sense?  Like people
> saying, 'Oh here's a ballot,' being, 'here's another ballot - throw it away, throw it away.
> Oh, here's one I like, we'll keep that one.  I have real problems—so get your ballots in.
> We're trying to have some pretty good supervision out there.  We got a lot of people
> watching you people that collect the ballots.  We got a lot of people watching the people
> that collect the ballots.  Now, the, you know, dishonest media will say 'oh, that wasn't
> nice.  Everything is so honest.  Everything in our country –'  We have 1.8 million people
> that are dead registered to vote.  Right?  And some of them vote.  I wonder how that
> happens.  We have 2.7 million people on more than one state, they're registered two
> states, and sometimes more than that. And I could go on and on and on."

*See* "Full Speech: Donald Trump Rally in Golden, Colorado," at 43:05-44:02, YouTube (Oct. 29,

2016), https://www.youtube.com/watch?v=_6I1xXf_QmE.

33.     Stone has amplified Trump's message.  Stone is a far-right-wing political

operative who has served as a close advisor to Trump throughout his run for President.  Stone

has a history of engaging in voter intimidation, racist and misogynist hate speech, and incitement

to violence.  Stone has publicly called for the execution of Secretary Clinton, Senator Bernie

Sanders, and George Soros, among others.  He has referred to Herman Cain as a "mandingo," to

former presidential candidate Ben Carson as an "Uncle Tom," and Representative Allen West as

an "arrogant know-it-all negro."   He is also the peddler of numerous widely discredited

conspiracy theories, just a few of which include that the Bush family tried to assassinate

President Reagan, that President Lyndon Johnson orchestrated the assassination of President

John F. Kennedy, and that Senator Ted Cruz's father was tied to the Kennedy assassination.

34.     Stone's super PAC Stop the Steal is currently running a website called

"StopTheSteal.org," through which Stone is actively signing up Trump supporters to "volunteer"

to fight "voter fraud." #StopTheSteal is a popular hashtag among Trump supporters on Twitter, and Stone's group maintains an active Facebook presence. Stone and his organization also have widely disseminated messages via websites such as stopthesteal.org and through social media under hashtags such as #StopTheSteal, falsely claiming that Secretary Clinton rigs elections. One image states: "HILLARY CLINTON CHEATED AND STOLE THE PRIMARY FROM BERNIE . . . WE THE PEOPLE CAN STOP HER FROM STEALING THE GENERAL." Another states that "25% of Votes needed to win, is decided by illegals" and that hundreds of "electoral votes [are] at RISK of being RIGGED." Through these and other messages, Stone has sought to encourage Trump supporters to engage in unlawful voter intimidation.

35.     Stone is also using social media to promote the common plan that Trump supporters—and particularly those who have agreed to engage in vigilante "ballot security" efforts—wear red shirts on Election Day.

36.     Further, Stone and Stop the Steal Inc. are actively recruiting Trump supporters for "exit polling," specifically targeting nine Democratic-leaning cities with large minority populations, including Las Vegas. As of October 29, 2016, Stone claimed to have organized 2,177 volunteers to engage in this "exit polling" operation. That number includes volunteers signed up to participate throughout Nevada, with dozens statewide. Stone's purported polling exercise serves no legitimate purpose. Stone does not run a polling operation, and effective "exit polling" requires focusing on competitive electoral districts rather than areas that vote overwhelmingly for one party. On information and belief, Stone has no interest in conducting so-called "exit polling" activities, but instead has focused on majority-minority communities, such as certain areas in Las Vegas, in order to intimidate non-white persons from voting.

37.    Through an organization called "Vote Protectors," Stone has also recruited hundreds of volunteers to watch polling places.   The Vote Protectors website permits any volunteer to download and print official-looking identification badges, and asks that volunteers "commit to go out in November and Youtube and Periscope streams to the [Vote Protectors] website."   The website offers detailed instructions for posting videos of voters online but provides few instructions for conducting legitimate exit polling.   Instead, volunteers are permitted to tally up votes on the Vote Protectors website—for Trump or any other candidate— without any proof that they had spoken to voters or visited a polling site.   Vote Protectors discontinued some, but not all, of these practices after they were exposed by a national media outlet.

38.    As recently as October 26, 2016, Vote Protectors encouraged volunteers it styles "citizen journalists" to "approach voters at the polls," identify themselves as "reporting for Vote Protectors," and ask them about election fraud.

39.    The notion of widespread voter fraud in modern American politics is itself a fraud.  Every attempt to verify the presence of voter fraud has proven fruitless.  *See generally* Lorraine C. Minnite, *The Myth of Voter Fraud* (2010) (concluding that the notion of widespread voter fraud is a "myth").  One 2014 study found 241 potentially fraudulent ballots had been cast nationwide over a fourteen-year period—*out of 1 billion ballots cast*.

40.    Those statistics help explain why the courts that have examined the evidence have concluded that widespread voter fraud does not exist.  In a challenge to Pennsylvania's voter ID law, for example, "[t]he parties [we]re not aware of any incidents of in-person voter fraud in Pennsylvania and d[id] not have direct personal knowledge of in person voter fraud elsewhere." *Applewhite v. Commonwealth*, No. 330 M.D. 2012, 2014 WL 184988, at *57 (Pa. Commw. Ct.

Jan. 17, 2014).  A federal judge in North Dakota recently determined that "[t]he undisputed evidence before the Court reveals that voter fraud in North Dakota has been virtually non-existent." *Brakebill v. Jaeger*, No. 16-cv-00008 (DLH), Dkt. No. 50 (D.N.D. Aug. 1, 2016).  A federal judge in Wisconsin has similarly observed that "[t]he Wisconsin experience demonstrates that a preoccupation with mostly phantom election fraud leads to real incidents of disenfranchisement, which undermine rather than enhance confidence in elections, particularly in minority communities." *One Wis. Inst. v. Thomsen*, No. 15-cv-324 (JDP), 2016 WL 4059222, at *2 (W.D. Wis. July 29, 2016); *see also Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 194 (2008) ("The only kind of voter fraud that SEA 483 addresses is in-person voter impersonation at polling places.  The record contains no evidence of any such fraud actually occurring in Indiana at any time in its history."); *Veasey v. Abbott*, 830 F.3d 216, 238 (5th Cir. 2016) ("[T]he evidence before the Legislature was that in-person voting, the only concern addressed by SB 14, yielded only two convictions for in-person voter impersonation fraud out of 20 million votes cast in the decade leading up to SB 14's passage."); *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 246 (4th Cir. 2014) ("North Carolina asserts goals of electoral integrity and fraud prevention.  But nothing in the district court's portrayal of the facts suggests that those are anything other than merely imaginable."); *Frank v. Walker*, 17 F. Supp. 3d 837, 848 (E.D. Wis. 2014) ("[I]t appears that there have been zero incidents of in-person voter-impersonation fraud in Wisconsin during recent elections."), *rev'd on other grounds*, 768 F.3d 744 (7th Cir. 2014); *Lee v. Va. State Bd. of Elections*, No. 3:15-cv-357-HEH, 2016 WL 2946181, at *23 (E.D. Va. May 19, 2016) ("evidence of actual voter impersonation-type fraud was scant").

41.     The fact that widespread voter fraud is a myth does not prevent many people—particularly those who are listening most closely to the RNC, Trump, and their surrogates such as

Stone—from believing it is real.  As a recent Washington Post-ABC poll showed, nearly 70% of Trump's supporters (but less than half of all voters) believe that voter fraud happens "very often" or "somewhat often."  This widespread belief, despite a total lack of evidence to support it, has been stoked for decades by certain elements of the Republican Party, including Stone and Trump's allies in the so-called "alt-right" media ecosystem, such as the Breitbart website that was run until recently by Trump Campaign CEO Steve Bannon.  In the last few months alone, Breitbart has run dozens of articles on supposed voter fraud, with ominous headlines about "Obama forces" and "Soros-backed" cover-ups, and Stone has appeared on Breitbart-affiliated radio stations to echo Trump's fearmongering about a stolen election. Stone's "StopTheSteal" campaign has fanned these flames by widely distributing via social media and elsewhere the false claim that "the Democratic National Committee" and "the Clintons" "intend to flood the polls with illegals" and encouraging Trump supporters to "monitor for voting fraud" in "targeted localities."  And, appearing on Face the Nation on October 23, 2016, RNC Chairman Reince Priebus declared that voter fraud "is real," and that what Trump is doing is "trying to also tell his folks to watch out for this fraud that might occur."

42.     Voter intimidation efforts aimed at suppressing minority voters have frequently been "ostensibly aimed at combatting voter fraud." *Ne. Ohio Coal. for the Homeless v. Husted*, No. 2:06-cv-896, 2016 WL 3166251, at *28 (S.D. Ohio June 7, 2016), *aff'd in part, rev'd in part on other grounds*, No. 16-3603, 2016 WL 4761326 (6th Cir. Sept. 13, 2016); *see also Veasey*, 830 F.3d at 237 ("[T]he record shows that Texas has a history of justifying voter suppression efforts such as the poll tax and literacy tests with the race-neutral reason of promoting ballot integrity.").  As the New Jersey District Court held in rejecting the RNC's 2009 request to vacate the Consent Decree, "[v]oter intimidation presents an ongoing threat to the participation of

minority individuals in the political process, and continues to pose a far greater danger to the integrity of that process than the type of voter fraud the RNC is prevented from addressing by the Decree." *Democratic Nat'l Comm.*, 671 F. Supp. 2d at 578-79.

43.    Trump's calls for unlawful vigilantism to stop purported voter fraud are calculated to advance a coordinated effort to harass and intimidate voters at the polls.  Many of the Trump Campaign's supporters have responded to Trump's call to action.

## III.    REPUBLICAN NATIONAL AND STATE COMMITTEES CONSPIRE WITH TRUMP AND STONE TO ENCOURAGE VOTER INTIMIDATION

44.    As the Republican Party nominee for President, Trump and his campaign coordinate closely with the RNC and NRP on a wide variety of matters, including overall campaign strategy, public messaging, voter outreach, and field operations.  It has been widely reported that the Trump Campaign "relinquished control over many of its tactical decisions" to the RNC.  Shortly after Trump became the Republican nominee, the RNC met with the Trump Campaign to discuss what they described as "the merger."  The Trump Campaign and RNC "negotiated a partnership," in which the RNC "buil[t] assets and infrastructure and the nominee gets to benefit from it."

45.    On May 25, 2016, the RNC created a joint fundraising committee with the Trump Campaign specifically to fund the Trump Campaign and its operations, and to elect Republicans up and down the ballot.

46.    The Trump Campaign has decided largely to refrain from setting up its own offices and staff in Nevada and elsewhere, as past Republican Party nominees have done. Instead, as has been widely reported, the Trump Campaign is relying predominantly on the RNC and Republican state party entities (such as the NRP) to manage get-out-the-vote operations in contested states such as Nevada.

47.     The Trump Campaign's coordination with the RNC and NRP extends to efforts to monitor polling locations for purported voter fraud.   Trump's running mate, Governor Mike Pence, publicly confirmed that the Trump Campaign is working directly with the RNC and state Republican parties on ballot security measures.   At an August 3, 2016, town hall rally in Denver, Colorado, Pence was asked "how is the Trump-Pence campaign going to . . . prevent" Secretary Clinton from "steal[ing] this election."   Pence responded:

> "I will tell you that the Trump campaign and the Republican National Committee are working very very closely with state governments and secretaries of states all over the country to ensure ballot integrity. . . .   We are working hard all over the country, the Republican National Committee is working all over the country, but I would encourage everyone within the sound of my voice, get involved, participate, be a poll worker on election day . . . be a part of that process, and uphold the integrity of one person one vote in America."

48.     Last week, Trump's campaign manager Kellyanne Conway confirmed that the Trump campaign is "actively working with" the RNC and other branches of the Republican Party apparatus, including the NRP, to engage in "ballot security" initiatives.   The RNC and NRP have continued this close coordination even after Trump's widespread and racially charged pleas to his supporters to engage in voter intimidation in areas like Las Vegas that contain large communities of racial minorities.

49.     The RNC and NRP have delegated certain "ballot security" initiatives to third parties in Nevada.   For example, Nevada Grassroots—a political organization affiliated with the Republican Party—is currently hiring "hard working, professionals, who are interested in politics and want the opportunity to participate in shaping the 2016 election" to serve as "Election Representatives to assist with voting integrity efforts in Clark County."   Nevada Grassroots' plan to pay "professionals" to monitor polling places in Clark County has been publicized by Morgan Myers, an employee of an firm called Stampede Consulting that the NRP has paid more than

$750,000 this year alone.   Individuals employed by Nevada Grassroots have already been deployed to early voting locations in Clark County.

50.    Just days ago, the Trump Campaign distributed talking points to Republican Party surrogates directing that they "[m]ust make points on rigged system," and encouraging them to claim there has been "an increase in unlawful voting by illegal immigrants."

## IV.    CO-CONSPIRATORS RESPOND WITH PROMISES TO INTIMIDATE VOTERS

51.    The available evidence suggests that Trump's supporters are responding to his calls to engage in voter intimidation.   The *Boston Globe* has reported on Trump supporters who are planning to engage in unlawful voter intimidation, and who understand themselves to be doing so at Trump's behest:

> "Trump said to watch your precincts. I'm going to go, for sure," said Steve Webb, a 61-year-old carpenter from Fairfield, Ohio.

> "I'll look for . . . well, it's called racial profiling.  Mexicans.  Syrians.  People who can't speak American," he said.   "I'm going to go right up behind them.  I'll do everything legally.  I want to see if they are accountable.  I'm not going to do anything illegal.  I'm going to make them a little bit nervous."

52.    Notwithstanding Mr. Webb's pledge not to do "anything illegal," the conduct in which he plans to engage on Trump's behalf—deliberately targeting of minority voters via "racial profiling" in order to "make them a little bit nervous" while they are attempting to vote— unequivocally violates Section 11(b) of the Voting Rights Act.   *See, e.g.*, Temporary Restraining Order, *Daschle*, No. 04-cv-4177, Dkt. No. 6.

53.    One Trump supporter from Texas named Jack Posobiec, the Director of Special Projects at a grassroots support group called Citizens for Trump, told a reporter for Fortune magazine that he hopes to mobilize 3,000 volunteers to be poll monitors in swing states, including busing supporters for Trump from Texas to Ohio.

54.     Similarly, Harry Miller, purportedly of Palm Beach, Florida, tweeted in response to Trump's calls for election observers that he would be "wear'n red at polls... We gonna be watch'n fer shenanigans...& haul ya away..."  The tweet included a picture of a pickup truck with Florida plates and a person-sized cage built into the bed, surrounded by American flags.  Miller has over 20,000 Twitter followers and tweets almost exclusively about Trump, Secretary Clinton, and racially charged political themes such as deporting "Muzzys."  A typical tweet asserts that "Our Muzzy Commander in Chief" is "shov'n Sharia Law down our throats…. & Crooked Hiltlery follow'n his every move…"

55.     At a "poll watcher training" class for Trump supporters organized by the Republican Party of Virginia, would-be watchers expressed their belief that "there is going to be massive voter fraud, and it definitely will be to ensure Hillary Clinton wins."  The leader of the class listed purported voter-fraud schemes "orchestrated by liberal groups," including "civil rights leaders coercing severely disabled people into voting."  One Trump supporter seeking to be a poll watcher said her "biggest concern" was "[i]llegals voting," and noted as an example of said phenomenon that in 2012 she saw voters who did not appear to speak English.

56.     Other examples of vigilantism and planned voter intimidation connected to Trump and Stone's call to action abound.  For instance, on October 13, 2016, two armed Trump supporters staged a purported "protest" in front of the office of a Virginia Democratic candidate for Congress, Jane Dittmar.  The armed Trump supporters, one of whom wore a signature Trump campaign hat, stood for nearly twelve hours outside Dittmar's campaign office, turning sideways so that those inside could see that they were carrying firearms.

57.     In Nevada, Trump supporters and volunteers for the Campaign have harassed and intimidated voters in Clark County.  For example, in one instance, a Trump supporter harassed

and intimidated multiple voters outside of the Albertsons early voting location on Lake Mead Boulevard, repeatedly asking voters for whom they were voting, and then yelling at them belligerently and attempting to keep them from entering the voting location when they stated they were not voting for Donald Trump. The poll workers present at the voting site confronted the Trump supporter and attempted to get him to leave the premises. The Trump supporter told poll workers that he had "a right to say anything he wanted to the voters," and the poll workers were forced to call the police to report an incident of voter intimidation.  The Trump supporter left before the police arrived.

58.     Similarly, a poll observer for the Trump Campaign was asked to leave the Arroyo Market Square early voting location because she was yelling at voters, accusing voters and poll workers of breaking the law, and talking to voters in line and giving them inaccurate information. Despite being permanently banned from the location, the poll observer has attempted to return.

59.     At a polling place in Nye County, a woman identifying herself as an agent and "part" of the RNC conducted "exit polling" of voters and questioned them on their votes within the 100 feet of the polling place, as barred by Nev. Rev. Stat. § 293.740.

60.     In North Carolina, according to one report, "someone showed up to early voting with a badge saying 'poll observer' and was photographing and videotaping cars coming and going and 'generally being an intimidating factor there.'"

61.     Trump supporters have also sought to sow misinformation among supporters of Secretary Clinton.  For example, Joshua Lorenz, a Republican City Councilman from Murrysville, Pennsylvania, posted on Facebook an image with the phrase:  "Vote Hillary November 8th" and "YOU CAN VOTE AT HOME COMFORTABLY ONLINE!" with

instructions for how only Clinton supporters could purportedly vote online.  Lorenz included

with his post a statement:  "More proof that the election process is rigged.  Only Hillary

supporters can vote from their smartphones or in the comfort of their own homes."  A similar

image being circulated online features a photo of Clinton and the statement:  "Did you know?

Pennsylvania now has online voting?" in a font that is similar to that used in official Clinton

campaign advertising.  Of course, these statements are false.

62.     Stone has participated directly in this misinformation campaign.  On October 23,

2016, Stone sent out a message via his Twitter feed deliberately designed to mislead Democratic

voters by representing—using Secretary Clinton's likeness and logo—that supporters can

"VOTE the NEW way on Tues. Nov 8th," by texting "HILLARY to 8888," after which voters

will apparently "receive official confirmation."

63.     All the while, Trump continues to fan the flames of polling-place harassment

targeting non-white voters in urban areas, and continues to invoke the baseless claim that the

unlawful conduct that his supporters are planning, at his behest, is justified by fictitious "voter

fraud."  Trump and Stone's formalized efforts to organize these vigilantes through the "Trump

Election Observers" and "StopTheSteal" mechanisms remain mostly hidden from public view.

## V.      DEFENDANTS' PLANNED ACTIONS ARE NEITHER LEGITIMATE NOR LAWFUL MEASURES TO PROTECT AGAINST VOTER FRAUD

64.     Trump's calls for his supporters to travel en masse outside their counties of

residence and engage in vigilante voter intimidation bear no possible relationship to legitimate

efforts to protect against voter fraud.  In fact, Trump has directed his supporters to engage in

activity forbidden by Nevada state election law.

65.     Nevada law sets forth detailed and comprehensive measures designed to protect

the integrity of Nevada elections.  For example, Nevada law makes it unlawful, whether inside a

polling place or within 100 feet of the polling place, to engage in electioneering or to "speak to a voter on the subject of marking the voter's ballot."  Nev. Rev. Stat. § 293.740.

66.     Nevada election law does permit "members of the general public to observe the conduct of voting of the polling place," Nev. Rev. Stat. § 293.274, but that general rule is subject to several important limitations.

    a.  First, Nevada law restricts the right to challenge another voter's eligibility to vote to only a "registered voter *of the precinct*" in question.  Nev. Rev. Stat. § 293.303 (emphasis added).

    b.  Second, any challenge to a voter's qualifications at the polls must do so "based on [his or her] personal knowledge," Nev. Rev. Stat. § 293.303, and therefore cannot be based upon a voter's appearance, race, gender, or national origin.

    c.  Third, members of the general public are forbidden from taking any photograph of the conduct of voting at a polling place, or recording or taping any activity at a polling place.  Nev. Rev. Stat. § 293.274(2).

    d.  Fourth, any member of the general public engaged in observing polling may not "[r]emain in or outside of any polling place so as to interfere with the conduct of the election" and may not engage in any "intimidation" of voters."  Nev. Rev. Stat. § 293.730; 293.710.

    e.  Fifth, no poll observer may ask another person "for whom he or she intends to vote," Nev. Rev. Stat. § 293.730(f), nor may any poll observer ask "another person his or her name, address or political affiliation," Nev. Rev. Stat. § 293.730(h).

\*        \*        \*

67.    It is unfortunate that this Complaint must be filed. What would be more unfortunate still is if the harms against which Congress acted in the 1870s and the 1960s were allowed to return to undermine the democratic process. This Court should act quickly and firmly to ensure that the citizens of Nevada are able to vote free from intimidation in the 2016 election.

### COUNT ONE: KU KLUX KLAN ACT

68.    Plaintiff incorporates by reference the allegations of the preceding paragraphs.

69.    Defendants the Trump Campaign, Stone, Stop the Steal Inc., and the NRP have called on supporters to descend on polling places in "certain areas"—generally, the urban communities of color where they and their allies have stoked fabricated threats of massive voter fraud—in order to intimidate voters at the polls. Trump's calls to stake out polling places in those communities and to suspiciously, aggressively "watch" these minority voters—"You know what I mean," he has clarified for his co-conspirators—have resulted in plans to engage in "racial profiling" and threaten lawful voters with the prospect of monitoring, questioning after voting under the guise of phony "exit polling," baseless legal action, and even possible physical harm, including unlawful detention because they have come out to cast a ballot.

70.    The Trump Campaign, Stone, and Stop the Steal Inc. have engaged in online organizing and mobilization efforts to support their plan.

71.    The RNC and Defendant NRP are providing financial, personnel, and other organizational support to the voter intimidation efforts launched by the Trump Campaign, Stone, and Stop the Steal Inc. in violation of the Ku Klux Klan Act.

72.    Absent declaratory and injunctive relief, voters will be subjected to intimidation, threats, and perhaps even force at the hands of vigilante "poll watchers" and "ballot integrity"

volunteers on Election Day, and many may suffer unwarranted delays or denials of their right to cast a ballot in the approaching elections.

73.　　Plaintiffs are entitled to a declaration that the NRP, the Trump Campaign, Stone, Stop the Steal Inc., and their co-conspirators have violated the Ku Klux Klan Act through their conspiracy to intimidate voters, and an injunction enjoining Defendants and others from any further activity to advance their conspiracy.

## COUNT TWO: VOTING RIGHTS ACT

74.　　Plaintiff incorporates by reference the allegations of the preceding paragraphs.

75.　　Following Trump's urging, Defendants have called for—and their supporters have promised—polling-place activity that is objectively likely to instill fear in voters.　Such intimidation includes racial targeting, invasions of physical space, aggressive questioning and other forms of menacing, suggestions of possible criminal prosecution, and threats of physical violence or harm.

76.　　The RNC and Defendant NRP have provided financial, personnel, and organizational support to the efforts of the Trump Campaign, Stone, and Stop the Steal Inc. to organize people to engage in intimidation efforts in Nevada.

77.　　This planned course of intimidation constitutes a violation of Section 11(b) of the Voting Rights Act, which prohibits all actual or attempted "intimidation," "threats," or "coercion" against a person, either "for voting or attempting to vote."

78.　　Absent declaratory and injunctive relief, voters will be subjected to intimidation, threats, and perhaps even force at the hands of vigilante "poll watchers" and "ballot integrity" volunteers on Election Day, and many may suffer unwarranted delays or denials of their right to cast a ballot in the approaching elections.

79.     Plaintiffs are entitled to a declaration that the NRP, the Trump Campaign, Stone, Stop the Steal Inc., and their co-conspirators have violated Section 11(b) of the Voting Rights Act.

## COUNT THREE:  INJUNCTIVE RELIEF

80.     Based on Defendants' above-described violations of law, Plaintiff is entitled to an injunction enjoining the Defendants and others from any of their contemplated voter-intimidation activity.  This activity includes but is not limited to:

a.  Funding, encouraging, or otherwise supporting, including by training or organizing, individuals to be present at or around Nevada polling places or voter lines for the purpose of engaging in any poll watching or monitoring activities that are not explicitly authorized by Nevada's election code;

b.  Monitoring polling places, or permitting, encouraging, or assisting individuals to monitor polling places, if the proposed monitor does not meet the statutory requirements for service as a poll watcher;

c.  Gathering or loitering outside of any polling place for the purpose or with the effect of interfering with or intimidating voters;

d.  Questioning, interrogating, or verbally harassing prospective voters or voters, or training, organizing, or directing others to do the same, for the purpose or with the effect of intimidating prospective voters or voters;

e.  Following, taking photos of, or otherwise recording prospective voters or voters, those assisting prospective voters or voters, or their vehicles, or training, organizing, or directing others to do the same.

81.    Defendants Stone and Stop the Steal Inc. should be enjoined from questioning, and from training, organizing, or deputizing any persons to question, prospective voters or voters at Nevada polling locations under the guise of purported "exit polling" operations.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Court:

a)    Declare that the harassment or intimidation of voters at or outside of Nevada polling locations based on unsubstantiated beliefs in supposed voter fraud—including through tactics such as the aggressive questioning of those waiting to vote, threats or suggestions of legal or criminal action, or any other form of menacing or intimation of violence—is contrary to law.

b)    Declare that Defendants' "exit polling" and "citizen journalist" initiatives are contrary to law.

c)    Temporarily restrain and enjoin any such conduct effective through November 8, 2016.

d)    Temporarily restrain and enjoin the NRP, the Trump Campaign, Stone, Stop the Steal Inc., and their affiliates and collaborators from organizing efforts to engage in voter intimidation.

e)    Publicize the Order to all law enforcement and elections officials in advance of Election Day.

f)    Grant such other relief as this Court may deem proper.

Respectfully submitted,

s/ Bradley S. Schrager

Bradley S. Schrager (Nevada Bar # 10217)
Don Springmeyer (Nevada Bar # 1021)

WOLF, RIFKIN, SHAPIRO, SCHULMAN
& RABKIN, LLP
3556 East Russell Road
Las Vegas, NV 89120
(702) 341-5200
Fax #: (702) 341-5300

Marc E. Elias
*Pro Hac Vice pending, will comply with LR*
*IA 11-2 within 3 days*
PERKINS COIE LLP
700 13th Street, Suite 600
Washington, DC 20005
Tel: (202) 434-1609
Fax: (202) 654-9126
melias@perkinscoie.com

Michael J. Gottlieb
*Pro Hac Vice pending, will comply with LR*
*IA 11-2 within 3 days*
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave, N.W.
Washington, DC  20015
Tel: (202) 237-2727
Fax: (202) 237-6131
mgottlieb@bsfllp.com

Dawn L. Smalls
*Pro Hac Vice pending, will comply with LR*
*IA 11-2 within 3 days*
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
Tel: (202) 754-4216
Fax: (212) 446-2350
dsmalls@bsfllp.com

*Attorneys of Record for Plaintiff*

Date: October 30, 2016