Bradley S. Schrager (Nevada Bar # 10217)
Don Springmeyer (Nevada Bar # 1021)
**WOLF, RIFKIN, SHAPIRO,**
**SCHULMAN & RABKIN, LLP**
3556 East Russell Road
Las Vegas, NV 89120
(702) 341-5200
Fax #: (702) 341-5300

Marc E. Elias
***Pro Hac Vice pending, will comply with LR***
***IA 11-2 within 1 day***
**PERKINS COIE LLP**
700 13th Street, N.W.
Washington, DC 20005
(202) 654-6200
Fax #: (202) 654-9126

*Attorneys of Record for Plaintiff Nevada State Democratic Party*

## UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF NEVADA

| | |
|---|---|
| NEVADA STATE DEMOCRATIC PARTY,<br><br>                              Plaintiff,<br><br>v.<br><br>NEVADA REPUBLICAN PARTY, DONALD J. TRUMP FOR PRESIDENT, INC., ROGER J. STONE, JR., and STOP THE STEAL INC.,<br><br>                              Defendants. | Case No. 2:16-cv-02514-RFB-NJK<br><br>**PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION**<br><br>**<u>EMERGENCY MOTION</u>**<br>PURSUANT TO LR 7-4<br><br>TRO/PI RESPONSE REQUESTED ON WEDNESDAY, NOVEMBER 2, 2016<br><br>TRO/PI HEARING REQUESTED AS SOON AS POSSIBLE FOLLOWING SUBMISSION OF RESPONSE, NO LATER THAN THURSDAY, NOVEMBER 3, 2016 |

## MEMORANDUM OF POINTS AND AUTHORITIES

Plaintiff the Nevada Democratic Party hereby moves this Court for a Temporary Restraining Order and/or Preliminary Injunction granting the temporary and preliminary relief sought in the attached Complaint.  In particular, Plaintiff respectfully seeks a Temporary Restraining Order and/or Preliminary Injunction restraining and enjoining Defendants—as well as their agents, employees, successors, and attorneys, and all persons in active concert and participation with them—from advancing their conspiracy to intimidate, threaten, harass, or coerce voters in violation of Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b), and the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3);

Pursuant to Rule 65(a) of the Federal Rules of Civil Procedure and Rule 7.1(d) of the Local Rules of Civil Procedure, Plaintiff will provide actual notice to Defendants at the time of making this Motion, and will provide copies of all pleadings and papers filed in this action to date.

Preliminary injunctive relief is urgently needed to protect the right of Nevada's minority and Democratic voters to vote free from intimidation, harassment, and coercion.  As further explained herein, the allegations set forth in the accompanying Complaint and the materials submitted with this motion justify immediate temporary relief in order to prevent irreparable harm.  An injunction against Defendants' unfolding planned intimidation tactics is the only way to protect countless lawfully registered voters from harassment, threats, and intimidation that could interfere with their ability to vote in the rapidly approaching election.

To obtain temporary or preliminary injunctive relief, a plaintiff must demonstrate: (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm; (3) that the balance of hardships favors the plaintiff; and (4) that the injunction is in the public interest.  *E.g.*, *Friends of*

the Wild Swan v. Weber, 767 F.3d 936, 942 (9th Cir. 2014); Sanchez v. Cegavske, No. 16-cv-00523 MMD WGC, 2016 WL 5936918, at *3 (D. Nev. Oct. 7, 2016).  "Alternatively, in the Ninth Circuit, an injunction may issue under a 'sliding scale' approach if there are serious questions going to the merits and the balance of hardships tips sharply in the plaintiff's favor." Id. (citing All. For the Wild Rockies v. Cottrell, 623 F.3d 1127, 1134-35 (9th Cir. 2011)).

As explained herein, (1) Plaintiff is likely to succeed on the merits of its claims under Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b), and the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3); (2) irreparable harm to Plaintiff, candidates, and voters will occur in the absence of immediate relief; (3) the balance of equities tips in favor of temporary relief barring Defendants from carrying out their plans to intimidate, harass, and suppress voters; and (4) an injunction barring such unlawful and flagrantly anti-democratic conduct is in the public interest.

## I.      STATEMENT OF FACTS

Defendants Donald J. Trump for President, Inc. (the "Trump Campaign"), Trump's close adviser Roger J. Stone, Jr., Stone's organization Stop the Steal, Inc., and the Nevada Republican Party ("NRP") are conspiring to threaten, intimidate, and thereby prevent minority voters in urban neighborhoods from voting in the 2016 election.  The stated goal of the Trump Campaign, as explained by an unnamed official to Bloomberg News on October 27, 2016, is to depress voter turnout, and particularly minority voter turnout—in the official's words: "**We have three major voter suppression operations under way**."   Declaration of Bradley S. Schrager, Esq. (hereinafter "Schrager Decl.") at Ex. 17 (Joshua Green & Sasha Issenberg, *Inside the Trump Bunker, with Days to Go*, Bloomberg Businessweek, Oct. 27, 2016).  In recent weeks, Trump has sought to advance that goal by using the loudest microphone in the nation to implore his

supporters to engage in unlawful intimidation at Nevada polling places.  Trump's exhortations have been amplified by direct and tacit assistance from the NRP, and Stone, who helped pioneer similar tactics in the 1980s before those efforts were blocked by the federal courts. *See* Schrager Decl. at Ex. 30 (Jeffrey Toobin, *The Dirty Trickster*, The New Yorker, June 2, 2008). Defendants have sought to organize, fund, and assist Trump's supporters to carry out the conspiracy's goals. And Trump's supporters have responded with pledges to descend upon polling places in "certain areas" where many minority voters live in order to interfere with their efforts to exercise the franchise.

In the months leading up to the 2016 election, Trump has made an escalating series of statements, often racially tinged, suggesting that his supporters should go to particular precincts on Election Day and intimidate voters—intimating that otherwise,  he will lose the election because of imagined voter fraud. Of course, voter fraud is practically nonexistent—but that has not stopped Trump from telling his supporters that certain people, in certain precincts, will vote "15 times" for Secretary Clinton.  Schrager Decl. at Ex. 18 (Louis Nelson, *Trump: Without ID Law, Voters Will Vote '15 Times' for Clinton*, Politico, Aug. 9, 2016).

For example, Trump told a crowd in Altoona, Pennsylvania in August 2016 that "I hope you people can … not just vote on the 8th, [but] go around and look and watch other polling places and make sure that it's 100-percent fine. . . .  We're going to watch Pennsylvania—go down to certain areas and watch and study—[and] make sure other people don't come in and vote five times. . . .  The only way we can lose, in my opinion—and I really mean this, Pennsylvania—is if cheating goes on."  Schrager Decl. at Ex. 19 (Erick Trickey, *How Hostile Poll-Watchers Could Hand Pennsylvania to Trump*, Politico Mag., Oct. 2, 2016).

In a speech 10 days later in Ohio, Trump explained that he did not just mean that supporters should "watch," but implored them to further intimidation: "You've got to get everybody to go out and watch, and go out and vote," Trump said. "And when [I] say 'watch,' you know what I'm talking about, right?"  Trump has explained that his "watchers" should act in a capacity similar to law enforcement (i.e., as vigilantes).  *Id.*

In the midst of such comments, the Trump campaign rolled out a signup form on its website for supporters to sign up to be "Trump Election Observers" in order to stop "Crooked Hillary From Rigging This Election," further encouraging his supporters to join in a common plan to "watch" voters in "certain areas" of states like Pennsylvania for voter fraud.  Schrager Decl. at Ex. 3 ("Volunteer to be a Trump Election Observer," DonaldJTrump.com.).

Trump has specifically encouraged his supporters who work in law enforcement to use their official authority to assist in "watching" Democratic-leaning communities.  For example, he stated at the August Altoona rally that to protect against supposed voter fraud, "[w]e have to call up law enforcement" and "we have to have the sheriffs and the police chiefs and everybody watching."  Schrager Decl. at Ex. 19 (Erick Trickey, *How Hostile Poll-Watchers Could Hand Pennsylvania to Trump*, Politico, Oct. 2, 2016).

Trump's exhortations have grown more ominous and more specific as the election draws closer.  At an October 1, 2016, rally in Manheim, Pennsylvania, for example, Trump instructed his supporters to "go check out [other] areas because a lot of bad things happen, and we don't want to lose for that reason."  Schrager Decl. at Ex. 20 (Garrett Epps, *Donald Trump's Attacks on the Rights of Minority Voters*, The Atlantic, Oct. 13, 2016).  Trump and Trump Campaign surrogates like Rudy Giuliani have told supporters that voters of color should be suspected of fraud.  Schrager Decl. at Ex. 21 (Greg Stohr, *Giuliani, Gingrich Raise Specter of Voter Fraud*

*Ahead of Election*, Boston Globe, Oct. 16, 2016).  Trump has suggested that Latino voters are undocumented immigrants whom the federal government has allowed to "pour into this country" specifically to vote in the election.  Schrager Decl. at Ex. 22 (Jonathan Swan, *Trump: Government Bringing in Illegal Immigrants to Vote*, The Hill, Oct. 7, 2016).  And Trump's closest advisors – who are prominent Trump Campaign surrogates – have echoed Trump's statements, asserting that urban voters routinely commit voter fraud in cities like Philadelphia, and that the only way Trump will lose is if the election is "rigged."  For example, in a nationally televised interview on October 16, Giuliani expressed that voter fraud is concentrated in predominantly minority communities in "inner cities" that support "Democrats," like "Philadelphia and Chicago."  Schrager Decl. at Ex. 23 (*CNN's Jake Tapper vs. Rudy Giuliani: You're Saying Only Democrats Rig Elections?*, RealClearPolitics, Oct. 16, 2016).

While speaking in Ambridge, Pennsylvania, on October 11, 2016, Trump warned that it is "[s]o important that you watch other communities,"—which, he clarified, meant Philadelphia—"because we don't want this election stolen from us . . . . And everybody knows what I'm talking about."  Schrager Decl. at Ex. 20 (Garrett Epps, *Donald Trump's Attacks on the Rights of Minority Voters*, The Atlantic, Oct. 13, 2016).  Trump was referring in particular to stories he had circulated earlier in the summer about Philadelphia precincts comprised nearly exclusively of African American voters in which Mitt Romney had received no votes in 2012.  At that same rally, a prominent Trump supporter, U.S. Representative Bill Shuster, made clear that Trump supporters should focus their voter intimidation in Philadelphia, stating:  "The people in Western and Central Pennsylvania have to overcome what goes on down in Philadelphia—the cheating."  Schrager Decl. at Ex. 19 (Erick Trickey, *How Hostile Poll-Watchers Could Hand Pennsylvania to Trump*, Politico Mag., Oct. 2, 2016).  Another prominent Trump surrogate,

former Speaker of the House Newt Gingrich, has similarly stated that the election might be "stolen" because of voter fraud in Philadelphia and other Democratic-leaning communities: "You look at Philadelphia, you look at St. Louis, you look at Chicago, I mean, again, I'm old enough, I remember when Richard Nixon had the election stolen in 1960 . . . .  So to suggest that we have — that you don't have theft in Philadelphia is to deny reality."  Schrager Decl. at Ex. 24 (*Gingrich: 20 Media Executives Are Launching a "Coup d'Etat" Against Millions of Trump Voters*, RealClearPolitics, Oct. 16, 2016).

Trump now constantly repeats at rallies that the presence of fraud at the polls will prevent him from winning the November 8 election.  His comments are consistently directed at Democratic-leaning communities in states like Nevada, Ohio, Pennsylvania, and Florida.  For example, at an October 18 rally in Colorado Springs, Colorado, Trump warned his supporters about voter fraud, starting:  "take a look at Philadelphia, what's been going on, take a look at Chicago, take a look at St. Louis. Take a look at some of these cities, where you see things happening that are horrendous."  Schrager Decl. at Ex. 2 (Trip Gabriel, *Donald Trump's Call to Monitor Polls Raises Fears of Intimidation*, N.Y. Times, Oct. 18, 2016).

The Trump Campaign has admitted that it is engaged in a nationwide effort to suppress Democratic voter turnout.  As a senior Trump Campaign official told Bloomberg News on October 27, "**We have three major voter suppression operations under way**."  Schrager Decl. at Ex. 17 (Joshua Green & Sasha Issenberg, *Inside the Trump Bunker, with Days to Go*, Bloomberg Businessweek, Oct. 27, 2016).

Defendant Roger Stone, a key Trump advisor, has meanwhile amplified Trump's message.  Through his super PAC, Defendant Stop the Steal, Inc., Stone is currently running a website that is actively signing up Trump supporters to "volunteer" to fight "voter-fraud and

election theft."   Stop the Steal, https://stopthesteal.org/ (last visited Oct. 28, 2016). #StoptheSteal is a popular hashtag among Trump supporters on Twitter, and Stone's group maintains an active Facebook presence.   Stone and his associates, including Stop the Steal Inc., have also widely disseminated messages via websites such as Stop the Steal and through social media under hashtags such as #stopthesteal. One image states: "HILLARY CLINTON CHEATED AND STOLE THE PRIMARY FROM BERNIE . . . WE THE PEOPLE CAN STOP HER FROM STEALING THE GENERAL."   Schrager Decl. at Ex. 25 (Roycan79, Twitter (Oct. 17, 2016, 9:53 AM EST), https://twitter.com/roycan79/status/788060472918568960).   Another states that "25% of Votes needed to win, is decided by illegals" and that hundreds of "electoral votes [are] at RISK of being RIGGED."   Schrager Decl. at Ex. 26 (Soniafarace, Twitter (Oct. 11, 2016, 5:11 PM EST), https://twitter.com/soniafarace/status/785996199694262272).   Through these and other messages, Stone has sought to encourage Trump supporters to engage in unlawful voter intimidation.

Stone has also participated directly in a campaign to sow misinformation among supporters of Secretary Clinton.  On October 23, 2016, Stone sent out a (now deleted) message via his Twitter feed deliberately designed to mislead Democratic voters by representing—using Secretary Hillary Clinton's likeness and logo—that supporters can "VOTE the NEW way on Tues. Nov 8th" by texting "HILLARY to 8888," after which voters would apparently "receive official confirmation."   *See* Declaration of Marc E. Elias, Esq. at Ex. 1.   On the same day, Stone's media outlet "Stone Cold Truth" tweeted out the same image, accompanied by a similar message.  Schrager Decl. at Ex. 34.  Other Republican officials have engaged in similar efforts. For example, Joshua Lorenz, a Republican City Councilman from Murrysville, Pennsylvania posted on Facebook an image with the phrase:  "Vote Hillary November 8th" and "YOU CAN

VOTE AT HOME COMFORTABLY ONLINE!" with instructions for how only Clinton supporters could purportedly vote online. Lorenz included with his post a statement: "More proof that the election process is rigged. Only Hillary supporters can vote from their smartphones or in the comfort of their own homes." Schrager Decl. at Ex. 31 (*'Rigged?'* *Western PA Republican Circulates Fake Meme About Online Voting in PA*, BillyPenn.com, Oct. 18, 2016). A similar image being circulated online features a photo of Clinton and the statement: "Did you know? Pennsylvania now has online voting?" in a font that is similar to that used in official Clinton campaign advertising. *Id.* Of course, these statements are false.

Stone and Stop the Steal Inc. are actively recruiting Trump supporters for "exit polling," specifically targeting nine Democratic-leaning cities with large minority populations, including Las Vegas. *See* Schrager Decl. at Ex. 4 (Oliver Laughland and Sam Thielman, *Trump Loyalists Plan Own Exit Poll Amid Claims of 'Rigged' Election*, The Guardian, Oct. 20, 2016). As of October 29, 2016, Stone claimed to have organized 2,627 volunteers to engage in this "exit polling" operation. Stop the Steal, https://stopthesteal.org/ (last visited Nov. 1, 2016). That number includes volunteers signed up to participate throughout Nevada. *Id.* https://stopthesteal.org/states/nevada/ (last visited Nov. 1, 2016). Stone's purported polling exercise serves no legitimate purpose. Stone does not run a polling business, and effective "exit polling" does not merely focus on Democratic-leaning or majority-minority districts—rather, legitimate exit polling ordinarily focuses on competitive districts rather than areas that vote overwhelmingly for one party. Stone's "exit polling" activities appear to be aimed chiefly at majority-minority communities, such as certain majority-minority communities in Arizona, with the purpose or effect of intimidating non-white persons from voting. Schrager Decl. at Ex. 4

(Oliver Laughland & Sam Thielman, *Trump Loyalists Plan Own Exit Poll Amid Claims of 'Rigged' Election*, The Guardian, Oct. 20, 2016).

Through a program called "Vote Protectors," Defendant Stone has also recruited volunteers to "watch" polling places and conduct "exit polls." The Vote Protectors website permits any volunteer to download and print official-looking identification badges, and provides scripts for volunteers that instruct them on how to interrogate voters on Election Day. Schrager Decl. at Ex. 36 (Christina Wilke, *Trump-Linked Voter Intimidation Group Releases New Script for 'Citizen Journalists,'* The Huffington Post, Oct. 26, 2016). Stone's operation is not a legitimate poll watching or exit poll effort. Instead, volunteers are permitted to tally up votes on the Stop the Steal website—for Trump or any other candidate—without any proof that they had spoken to voters or visited a polling site. *See* "Popular Vote (Citizen Exit Polls)," *available at* http://stopthesteal.org (last accessed Oct. 31, 2016). Vote Protectors and Stop the Steal discontinued some, but not all, of these practices after they were exposed by a national media outlet.

The fact that voter fraud is a myth does not prevent many people—particularly those who are listening most closely to the Republican National Committee (RNC), Trump, and their surrogates such as Stone—from believing it is real. As a recent Washington Post-ABC poll showed, 69% of Trump's supporters (but less than half of all voters) believe that individual voter fraud happens "very often" or "somewhat often." Schrager Decl. at Ex. 28 (Emily Gustkin & Scott Clement, *Poll: Nearly Half of Americans Say Voter Fraud Occurs Often*, Wash. Post, Sept. 15, 2016). This widespread belief, despite a total lack of evidence to support it, has been stoked for decades by certain elements of the Republican Party, including Stone and Trump's allies in the so-called "alt-right" media ecosystem, such as the Breitbart website that was run until

recently by Trump Campaign CEO Steve Bannon.  In the last few months alone, Breitbart has run dozens of articles on supposed voter fraud, with ominous headlines about "Obama forces" and "Soros-backed" cover-ups, *see, e.g.*, Schrager Decl. at Ex. 29 (Patrick Howley, *Wikileaks: John Podesta Believed 'Obama Forces' Committed Voter Fraud*, Breitbart, Oct. 15, 2016), and Stone has appeared on Breitbart-affiliated radio stations to echo Trump's fearmongering about a stolen election, *see, e.g.*, Milo Yiannopoulos, *The Milo Show Teaser: Roger Stone on How Trump Can Stop Voter Fraud*, YouTube (July 29, 2016), https://www.youtube.com/watch?v=1bPR846gO8U.  Stone's "Stop the Steal" campaign has fanned these flames by widely distributing message via social media and elsewhere falsely claiming that election will be "rigged" by "illegals."  Schrager Decl. at Ex. 5 (Stop the Steal home page).  And, appearing on Face the Nation on October 23, 2016, RNC Chairman Reince Priebus declared that voter fraud "is real," and that what Trump is doing is "trying to also tell his folks to watch out for this fraud that might occur."  Schrager Decl. at Ex. 14 (*Face the Nation Transcript October 23, 2016: Priebus, Axelrod*, CBS News, Oct. 23, 2016).

Trump's calls for unlawful vigilantism in the name of purported voter fraud are in fact a coordinated effort to harass and intimidate voters at the polls.  Voter intimidation efforts aimed at suppressing minority voters have frequently been "ostensibly aimed at combatting voter fraud." *Ne. Ohio Coal. for the Homeless v. Husted*, No. 2:06-cv-896, 2016 WL 3166251, at *28 (S.D. Ohio June 7, 2016), *aff'd in part, rev'd in part on other grounds*, No. 16-3603, 2016 WL 4761326 (6th Cir. Sept. 13, 2016); *see also Veasey*, 830 F.3d at 237 ("[T]he record shows that Texas has a history of justifying voter suppression efforts such as the poll tax and literacy tests with the race-neutral reason of promoting ballot integrity.").  As the New Jersey District Court held in rejecting the RNC's 2009 request to vacate a Consent Decree that has been in place since

1982 to address and prevent Republican Party-sponsored efforts to intimidate voters, *see* Complaint at 3-4, "[v]oter intimidation presents an ongoing threat to the participation of minority individuals in the political process, and continues to pose a far greater danger to the integrity of that process than the type of voter fraud the RNC is prevented from addressing by the Decree." *Democratic Nat'l Comm. v. Republican Nat'l Comm.*, 671 F. Supp. 2d 575, 578-79 (D.N.J. 2009), *aff'd*, 673 F.3d 192 (3d Cir. 2012).

Today, Defendants are engaged in a concerted effort to repeat this sad history.  As the Republican Party's nominee for President, Trump and his campaign coordinate closely with the RNC and NRP on a wide variety of matters, including overall campaign strategy, public messaging, voter outreach, and field operations.  On May 17, 2016, the RNC created a joint fundraising committee with the Trump Campaign specifically to fund the Trump Campaign and its operations, and to elect Republicans "up and down the ballot."  Schrager Decl. at Ex. 1 (Press Release: *RNC & Trump Campaign Announce Joint Agreements*, May 17, 2016).  The Trump Campaign has "relinquished control over many of its tactical decisions" to the RNC.  Schrager Decl. at Ex. 17 (Joshua Green, *Inside the Trump Bunker, with Days to Go*, Bloomberg Businessweek, Oct. 26, 2016).  Indeed, shortly after Trump became the Republican nominee, the RNC met with the Trump Campaign to discuss what they described as "the merger."  *Id.*  The Trump Campaign and RNC "negotiated a partnership," in which the RNC "buil[t] assets and infrastructure and the nominee gets to benefit from it."  *Id.*

The Trump Campaign has decided largely to refrain from setting up a parallel layer of offices and staff in Nevada and elsewhere, as past Republican Party nominees have done. Instead, as has been widely reported, the Trump Campaign is relying predominantly on the RNC and NRP to manage get-out-the vote operations in contested states such as Nevada.  *See* Schrager

Decl. at Ex. 20 (Garrett Epps, *Donald Trump's Attacks on the Rights of Minority Voters*, The Atlantic, Oct. 13, 2016).

The Trump Campaign's coordination with the RNC and NRP extends to efforts to monitor polling locations for purported voter fraud. Trump's running mate, Governor Mike Pence, publicly confirmed that the Trump campaign is working with the RNC and state Republican parties on ballot security measures.  At an August 3, 2016 town hall rally in Denver, Colorado, Pence was asked "how is the Trump-Pence campaign going to . . . prevent" Hillary Clinton from "steal[ing] this election."  Pence responded:  "I will tell you that the Trump campaign and the Republican National Committee are working very, very closely with state governments and secretaries of states all over the country to ensure ballot integrity. . . .  We are working hard all over the country, the Republican National Committee is working all over the country, but I would encourage everyone within the sound of my voice, get involved, participate, be a poll worker on election day . . . be a part of that process, and uphold the integrity of one person one vote in America."  *8-3 Replay: Pence Denver Rally Town Hall*, TrumpTube.tv, http://trumptube.tv/donald-trump-rally-speech-video/video/pence-live-stream-town-hall-8-3-16/, at 16:22 - 17:27 (last accessed Oct. 28, 2016).

Last week, Trump's campaign manager Kellyanne Conway confirmed that the Trump campaign is "actively working with" the RNC and other branches of the Republican Party apparatus, including the NRP, to "monitor precincts around the country."  *See* Schrager Decl. at Ex. 9 (Tierney Sneed, *Why the RNC Wants Nothing to Do with Trump's Poll Watcher Call to Arms*, Talking Points Memo, Oct. 21 2016); *see also Trump Poll Watching Call a Legal Risk for RNC*, MSNBC.com (Oct. 20, 2016), http://www.msnbc.com/rachel-maddow/watch/trump-poll-watching-call-a-legal-risk-for-rnc-790392387688.

The RNC and NRP have delegated certain "ballot security" initiatives to third parties in Nevada.  For example, Nevada Grassroots—a political organization affiliated with the Republican Party—is currently hiring "hard working, professionals, who are interested in politics and want the opportunity to participate in shaping the 2016 election" to serve as "Election Representatives to assist with voting integrity efforts in Clark County."  Schrager Decl. at Ex. 35 (Tweet of @RalstonReports with accompanying images, Oct. 28, 2016, 2:30 P.M.).  Nevada Grassroots' plan to pay "professionals" to monitor polling places in Clark County has been publicized by Morgan Myers, an employee of a firm called Stampede Consulting that the NRP has paid more than $750,000 this year alone. Schrager Decl. at Ex. 39 (Tweet of @Ralston Reports, Oct. 28, 2016, 5:11 P.M.)

Just days ago, the Trump Campaign distributed talking points to Republican Party surrogates directing that they "[m]ust make points on rigged system," and encouraging them to claim there has been "an increase in unlawful voting by illegal immigrants."  Schrager Decl. at Ex. 10 (Jonathan Swan, *Trump Campaign Encouraging Surrogates to Double Down on Ballot Fraud*, The Hill, Oct. 21, 2016).

The available evidence suggests that Trump's supporters are responding to his calls to engage in voter intimidation. Already, Trump supporters and volunteers for the Trump Campaign have harassed and intimidated voters in Clark County. For example, in one instance, a Trump supporter harassed and intimidated multiple voters outside of the Albertsons early voting location on Lake Mead Boulevard, repeatedly asking voters for whom they were voting, and then yelling at them belligerently and attempting to keep them from entering the voting location when they stated they were not voting for Donald Trump.  Declaration of Bennett Murphy.  The poll workers present at the voting site confronted the Trump supporter and attempted to get him to

leave the premises.  The Trump supporter told poll workers that he had "a right to say anything he wanted to the voters," and the poll workers were forced to call the police to report an incident of voter intimidation.  *Id.*  The Trump supporter left before the police arrived. *Id.*

Similarly, a poll observer for the Trump Campaign was asked to leave the Arroyo Market Square early voting location because she was yelling at voters, accusing voters and poll workers of breaking the law, and talking to voters in line and giving them inaccurate information.  Declaration of Ellyn Lindsay ¶ 8.  Despite being permanently banned from the location, the poll observer has attempted to return.  *Id.*

Similar responses have emerged in other states.  The *Boston Globe* has reported on Trump supporters who are planning to engage in unlawful voter intimidation, and who understand themselves to be doing so at Trump's behest:

> "Trump said to watch your precincts. I'm going to go, for sure," said Steve Webb, a 61-year-old carpenter from Fairfield, Ohio.
>
> "I'll look for . . . well, it's called racial profiling. Mexicans. Syrians. People who can't speak American," he said.  "I'm going to go right up behind them.  I'll do everything legally.  I want to see if they are accountable.  I'm not going to do anything illegal.  I'm going to make them a little bit nervous."

Schrager Decl. at Ex. 6 (Matt Viser & Tracy Jan, *Warnings of Conspiracy Stoke Anger Among Trump Faithful*, Boston Globe, Oct. 15, 2016).

Similarly, Harry Miller, purportedly of Palm Beach, Florida, tweeted in response to Trump's calls for election observers that he would be "wear'n red at polls. . . .  We gonna be watch'n fer shenanigans . . . haul ya away . . . ."  Schrager Decl. at Ex. 7 (Jackbgoode1, Twitter (Aug. 19, 2016, 7:43 A.M).  The tweet included a picture of a pickup truck with Florida plates and a person-sized cage built into the bed, surrounded by American flags.  *See id.*  Miller has over 20,000 Twitter followers and tweets almost exclusively about Trump, Secretary Clinton,

and racially-charged political themes such as deporting "Muzzys." *See generally* Harry Miller (@jackbgoode1), Twitter, https://twitter.com/jackbgoode1 (last visited Oct. 28, 2016). A typical tweet asserts that "Our Muzzy Commander in Chief" is "shov'n Sharia Law down our throats . . . & Crooked Hiltlery follow'n his every move. . . ." Schrager Decl. at Ex. 8 (Jackbgoode1, Twitter (July 14, 2016, 9:14 A.M.).

## II.   PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS

### A.   Plaintiff Is Likely To Prevail On Its Claim Under Section 11(b) Of The Voting Rights Act.

Plaintiff is likely to prevail on its claim that Defendants have violated Section 11(b) of the Voting Rights Act codified at 52 U.S.C. § 10307(b). That statute provides in relevant part: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b).[1] Section 11(b) was passed as part of the Voting Rights Act "to banish the plight of racial discrimination in voting," *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966), but Congress intentionally drafted Section 11(b) "not [to] require proof that racial discrimination motivated the intimidation, threats, or coercion," *Willingham v. Cnty. of Albany*, 593 F. Supp. 2d 446, 462 (N.D.N.Y. 2006); *see Cameron v. Johnson*, 262 F. Supp. 873, 884 n.9 (S.D. Miss. 1966) (same); H.R. Rep. No. 89-439, at 30 (1965) ("The prohibited acts of intimidation need not be racially motivated."), *as reprinted in* 1965 U.S.C.C.A.N. 2437, 2462.[2] Section 11(b) "on its face prohibits *any* intimidation, threat, or coercion, whether done by a

---

[1] Section 11(b) affords a private right of action. *See Allen v. State Bd. of Elections*, 393 U.S. 544, 555-56 & n.18 (1969); *Gray v. Main*, 291 F. Supp. 998, 999-1000 (M.D. Ala. 1966); *see also* 28 U.S.C. § 1343(a)(4).

[2] Attorney General Nicholas Katzenbach, who drafted much of the Voting Rights Act, explained to the Senate that "defendants [sh]ould be deemed to intend the natural consequences of their acts." Voting Rights, Part 1:  Hearings on S. 1564 Before the S. Comm on the Judiciary, 89th Cong. 16 (1965).

public official or by a private individual." *Whatley v. Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968); *see Jackson v. Riddell*, 476 F. Supp. 849, 859 (N.D. Miss. 1979) (Section 11(b) "is to be given an expansive meaning").

The operative words of Section 11(b)—to "intimidate," "threaten," and "coerce," or to attempt to do so—should be given their commonly understood meaning.  *Pakootas v. Teck Cominco Metals, Ltd.*, 830 F.3d 975, 980 (9th Cir. 2016) ("Unless a statute provides an explicit definition, we generally give words 'their ordinary, contemporary, common meaning.'" (citation omitted)); *see, e.g.*, Merriam Webster ("intimidate": "to make timid or fearful"; "to compel or deter by or as if by threats")[3]; *id.* ("threaten": "to utter threats against"; "to hang over dangerously"; "to cause to feel insecure or anxious")[4]; *id.* ("coerce": "to restrain or dominate by force"; "to compel to an act or choice"; "to achieve by force or threat").[5]  These terms cover not only the most powerful levers of state power, such as "arrest and prosecution," *see Cameron*, 262 F. Supp. at 897, but also plainly apply to threatening, intimidating and coercive acts carried out by private individuals.

Section 11(b)'s reach is not restricted to overt acts of physical violence.  Indeed, courts assessing comparable language in other civil rights statutes have held that terms such as "intimidating" and "threatening" include conduct short of actual violence.  For instance, the Ninth Circuit found that it constituted "intimidation" to send a mass mailing to 14,000 newly registered voters with Hispanic surnames warning them that if they voted in the election, their personal information would be collected and made available to organizations that were "against immigration."  *United States v. Nguyen*, 673 F.3d 1259, 1261 (9th Cir. 2012) (interpreting a

---

[3] *Available* at http://www.merriam-webster.com/dictionary/intimidate.
[4] *Available at* http://www.merriam-webster.com/dictionary/threaten.
[5] *Available at* http://www.merriam-webster.com/dictionary/coerce.

criminal voter intimidation provision of the California election code).  As the Ninth Circuit held, "intimidation" is "not limited to displays or applications of force, but can be achieved through manipulation and suggestion," including "through subtle, rather than forcefully coercive means."  *Id.*  In another example, the Seventh Circuit found that the writing of a racial slur on property was proscribed under the Fair Housing Act.  *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 330 (7th Cir. 2004) (Posner, J.).  The court explained that even if the intimidating and threatening conduct was not as "ominous, frightening, or hurtful [as] burning a cross . . . or assaulting the [victim] physically," there exist "less violent but still effective[] methods" by which an offender can frustrate a victim's protected rights, such as through "a *pattern* of harassment."  *Id.*; *see also, e.g.*, *Fowler v. Borough of Westville*, 97 F. Supp. 2d 602, 613 (D.N.J. 2000) ("violence or physical coercion" is not "a necessary prerequisite" under a Fair Housing Act provision barring "coerc[ion], intimida[ion], [and] threaten[ing]").

Courts assessing voter intimidation claims thus have looked to whether the challenged conduct would reasonably intimidate, threaten, or coerce voters.  For example, during the 2004 election cycle, Senator Daschle challenged certain conduct committed by Republican candidate John Thune, the South Dakota Republican Party, and their agents as violating Section 11(b): "[f]ollowing Native American voters at [a] polling place . . . and standing two to three feet behind Native American voters, and ostentatiously making notes"; "[f]ollowing Native American voters out to their cars after they have voted, walking up to their vehicles, and writing down their license plate numbers"; and "[h]aving a loud conversation in a polling place, where Native Americans were voting, about Native Americans who were prosecuted for voting illegally in Minnesota."  Schrager Decl. at Ex. 37 (*Daschle v. Thune*, Complaint at 5-6, No. 04-cv-4177

(D.S.D. Nov. 1, 2004)).  Daschle claimed that "[t]he persons carrying out these activities are part of a large group of Republican Thune supporters who have come to South Dakota from across the country, and who are poised to repeat the same conduct in Native American voting places across South Dakota . . . on Election Day."  *Id.* (Complaint at 6).  The district court granted a temporary restraining order and found Daschle was "likely to succeed" on his Section 11(b) claim, "as the Court finds that there was intimidation particularly targeted at Native American voters . . . by persons who were acting on behalf of John Thune."  Schrager Decl. at Ex. 38 *Daschle v. Thune*, TRO at 2, No. 04-cv-4177 (D.S.D. Nov. 2, 2004)).  Although Daschle alleged intentional intimidation, the district court explained that "[w]hether the intimidation was intended or simply the result of excessive zeal is not the issue, as the result was the intimidation of prospective Native American voters."  *Id.*; *see also United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965) (concluding that the "inevitable effect" of challenged conduct would be to deter voters).

Just as in the *Daschle* case, such illegal conduct should be enjoined here.  As shown in the Complaint and herein, Defendants are engaged in a concerted effort to intimidate, threaten, and coerce lawful voters from exercising their right to vote, targeting in particular minority and Democratic voters.  Even if those efforts have not yet achieved success, Defendants have already *attempted* to induce fear and anxiety among minority and Democratic voters in Nevada, and likewise have taken steps designed to prevent such voters from voting.  The Trump Campaign is exhorting its supporters to go to Democratic-leaning, majority-minority areas to watch over minority voters.  Specifically, Trump has encouraged his supporters to "go down to certain areas" where Democratic-leaning minority voters are concentrated and "go out and watch," and "when [I] say 'watch,' you know what I'm talking about, right?"  Schrager Decl. at Ex. 19 (Erick

Trickey, *How Hostile Poll-Watchers Could Hand Pennsylvania to Trump*, Politico Mag., Oct. 2, 2016).  And Trump has informed his supporters that "illegals" have been "pour[ing] into this country" to affect the election, and Trump Campaign surrogates have explicitly linked voter fraud to "inner cities" that support "Democrats."  Schrager Decl. at Ex. 13 (Eric Bradner, *Giuliani on Rigged Election: 'Dead People Generally Vote for Democrats'*, CNN, Oct. 16, 2016).  Meanwhile, Defendant Stone is actively recruiting people to engage in "exit polling" in majority-minority areas aimed to intimidate and threaten non-white voters and prevent them from voting.  Schrager Decl. at Ex. 4 (Oliver Laughland & Sam Thielman, *Trump Loyalists Plan Own Exit Poll Amid Claims of 'Rigged' Election*, The Guardian, Oct. 20, 2016).

Plaintiffs need not show that Defendants' voter suppression efforts have yet been successful in order to obtain injunctive relief, as only a *likelihood* of success on the merits and of irreparable harm must be shown for an injunction to issue.  That said, as detailed *supra*, available news reporting demonstrates that Trump supporters are already responding to the candidate's call to intimidate voters in Nevada and beyond.  See *supra*, at 14-16 (describing responses in Nevada and other states).  Such planned conduct is indistinguishable from the allegations that the *Daschle* court found more than sufficient to constitute intimidation and threats in violation of Section 11(b) and therefore to support a TRO or preliminary injunction.  The law does not require Plaintiff to be forced to wait for intimidators to arrive at polling stations in Nevada before obtaining relief against Defendants for attempting to organize their arrival.

For these reasons, Plaintiff has provided more than a sufficient basis to establish Defendants' intent to intimidate and threaten voters under Section 11(b).  Plaintiffs are likely to succeed on the merits of this claim.

/ / /

**B.**     **Plaintiff Is Likely To Prevail On Its Claim Under The Ku Klux Klan Act, 42 U.S.C. § 1985(3).**

Plaintiff is likely to prevail on its claim that Defendants have violated the Ku Klux Klan Act of 1871 (the "Klan Act").  The relevant provision of the Klan Act, 42 U.S.C. § 1985, creates liability for several kinds of conspiracies.  *See Bretz v. Kelman*, 773 F.2d 1026, 1027 n.3 (9th Cir. 1985) (en banc); *see also United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 839 n.1 (1983) (Blackmun, J., dissenting).  Plaintiff's claim arises under § 1985(3)'s provision barring conspiracies to suppress voters, which provides:  "[I]f two or more persons conspire to prevent by force, intimidation or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy," and "one or more persons engaged" in that conspiracy commit an act in furtherance of the conspiracy that injures a person or deprives that person of a federal right, "the party so injured or deprived may have an action . . . ."   42 U.S.C. § 1985(3).

The Ninth Circuit has referred to this type of a § 1985(3) conspiracy as "a conspiracy to interfere with federal elections."  *Bretz*, 773 F.2d at 1027 n.3.  A straightforward reading of the statutory text, coupled with case law interpreting the Klan Act, makes clear that Plaintiff's claim in this case is likely to succeed.

In the context of construing § 1985(3) conspiracy claims, the Supreme Court has explained that:

> to make out a violation of § 1985(3), as construed in *Griffin v. Breckenridge* [which construed the section's first clause], the plaintiff must allege and prove four elements:  (1) a conspiracy;  (2) *for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws*; and (3) an act in furtherance of

the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Scott*, 463 at 828-29 (emphasis added).  It follows that to make out a violation of the part of § 1985(3) at issue here, a plaintiff must allege and prove the following four elements: (1) a conspiracy; (2) *to prevent a lawful voter from supporting a candidate in a federal election by force, intimidation, or threat*; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States.

First, Plaintiff is likely to succeed on the merits of its claim that Defendants have engaged in a conspiracy.  "A civil conspiracy is a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage."  *Lacey v. Maricopa Cty.*, 693 F.3d 896, 935 (9th Cir. 2012). As the Ninth Circuit explained:

> To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy.  A defendant's knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and from evidence of the defendant's actions.

*Id.*

Plaintiff has alleged facts likely to prove that Defendants have agreed, tacitly and explicitly, to a "single plan" to suppress voting by minority and Democratic voters in the 2016 Election, and that each individual Defendant shares in the "general conspiratorial objective."  A "senior official" at the Trump Campaign recently admitted to Bloomberg Businessweek that the Campaign is engaged in "major voter suppression operations" designed to prevent minority and Democratic-leaning voters from casting lawful ballots.  Schrager Decl. at Ex. 17 (Joshua Green & Sasha Issenberg, *Inside the Trump Bunker, with Days to Go*, Bloomberg Businessweek, Oct. 27, 2016).  Trump has repeatedly warned his followers that the election will be "rigged," and

exhorted his followers to "go check out [other] areas," Schrager Decl. at Ex. 20 (Garrett Epps, *Donald Trump's Attacks on the Rights of Minority Voters*, The Atlantic, Oct. 13, 2016), and to "go out and watch . . . and when [I] say 'watch,' you know what I'm talking about, right?" Schrager Decl. at Ex. 19 (Erick Trickey, *How Hostile Poll-Watchers Could Hand Pennsylvania to Trump*, Politico Mag., Oct. 2, 2016).

Agents of the Trump Campaign have supported Trump's message.  Trump's running mate, Indiana Governor Mike Pence, has admitted in public that "the Trump Campaign and the Republican National Committee are working very very closely with state governments and secretaries of states all over the country to ensure ballot integrity."  *8-3 Replay: Pence Denver Rally Town Hall*, TrumpTube.tv, http://trumptube.tv/donald-trump-rally-speech-video/video/pence-live-stream-town-hall-8-3-16/, at 16:22 - 17:27 (last accessed Oct. 28, 2016). Trump's campaign manager Kellyanne Conway confirmed to a reporter that the Trump Campaign is "actively working with" the RNC and state-level Republican Party organizations, such as the NRP, to engage in "ballot security" initiatives.  Schrager Decl. at Ex. 9 (Tierney Sneed, *Why the RNC Wants Nothing to Do with Trump's Poll Watcher Call to Arms*, Talking Points Memo, Oct. 21 2016); *see also Trump Poll Watching Call a Legal Risk for RNC*, MSNBC.com, Oct. 20, 2016, http://www.msnbc.com/rachel-maddow/watch/trump-poll-watching-call-a-legal-risk-for-rnc-790392387688 (last accessed Oct. 26, 2016).  Thus, Defendants have not only agreed on a common plan; they are boasting about it in public, and seeking to recruit new conspirators to their cause.

Similarly, Stone and his organization Stop the Steal Inc. have amplified Trump's recruiting call, by signing up Trump supporters to "volunteer" to fight "voter fraud," spreading false claims and encouraging his audience to engage in unlawful voter intimidation.  Schrager

Decl. at Ex. 32 ("Defend Donald – Stop the Steal," StopTheSteal.org).  Stone and Stop the Steal Inc. are also organizing Trump supporters to engage in racial profiling in the form of minority-neighborhood focused "exit polling" designed to intimidate minority voters.  Schrager Decl. at Ex. 4 (Oliver Laughland & Sam Thielman, *Trump Loyalists Plan Own Exit Poll Amid Claims of 'Rigged' Election*, The Guardian, Oct. 20, 2016).  These efforts have the backing of the NRP and RNC.

Second, Plaintiffs will likely prove that the conspiracy is directed at preventing lawful voters from voting "by force, intimidation, or threat."  For the reasons laid out above, Defendants' efforts are plainly designed to threaten, coerce, and intimidate minority and Democratic voters, and to encourage Trump's supporters to engage in activities outside of the ordinary election procedures established by Pennsylvania law.

Third, each co-conspirator has performed an act in furtherance of that conspiracy.  Representatives and agents of the Trump Campaign have regularly warned of vote-rigging and advanced calls to "watch" "certain areas" of the country.  Schrager Decl. at Ex. 11 (David Weigel, *Trump Fires up Recruitment of Poll Watchers as He Warns of Election 'Cheating,'* Wash. Post, Aug. 13, 2016).  Defendant NRP has amplified these calls, organized poll watchers, and supplied the Trump Campaign with data, personnel, and resources to further its voter intimidation efforts.  Schrager Decl. at Ex. 1 (Press Release: *RNC & Trump Campaign Announce Joint Agreements*, May 17, 2016); Schrager Decl. at Ex. 17 (Joshua Green & Sasha Issenberg, *Inside the Trump Bunker, with Days to Go*, Bloomberg Businessweek, Oct. 27, 2016).  Defendants Stone and Stop the Steal Inc. have similarly amplified the Trump Campaign's message, organized an "exit polling" operation that is targeted at minority voters in locations including Las Vegas, and recruited "vote protectors" to patrol polling places around the country

where they believe voters are likely to vote for Secretary Clinton. Schrager Decl. at Ex. 4 (Oliver Laughland & Sam Thielman, *Trump Loyalists Plan Own Exit Poll Amid Claims of 'Rigged' Election*, The Guardian, Oct. 20, 2016); Schrager Decl. at Ex. 27 (Register at Stop The Steal to become a Vote Protector Exit Poller), https://stopthesteal.org/register/ (last visited Oct. 28, 2016). Each of these acts, and many others, has furthered the conspiracy to prevent lawful voters from voting, by intimidation.

Finally, each of those acts has injured Plaintiff in its capacity as the Democratic Party organization in the State of Nevada, both by harming its prospects in the upcoming election, and by depriving the lawful voters whose interests it represents of their legal right to vote in that election without intimidation. In the absence of immediate relief, thousands of voters, if not more, will suffer the deprivation of their right to vote on account of the co-conspirators' intimidation.

The Supreme Court has explained that the correct interpretive approach to "Reconstruction civil rights statutes" is "to accord them a sweep as broad as their language." *Griffin*, 403 U.S. at 97 (alterations and internal quotation marks omitted). Plaintiffs have alleged facts that, under established Supreme Court law, make them likely to succeed on the merits of their Klan Act claim.[6]

/ / /

/ / /

---

[6] Plaintiff is not required to prove that Defendants are motivated by racial or other class-based animus, as would be required to prevail on a claim for violations of the other two conspiracy bars in § 1985(3). *Kush v. Rutledge*, 460 U.S. 719, 721 (1983) (analogizing the anti-voter suppression conspiracy bar to 42 U.S.C. § 1985(2), which does not require a racial or other class-based animus). But even were that requirement to apply, the explicit targeting of minority areas and voters alleged in the Complaint is sufficient to demonstrate a likelihood of success on that aspect as well.

      **C.**        **Defendants Have No Legally Cognizable Interest In Voter Intimidation Tactics.**

Defendants cannot rely on the First Amendment for permission to intimidate and harass voters under the guise of poll-watching, as "poll watching is not a fundamental right which enjoys First Amendment protection." *Dailey v. Hands*, No. 14-cv-423-KD-M, 2015 WL 1293188, at *4 (S.D. Ala. Feb. 20, 2015), *report and recommendation adopted*, Mar. 23, 2015; *see Democratic Nat'l Comm.*, 671 F. Supp. 2d at 596 (rejecting as "meritless" the argument that consent decree bar on RNC "ballot security activities" "infringes on activity protected by the First Amendment"), *aff'd*, 673 F.3d 192 (3d Cir. 2012); *Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 364 (S.D.N.Y. 2007) ("poll watching . . . has no distinct First Amendment protection"); *Turner v. Cooper*, 583 F. Supp. 1160, 1162 (N.D. Ill. 1983) ("no authority" for "the proposition that" a person has "a first amendment right to act as a pollwatcher"). The "position of poll-watcher," rather, is "a mere creature of state statute," *Cotz*, 476 F. Supp. 2d at 364, so any individual's supposed "right" to be a poll-watcher "derive[s] solely from state law," *Turner*, 583 F. Supp. at 1162; *see Dailey*, 2015 WL 1293188, at *5 (rejecting the argument that "poll watching is actually a First Amendment right that 'transcends' merely serving as a poll watcher"; "Plaintiff provides no case law to support [that] argument"). "[T]he State is not constitutionally required to permit pollwatchers." *Turner*, 583 F. Supp. at 1162.

It is sensible and unsurprising that courts have rejected extending the First Amendment to poll-watching activities, as that conduct is a form of law-enforcement delegable by States, rather than a form of expressive speech. *See Mont. Democratic Party v. Eaton*, 581 F. Supp. 2d 1077, 1079 (D. Mont. 2008) (poll-watching involves "a citizen challeng[ing] another citizen's right to vote"); *Tiryak v. Jordan*, 472 F. Supp. 822, 823-24 (E.D. Pa. 1979) ("the position of poll-

watcher" is "a state responsibility" that constitutes "delegation" of the State's authority over "the conduct and organization of elections" to "the political parties").

Further, courts have recognized that the official responsibility States have entrusted to poll-watchers is vulnerable to abuse. In *Eaton*, for example, Republican Party officials invoked state law to file "*en masse* challenges to the right to vote of 6,000 Montana citizens" that were "frivolous." *Eaton*, 581 F. Supp. 2d at 1078-79. The court noted that the state law permitting such challenges could be used "to execute a tawdry partisan ploy" in which "[v]oters might be intimidated, confused, or even discouraging from voting." *Id.* at 1079. The *Eaton* court's holding is consistent with the straightforward principle that otherwise lawful activities such as poll watching pursuant to state election procedures nonetheless violates Section 11(b) where the purpose and effect of such activities is to interfere with the right to vote. *See, e.g.*, *United States by Katzenbach v. Original Knights of Ku Klux Klan*, 250 F. Supp. 330, 348 (E.D. La. 1965) (noting that "acts otherwise lawful may become unlawful and be enjoined under [section 11(b)] if the purpose and effect of the acts is to interfere with the right to vote").

Thus, even assuming *arguendo* a hypothetical First Amendment right to watch polls (which does not in fact exist), such right would be further circumscribed as state action. *Tiryak*, 472 F. Supp. at 824-25 (poll-watchers' activities constitute state action under 42 U.S.C. § 1983); *see Garcetti v. Ceballos*, 547 U.S. 410, 421 (2006) (government may regulate speech by employees made "pursuant to their official duties"). That in part explains why Nevada has placed important limitations on public observation at Nevada polling places, such as banning individuals from "[r]emain[ing] in or outside of any polling place so as to interfere with the conduct of the election" or engaging in any "intimidation" of voters. *See* Complaint at 22-23 (citing various provisions of Nev. Rev. Stat.).

Separately, any purported right to engage in poll watching must give way to the compelling state interest in securing the franchise by preventing voter intimidation.  "Poll watching, . . . although ostensibly aimed at combatting voter fraud, has a pernicious history of intimidation of minority voters."  *Ne. Ohio Coal. for the Homeless v. Husted*, 2016 WL 3166251, at *28 (S.D. Ohio June 7, 2016), *aff'd in part and rev'd in part*, __ F.3d __, 2016 WL 4761326 (6th Cir. Sept. 13, 2016); *see Democratic Nat'l Comm.*, 671 F. Supp. 2d at 578-79 ("Voter intimidation presents an ongoing threat to the participation of minority individuals in the political process, and continues to pose a far greater threat to the integrity of that process than the type of voter fraud the RNC is prevented from addressing by the [Consent] Decree."), *aff'd*, 673 F.3d 192 (3d Cir. 2012).  It is impossible to ignore the "fear and intimidation" racial minorities face in some areas where "poll watchers . . . dress in law enforcement-style clothing for an intimidating effect."  *Veasey v. Perry*, 71 F. Supp. 3d 627, 636-37 (S.D. Tex. 2014), *aff'd in part and rev'd in part and remanded*, 830 F.3d 216 (5th Cir. 2016).

## III.      PLAINTIFF WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF

In the absence of injunctive relief, Defendants' plans and unfolding efforts to intimidate minority voters are likely to succeed, causing irreparable harm to Plaintiff Nevada State Democratic Party. That harm will be occassioned both by the loss of votes for Plaintiff's supported candidates, and by loss of voting rights by voters associated with the Plaintiff.  *See, e.g.*, *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 189 n.7 (2008) (citing *Crawford v. Marion County Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) ("The Democratic Party also has standing to assert the rights of those of its members who will be prevented from voting by the new law.")); *Sandusky Cty. Democratic Party v. Blackwell*, 387 F.3d 565, 573-74 (6th Cir. 2004).  U.S. political history suggests that Defendants' schemes are neither anomalous nor

unthreatening—to the contrary, voter intimidation efforts have been known to compromise the integrity of both federal and state elections.  *See, e.g.*, *Ne. Ohio Coal. for the Homeless*, 2016 WL 3166251, at *28 ("Poll watching, . . . although ostensibly aimed at combatting voter fraud, has a pernicious history of intimidation of minority voters."); *Democratic Nat'l Comm.*, 671 F. Supp. 2d at 578-79 ("Voter intimidation presents an ongoing threat to the participation of minority individuals in the political process, and continues to pose a far greater threat to the integrity of that process than the type of voter fraud the RNC is prevented from addressing by the [Consent] Decree."), *aff'd*, 673 F.3d 192 (3d Cir. 2012).

Defendants seek to intimidate and suppress Nevada voters, and "[i]t is clear that abridgment of the right to vote constitutes an irreparable injury."  *Sanchez*, 2016 WL 5936918, at *10; *see Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that deprivation of constitutional rights unquestionably constitutes irreparable injury.") (internal quotation marks omitted); *California ex rel. Lockyer v. Cty. of Santa Cruz*, No. C06-04708 RMW, 2006 WL 3086706, at *6 (N.D. Cal. Oct. 30, 2006) ("the loss of voting rights constitutes irreparable injury") (internal quotation marks omitted); *Cardona v. Oakland Unified Sch. Dist., Cal.*, 785 F. Supp. 837, 840 (N.D. Cal. 1992) ("Abridgment or dilution of a right so fundamental as the right to vote constitutes irreparable injury.").  Courts find irreparable harm where, as here, the right to vote is threatened, even if the impingement is not yet complete.  For example, the Third Circuit found irreparable harm in the context of an upcoming election because the denial of "voting and associational rights"—including the ability to "vote for candidates who represent their beliefs"—"cannot be alleviated after the election."  *Council of Alternative Political Parties v. Hooks*, 121 F.3d 876, 883 (3d Cir. 1997).  "There can be no 'do-over' or redress of a denial of the right to vote after an election," so "denial of the right to vote constitutes a strong showing of

irreparable harm." *Fish v. Kobach*, __ F.3d __, 2016 WL 6093990, at *30 (10th Cir. Oct. 19, 2016) (irreparable harm where "over 18,000 Kansans stood to lose the right to vote in the coming general elections"); *see, e.g.*, *Lucas v. Townsend*, 486 U.S. 1301, 1305 (1988) (Kennedy, J., in chambers) (granting injunction enjoining a bond referendum election because "[p]ermitting the election to go forward [without statutory protection] would place the burdens of inertia and litigation delay on those whom the statute was intended to protect"); *League of Women Voters of North Carolina v. North Carolina*, 769 F.3d 224, 244 (4th Cir. 2014) ("Courts routinely deem restrictions on fundamental voting rights irreparable injury. . . .  This makes sense generally and here specifically because whether the number is thirty or thirty-thousand, surely some North Carolina minority voters will be disproportionately adversely affected in the upcoming election. And once the election occurs, there can be no do-over and no redress.  The injury to these voters is real and completely irreparable if nothing is done . . . ."); *Obama for Am. v. Husted*, 697 F.3d 423, 436 (6th Cir. 2012) ("A restriction on the fundamental right to vote . . . constitutes irreparable injury."); *Williams v. Salerno*, 792 F.2d 323, 326 (2d Cir. 1986) ("The registration applicants in this case would certainly suffer irreparable harm if their right to vote were impinged upon.").

In the absence of preliminary relief, Defendants' voter intimidation and suppression scheme is likely to cause significant and widespread harm to voters' ability to exercise the franchise.  This will both prevent voters affiliated with Plaintiff from having their votes counted, and will impair the candidates supported by Plaintiff.   Such likely denial of voting rights is irreparable harm supporting immediate injunctive relief here.

/ / /

/ / /

IV.     **THE BALANCE OF EQUITIES FAVORS PLAINTIFF**

A.     **Preventing Voter Intimidation And Coercion Is A Critical Interest Enshrined In Federal Law.**

"[V]oter intimidation and coercion [are] . . . obvious harm[s] that federal law strongly and properly prohibits." *United States v. Madden*, 403 F.3d 347, 352 (6th Cir. 2005) (Boggs, C.J., concurring in part and dissenting in part). Indeed, the constitutional interest at stake in this litigation is the voters' "most precious "right . . . , regardless of their political persuasion, to cast their votes effectively" and free of intimidation. *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968). The interest in "protecting voters from confusion and undue influence" is "compelling," *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality opinion of Blackmun, J.), and laws that protect voters from intimidation safeguard the "fundamental political right . . . preservative of all rights," *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). The Constitution secures the "citizen's right to a vote free of arbitrary impairment by state action," including intimidation by state-authorized poll-watchers (who themselves have no countervailing constitutional right to vindicate). *Baker v. Carr*, 369 U.S. 186, 208 (1962).

Given the fundamental nature of the franchise, in the aftermath of previous voter suppression efforts in American history, Congress responded forcefully by enacting laws that unequivocally prohibit voter intimidation. In the 1870s, in response to threats of political violence and harassment against former slaves and their white supporters by the newly formed Ku Klux Klan, Congress banned private conspiracies to intimidate or threaten voters. In the 1960s, in response to the menacing of African-Americans who sought their full rights at the ballot box, Congress prohibited any threats or intimidation against any and all persons engaged in the democratic process. Through these actions, Congress embedded tools in federal law – the

laws that Plaintiff invokes here – to ensure that elections in the United States will be free from harassment and intimidation at the polls.

As explained above, is no countervailing right of Defendants and their agents to poll-watching or election observation.  Rather, the ability to poll-watch is entirely a state-created interest; thus, poll-watching activities in federal elections are permissible only insofar as they comply with the federal laws proscribing voter intimidation.  *See* 42 U.S.C. § 1985(3); 52 U.S.C. § 10307(b); *see also* U.S. Const. art. I, § 4 ("Congress may at any time by Law make or alter [state] Regulations" governing congressional elections); *Smiley v. Holm*, 285 U.S. 355, 366 (1932) (the Elections Clause "embrace[s] authority to provide a complete code . . . in relating to . . . protection of voters"); *Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S. Ct. 2247, 2257 (2013) ("the Elections Clause empowers Congress to regulate *how* federal elections are held"). Moreover, even activities that comply with the strict letter of state election procedures will violate Section 11(b) where the purpose and effect of such activities is to interfere with the right to vote.  *See Katzenbach*, 250 F. Supp. at 348 (noting that "acts otherwise lawful may become unlawful and be enjoined under [section 11(b)] if the purpose and effect of the acts is to interfere with the right to vote").

### B.  Widespread Or Systemic Voter Fraud Is A Myth.

The claimed rationale for the conspiracy in which Defendants are engaged is to combat alleged "voter fraud."  But widespread voter fraud is a myth. One recent study discovered only "31 credible incidents" of in-person voter fraud – out of *one billion* votes cast. Schrager Decl. at Ex. 16 (Justin Levitt, *A Comprehensive Investigation of Voter Impersonation Finds 31 Credible Incidents Out of One Billion Ballots Cast*, Washington Post, Aug. 6, 2014). The actual frequency of substantiated claims of voter fraud reveal that efforts to combat it are misguided at best and

pretextual at worst; in many if not most cases, the true purpose of voter fraud initiatives is to
suppress voter turnout.

The courts that have examined the evidence have concluded that widespread voter fraud
does not exist.  In a challenge to Pennsylvania's voter ID law, for example, "[t]he parties [we]re
not aware of any incidents of in-person voter fraud in Pennsylvania and d[id] not have direct
personal knowledge of in person voter fraud elsewhere.  *Applewhite v. Commonwealth*, No. 330
M.D. 2012, 2014 WL 184988, at *57 (Pa. Commw. Ct. Jan. 17, 2014).  A federal judge in North
Dakota recently determined that "[t]he undisputed evidence before the Court reveals that voter
fraud in North Dakota has been virtually non-existent."  Schrager Decl. at Ex. 15 (*Brakebill v.*
*Jaeger*, No. 16-civ-00008 (DLH), Dkt. No. 50, Aug. 1, 2016). A federal judge in Wisconsin has
similarly observed that "[t]he Wisconsin experience demonstrates that a preoccupation with
mostly phantom election fraud leads to real incidents of disenfranchisement, which undermine
rather than enhance confidence in elections, particularly in minority communities."  *One Wis.*
*Inst. v. Thomsen*, No. 15-civ-324 (JDP), 2016 WL 4059222, at *2 (W.D. Wis. July 29, 2016); *see*
*also Veasey v. Abbott*, 830 F.3d 216, 238 (5th Cir. 2016) ("[T]he evidence before the Legislature
was that in-person voting, the only concern addressed by SB 14, yielded only two convictions for
in-person voter impersonation fraud out of 20 million votes cast in the decade leading up to SB
14's passage."); *League of Women Voters*, 769 F.3d at 246 ("North Carolina asserts goals of
electoral integrity and fraud prevention.  But nothing in the district court's portrayal of the facts
suggests that those are anything other than merely imaginable."); *Crawford v. Marion Cty.*
*Election Bd.*, 553 U.S. 181, 194 (2008) ("The only kind of voter fraud that SEA 483 addresses is
in-person voter impersonation at polling places.  The record contains no evidence of any such
fraud actually occurring in Indiana at any time in its history."); *Frank v. Walker*, 17 F. Supp. 3d

837, 848 (E.D. Wis. 2014) ("[I]t appears that there have been zero incidents of in-person voter-impersonation fraud in Wisconsin during recent elections."), *rev'd on other grounds*, 768 F.3d 744 (7th Cir. 2014); *Lee v. Va. State Bd. of Elections*, No. 15-cv-357 (HEH), 2016 WL 2946181, at *23 (E.D. Va. May 19, 2016) ("evidence of actual voter impersonation-type fraud was scant").

V.    **A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST**

A.    **The Preliminary Relief Plaintiff Seeks Would Simply Enforce Federal Law.**

The preliminary relief that Plaintiff seeks would enforce federal law securing the right to vote, which clearly advances the public interest.  Plaintiff asks this Court to enjoin Defendants from voter intimidation activity and other violations of federal law.  As described above, voter intimidation is expressly prohibited by Section 11(b) of the Voting Rights Act, which provides that "[n]o person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b).  Defendants are also conspiring to intimidate lawful voters into staying away from the polls, in violation of the Klan Act, 42 U.S.C. § 1985(3).  Plaintiff's requested injunctive relief does no more than to effectuate the mandate of federal law.[7]

B.    **The Public Interest Is Advanced By Securing The Right To Vote, Not By Its Suppression.**

"In the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights, including the voting and associational rights of . . . candidates, and their potential supporters."  *Hooks*, 121 F.3d at 883-84.  "By definition,

---

[7] Plaintiff's requested relief would also further the interests of Nevada statutory provisions that regulate and restrict poll-watching activity.  *See* Nev. Rev. Stat. §§ 293.303, 293.730, 293.740, 293.274(2).  Plaintiff's requested relief would further compliance with Nevada laws that protect Nevada voters from vigilante poll watchers' unlawful interference with their votes.  *See* Nev. Rev. Stat. § 293.710, 293.730.

34

[t]he public interest . . . favors permitting as many qualified voters to vote as possible." *League of Women Voters*, 769 F.3d at 247; *see Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (the public has a "strong interest in exercising the fundamental political right to vote") (internal quotation marks omitted); *Husted*, 697 F.3d at 437 ("That interest is best served by favoring enfranchisement and ensuring that qualified voters' exercise of their right to vote is successful."); *Sanchez*, 2016 WL 5936918, at *10 ("The public interest is served by the enforcement of [federal voting rights law] and the inclusion of protected classes in the political process."); *Wash. Ass'n of Churches v. Reed*, 492 F. Supp. 2d 1264, 1271 (W.D. Wash. 2006) ("the public interest weighs strongly in favor of letting every eligible resident of Washington register and cast a vote").

An injunction is particularly favored where – as here – there is no credible argument that an injunction against Defendants "would interfere with the state's ability to move forward with the November election as scheduled." *Sanchez*, 2016 WL 5936918, at *10.

For all of these reasons, the public interest clearly would be advanced by the injunction sought here.  Against a backdrop of widespread past and threatened future voter intimidation and minimal evidence of voter fraud, Defendants cannot be permitted to engage in conduct that threatens the most basic right in American democracy—the right of voters to cast their votes free of coercion and intimidation.  "[O]ther rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

## VI.    CONCLUSION

This Court should grant Plaintiff's motion for preliminary injunctive relief.


November 1, 2016                                  /s/ Bradley S. Schrager

                                                 Bradley S. Schrager (Nevada Bar # 10217)
                                                 Don Springmeyer (Nevada Bar # 1021)
                                                 **WOLF, RIFKIN, SHAPIRO,**
                                                 **SCHULMAN & RABKIN, LLP**

3556 East Russell Road
Las Vegas, NV 89120
(702) 341-5200
Fax #: (702) 341-5300

Marc E. Elias
***Pro Hac Vice Pending,***
***will comply with LR IA 11-2 within 1 day***
Perkins Coie LLP
700 13th Street, Suite 600
Washington, DC 20005
Tel: (202) 434-1609
Fax: (202) 654-9126
melias@perkinscoie.com

Michael J. Gottlieb
***Pro Hac Vice Pending,***
***will comply with LR IA 11-2 within 1 day***
BOIES, SCHILLER & FLEXNER LLP
5301 Wisconsin Ave, N.W.
Washington, DC  20015
Tel: (202) 237-2727
Fax: (202) 237-6131
mgottlieb@bsfllp.com

Dawn L. Smalls
***Pro Hac Vice Pending,***
***will comply with LR IA 11-2 within 1 day***
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
Tel: (202) 754-4216
Fax: (212) 446-2350
dsmalls@bsfllp.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 1st day of November, 2016 a true and correct copy of **PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** was served via the United States District Court CM/ECF system on all parties or persons requiring notice, and having access to the electronic filing system referenced.

Please see the Declaration of Michael Gottlieb, Esq., filed herewith, for specific notice and service attempts and efforts as concern Defendants Donald J. Trump for President, Inc., Roger J. Stone, Jr., and Stop the Steal Inc.

Plaintiff will attempt to serve Defendant the Nevada Republican Party with a true and complete copy of this motion by hand today, November 1, 2016, at its offices at 500 S. Rancho Drive, Suite 7, Las Vegas, Nevada 89106.

By:   */s/ Dannielle Fresquez*
_____
Dannielle Fresquez, an Employee of
WOLF, RIFKIN, SHAPIRO, SCHULMAN &
RABKIN, LLP