1  **Marquis Aurbach Coffing**
Brian R. Hardy, Esq.
2  Nevada Bar No. 10068
10001 Park Run Drive
3  Las Vegas, Nevada 89145
Telephone: (702) 382-0711
4  Facsimile: (702) 382-5816
bhardy@maclaw.com
5
STATECRAFT PLLC
6  Kory Langhofer - *Pro Hac Vice Application Pending*
649 North Fourth Avenue, First Floor
7  Phoenix, Arizona 85003
*Counsel for the Nevada Republican Party*
8  *and Donald J. Trump for President, Inc.*

9                **UNITED STATES DISTRICT COURT**

10                    **DISTRICT OF NEVADA**

11  NEVADA STATE DEMOCRATIC PARTY,

12                                              Case No.:      2:16-cv-02514-RFB-NJK
                        Plaintiff,
13
14      vs.

15
NEVADA REPUBLICAN PARTY, DONALD J.
16  TRUMP FOR PRESIDENT, INC., ROGER J.
STONE, JR., and STOP THE STEAL, INC.,
17
18                        Defendants.

19
**RESPONSE OF DEFENDANTS NEVADA REPUBLICAN PARTY AND DONALD J.**
20  **TRUMP FOR PRESIDENT, INC. TO PLAINTIFF'S MOTION FOR TEMPORARY**
**RESTRAINING ORDER AND PRELIMINARY INJUNCTION**
21
22          Defendants Nevada Republican Party and Donald J. Trump for President, Inc.

23  (collectively "Defendants"), through the law firm of Marquis Aurbach Coffing, hereby submit

24  their Response of Defendants Nevada Republican Party and Donald J. Trump for President, Inc.

25  to Plaintiff's Motion ror Temporary Restraining Order and Preliminary Injunction.    This

26  Response is made and based upon the papers and pleadings on file herein, the following

27  Memorandum of Points and Authorities, and any oral argument allowed at the time of hearing.

28
                        Page 1 of 22

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

Citing opaque remarks in public speeches by political candidates in four cookie-cutter lawsuits filed across the country to garner headlines and cause chaos in the efforts of their political opponents, state Democratic Party organizations have brought to this Court and three others an emergency request that the Court prohibit hypothetical political conduct, by unidentified persons, that allegedly will improperly dissuade other unknown persons from voting.  These filings are based on miscellaneous long-ago statements, vague innuendo, rank speculation, and a heavy dose of rhetoric—all geared solely toward creating political mayhem rather than preventing actual misconduct.  For the reasons detailed below, this Court should deny Plaintiff's Motion for A Temporary Restraining Order and Preliminary Injunction—a request that is as misguided as it is sweeping.

It is misguided because the Plaintiff at bottom seeks an injunction requiring that the Defendants follow Nevada and federal election rules on Election Day—this despite the fact that federal courts will not typically issue "obey-the-law" injunctions absent compelling evidence that the law will not otherwise be followed.  *See N.L.R.B. v. U.S. Postal Serv.*, 486 F.3d 683, 691 (10th Cir. 2007).  And it is sweeping because any order adopting the Complaint's numerous requests for relief threatens to dissuade Nevadans from exercising their bedrock rights to political speech and political organizing.

As a legal matter, the Complaint fails even the most basic requirements for seeking emergency injunctive relief.  *First*, the Complaint cites no actual acts of "voter intimidation" attributable to the Nevada Republican Party ("NRP") or Donald J. Trump for President, Inc. (the "Campaign"), even with voting in Nevada commencing over a week ago.  To the contrary, it proffers a single alleged instance in which a poll observer was asked to leave the facility after engaging in improper communications with voters.  Complt. ¶ 58.  An isolated instance of misconduct by a single individual—one of hundreds of Nevadans who have volunteered to serve as poll watchers—is not a remotely sufficient basis for the capacious and constitutionally invasive relief the Plaintiff seeks.  The Complaint's remaining examples of alleged "voter

MAC:14221-010 2935265_1 11/2/2016 10:23 AM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

intimidation" in Nevada were committed by individuals who are ostensibly self-identified "Trump supporters." The Complaint, however, *never* alleges that these individuals were acting at the direction, under the control, or even with the knowledge of the Nevada Republican Party or the Campaign. Complt. ¶ 57. On that ground alone, the Complaint fails to demonstrate a high probability of actual or likely harm justifying injunctive relief.

Perhaps sensing this deficiency, Plaintiff relies heavily on the supposed activities of another person and another entity—one Roger Stone and his group "Stop the Steal." *See* Complt. ¶¶ 1, 9, 33-38, 41, 56, 62, 69. But Mr. Stone and his group are completely independent from the NRP and the Campaign and there is no basis in fact or law for ascribing or imputing their activities to the NRP or the Campaign. Mr. Stone and his organization are not employed by or affiliated with the NRP or the Campaign in any way. The NRP and the Campaign have no knowledge of Mr. Stone and Stop the Steal's activities. Nor did they direct, control, authorize, approve, or consent to any of the statements or actions Mr. Stone and Stop the Steal are alleged to have undertaken. Plaintiff conclusorily calls Mr. Stone a "longtime associate of Trump's," Complt. ¶ 9, but that vague allegation—even if true—is plainly not enough to establish the sort of nefarious conspiracy Plaintiff imagines.

*Second*, Plaintiff's proposed remedy threatens to undermine the political and speech rights afforded Defendants, and all Nevadans, by Nevada law and the United States Constitution. Nevadans enjoy the right to political speech, as well as the right to volunteer for their preferred political party, among other election-related rights. Yet, Plaintiff would have the Court issue a broad, vaguely worded order that threatens to restrain this protected political engagement. Given the lack of evidence of actual illegal conduct in the Complaint, it is impossible to know how broadly Plaintiff's requested relief would extend, and thus what protected political conduct would be swept up under the order, in disregard of both state law and the First Amendment.

For these and other reasons explained below, Plaintiff cannot satisfy its burden to prove a right to extraordinary emergency relief. Accordingly, the motion should be denied.

MAC:14221-010 2935265_1 11/2/2016 10:23 AM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

## II.   ARGUMENT

A preliminary injunction is "'an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing,* carries the burden of persuasion.'"  *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012).  "A plaintiff seeking a preliminary injunction must establish [1] that he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is in the public interest."  *Ctr. for Competitive Politics v. Harris*, 784 F.3d 1307, 1311–12 (9th Cir. 2015) (quoting *Winter v. NRDC,* 555 U.S. 7, 20 (2008)).  Plaintiff's motion fails at every step.

### A.   PLAINTIFF CANNOT SHOW THAT ANYONE WILL BE IRREPARABLY HARMED BY THE COURT'S REFUSAL TO AWARD A TEMPORARY RESTRAINING ORDER.

This analysis begins with the second part of this four-factor test, because the relevant facts illustrate just how frivolous this case is.  There is no evidence—none—that Plaintiff's imagined harms will come to pass in Nevada.

Plaintiff's request for emergency relief rests upon an alleged conspiracy among the NRP, the Campaign, and others to "threaten, intimidate, and thereby prevent" voters from voting in the 2016 election.  Complt. ¶ 1.  Given the serious nature of these allegations—that one of our State's two venerable political parties is actively seeking to deny Nevadans their fundamental right to vote—one would expect firm evidence supporting such allegations.  But that evidence is nowhere to be found in 35 pages of briefing.

The principal source of Plaintiff's "evidence" is a handful of stray comments cherry picked out of media reports covering hundreds of hours of campaign speeches by the Republican Presidential and Vice-Presidential candidates.  Setting aside the obvious evidentiary issues with such an offer of proof—and the fact that these speeches by and large were not given in Nevada, did not reference Nevada, and did not urge any specific conduct in Nevada—nothing in those speeches can justify an extraordinary judicial order restricting quintessential political conduct.  The speech at issue includes general references to campaign volunteers "watching" polling places, *id.* ¶¶21–24, encouragement to supporters to "be involved" in the campaign, *id.* ¶28,

MAC:14221-010 2935265_1 11/2/2016 10:23 AM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

invitations to supporters to participate in the election to ensure it is not "stolen," *id.* ¶27, and questions regarding the possibility of election fraud, *id.,* a notion that enters the political vernacular (and process on occasion) *every* election season. *See Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 191 (2008) (Stevens, J.) (explaining that states have a valid interest "in deterring and detecting voter fraud"). On its face, none of this amounts to express direction that Nevadans engage in forms of "voter suppression," or "vigilantism," Complt. ¶¶ 41–43, 56—an unfortunate, inflammatory characterization that serves only to prop up the Plaintiff's media strategy and invoke heated reactions by those on all sides of the political arena.

Plaintiff's other "evidence" is even more specious. Plaintiff relies on an anonymous hearsay quote from an "unnamed official" regarding alleged voter suppression. Complt. ¶ 1. It cites statements urging supporters to serve as "poll watchers," *id.* ¶ 30, also known as poll observers, a long-standing practice used by both parties and sanctioned by Nevada law. *See* Nev. Rev. Stat. § 293.274 ("Members of general public allowed to observe conduct of voting at polling place"); Nev. Admin. Code § 293.245. Plaintiff suggests a nefarious motive in the NRP and Campaign seeking volunteers in urban areas like Las Vegas and Philadelphia, *see* Complt. ¶¶ 27, 36, 48, yet fails to acknowledge the obvious—that these are the largest cities with the largest concentration of voters in states critical to the outcome of the Presidential election. And Plaintiff strains to impute nebulous unlawful connotations to the prospect that many voters and observers may wear red-colored clothing to the polling place, Complt. ¶ 35.

Compare this thin record to that assembled in *Daschle v. Thune*, the lone case Plaintiff cites to justify the granting of a TRO. *See* Motion at 19 (citing Temporary Restraining Order, *Daschle v. Thune*, No. 04-cv-4177, Dkt. No. 6 (D.S.D. Nov 2. 2004). There, the TRO was issued only after the plaintiff there presented express evidence—including "[o]ral testimony" and "photographs," *id.* at 1—revealing that individuals were "follow[ing] Native Americans from the polling places," "copy[ing] [their] license plates," and recording "the license plates of Native Americans driving away for the polling places." *Id.* at 2. Nothing similar—or even in the same ballpark—has been shown here.

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14221-010 2935265_1 11/2/2016 10:23 AM

Perhaps best illustrating the weakness in Plaintiff's case is its reliance on stray remarks from Twitter and other places. *See* Complt. ¶¶ 54, 61. This patchwork of comments came from non-parties who are not controlled by, and have no discernible connection to, the NRP or the Campaign. Needless to say, they have no relevance to the question whether *these defendants* will irreparably harm anyone. (Nor is there precedent for Plaintiff's requested remedy in this context. After all, if every social-media comment could serve as the basis for injunctive relief against affiliates of the speaker, our courts would be drowning in cases.)

In the end, Plaintiff's claims rest on rhetoric, not evidence. This deficiency is particularly surprising given that Plaintiff filed its motion knowing the burden it faces in this setting, as well as the extraordinary nature of the relief it seeks. It is also telling. Nevadans have been voting for over a week, more than enough time for the harms threatened in the Complaint to materialize. Yet nothing untoward has transpired, as evidenced by the dearth of evidence in the Complaint. On this record, there is no basis for awarding the extraordinary remedy Plaintiff seeks and injecting this Court into Nevada's electoral process.[1]

## B.  ENTERING A TRO WOULD SUBSTANTIALLY HARM THIRD PARTIES, THEREBY UNDERMINING THE PUBLIC INTEREST.

Plaintiff's request for emergency relief should also be denied because the issuance of a temporary restraining order would cause substantial harm to non-parties, and would be contrary to the public interest. *See Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009) ("If . . . the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences, the public interest will be relevant to whether the district court grants the preliminary injunction.").

### 1.  The Motion Seeks Impermissible, Content-Based Restrictions on Political Speech.

Because democracy depends upon the free exchange of ideas, the First Amendment forbids laws "abridging the freedom of speech." U.S. Const., Am. 1. Political speech "is at the

---

[1]     The Complaint also includes allegations against other defendants. Those parties are not associated with the NRP or Donald J. Trump for President, Inc.  Nonetheless, Plaintiff's claims against those defendants fail for many of the reasons articulated here—including a lack of factual support.

MAC:14221-010 2935265_1 11/2/2016 10:23 AM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

core of what the First Amendment is designed to protect." *Morse v. Frederick*, 551 U.S. 393, 403 (2007). The Supreme Court has thus long interpreted that Amendment as "afford[ing] the broadest protection to such political expression in order 'to assure [the] unfettered interchange of ideas for the bringing about of political and social changes desired by the people." *McIntyre v. Ohio Elections Comm'n*, 514 U.S. 334, 346 (1995) (quoting *Buckley v. Valeo*, 424 U.S. 1, 14–15 (1976) (per curiam)).

The Complaint relies on numerous statements that are unambiguously protected political speech. *See, e.g.*, Complt. ¶ 22 ("The only way we can lose, in my opinion—and I really mean this, Pennsylvania—is if cheating goes on."); *id.* ¶ 23 ("You've got to get everybody to go out and watch, and go out and vote."). As Plaintiff is well aware, candidates are perfectly within their rights to encourage their supporters to serve as poll watchers. *See, e.g.*, Join Victory Counsel, HILLARY FOR AMERICA (last visited Oct. 31, 2016), https://perma.cc/MV9U-35QP ("Volunteer to protect the vote as a poll observer this election cycle."). And supporters of opposing candidates are perfectly within their rights to debate whether an election is at risk of being "rigged" because of voter fraud. However upsetting or deplorable the Plaintiff may find these views, it cannot restrict them. "As a Nation we have chosen a different course—to protect even hurtful speech on public issues to ensure that we do not stifle public debate." *Snyder v. Phelps*, 562 U.S. 443, 461 (2011). It is hard to imagine a court order more inimical to the public interest than one aimed at chilling a candidate's or citizen's political speech.

Nonetheless, based on statements like those noted above, Plaintiff asks the Court to issue vague injunctions forbidding "harassment or intimidation of voters," defined to include, among other things, "suggestions of legal or criminal action" and "'citizen journalist' initiatives.'" Complt. Prayer for Relief (b). The trouble with these proposed injunctions—apart from their dubious legal foundation—is their potential breadth. Intimidating voters is illegal, and neither the NRP nor the Campaign remotely condones such conduct. But Plaintiff has tried to claim that all sorts of innocuous, entirely legal conduct constitutes "intimidation"—conduct such as protesting against a candidate on a sidewalk several hundred feet from a polling place; "suggest[ing]" that a co-worker believed to be voting illegally may be subject to "legal or

MAC:14221-010 2935265_1 11/2/2016 10:23 AM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    criminal action;" or even simply asking fellow citizens for whom they voted.  Complt. Prayer for

2    Relief (a).

3        Plaintiff's sweeping request for relief thus runs roughshod over the First Amendment.  As

4    an initial matter, the TRO that Plaintiff proposes is entirely lacking in specificity; it seeks, in

5    essence, an order directing Defendants and others to "obey the law."  But "[i]njunctions that

6    broadly order the enjoined party simply to obey the law and not violate the statute," *N.L.R.B.*,

7    486 F.3d at 691, are disfavored, though not *per se* forbidden, *see MDY Indus., LLC v. Blizzard*

8    *Entm't, Inc.*, CV-06-2555-PHX-DGC, 2009 WL 649719, at *1 (D. Ariz. Mar. 10, 2009)

9    ("'[B]lanket injunctions to obey the law are disfavored.'"); *F.T.C. v. EDebitPay, LLC*, 695 F.3d

10   938, 944 (9th Cir. 2012).  That is so because such injunctions "often lack the specificity required

11   by Rule 65(d)."  *S.E.C. v. Goble*, 682 F.3d 934, 950 (11th Cir. 2012); *see* Fed. R. Civ. P. 65(d)

12   (requiring that every temporary restraining order and injunction "state its terms specifically").

13   That "Rule was designed to prevent uncertainty and confusion on the part of those faced with

14   injunctive orders, and to avoid the possible founding of a contempt citation on a decree too

15   vague to be understood."  *Schmidt v. Lessard*, 414 U.S. 473, 476 (1974).  Temporary restraining

16   orders should thus "be phrased in terms of objective actions, not legal conclusions."  *Goble*, 682

17   F.3d at 950 (internal quotation marks omitted).

18       This is particularly critical in the speech context.  Injunctions "carry greater risks of

19   censorship and discriminatory application than do general ordinances."  *Madsen v. Women's*

20   *Health Ctr., Inc.*, 512 U.S. 753, 764 (1994).  Courts thus interpret the First Amendment to permit

21   speech-restricting injunctive relief "only if there is a showing that the defendant has violated, or

22   imminently will violate, some provision of statutory or common law."  *Id.* at n.3.  As explained

23   above, the supposed legal violations are based on pure speculation.  Further, even content-neutral

24   injunctions must "burden no more speech than necessary to serve a significant government

25   interest."  *Id.* at 765.  Yet Plaintiff has made no effort to show that the exceptionally broad relief

26   it seeks "burdens no more speech than necessary" to serve a significant government interest.  In

27   addition, the proposed injunctions here *are* content-based, since the Plaintiff is seeking to

28   "draw[] distinctions based on the message a speaker conveys," *Reed v. Town of Gilbert*, 135 S.

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14221-010 2935265_1 11/2/2016 10:23 AM

Ct. 2218, 2227 (2015)—it asks the Court to declare citizens free to speak "around polling places," but only if they do not convey certain messages. Because the injunction is content-based, it is subject to strict scrutiny—a standard the Plaintiff plainly cannot satisfy given that it cannot even satisfy the lesser standard that applies to content-neutral injunctions.

The "First Amendment embodies our choice as a Nation that, when it comes to [political] speech, the guiding principle is freedom—the unfettered interchange of ideas." *Arizona Free Enter. Club's Freedom Club PAC v. Bennett*, 564 U.S. 721, 750 (2011) (internal quotation marks omitted). Despite this command, Plaintiff has regrettably made it necessary to say that which should go without saying: court orders that punish and restrict political speech are contrary to the public interest, impose substantial costs on the electorate, and are appropriate (if ever) only in the most dramatic of circumstances.

### 2.  Polling Place Observation Is a Protected Right Under Nevada Law.

The vague injunction Plaintiff seeks is also infirm because it is likely to dissuade citizens from exercising their rights under Nevada law, and threatens to interfere with the State's orderly management of the election.

To the extent Plaintiff's requested injunction extends beyond merely ordering Defendants to comply with Nevada law, the injunction contemplates relief that would infringe rights the parties and indeed all Nevadans enjoy. Voting procedures are highly regulated; Nevada has codified an extensive framework of rules governing voting. Yet Plaintiff flaunts or ignores nearly all of them.

To start, many of Plaintiff's allegations focus on statements encouraging supporters to serve as "poll watchers." Complt. ¶ 23. But Nevada law expressly permits all "members of the general public to observe the conduct of voting at a polling place." Nev. Rev. Stat. § 293.274(1). There is simply nothing impermissible about Defendants encouraging or facilitating Nevada supporters' exercise of their statutorily secured prerogative to observe polling place proceedings.

Balancing the need for honest and open elections with the desire for a safe, orderly process, the State requires individuals to sign and file a statement notifying the Secretary of State of their intention to serve as an observer. *See* Nev. Admin. Code § 293.245(2). Once appointed,

Page 9 of 22

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1    an observer is entitled to remain in the polling place for the duration of voting hours and may

2    remain after voting has concluded to monitor compliance with procedures for closing the polls.

3    *Id.* § 293.245(5).  Recognizing the critical interest in keeping our political process fair and

4    transparent, the statute requires all observers to acknowledge in writing that they will abide by

5    the rules and restrictions governing polling place observation, and to wear an identification

6    badge at all times while inside the polling place. *Id.* § 293.245(2)(a), (7).

7         Measured against this statutory backdrop, Plaintiff's claim that Defendants have

8    "directed [their] supporters to engage in activity forbidden by Nevada state election law" by

9    calling for supporters to serve as poll watchers (Complt. ¶ 64) is an invitation to punish lawful,

10   political conduct.  The State has enshrined poll observing as a means for ensuring trust in our

11   election outcomes.  Plaintiff provides no evidence that Defendants have done anything more than

12   seeking to exercise this statutory right (or engage in other protected activity outside polling

13   places). *See id.* ¶ 47 (quoting Governor Pence as stating, "I would encourage everyone within

14   the sound of my voice, get involved, participate, be a poll worker on election day . . . be a part of

15   that process, and uphold the integrity of one person one vote in America.").

16        Next, Plaintiff points to statements asking those in law enforcement to serve as poll

17   watchers. *Id.* ¶ 25.  But nothing in Nevada law prohibits law enforcement personnel from acting

18   as poll observers in their personal capacities.  Certainly Plaintiff is not suggesting that those best

19   equipped to identify illegal activity should nonetheless be enjoined from serving as poll

20   observers.  Nor could Plaintiff fairly suggest that police officers be banned from polling sites

21   altogether.

22        Plaintiff also complains that supporters allegedly have been encouraged to "travel en

23   masse outside their counties of residence" to serve as poll observers.  Complt. ¶ 64.  In Nevada,

24   however, political rights do not end at the county line.  Rather, *all* "members of the general

25   public" may serve as an observer at any particular polling location they wish.  Nev. Rev. Stat. §

26   293.274.  The notion that Defendants should be faulted for not manufacturing a county-based

27   residency requirement for poll observers nowhere found in Nevada law is simply untenable.

28

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14221-010 2935265_1 11/2/2016 10:23 AM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1   Equally troubling is Plaintiff's suggestion that Defendants seek to depress voter

2   participation by invoking concerns over potential voter fraud.  *See* Complt. ¶ 69.  Regardless of

3   whether Plaintiff believes voter fraud is real or imaginary, Nevada itself has enacted rules that

4   voters must follow to ensure a fair election process.  For example, before supplying a voter with

5   a ballot, polling place officials check the signature provided by the voter at the polling place

6   against the signature on file in the registration records to verify the identity of the voter.  *See*

7   Nev. Rev. Stat. § 293.285.   In addition, "any registered voter of the precinct" may challenge the

8   eligibility of another elector.  *See* Nev. Rev. Stat. § 293.303.   Plaintiff repeatedly decries

9   purported efforts to ensure that only citizens cast votes, *see* Complt. ¶¶ 31, 34, 50, but it is, of

10  course, illegal for a non-citizen to vote.  *See* 18 U.S.C. § 611 ("It shall be unlawful for any alien

11  to vote in any election.");  Nev. Rev. Stat. § 293.485(1) (providing that only U.S. citizens are

12  eligible to register to vote).  Recognizing as much, Nevada law permits voters' eligibility to be

13  challenged "on any ground," Nev. Rev. Stat. § 293.303(1)(b), articulates the precise procedure

14  poll workers must follow to adjudicate the validity of the challenge and ensure that only duly

15  registered electors are permitted to cast ballots.  *See id.* §§ 293.303(2), 293.304.  Poll observers

16  are entitled to verify whether these laws are being followed—and to notify elections officials

17  (and if necessary, legal counsel) so that any violations of duly enacted procedural requirements

18  can be remedied.

19  Nevada law also protects the right of any person to access and view a list of all registered

20  voters in the precinct.  Such lists must be publicly posted at each polling place and must be

21  updated at various intervals throughout the day to reflect which electors have cast ballots.  *See*

22  Nev. Rev. Stat. § 293.301.  These lists are critical to political parties' and candidates' get-out-

23  the-vote efforts.  Yet the vague, far-reaching relief Plaintiff seeks threatens to infringe this right.

24  *See* Complt. Prayer for Relief (e) (requesting injunction prohibiting "individuals . . . to be present

25  at or around polling places . . . for the purpose or with the effect of intimidating voters or

26  prospective voters").

27  Finally, Plaintiff seeks to infringe on Nevadans' First Amendment right to conduct exit

28  polling.  *See id.* Prayer for Relief (b) (requesting injunction prohibiting "collaborators from

MAC:14221-010 2935265_1 11/2/2016 10:23 AM

questioning . . . voters at Nevada polling locations under the guise of purported 'exit polling' or 'citizen journalist' operations"). First and foremost, the Campaign and the NRP have no intention of conducting any exit polls—such that this issue is irrelevant as to them. But even if they did want to conduct exit polls, respectfully asking voters how they voted is a well-worn tradition in American politics that has become a staple of every election and that is, more importantly, protected by the First Amendment.

Hence, the Ninth Circuit invalidated on First Amendment grounds a statute that prohibited exit polling within 300 feet of a polling place as an impermissible content-based regulation of speech. *See Daily Herald Co. v. Munro*, 838 F.2d 380 (9th Cir. 1988). And a federal district court previously enjoined any effort to prohibit exit polling even within the 100 foot "buffer" zone at polling places. *See ABC v. Blackwell*, 479 F. Supp. 2d 719, 741, 744 (S.D. Ohio 2006). The court found that Ohio's loitering statutes "cannot be interpreted to prohibit exit polls within the 100 foot designated area around polling places without violating the First Amendment to the U.S. Constitution." *Id.* at 744. Exit polling "is a form of political speech," and "does not implicate the State's interests in preventing voter intimidation and fraud." *Id.* at 738. After all, "[b]y definition, exit polling affects only those who have already voted." *Id.*

Plaintiff cites no countervailing authority that would support a general ban on exit polling or other journalistic activities, particularly where such restrictions are placed on only one political party or campaign. That is because such conduct is protected by the First Amendment.

### 3. The Court Should Not Intervene in a Political Dispute Absent Specific Allegations of Concrete Misconduct.

One final reason why injunctive relief is contrary to the public interest bears mentioning—such action would undermine trust in the judiciary. This case is one of four coordinated attacks across the country that are clearly long-planned efforts to sow chaos in the Defendant's political efforts, while garnering maximum publicity for Plaintiff's unsubstantiated, extraordinarily inflammatory claims on the eve of the Presidential Election. The Court should not permit Plaintiff to enlist it in that political crusade where, as here, Plaintiff has offered no

MAC:14221-010 2935265_1 11/2/2016 10:23 AM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

allegations and presented no evidence of any actual misconduct by the Campaign or the NVP.

That is particularly true where, as here, Plaintiff is asking the Court to take sides on a hotly debated policy issue. Specifically, the Complaint is critical of those concerned with voter fraud and those who believe our political system is "rigged" to favor certain interests over others. In one form or another, these policy debates are long-running and legitimate ones. Defendants respectfully submit that whether those views are right or wrong is a political question that is not for the judiciary to decide. Indeed, a pervasive element of this lawsuit is the Plaintiff's attempt to use this Court as a forum for contesting the merits of public policy questions relating to voter fraud and irregularities, and to wield an injunction against these Defendants as a means of advancing their political position. Courts should be highly reluctant to silence the debate without concrete and compelling evidence that doing so is necessary. Here, no such evidence exists.

### C. PLAINTIFF HAS NOT DEMONSTRATED A STRONG LIKELIHOOD OF SUCCESS.

Plaintiff similarly has not shown that it has any chance to prevail on the merits, much less a "strong" chance.

For one thing, as noted above, the order cannot be entered consistent with the First Amendment. *Supra* II.A. But even were that not the case, Plaintiff *still* fails to state a claim.

### 1. The Activities of Roger Stone and Stop the Steal, Inc. Cannot Be Imputed to the Nevada Republican Party or the Campaign.

As an initial matter and as noted above, the Plaintiff relies heavily on alleged actions and statements by a certain Roger Stone and Stop the Steal, Inc. *See* Complt. ¶¶ 1, 9, 33-38, 41, 56, 62, 69. There simply is no basis in fact or law, however, for ascribing or imputing Mr. Stone or Stop the Steal's activities to the NRP or the Campaign. Mr. Stone and his organization are not employed by or affiliated with the other Defendants in any way. The NRP and the Campaign have no knowledge of Mr. Stone and Stop the Steal's activities, and did not direct, control, authorize, approve, or consent to any of the statements or actions Mr. Stone and Stop the Steal are alleged to have undertaken. Indeed, the Plaintiff has provided no evidence whatsoever that

MAC:14221-010 2935265_1 11/2/2016 10:23 AM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

Mr. Stone or Stop the Steal are agents of the NRP or the Campaign.  The Complaint vaguely identifies Mr. Stone as a "political operative" and a "longtime associate" of Donald Trump, *id.* ¶ 9, but never adduces any factual basis for concluding that Mr. Stone and Stop the Steal's alleged conduct was carried out at the direction or behest—or even with the passive knowledge of—the NRP or the Campaign.  To invoke the alleged actions and statements of unrelated third parties as a basis for abrogating the rights or the NRP or the Campaign under the First Amendment and Nevada law defies law and logic.

**2.**     **There Is No Evidence that the Campaign or Nevada Republican Party Participated in a Conspiracy to Intimidate or Suppress Voters**

While the Plaintiff expends much time and ink detailing alleged statements and conduct by third parties, there is simply no factual sustenance for the notion that the NRP or the Campaign have forged an agreement to intimidate or suppress Nevada voters.  To the contrary, the NRP and the Campaign have explicitly and repeatedly instructed their supporters to **never engage** in any course of conduct even remotely approximating voter suppression, and have at all times endeavored to ensure that supporters serving as poll observers punctiliously adhere to Nevada's laws.  Precisely to avoid confusion or misunderstandings of the law's demands, the NRP and the Campaign have hosted training classes for Nevada supporters who have volunteered to serve as polling place observers.  The slide deck presented at each class (attached hereto as **Exhibit 1**) unequivocally informs observers, "We do not and will not tolerate any voter intimidation or suppression.  No person should interfere with any individual's right to legally cast a ballot.  No person should interfere with or delay the legal voting process."  Exh. 1 at 4. The slide deck details the particular restrictions governing Nevada poll observers, and directs volunteers that they are strictly prohibited from "[s]peaking or interacting with any voters," "[a]ttempting to determine for which candidates a persn has voted," or in any way "[i]nterfering with the orderly conduct of the election."  *Id.* at 7.  Poll observers are also are instructed to immediately report any instances of "[i]ntimidation/coercion/harassment of voters by any person," *id.* at 17, so that campaign personnel can contact elections officials and ensure that appropriate remedial measures are taken.  These admonishments are reiterated in a separate two-

Page 14 of 22

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14221-010 2935265_1 11/2/2016 10:23 AM

page primer drafted by the Campaign and provided to every person who volunteers through the campaign to serve as a poll observer. *See* **Exhibit 2**.

"The essence of a conspiracy is a combination or agreement to violate or to disregard the law." *United Steelworkers of Am. v. Phelps Dodge Corp.*, 865 F.2d 1539, 1549 (9th Cir. 1989); *see also* 15 Am. Jur. 2d Civil Rights § 153 ("The pleadings must specifically present facts tending to show agreement and concerted action"). When, as here, a plaintiff merely delineates a constellation of independent acts by different persons acting at different times and in different places, courts will not infer the subjective unity of purpose necessary to a viable claim of civil conspiracy. *See Weinstein v. Mortgage Capital Associates, Inc.*, 2:10-CV-01551-PMP, 2011 WL 90085, at *9 (D. Nev. Jan. 11, 2011) ("Plaintiff does not state when the conspiracy began or ended, the geographic scope of the conspiracy, what persons were involved, or any other facts supporting a meeting of the minds. Plaintiff does not allege facts which suggest Defendants would not have acted as they did absent a conspiracy."). Rattling off a litany of alleged statements and actions by various putative "Trump supporters" and other sundry third parties at various times in different locales simply does not, as a matter of law, establish a conspiracy by the NRP or the Campaign to engage in voter suppression. As discussed above, the NRP and the Campaign have taken scrupulous care to educate supporters serving as poll observers on the parameters of permissible conduct and to facilitate their compliance with them. Isolated instances evidencing poll observers' misunderstanding or disregard of these instructions—if and to the extent they occur at all—do not constitute a "meeting of the minds" to violate voting rights. *See Gilbrook v. City of Westminster*, 177 F.3d 839, 856 (9th Cir. 1999) ("To prove a civil conspiracy, the plaintiff must show that the conspiring parties 'reached a unity of purpose or a common design and understanding, or a meeting of the minds in an unlawful arrangement.'").

### 3. The Plaintiff Has Not Pled a Valid Claim Under 42 U.S.C. § 1985(3).

The Plaintiff's theory of relief under 42 U.S.C. § 1985(3) is premised on a fundamental misapprehension of the law. According to the Plaintiff, a *prima facie* claim under the statute requires only four elements, namely, "(1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of equal protection of the laws, or of equal

Page 15 of 22

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

1  privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4)

2  whereby a person is either injured in his person or property or deprived of any right or privilege

3  of a citizen of the United States."  Motion at 21-22 (quoting *United Brotherhood of Carpenters*

4  *& Joiners of Am. Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 828-29 (1983)).

5  This is simply incorrect.  While a variant of this standard still is the controlling rubric in

6  cases alleging conspiracies by *government actors*, an entirely different doctrinal framework

7  governs when, as here, the defendants are private persons not acting under any color of state

8  law.[2]  A decade after *Scott* was decided, the United States Supreme Court clarified that only a

9  narrow ambit of private conspiracies are actionable under Section 1985(3).  Specifically, the

10  Court explained that "to prove a private conspiracy in violation of the first clause of § 1985(3), a

11  plaintiff must show, *inter alia*, (1) that 'some racial, or perhaps otherwise class-based,

12  invidiously discriminatory animus [lay] behind the conspirators' action,' and (2) that the

13  conspiracy 'aimed at interfering with rights' that are 'protected against private, as well as

14  official, encroachment.'"  *Bray v. Alexandria Women's Health Clinic*, 506 U.S. 263, 267–68

15  (1993).  Neither element is satisfied here.

16  _____

17  [2]  As the Plaintiff appears to tacictly acknowledge, neither the Campaign, a private nonprofit corporation, nor the NRP is a "state actor."  See *Johnson v. Knowles*, 113 F.3d 1114, 1118 (9th Cir. 1997)

18  (holding that alleged discrimination by political party officers did not constitute "state action" for purposes of civil rights claim, noting that "[u]nder the law of this circuit, county central committees of

19  political parties are private actors, not public agencies, even though they are regulated by the state," adding that "action taken by private individuals may be 'under color of state law' where there is

20  'significant' state involvement in the action.").  More generally, courts have held political parties to be "state actors" when they are exercising governmental functions pursuant to statutory grants of authority—

21  most notably, conducting primary elections.  See *Smith v. Allwright*, 321 U.S. 649, 663 (1944) ("We think that this statutory system for the selection of party nominees for inclusion on the general election ballot

22  makes the party which is required to follow these legislative directions an agency of the state in so far as it determines the participants in a primary election.  The party takes its character as a state agency from

23  the duties imposed upon it by state statutes; the duties do not become matters of private law because they are performed by a political party.").  In most other situations, however, courts have been loath to ascribe

24  state action to political parties.  See, e.g., *Vickery v. Jones*, 100 F.3d 1334, 1344 (7th Cir. 1996) ("The fact that the State Defendants acted in compliance with the 'rules and recommendations' of the [Republican]

25  Party Defendants [when making hiring decisions] does not turn the Party Defendants' conduct into state action," and adding that there was no evidence that the political party had performed any traditional

26  government functions); *Steigmann v. Democratic Party of Illinois*, 406 F. Supp. 2d 975, 980 (N.D. Ill. 2005) (political party not a state actor for purposes of Section 1983 claim alleging that political party had

27  worked in concert with state officials to fire government employee because of his political affiliations).

28

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14221-010 2935265_1 11/2/2016 10:23 AM

### a.    There Is No Evidence of "Racial Animus."

As a preliminary matter, it should be emphasized that Section 1985(3) consists, in relevant part, of two distinct provisions.  The first makes actionable any conspiracy "for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws" [the "Equal Privileges Clause"].  The second provides a cause of action for any conspiracy "to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy" [the "Support and Advocacy Clause"].    Despite the Plaintiff's efforts to conflate them, the distinction is material.  Although the Plaintiff invokes the text of only the Support and Advocacy Clause in pleading its claims, that provision generally has not been recognized as encompassing purely private conspiracies; undersigned counsel's research has located no federal appellate decision extending the Support and Advocacy Clause's to alleged conspiracies involving only private actors.  Notwithstanding the Plaintiff's attempt to import it into the Support and Advocacy Clause (*see* Motion at 22), the four-part test prescribed in *Scott* and modified in *Bray* recognizes only private conspiracies arising under the Equal Privileges Clause.

Assuming, *arguendo*, that a uniform doctrinal standard governs alleged private conspiracies under both provisions, however, the Plaintiff's Section 1985(3) is still fatally defective.    The Complaint and Motion are devoid of any articulable evidence that the Defendants' alleged statements and actions were the product of racial animus.    Indeed, the Complaint asserts that Mr. Trump's alleged comments encouraging citizens to serve as poll observers "are consistently directed at Democratic-leaning communities with large minority populations," Complt. ¶ 29, which confounds a vital distinction between a putative racial motivation and a partisan motivation.    Courts have held consistently that private conspiracies predicated on political or partisan rationales are not actionable under Section 1985(3).    *See, e.g.*, *Bretz v. Kelman*, 773 F.3d 1026, 1028 (9th Cir. 1985) (dismissing Section 1985(3) conspiracy

Page 17 of 22

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

claim, explaining that "[e]ven construing [the] complaint liberally, we cannot find an allegation of racial or class-based discrimination.  [The plaintiff], therefore, cannot state a cause of action under the first clause of § 1985(3)."); *Farber v. City of Paterson*, 440 F.3d 131, 142 (3d Cir. 2006) ("Allowing § 1985(3) to reach politically motivated conspiracies would involve the federal courts in policing the political arena in ways that the drafters of § 1985(3) could not have intended."); *Grimes v. Smith*, 776 F.2d 1359, 1366 (7th Cir. 1985) ("[W]e join the conclusion of the Fourth Circuit . . . that § 1985(3) does not reach nonracial political conspiracies.").  Crucially, the Plaintiff has adduced no statement, representation or conduct by either the NRP or the Campaign that plausibly evinces the "invidious racial animus" required under *Bray*.  Indeed, the only statements bearing a racial cast proffered by the Plaintiff were made by random individuals on social media who claim to be "Trump supporters."  *See* Complt. ¶¶ 51-54.  These individuals do not have—and are not even alleged to have—any relationship or affiliation whatsoever with either the NRP or the Campaign; their views or words cannot, as a matter of law, be imputed to these Defendants.

### b.     Plaintiff Has Not Alleged the Violation of Any Right Protected Against Private Impairment.

Plaintiff's Section 1985(3) claim is defective for a second, independent reason.  To maintain a cause of action against private actors, the Plaintiff must prove "an intent to deprive persons of a right guaranteed against private impairment."  *Bray*, 506 U.S. at 274.  Importantly, "[t]here are few such rights."  *Id.* at 278.  Federal courts have recognized two—and only two—constitutional rights amenable to enforcement against private actors, namely, (1) the Thirteenth Amendment's prohibition against slavery or involuntary servitude, and (2) the right of interstate travel.  *See id.*; *see also Jimenez v. Wellstar Health Sys.*, 596 F.3d 1304, 1312 (11th Cir. 2010) ("When the alleged § 1985(3) conspirators are private actors, the plaintiff must demonstrate that the conspiracy was aimed at rights constitutionally protected against private impairment. . . . The only rights the Supreme Court has expressly declared enforceable against private conspirators under § 1985(3) are the right to interstate travel and the right against involuntary servitude."); The right to vote—which derives from the First and Fourteenth Amendments—accordingly is

MAC:14221-010 2935265_1 11/2/2016 10:23 AM

not a cognizable predicate for Section 1985(3) claims against private actors.  *See Federer v. Gephardt*, 363 F.3d 754, 759–60 (8th Cir. 2004) (rejecting Section 1985(3) claim of political candidate who alleged his headquarters had been broken into and that he had been assaulted by political opponents, holding that "[p]assing the question of whether or not a political party is a 'class' under the statute, it is clear that the 'rights' involved here are solely First Amendment rights. As such, they are not rights that are 'protected against both private and official encroachment.'"); *Brown v. Philip Morris Inc.*, 250 F.3d 789, 805 (3d Cir. 2001) (rejecting claim that tobacco companies undertook a racially based conspiracy, reasoning that "in the context of actions brought against private conspirators, the Supreme Court has thus far recognized only two rights protected under § 1985(3): the right to be free from involuntary servitude and the right to interstate travel.  The instant case is distinguishable from the cases cited above because Black Smokers assert the deprivation of a different type of rights: those of property and contract.").[3]

More generally, this lawsuit encapsulates precisely the type of dispute federal courts have long eschewed as political warfare through judicial means.  Expressing skepticism of the notion that Section 1985(3) could encompass non-racial conspiracies, the Supreme Court cautioned that such a proposition "would go far toward making the federal courts, by virtue of § 1985(3), the monitors of campaign tactics in both state and federal elections, a role that the courts should not be quick to assume.  If [this] submission were accepted, the proscription of § 1985(3) would arguably reach the claim that a political party has interfered with the freedom of speech of another political party by encouraging the heckling of its rival's speakers and the disruption of the rival's meetings." *Scott*, 463 U.S. at 836.  Mindful that "§ 1985(3) is not to be construed as a general federal tort law," *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529, 1536 (9th Cir. 1992), courts have consistently turned a jaundiced eye toward quintessentially political disputes

---

[3]    That the constitutional right to vote is also protected by statutory enactments against certain private interferences—such as the Voting Rights Act—does not salvage Plaintiff's claim.  A Section 1985(3) plaintiff must demonstrate that the underlying right s/he seeks to vindicate is "*constitutionally* protected against private impairment." *Jimenez*, 596 F.3d at 1312 (emphasis added); *see also Brown*, 250 F.3d at 805 (noting that although the rights of property and contract posited by the plaintiffs do "entail freedom from discrimination by a private actor," they "are statutorily enacted, rather than of purely constitutional provenance, [and thus] they cannot be vindicated under § 1985(3)").

MARQUIS AURBACH COFFING

10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14221-010 2935265_1 11/2/2016 10:23 AM

between private parties cloaked in the lexicon of civil rights.  *See Grimes*, 776 F.2d at 1366 (holding that alleged private conspiracy to mislead voters by running a "sham" candidate was not actionable under Section 1985(3), reasoning that "this case presents a far greater danger that, in the words of *Scott*, § 1985(3) would provide 'a remedy for every concerted effort by one political group to nullify the influence of or do injury to a competing group by use of otherwise unlawful means'").

In sum, the Plaintiff has offered no evidence whatsoever that the NRP or the Campaign engaged in a conspiracy born of racial animus.  In addition, because the right to vote is not constitutionally protected against impairment by private actors, it cannot undergird a Section 1985(3) claim against private persons such as the NRP and the Campaign.  Accordingly, the Plaintiff's claim under the Ku Klux Klan act fails as a matter of law.

### 4.   Plaintiff Has Failed to State a Valid Claim Under the Voting Rights Act.

Plaintiff's second cause of action fares no better.  To prevail under Section 11(b) of the Voting Rights Act of 1965, a plaintiff must prove "(1) that there was an intimidation, threat or coercion, or an attempt to intimidate, threaten or coerce and (2) that the intimidation or attempt was for the purpose of interfering with the right to vote."  *Am. Fed'n of State, Cty. & Mun. Employees, Council 25 v. Land*, 583 F. Supp. 2d 840, 846 (E.D. Mich. 2008); *see Olagues v. Russoniello*, 770 F.2d 791, 804 (9th Cir. 1985) ("[T]he organizations' claims under the Voting Rights Act against these officials do not appear to have merit.  Assuming that the search of voting records intimidated bilingual voters, such intimidation would satisfy only one part of a two-pronged test for violations of [Section 11(b)]: the voters and organizations were intimidated, but the officials did not *intend* to intimidate.").  Claims under this provision are exceedingly difficult to establish.  *See United States v. Brown*, 494 F. Supp. 2d 440, 477 (S.D. Miss. 2007), *aff'd*, 561 F.3d 420 (5th Cir. 2009) (noting that the court itself "has found no case in which plaintiffs have prevailed under this section"); *Parson v. Alcorn*, 157 F. Supp. 3d 479, 498–99 (E.D. Va. 2016) (finding no likelihood of success on the merits).

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

MAC:14221-010 2935265_1 11/2/2016 10:23 AM

Unsurprisingly, Plaintiff here fails to clear even the first hurdle. Its various allegations of "intimidation" are nothing more than legitimate exercises of free speech. Wearing shirts that happen to be red—a ubiquitous color carrying no particular political or other connotation—plainly is not the kind of activity that inspired the statute. Conducting exit polling, *id.* ¶¶ 36-37, 59, is a regular, harmless feature of the election-day process, and an entirely proper exercise of First Amendment rights. And Plaintiff itself admits that poll watching is a legal, statutorily sanctioned activity in Nevada, *id.* ¶¶ 66, 82. These benign activities bear no resemblance to the conduct demonstrated in *Thune*—a case involving a concerted effort to follow a discrete class of voters (Native Americans) to record their license-plate numbers. *See Thune*, Dkt. No. 6. Moreover, even setting aside this problem, Plaintiff's claim under § 1971(b) also fails because Plaintiff offers no evidence that any of the alleged "intimidation" is animated by a "specific intent to intimidate, threaten, coerce, or attempt to do so to prevent a person from voting or attempting to vote." *Parson v. Alcorn*, 157 F. Supp. 3d 479, 498 (E.D. Va. 2016). Plaintiff's claim thus fails several times over.

In short, Plaintiff's claims lack both factual and legal support. And the relief Plaintiff requests would undoubtedly violate the First Amendment. For all these reasons, Plaintiff cannot meet its burden of showing a "'strong' likelihood of success on the merits." *Leary v. Daeschner*, 228 F.3d 729, 736 (6th Cir. 2000).

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

/ / /

MAC:14221-010 2935265_1 11/2/2016 10:23 AM

MARQUIS AURBACH COFFING
10001 Park Run Drive
Las Vegas, Nevada 89145
(702) 382-0711 FAX: (702) 382-5816

## III.   CONCLUSION

Defendants the NRP and Donald J. Trump for President, Inc. respectfully request that the Court deny the request for a temporary restraining order and injunctive relief.  But should the Court grant any of the relief Plaintiff seeks, it should enter an injunction as to *both* Plaintiff *and* Defendants.  The same rules apply to everyone and Plaintiff should not be given the unfair political advantage of being free from a judicial decree requiring that federal and state law be followed.  In short, this Court's intervention is not warranted, but should the Court intervene it should do so evenhandedly against both sides.

Dated this 2nd day of November, 2016.

MARQUIS AURBACH COFFING

By: */s/ Brian R. Hardy*
Brian R. Hardy
10001 Park Run Drive
Las Vegas, Nevada 89145

STATECRAFT PLLC
Kory Langhofer
649 North Fourth Avenue, First Floor
Phoenix, Arizona 85003
*Pro Hac Vice Application Pending*

*Counsel for the Nevada Republican Party and Donald J. Trump for President, Inc.*

MAC:14221-010 2935265_1 11/2/2016 10:23 AM

# Exhibit 1

SLIDE DECK PRESENTED AT EACH CLASS



Nevada Poll Watcher Training



We Are Not the Republican National Committee

# Poll Watcher Training

## Poll Watchers Are The First Line Of Defense

o Part of a coordinated system to quickly detect, mitigate, and document unintentional or intentional election-related disruptions that arise during the registration, voting, and counting periods.

o Program goal is to ensure a fair and open process where every person entitled to vote has the opportunity to legally cast a ballot and have that ballot counted properly.



# Poll Watcher Training

## Poll Watchers Do Not . . .

○ We do not and will not tolerate any voter intimidation or suppression.

○ No person should interfere with any individual's right to legally cast a ballot.

○ No person should interfere with or delay the legal voting process.

# Poll Watcher Training

## Rules Regarding Poll Watchers

o Poll watchers are permitted to:

- o Observe the conduct of the election.

- o View the posted roster of registered voters in the precinct.
  - o The roster will be updated at several points during Election Day to reflect who in the precinct has already voted.

- o Pose questions directly to poll workers for resolution.

# Poll Watcher Training

## Rules Regarding Poll Watchers

- Each poll watcher must sign and file a form with the Secretary of State prior to Election Day.

- Each poll watcher must wear a name tag while in the polling place.

- Poll watchers must remain within the area designated for observation when inside the polling place.

# Poll Watcher Training

**Rules Regarding Poll Watchers**

o Poll watchers are prohibited from:

- o Speaking/interacting with any voters.

- o Touching or handling ballots or other voting equipment.

- o Wearing campaign gear (*e.g.*, clothing, buttons, etc.).

- o Using cell phone or other electronic device inside the polling place.

- o Taking photographs or video inside the polling place.

- o Attempting to determine for which candidates a person has voted.

- o Asking for or writing down any personally identifying information about any voter.

- o Challenging or arguing with the decisions of polling place officials.

- o Interfering with the orderly conduct of the election.



# Poll Watcher Training

**If You See Something, Say Something**

- If you see a problem and the poll official does not resolve it quickly, call the Command Center.



# Poll Watcher Training

## Rules Regarding Voters

○ Voters are entitled to:

- ○ Receive a replacement ballot if the original ballot is spoiled.
- ○ Cast a provisional ballot if registration or identity is in question.
- ○ Bring voting aid materials (*e.g.*, sample ballot) into the booth.

○ Voters are prohibited from:

- ○ Engaging in any electioneering activity (to include wearing political buttons, pins, hats, etc.) or solicitation within 100 feet of the polling place.
- ○ Taking photographs or videos inside the polling place

# Poll Watcher Training

## Polling Place Process

o Voters generally are <u>not</u> required to present an I.D. in order to vote.

  o The only exception is that individuals who registered to vote by mail and who have not previously voted at a polling place must present some form of I.D.  The I.D. need not contain a photo (a utility bill, paystub, etc. is acceptable).

o The voter must sign the polling place roster.  The poll worker then checks the signature against the signature contained in the voter's registration record or the signature on a form of I.D. presented by the voter (*e.g.*, driver's license).

  o If the signatures do not match, the poll worker may ask the voter a series of questions to verify his or her identity.

  o Poll worker verifies that the voter is registered to vote in the precinct and marks his/her name as having voted.

# Poll Watcher Training

## Polling Place Process

- If the poll workers are unable to confirm that a person is registered to vote in the precinct, the voter may vote only by provisional ballot.

  - A voter who presents at the wrong precinct must be informed of his correct precinct and must be informed that any provisional ballot cast at the wrong precinct will not be counted.  If the voter chooses to vote in the wrong precinct, he may cast only a provisional ballot.

  - If a voter moved into the precinct before Election Day but has not yet updated his voter registration record, he must vote in his old precinct.

- Voters casting a provisional ballot must complete and sign, in front of poll workers, an affidavit. The poll worker must provide the voter with a receipt that contains a unique identification number for the provisional ballot and information on how the voter can determine whether or not the provisional ballot is counted.

  The sealed provisional ballot envelope must be placed in a ballot box to be reviewed by the county elections officials before being counted.

# Poll Watcher Training

## Voter Challenges

- Poll watchers generally are <u>not</u> permitted to challenge the qualifications of a voter.

  - A poll watcher may, however, challenge a voter if the poll watcher is a registered voter in the precinct where he is serving as an observer.

- There are two permissible reasons for challenging a voter:

  - The voter is not the person s/he claims to be.
  - The voter has already voted in this election.

- Challenged voters will be issued a ballot if they sign an affidavit affirming that they are eligible to vote. Voters challenged on the basis of their identity must also provide proof of identity.

# Poll Watcher Training

### Issues to Monitor – Hours of Operation

Polls not opening/closing on time.

- Polls must open at 7am.

- Polls close at 7pm. Voters in line by 7pm may vote.

- If a court orders polls to remain open after 7pm, voters must vote provisional ballots that are segregated from all other ballots.

# Poll Watcher Training

## Issues to Monitor – Electioneering Activity

- Campaigning/electioneering/solicitation by any person is prohibited within 100 feet of polling place.

- Wearing political attire/materials or even discussing politics is prohibited.

- The prohibition against electioneering activity applies to all voters, polling place officials and poll watchers.

# Poll Watcher Training

## Issues to Monitor – Improper Voter Assistance

- Voters with a physical disability or who do not speak English may receive assistance in completing and casting their ballot.

  - A poll worker or another person chosen by the elector may assist (but not persuade), the voter throughout the voting process.

    - But: a voter's employer or an official of a labor union to which the voter belongs may not provide assistance to a voter.

# Poll Watcher Training

## Issues to Monitor – Voter Already Cast Ballot

○ A voter who has already voted an early or absentee ballot is not entitled to vote a regular ballot on Election Day.

○ A voter who has not yet voted an absentee ballot may vote in person if they have returned the ballot to the election board in the voter's precinct.

○ A voter who received an absentee ballot but who has not yet returned it may be given a regular ballot at the polling place if the voter:

　　Provides proof of identification
　　Signs a sworn affidavit stating that he has not already voted in the election

# Poll Watcher Training

## Issues to Monitor – Miscellaneous

- Please immediately report any instances of the following:

  - Shortage of ballots.

  - Malfunctioning voter equipment.

  - Unusually long lines.

  - Intimidation/coercion/harassment of voters by any person.

# Poll Watcher Training

## Questions

- If you have questions before Election Day, please contact
- Jesse Law – **702-715-1401**

- NEVADA COMMAND CENTER HOTLINE
- **775-204-0500**

# Exhibit 2
ADMONISHMENTS

What To Look For

# Nevada Poll Watcher Guide

## Rules Regarding Poll Watchers

**We do not and will not tolerate any voter intimidation or suppression.**

**No person should interfere with any individual's right to legally cast a ballot.**

**No person should interfere with or delay the legal voting process.**

Poll watchers must fill out acknowledgment form with the County Registrar prior to Poll watching, and must wear a name tag while inside the polling place.   The form and name tag is provided at the polling location

Poll watchers are permitted to:

- o   Observe the conduct of the election.

- o   View the precinct register to see who has voted and who is registered in the precinct.

- o   Pose questions directly to the polling place officials for resolution.

Poll watchers are prohibited from:

- o   Speaking/interacting with any voters.

- o   Wearing campaign gear (*e.g.*, clothing, buttons, etc.).

- o   Touching any ballots or voting equipment.

- o   Taking photographs or videos inside the polling place.

- o   Using cell phones or electronic devices inside the polling place.

Campaigning/electioneering/solicitation by any person is prohibited within 100 feet of polling place.

All persons (including voters) are prohibited from wearing political attire within 100 feet of the polling place.

Voters generally are not required to show an I.D. at the polling place.

If the poll workers are unable to confirm that a voter is registered to vote in the precinct, the voter may only vote a provisional ballot.

- o Voter must complete and sign, in front of the poll worker, an affidavit.  The poll worker must indicate why the voter is voting a provisional ballot.

- o The sealed provisional ballot envelope must be placed in a ballot box to be reviewed by the county canvassing board before being counted.

Voters who are physically disabled or who do not speak English may receive voting assistance from either election officials or another person of voter's choosing.

- o If one person (other than a poll worker) is assisting multiple voters, contact the Command Center.

A voter who has already voted an early or mail-in ballot is not entitled to vote a normal ballot on Election Day.

A voter who has been issued an unreturned mail-in ballot may vote a normal ballot only if he (a) provides proof of I.D., and (b) signs an affidavit saying he has not already voted.

Polls close at 7:00 P.M. but voters in line by then may vote.

- o If a court orders polls to remain open after 7:00 P.M., voters must vote provisional ballots that are segregated from all other ballots.

Paid for by Donald J. Trump for President, Inc.