Bradley S. Schrager (Nevada Bar # 10217)
Don Springmeyer (Nevada Bar # 1021)
**WOLF, RIFKIN, SHAPIRO,**
**SCHULMAN & RABKIN, LLP**
3556 East Russell Road
Las Vegas, NV 89120
(702) 341-5200
Fax #: (702) 341-5300
BSchrager@wrslawyers.com

Michael J. Gottlieb
*Admitted Pro Hac Vice*
**BOIES, SCHILLER & FLEXNER LLP**
5301 Wisconsin Ave, N.W.
Washington, DC  20015
Tel: (202) 237-2727
Fax: (202) 237-6131
mgottlieb@bsfllp.com

*Attorneys for Plaintiff Nevada State Democratic Party*

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEVADA**

| | |
|---|---|
| NEVADA STATE DEMOCRATIC PARTY,<br><br>               Plaintiff,<br><br>  v.<br><br><br>NEVADA REPUBLICAN PARTY, DONALD J. TRUMP FOR PRESIDENT, INC., ROGER J. STONE, JR., and STOP THE STEAL INC.,<br><br>               Defendants. | Case No. 2:16-cv-02514-RFB-NJK<br><br>**PLAINTIFF'S REPLY MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION** |

1

**SUMMARY OF ARGUMENT**

Plaintiff Nevada State Democratic Party submits this Reply Memorandum of Law in response to Defendants Nevada Republican Party and Donald J. Trump For President, Inc.'s Response filed November 2, 2016 (Doc. No. 26).

Given the truncated briefing schedule, Plaintiff focuses this Reply to two arguments that Defendants raise in their Response: 1) that Plaintiff must allege and prove racial animus and state action in order to prevail on its Section 1985(3) claim; and 2) that the First Amendment is a bar to the relief Plaintiff seeks. In addition, Plaintiff addresses two issues raised by the Court on November 2: 1) whether this Court has power to enjoin Defendants based on a risk of anticipated future harm; and 2) what level of intent a plaintiff must prove in order to prevail on a claim under Section 11(b) of the Voting Rights Act.

**ARGUMENT**

**I.    PLAINTIFF DOES NOT HAVE TO PROVE RACIAL ANIMUS IN ORDER TO PREVAIL ON ITS CLAIMS**

Defendants have never asserted that proof of racial animus is necessary to state a claim under Section 11(b) of the Voting Rights Act.  *See* Resp. at 21-22.  Nor could they.  As described *infra* in Section V, Section 11(b) was drafted specifically to prohibit acts that have the *effect* of voter intimidation, notwithstanding whether a defendant subjectively intended this result. Nothing in the text or legislative history of Section 11(b) indicates that claimants must demonstrate that a defendant intended for its actions to intimidate voters—let alone that a defendant's conduct was driven by racial animus.

Even Defendants' limited argument that racial animus is required to state a claim for voter intimidation under the Klan Act, 42 § 1985(3), fails. *See* Resp. 16 (arguing Plaintiff must show "some racial, or otherwise class-based, invidiously discriminatory animus" motivating the

Section 1985(3) conspiracy, as well as a purpose to "interfer[e] with rights . . . protected against private interference."). Examination of the plain text of Section 1985(3) and the cases that Defendants themselves cite in their brief demonstrates the error of Defendants' position.

Defendants are correct that the Supreme Court held in *Bray v. Alexandria Women's Health Clinic* that a showing of "some racial . . . or otherwise class-based[] invidiously discriminatory animus" and an injury to a right "protected against private . . . interference" is necessary to prove a Section 1985(3) claim, but that is true where the claim arises under Section 1985(3)'s *first* clause. *See* Resp. 16 ("Specifically, the Court explained that 'to prove a private conspiracy *in violation of the first clause* of § 1985(3) . . . .'") (quoting *Bray*, 506 U.S. at 267-68); *see also Griffin v. Breckenridge*, 403 U.S. 88, 102 (1971) (interpreting Section 1985(3)'s first clause). One would not know this from reading Defendants' submission, but Section 1985(3) has *three* clauses, and Plaintiff's claim arises under Section 1985(3)'s *third* clause.

Under the plain text of Section 1985(3), the distinction between these clauses makes all the difference. Section 1985(3) makes actionable three kinds of conspiracies:

> **[Clause 1]** If two or more persons in any State or Territory conspire or go in disguise on the highway or on the premises of another, for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; **[Clause 2]** or for the purpose of preventing or hindering the constituted authorities of any State or Territory from giving or securing to all persons within such State or Territory the equal protection of the laws; **[Clause 3]** or if two or more persons conspire to prevent by force, intimidation, or threat, any citizen who is lawfully entitled to vote, from giving his support or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy; . . . the party so injured or deprived may have an action . . . .

42 U.S.C. § 1985(3). As the Supreme Court has said of the first two clauses, "The language requiring intent to deprive of equal protection, or equal privileges and immunities, means that there must be some racial, or perhaps otherwise class-based, invidiously discriminatory animus

3

behind the conspirators' action." *Griffin*, 403 U.S. at 102. But as is clear from the statutory text, Section 1985(3)'s third clause works differently. Instead of referring to the denial of "equal protection," the third clause refers to private conspiracies "to prevent by force, intimidation, or threat" a lawful voter from exercising his or her right to vote. The statutory text therefore indicates that as long as a conspiracy exists whose goal is to "prevent by . . . intimidation" any lawful voter from voting, an action lies under Section 1985(3)'s third clause. In other words, unlike the first two clauses of Section 1985(3), the third—"support and advocacy"—clause does not require a showing of racial animus.

The Supreme Court has read Section 1985(3) in exactly this way. In *Kush v. Rutledge*, 460 U.S. 719, 726 (1983), the Court explained that § 1985 as a whole "outlaw[s] five broad classes of conspiratorial activity." *Id.* at 724. They are:

> conspiracies that interfere with (a) the performance of official duties by federal officers; (b) the administration of justice in federal courts; (c) the administration of justice in state courts; (d) the private enjoyment of "equal protection of the laws" and "equal privileges and immunities under the laws"; and (e) the right to support candidates in federal elections.

*Id.* The *Griffin* Court had held that the fourth type of conspiracy—which corresponds to the first two claims recognized by § 1985(3)—required a showing of "invidiously discriminatory animus." These types of conspiracies, which focus on the deprivation of rights guaranteed against the states, must "aim at a deprivation of the equal enjoyment of rights secured by the law to all." *Griffin*, 403 U.S. at 102. Defendants argue—without apparently noticing that Plaintiff has not brought a claim under either of the first two clauses of Section 1985(3)—that this requirement applies to Plaintiff's claim. But as the *Kush* Court explained, Section 1985's five "broad categories" are not created equal:

> Three of the five broad categories, the first two and the fifth, relate to institutions and processes of the federal government-federal officers, § 1985(1); federal

4

> judicial proceedings, the first portion of § 1985(2); and federal elections, the second part of § 1985(3). The statutory provisions dealing with these categories of conspiratorial activity contain no language requiring that the conspirators act with intent to deprive their victims of the equal protection of the laws. Nor was such language found in the corresponding portions of § 2 of the 1871 Act.

*Id.* at 724-25. The *Kush* Court, construing the elements of a conspiracy under the first part of Section 1985(2)—which the Court directly analogized to Section 1985(3)'s third clause—pointed out that *Griffin* had found a "class-based animus" requirement while explicitly confining its analysis to the first type of § 1985(3) conspiracy. *Id.* at 726.  Section 1985(2)'s first part, like Section 1985(3)'s third clause, required a different analysis. There was no basis in precedent or legislative history, the Court explained, for finding a "class-based animus" requirement in the "three of the five broad categories" of conspiracies that "relate to institutions and processes of the federal government," including Section 1985(3).  *Id.*  More importantly, "the statutory language that provides the textual basis for the 'class-based, invidiously discriminatory animus' requirement simply does not appear in the portion of the statute" that the Court was reviewing. *Id.* That is precisely the case here.  *Kush* compels the conclusion that Section 1985(3)'s third clause makes actionable any conspiracy to interfere with a lawful voter's right to vote in a federal election.

Defendants cite several cases that purportedly support an opposite conclusion.  They do not. With a single exception, every one of Defendants' authorities is actually a case interpreting Section 1985(3)'s first two clauses. Resp. 15-20. That should be no surprise, since none of those cases concern *federal* elections (and indeed, several do not concern elections at all). In the sole exception, *Federer v. Gephardt*, 363 F.3d 754 (8th Cir. 2004), the Eighth Circuit held that while a plaintiff did not need to show racial animus to prevail on a claim under Section 1985(3)'s third clause, a plaintiff did need to prove an injury to a right protected against private interference. In

5

that case, the plaintiff had alleged that a campaign headquarters break-in had interfered with his right to support his own candidacy for congressional office. The Eighth Circuit concluded that only the First Amendment protected that right, and to bring private interference with it under Section 1985(3)'s coverage would be tantamount to eliminating the First Amendment's state action requirement.  The Eighth Circuit has similarly held that Section 1985(3)'s third clause does not protect the right to fundraise for a candidate for federal office. *Gill v. Farm Bureau Life Ins. Co. of Missouri*, 906 F.2d 1265 (8th Cir. 1990). In that case, however, the court recognized that Section 1985(3)'s third clause *would* protect a plaintiff from private interference with at least one right in federal elections: the right to vote. *Id.* at 1270.[1]

Indeed, although Defendants argue that applying Section 1985(3) as written would turn it into a "general federal tort law," and make federal courts the "monitors of . . . *both state and federal elections*," Resp. at 19 (emphasis added), they do so while relying on case law interpreting Section 1985(3)'s first two clauses as applied to non-federal elections, or outside the election context entirely. *See United Bhd. Of Carpenters & Joiners of Am., Local 610 v. Scott*, 463 U.S. 825 (1983) (labor protest); *Sever v. Alaska Pulp Corp.*, 978 F.2d 1529 (9th Cir. 1992) (employment and contract dispute); *Grimes v. Smith*, 776 F.2d 1359 (7th Cir. 1985) (city court election).  In such cases, it is true enough (although irrelevant here) that federal courts cannot invoke Section 1985(3)'s ban on interference with the equal protection of the laws unless there is a lawful basis for enforcement of a *federal* right in *state and private* contexts.  Those concerns are inapplicable to Section 1985(3)'s third clause—which, in any event, could never apply to state and local elections, or "general . . . tort claims"—because, as the Supreme Court made clear

---

[1] Plaintiff has brought this action to protect the rights of individual voters to vote in the 2016 federal election free of intimidation or interference. Defendants have never disputed that Plaintiff has standing to litigate on those voters' behalf to vindicate those rights.

6

in *Kush v. Rutledge*, Section 1985(3)'s third clause enforces a federal right to vote in *federal* elections. 460 U.S. at 724-26.

The law is clear. No showing of racial animus is necessary for Plaintiff to prevail on a claim under the third clause of Section 1985(3). The text of Section 1985(3) could not be clearer that if a plaintiff is injured in any way by an act in furtherance of a conspiracy to interfere with his or her right to vote in a federal election, that plaintiff can recover against the conspiracy—meaning, against each and every one of the conspirators.

**II.    THE FIRST AMENDMENT IS NOT A BAR TO INJUNCTIVE RELIEF AGAINST UNLAWFUL POLL WATCHING ACTIVITIES**

Defendants' First Amendment arguments are meritless, as Plaintiff's sought relief is narrowly tailored toward Defendants' specific calls and support for supporters to violate federal and state law.  In *United States v. Tan Duc Nguyen*, the Ninth Circuit rejected a similar First Amendment argument brought by a Republican candidate for Congress who mailed a letter to 14,000 voters with Hispanic surnames (many registered as Democrats) explaining that voting was a crime if the recipients were "in this country illegally."  673 F.3d 1259, 1261 (9th Cir. 2012).  The Ninth Circuit agreed that intimidation under California law "can be achieved through manipulation and suggestion," and "subtle, rather than forcefully coercive means."  *Id.* at 1265. The letter could reasonably "constitut[e] a tactic of coercion intended to induce its recipients to refrain from voting."  *Id.* at 1266.  In response, Nguyen argued that "his letter was political speech," but the Ninth Circuit recognized that intimidation of voters "may be regulated by the state without running afoul of the First Amendment. . . .  If the targeted distribution of the letter by Nguyen's campaign falls within this prohibition, then it is speech that is proscribable under the First Amendment."   *Id*; *compare* Def. Resp. 7-8 (suggesting such conduct would be immunized).

Defendants' citations to two inapposite cases do not insulate them from liability for intimidating voters. In *Daily Herald Co. v. Munro*, the Ninth Circuit upheld exit polling against a 300-foot bar where the exit pollers were media organizations and the evidence showed that "the media plaintiffs conducted their polling in a 'systematic and statistically reliable manner.'" 838 F.2d 380, 383 (9th Cir. 1988); *see id.* at 389 (Reinhardt, J., concurring) (writing "separately . . . to emphasize" the fact that the statute at issue restricted the "media"). By contrast, Stone and Stop the Steal do not run a legitimate exit-polling operation, as Plaintiff's expert Mellman establishes. *See* Expert Report and Declaration of Mark Mellman. Defendants Stone and Stop the Steal have not even taken minimal steps to ensure the reliability or accuracy of their purported exit poll. *Id.* at 1. Most important, there was *no allegation* in *Munro* that the exit-polling operations were a pretext for voter intimidation. Indeed, *Munro* recognized the compelling interest in "maintaining peace, order, and decorum at the polls and preserving the integrity of their electoral process," which Defendants threaten by virtue of their planned intimidation tactics. *Id.* at 385. *Munro* struck down a statute that "prohibit[ed] all exit polling, *including nondisruptive exit polling*"—here, Defendants intend to use their exit-polling operation as a smoke screen for a scheme of intimidation and harassment of lawful voters to suppress turnout. *Id. ABC v. Blackwell* is inapposite for similar reasons: the suit was brought by media organizations engaged in a bona fide, scientifically valid exit-polling operation, and there was no allegation of an attempt to intimidate voters or any such effect. 479 F. Supp. 2d 719, 721-22, 739 (S.D. Oh. 2006).

Contrary to Defendants, the constitutional value that is truly at stake in this litigation is the "right to vote freely for the candidate of one's choice"—"the essence of a democratic society." *Reynolds v. Sims*, 377 U.S. 533, 555 (1964). The Supreme Court has rejected the

argument Defendants raise here—that there is "an absolute right to speak to potential voters at any location." *Piper v. Swan*, 319 F. Supp. 908, 910 (E.D. Tenn. 1970) (cited in *Burson v. Freeman*, 504 U.S. 191 (1992)). The Supreme Court, rather, has recognized the "compelling interest in protecting the right of [U.S.] citizens to vote freely for the candidates of their choice." *Burson*, 504 U.S. at 198. *See also Republican Party of Pennsylvania v. Cortés*, No. 16-cv-05524-GJP, at 13, 26 (E.D. Pa. Nov. 3, 2016) (Pennsylvania's restrictions on poll-watching activity "places no burden on . . . constitutional rights;" assertions that "statements made in one's capacity as a poll watcher constitute core political speech is meritless"). As Plaintiff explained in its opening brief, Defendants are unfolding a deliberate and dangerous scheme to deprive voters, including in Nevada, of their right to exercise the franchise free from intimidation and coercion. Pursuant to clearly established principles of federal law, they must not be allowed to continue with their flagrantly anti-democratic conduct.

### III. THIS COURT SHOULD ISSUE INJUNCTIVE RELIEF TO FORESTALL LIKELY FUTURE HARM TO NEVADA CITIZENS' VOTING RIGHTS

In determining whether to issue a preliminary injunction, courts do not require *actual* demonstrated violations of law. Instead, given the forward-looking nature of injunctive relief, courts "must evaluate the likelihood of *future* . . . violations, and thereby determine whether an injunction is needed." *United States v. Schiff*, 379 F.3d 621, 625 (9th Cir. 2004); *see Nat'l Wildlife Fed'n v. Burlington Northern R.R., Inc.*, 23 F.3d 1508, 1511 (9th Cir.1994) (to be entitled to an injunction under the Endangered Species Act, movant must "make a showing that a violation of the ESA is at least likely in the future."). Accordingly, where the statute in question does not expressly require evidence of past violations for the issuance of preliminary injunctive relief, courts are permitted to issue such relief based on the likelihood that "is about to violate" the statute. *F.T.C. v. Evans Prod. Co.*, 775 F.2d 1084, 1087 (9th Cir. 1985) ("the statute does not

9

mention past violations"); *see Commodity Futures Trading Comm'n. v. Frankwell Bullion Ltd.*, No. C-94-2166 DLJ, 1994 WL 449071, at *1 (N.D. Cal. Aug. 12, 1994) (where "an injunction [is] authorized by statute, the government need only show that the statutory conditions are met, *i.e.* that it is likely to succeed on the merits, and that there is a reasonable likelihood of future violations.").

The credible threat that Defendants will engage in future violations of law is sufficient to establish irreparable injury warranting preliminary injunctive relief. *See Park Vill. Apartment Tenants Ass'n v. Mortimer Howard Trust*, 636 F.3d 1150, 1159 (9th Cir. 2011) ("Defendants' threat to evict Plaintiffs created a likelihood of irreparable harm in the absence of an injunction barring future evictions," even though no evictions had actually been commenced or effectuated). In *Tucson Women's Ctr. v. Arizona Med. Bd.*, 666 F. Supp. 2d 1091 (D. Ariz. 2009), for example, the Court granted a preliminary injunction enjoining a restriction on abortion based on evidence that the challenged restriction "would have made abortions impossible" for some women—*had* they sought an abortion when that restriction was in effect. *Id.* at 1100. The Court did not require proof that the regulation in question had actually inhibited constitutionally protected conduct before issuing preliminary relief. *See id.* ("The Court's task in ruling on Plaintiffs' preliminary injunction motion is to determine a future likelihood" of harm"). Proof of previous violations of law is neither necessary nor sufficient to entitle a party to injunctive relief. Instead, a party must "demonstrate the prospect of future harm," by whatever competent evidence available in the record. *Gonzalez-Droz v. Gonzalez-Colon*, 573 F.3d 75, 79 (1st Cir. 2009); *see United States v. An Article of Drug,* 661 F.2d 742, 746-47 (9th Cir.1981) (approving preliminary injunction which prohibited arguably legal conduct in order to "bar future violations that [were] likely to occur."); *United States v. Oregon State Medical Soc*., 343 U.S. 326, 333

(U.S. 1952) ("The sole function of an action for injunction is to forestall future violations."). *Cf. Bradley v. United States*, 322 F. Supp. 369, 373–74 (D. Alaska 1971) ("Past violations are merely a factor to be weighed by the Commission in determining present and future fitness.").

IV.     **RECKLESSNESS IS A SUFFICIENT BASIS FOR LIABILITY UNDER 11(b)**

Recklessness is a sufficient state of mind to establish liability under Section 11(b) of the Voting Rights Act. When Congress passed Section 11(b), it intended to depart from the then-existing intimidation provision in the Civil Rights Act of 1957, Section 131(b), which required a showing that the defendant had "the purpose of interfering with the right . . . to vote." 52 U.S.C. § 10101(b). Section 11(b), by contrast, has no such explicit language requiring a particular *mens rea*. 52 U.S.C. § 10307(b); *see* H.R. Rep. No. 89-439, at 30 (1965) (unlike Section 131(b), "no subjective purpose or intent need be shown"), *as reprinted in* 1965 U.S.C.C.A.N. 2462. As Attorney General Nicholas Katzenbach testified during hearings on the Voting Rights Act: "Perhaps the most serious inadequacy results from the practice of district courts to require the Government to carry a very onerous burden of proof of 'purpose.' Since many types of intimidation . . . involve subtle forms of pressure, this treatment of the purpose requirement has rendered the statute largely ineffective." Voting Rights: Hearings on H.R. 6400 Before the Subcomm. No. 5 of the H. Comm. On the Judiciary, 89th Cong. 9 (1965), *quoted in* Gilda R. Daniels, *Voter Deception*, 43 Ind. L. Rev. 343, 361 n.98 (2010). As a result, Katzenbach concluded, "defendants [sh]ould be deemed to intend the natural consequences of their acts." Voting Rights, Part 1: Hearings on S. 1564 Before the S. Comm on the Judiciary, 89th Cong. 16 (1965).[2]

---

[2] Defendants cite *Olagues v. Russoniello*, 770 F.2d 791 (9th Cir. 1985), but *Olagues* does not settle the question. *Olagues* failed to distinguish between Section 11(b) and Section 131(b), which has an explicit intent requirement. Moreover, to support its conclusion as to the "test" for

11

In *Daschle v. Thune*, for example, a federal district court entered a TRO prohibiting a Republican state party, a Republican Senate candidate, and their supporters from engaging in conduct that could reasonably intimidate voters—namely, following them in and around polling places, talking loudly about voter fraud, and writing down their vehicle's license plate numbers. *See* Schrager Decl. at Ex. 38 (TRO at 1-2, Civ. 04-4177 (D.S.D., Nov. 2, 2004)). The Court explicitly held that proof of intent to engage in voter intimidation is unnecessary to succeed on a Section 11(b) claim: "Whether the intimidation was intended or simply the result of excessive zeal is not the issue, as the result was the intimidation of prospective Native American voters." *Id.*

Of course, even if Section 11(b) did have a more stringent intent requirement, Plaintiff has established the deliberate course of conduct Defendants have taken to encourage and exhort supporters to take the law into their own hands. The Nevada Republican Party and Defendants Stone, Stop the Steal, and the Trump Campaign have consistently and continuously warned that the 2016 presidential election is going to be "stolen" unless individual citizens descend en masse onto majority-minority polling locations—and they have each taken substantial steps to encourage, organize, and support individuals who plan to harass lawful Nevada voters. Even if Defendants invoke state law as a shield for their plan, "acts otherwise lawful may become unlawful and be enjoined." *United States by Katzenbach v. Original Knights of the Ku Klux Klan*, 250 F. Supp. 330, 348 (E.D. La. 1965).

---

Section 131(b) and Section 11(b), *Olagues* cited a case dealing <u>only with Section 131(b)</u>. 770 F.2d at 804 (citing *United States v. McLeod*, 385 F.2d 734, 740-41 (5th Cir. 1967)). It is clear that the Ninth Circuit did not have occasion to consider the textual differences between the two statutes or the legislative history of Section 11(b). In the absence of any indication that the Ninth Circuit considered and rejected an important set of arguments on the correct statutory meaning, the Court would be remiss to treat the matter as conclusively settled in the circuit.

12

## V. THIS CASE DOES NOT PRESENT A 'POLITICAL QUESTION' FROM WHICH COURTS SHOULD ABSTAIN

Somewhat incredibly, Defendants urge the Court to break faith with its judicial duty by suggesting that a suit to vindicate federal laws that plainly bar voter intimidation amounts to a "political question that is not for the judiciary to decide." Resp. at 13. In other words, Defendants argue that Plaintiff—and the thousands of Nevada voters threatened by tactics designed to intimidate, harass, and coerce—are without any recourse. It is not surprising that Defendants fail to cite a single authority for that untenable proposition. Of course, this case fulfills none of the criteria for a political question. *See Baker v. Carr*, 369 U.S. 186 (1962). Far from "undermin[ing] trust in the judiciary," Resp. at 12, the regular operation of the courts in the midst of Defendants' attempts to sully the democratic process is needed to maintain public trust in our institutions.

## VI. CONCLUSION

The Court should grant Plaintiff's motion for a temporary restraining order and/or preliminary injunction.

Respectfully submitted,

November 3, 2016                                    /s/   Michael J. Gottlieb

Michael J. Gottlieb
**BOIES, SCHILLER & FLEXNER LLP**
5301 Wisconsin Ave, N.W.
Washington, DC  20015
Tel: (202) 237-2727
Fax: (202) 237-6131
mgottlieb@bsfllp.com

Bradley S. Schrager (Nevada Bar # 10217)
Don Springmeyer (Nevada Bar # 1021)
**WOLF, RIFKIN, SHAPIRO,
SCHULMAN & RABKIN, LLP**

3556 East Russell Road
Las Vegas, NV 89120
(702) 341-5200
Fax #: (702) 341-5300
BSchrager@wrslawyers.com

Marc E. Elias
Bruce V. Spiva
***Admitted Pro Hac Vice***
Perkins Coie LLP
700 13th Street, Suite 600
Washington, DC 20005
Tel: (202) 434-1609
Fax: (202) 654-9126
melias@perkinscoie.com

Dawn L. Smalls
***Admitted Pro Hac Vice***
BOIES, SCHILLER & FLEXNER LLP
575 Lexington Avenue
New York, NY 10022
Tel: (202) 754-4216
Fax: (212) 446-2350
dsmalls@bsfllp.com

*Attorneys for Plaintiff*