———2:16-cv-2415-RFB-NJK———

1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF NEVADA

3

4   NEVADA STATE DEMOCRATIC        )
    PARTY,                         )   Case No. 2:16-cv-2415-RFB-NJK
5                                  )
                    Plaintiff,     )   Las Vegas, Nevada
6                                  )   Wednesday, November 2, 2016
           vs.                     )   3:30 p.m.
7                                  )
    NEVADA REPUBLICAN PARTY,       )   EMERGENCY MOTION FOR TEMPORARY
8   DONALD J. TRUMP FOR            )   RESTRAINING ORDER
    PRESIDENT, INC., ROGER J.      )
9   STONE, JR., and STOP THE       )
    STEAL, INC.,                   )
10                                 )
                    Defendants.    )
11  _____

12

13

14

                 REPORTER'S TRANSCRIPT OF PROCEEDINGS
15
                THE HONORABLE RICHARD F. BOULWARE, II,
16                  UNITED STATES DISTRICT JUDGE

17

18

19  APPEARANCES:           See the next page

20

21  COURT REPORTER:        Patricia L. Ganci, RMR, CRR
                           United States District Court
22                         333 Las Vegas Boulevard South, Room 1334
                           Las Vegas, Nevada  89101
23
    Proceedings reported by machine shorthand, transcript produced
24  by computer-aided transcription.

25

```
————————————— 2:16-cv-2415-RFB-NJK —————————————
```

1  APPEARANCES:

2  For the Plaintiff:
           **DON SPRINGMEYER, ESQ.**
3          **BRADLEY SCOTT SCHRAGER, ESQ.**
           WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN
4          3556 E. Russell Road, Second Floor
           Las Vegas, Nevada 89120
5          (702)341-5200

6          **MICHAEL JULIAN GOTTLIEB, ESQ.**
           BOIES, SCHILLER & FLEXNER, LLP
7          5301 Wisconsin Ave., Suite 800
           Washington, DC 20015
8          (202)237-9617

9          **BRUCE V. SPIVA, ESQ.**
           PERKINS COIE LLP
10         700 13th Street, Suite 600
           Washington, DC 20005
11         (202)654-6203

12
    For Defendants Nevada Republican Party and Donald J. Trump for
13  President, Inc.:
           **BRIAN R. HARDY, ESQ.**
14         MARQUIS AURBACH COFFING
           10001 Park Run Drive
15         Las Vegas, Nevada 89145
           (702)382-0711
16
           **KORY LANGHOFER, ESQ.**
17         STATECRAFT PLLC
           649 North Fourth Avenue, Suite B
18         Phoenix, Arizona 85003
           (602)382-4078
19

20

21

22

23

24

25

                 PATRICIA L. GANCI, RMR, CRR    (702) 385-0670
```

──────────── 2:16-cv-2415-RFB-NJK ────────────

1        LAS VEGAS, NEVADA; WEDNESDAY, NOVEMBER 2, 2016; 3:30 P.M.

2                              --oOo--

3                     P R O C E E D I N G S

4           THE COURT:  Please be seated.

5           COURTROOM ADMINISTRATOR:  Now calling Nevada State

6  Democratic Party versus Nevada Republican Party, et al., Case

7  No. 2:16-cv-02514-RFB-NJK.  This is the time for the hearing

8  regarding Docket 6, emergency motion for Temporary Restraining

9  Order.

10          Starting with counsel for defendants, please note your

11  appearance for the record.

12          THE COURT:  For the defendants?

13          MR. SPIVA:  With the plaintiffs, Your Honor.

14          THE COURT:  Well, okay, let's start with the

15  plaintiffs.  It doesn't matter.

16          MR. SPIVA:  Your Honor, Bruce Spiva from Perkins Coie

17  for the plaintiffs.

18          MR. GOTTLIEB:  Mike Gottlieb with Boies Schiller &

19  Flexner on behalf of plaintiffs.

20          MR. SPRINGMEYER:  Good afternoon, Your Honor.  Don

21  Springmeyer, Wolf Rifkin, for plaintiff.

22          MR. SCHRAGER:  Your Honor, Bradley Schrager, Wolf

23  Rifkin.

24          THE COURT:  Good afternoon.

25          MR. HARDY:  Your Honor, Brian Hardy with the law firm

———————— 2:16-cv-2415-RFB-NJK ————————

 1   of Marquis Aurbach Coffing on behalf of the Defendants, Nevada

 2   Republican Party and Donald J. Trump for President, Inc.  Also

 3   with me today is Kory Langhofer who has applied for pro hac

 4   vice.

 5        THE COURT:  Good afternoon.  So we are here on a motion

 6   that was filed, and there has been actually a response filed.

 7   And let me first hear from the plaintiffs about their desire to

 8   reply in writing to the response.  Obviously there was a

 9   declaration and other information that was filed.  So I'll hear

10   from you about responding to that.

11        We have -- I set a hearing for tomorrow because I

12   anticipated there would be these issues where we would have to

13   respond to information that would be provided.  So first let me

14   hear from you about what questions you may have or what you want

15   to do in terms of proceeding on that point.

16        MR. SPIVA:  Thank you, Your Honor.  We would like a

17   chance to reply, and we can do that.  I think Your Honor may

18   have set a deadline for a reply, if I'm not mistaken.  I may be

19   mistaken, but we can do that as -- you know, we can do that

20   tomorrow.

21        THE COURT:  Well, we couldn't do it -- we'd have to do

22   it by tomorrow morning I think would be the latest that I'd

23   allow you to reply.  And that reply may be focussed by our

24   conversation today, but I first want to confirm that you want a

25   reply and I'd want you to reply by tomorrow morning so that we

──────── 2:16-cv-2415-RFB-NJK ────────

1   could solve this matter as efficiently and quickly as possible.

2           MR. SPIVA:  That should be no problem, Your Honor.

3           THE COURT:  Okay.  And so while we're having this

4   conversation, why don't -- who's going to speak for the

5   plaintiffs?  Is it -- I'm sorry.  Your name is again?

6           MR. SPIVA:  Bruce Spiva.  I'm the lead counsel for the

7   plaintiffs, and I'll be speaking.

8           THE COURT:  Is it Spiva?

9           MR. SPIVA:  Spiva, yes.

10          THE COURT:  Mr. Spiva, why don't you come up to the

11  podium.

12          There are a few sort of questions I have for you having

13  gone through your motions.  First is the question of there are

14  appears to me to be unserved defendants at this point in time.

15  Is that correct?

16          MR. SPIVA:  Well, I just got the word, Your Honor, that

17  Stop the Steal and Mr. Stone were just served.  We had made

18  multiple attempts to serve both of them and hadn't been

19  successful, but literally after we got into the courtroom today

20  we learned that I believe both of them were served.

21          MR. GOTTLIEB:  We're confirming that.  We know that

22  Defendant Stop the Steal has been served as of this moment, but

23  we don't know about Defendant Stone.

24          THE COURT:  Okay.  And, of course, that's important

25  because then we would need to make sure that they had an

—— 2:16-cv-2415-RFB-NJK ——

1  opportunity to be able to respond.  And were they served with a

2  copy of the complaint and the TRO and this Court's previous

3  order or what were they served with?

4       MR. SPIVA:  We attempted to serve both the complaint

5  and the TRO, all of the papers we had filed multiple times.  I

6  think we tried to do it both through e-mail and process server.

7  Stop the Steal has kind of a sham mailbox set in California.

8  It's not really a real location.  We attempted to serve that

9  location.  And my colleague, Mr. Gottlieb, could probably speak

10 in more detail, but I know that we did make several efforts to

11 give them actual notice and formal notice, of course.

12      THE COURT:  Okay.  Well, what I'd want is I'd want to

13 have the proof of service filed by close of business today if

14 that's at all possible.  That way the Court could then enter an

15 order as it relates to those individuals or entities, and then

16 there would be an opportunity potentially to serve them with

17 what would be a subsequent order that would be issued by the

18 Court requiring them to respond by the hearing tomorrow as it

19 relates to the motion in this case.

20      So, I'm sorry, Spiva?  Am I saying that right?

21      MR. SPIVA:  Spiva.  Yes, sir.

22      THE COURT:  So, Mr. Spiva, let's talk about your motion

23 in relation to the Temporary Restraining Order.  There are a

24 couple of issues that I wanted just to clarify just in terms of

25 what evidence you may or may not have.  Do you have -- and it's

—————— 2:16-cv-2415-RFB-NJK ——————

1    not clear to me.  But do you have any information or evidence,

2    anything in the record, that suggests that the Nevada Republican

3    Party itself is specifically involved with poll watching or

4    sending poll observers in the context of your motion?

5              MR. SPIVA:  Well, the motion actually has evidence

6    about the coordination, I think, and also about --

7              THE COURT:  Well, what is the evidence of coordination?

8    Other than statements about the fact that people may coordinate,

9    what specific evidence is there that there is, in fact, actual

10   coordination?  Other than from what I can see from the motion

11   statements of people saying, We're working closely with the

12   Nevada Republican Party, what that means exactly I'm not sure,

13   but you're asking for very specific and fairly far-reaching

14   injunctive relief against specific entities.

15             And so first let me ask you, what evidence do you have

16   that the Nevada Republican Party as an entity and organization

17   is actually sending individuals to the polls in connection with

18   the activities you allege?

19             MR. SPIVA:  Right.  Well, I guess there may be three

20   things, Your Honor.

21             THE COURT:  Okay.

22             MR. SPIVA:  One is that the evidence of coordination,

23   which I do think is some evidence of that.  I understand it may

24   not be sufficient.

25             THE COURT:  I'm sorry, Mr. Spiva.  When you say

——————2:16-cv-2415-RFB-NJK——————

1  "evidence of coordination," you need to tell me specifically

2  what you mean by that because there are various portions of

3  things that have been filed.  I want to make sure that I'm not

4  missing anything.

5          MR. SPIVA:  Sure.

6          THE COURT:  So when you say "evidence of coordination,"

7  are you talking about the statements that are made about the

8  fact that they're coordinating?

9          MR. SPIVA:  Yes.  Yes, Your Honor.

10          THE COURT:  Okay.  Other than the statements about the

11  fact that the campaign is coordinating within the Nevada

12  Republican Party, what evidence of coordination is there?

13          MR. SPIVA:  Second thing that I would point to, Your

14  Honor, is I believe it's in Exhibits 35 and 39 of our -- of my

15  cocounsel, Mr. Schrager's declaration of a -- the Nevada

16  Republican Party delegating certain ballot security initiatives

17  to Nevada Grassroots and actually paying over $750,000 to an

18  employee who publicized that ballot security initiative who

19  works for a company called Stampede Consulting.  And we produced

20  evidence that they had paid significant funds to that

21  organization.  And then, thirdly, Your Honor --

22          THE COURT:  Okay.  Stop.  Okay.  So they paid

23  significant -- but you're not talking about -- are you talking

24  about coordination between the Nevada Republican Party and the

25  Trump Campaign or are you talking about the Nevada Republican

——— 2:16-cv-2415-RFB-NJK ———

1   Party and Nevada Grassroots?

2        MR. SPIVA:  Yeah, I'm actually talking about the

3   actions of the Nevada Republican Party itself, Your Honor.

4        THE COURT:  Right.  But you pointed to the Nevada

5   Republican Party as relates to Nevada Grassroots and the

6   connection between those two organizations.

7        MR. SPIVA:  Right, and the connection --

8        THE COURT:  Is there a further connection between those

9   two and the Trump Campaign that you can point to in this record?

10        MR. SPIVA:  Well, not -- no, no.  That -- I don't

11   think -- that's not certainly what I was trying to suggest.

12        THE COURT:  I'm not saying you were, but again partly

13   I'm trying to identify where this sort of the specific areas

14   where you're saying that each entity has engaged in certain

15   types of activity and then to be able to go back and say, Well,

16   what is the evidence of the activity that may or may not

17   manifest voter intimidation.  So right now you're saying the

18   Nevada Republican Party is connected and has paid organizations

19   to engage in poll watching, and that's your evidence of their

20   activity.

21        MR. SPIVA:  Right, of the party itself.  The third

22   piece of evidence, Your Honor, I believe came from one of the

23   exhibits to defendant's papers today, which was a power point

24   which provides a training on poll watching and challenging

25   activity.  And that actually provides additional evidence --

─────── 2:16-cv-2415-RFB-NJK ───────

1          THE COURT:  Evidence of the Nevada Republican Party or

2  evidence -- because, again, I'm looking at -- the declaration

3  was actually filed after the exhibit was filed --

4          MR. SPIVA:  Right.

5          THE COURT:  -- of Mr. Law.  So there was a little bit

6  of a time lag.  But if I actually read his declaration, I

7  actually thought that he said the exact opposite, which is that

8  this is just for the campaign.  It's actually not for Nevada

9  Republican Party.  Did I misunderstand that?

10          MR. SPIVA:  Well, Exhibit 1 of --

11          THE COURT:  Okay.  But let me stop you.  Let's talk

12  about the affidavit, the declaration.  Doesn't the declaration

13  say that as far as Mr. Law is concerned that he's organizing and

14  sending poll observers out in connection with the campaign

15  itself and not with the Nevada Republican Party?

16          MR. SPIVA:  That may be right, Your Honor, but I'm

17  actually referring to the exhibit to their -- to their papers

18  today which actually has the Nevada Republican Party's name on

19  it and Trump/Pence, by the way.

20          THE COURT:  Okay.  So if you're looking at the exhibit

21  to that declaration...

22          MR. SPIVA:  I just want to make sure I get this right

23  because we just got this a couple of hours ago, but it is

24  Exhibit 1 to the -- I believe it's Exhibit 1 to the response

25  itself, Your Honor.  And it's a slide deck presented at each

—— 2:16-cv-2415-RFB-NJK ——

1  class is what it's titled, and then the facing page, the initial

2  page says, Nevada Poll Watcher Training, Trump Pence, Make

3  America Great Again.  And it says we are not the Nevada National

4  Committee.

5           THE COURT:  I'm sorry.  Hold on.  Let me get to that.

6  Because I think there are different versions of that that are

7  filed.  I think attached to their response it's filed, but I

8  also think attached to the declaration of Mr. Law it's filed as

9  well.  Isn't that right?

10          MR. SPIVA:  I believe that's right, Your Honor.  Yeah.

11  And I misspoke, actually.  The cover page of that does not say

12  Nevada Republican Party, but --

13          THE COURT:  Right.

14          MR. SPIVA:  But my understanding is that this was a

15  training that they were involved with.

16          THE COURT:  Based upon what?

17          MR. SPIVA:  I thought that that was what it said in the

18  brief itself, Your Honor.

19          THE COURT:  Okay.  Well, I'm going to give them a

20  chance to respond, but again part of the challenge in this case

21  is figuring out exactly which entity is engaged in what specific

22  activity.  I mean, before we get to whether or not that activity

23  is a violation of the Voting Rights Act or the KKK Act, we still

24  have to figure out who specifically is doing what to determine

25  whether or not that action can even potentially be enjoined.

———— 2:16-cv-2415-RFB-NJK ————

1           And so from what I understand, Mr. Spiva, you're

2   talking about the connection to the Nevada Republican Party are

3   these statements about the coordination, this potentially

4   contractual relationship between the party and Nevada

5   Grassroots, and your assertion on sort of, I guess, information

6   and belief that the training for the poll watchers was done in

7   connection with the Nevada Republican Party.

8           MR. SPIVA:  Yes, Your Honor.

9           THE COURT:  Okay.  All right.  And is there any

10  evidence with respect to, again, the Stone -- when I say the

11  Stone defendants, there appear to be two, Mr. Stone and Stop the

12  Steal.

13          MR. SPIVA:  Stop the Steal.

14          THE COURT:  What evidence can you point to specifically

15  of any coordination between those, what I'll call, Stone

16  entities and either the Nevada Republican Party or the Trump

17  Campaign?

18          MR. SPIVA:  Right.  The coordination we point to in our

19  papers and in the exhibits, Your Honor, is between Stop the

20  Steal and Mr. Stone and the Trump Campaign.

21          THE COURT:  Okay.  And, again, just so we're clear, but

22  not between the Stone entities and the Nevada Republican Party

23  first?

24          MR. SPIVA:  We have not cited any specific evidence of

25  coordination between the Stone -- either the Stop the Steal

—————— 2:16-cv-2415-RFB-NJK ——————

1  entity or Mr. Stone himself, but Exhibit 5 which is an exhibit

2  from the Stop the Steal website -- this is a quote from it:

3  *Recruit trained poll watchers for the key precincts in key*

4  *states to monitor voting for fraud.  Between the Trump Campaign*

5  *and our efforts we believe we can cover every precinct in the*

6  *crucial states.*

7          THE COURT:  Okay.

8          MR. SPIVA:  So there are statements on their website

9  that indicate coordination between the two.  Mr. Stone himself

10 has stated, and tell me if -- did I interrupt you, Your Honor?

11         THE COURT:  No, no.  I'm listening.  Go ahead.

12         MR. SPIVA:  He has stated that the purpose of his

13 so-called exit polling operation is to serve Mr. Trump by

14 providing him with information he will need in order to make key

15 decisions at the most critical moment of the campaign.  And this

16 is not in terms of coordination, but we...

17         Well, it is.  I'm sorry.  We submitted the Melman

18 declaration to show that that was not true exit polling, but on

19 page 2 of that declaration, which is Document 13 on the ECF, he

20 cites sources, including a lengthy video interview of Mr. Stone

21 in which he states that the purpose of his exit polling exercise

22 is to use his, quote, army of info war warriors, and that's in

23 quotes as well, to collect intelligence that he will present to

24 Mr. Trump shortly after the polls close on election night.

25         THE COURT:  So let me ask you this question, Mr. Spiva.

—— 2:16-cv-2415-RFB-NJK ——

1  Again, we'll get to the issue of whether or not what's even

2  alleged constitutes a violation, but I want to first figure out

3  the relationships.  Don't I need some information or evidence

4  from the Trump Campaign that they are, in fact, coordinating?

5  Because if coordination can be established by one party arguing

6  that we're coordinating, right, that would be a fairly low

7  threshold for what could be potentially substantial injunctive

8  relief.

9          So why should I accept that without there being more

10 from the campaign itself indicating that it's intentionally

11 coordinating?  Is there anything that you can point to me from

12 the campaign that would say, We are in fact coordinating with

13 Stop the Steal or Mr. Stone explicitly as it relates to Nevada

14 poll watching?  Is there anything in the record that would

15 support that connection?

16         MR. SPIVA:  Not specifically with the Trump Campaign

17 saying, We are coordinating with Stop the Steal or Mr. Stone.

18 The only thing I would point to, Your Honor, is essentially the

19 numerous statements by Mr. Trump himself calling for that, that

20 very type of activity.

21         THE COURT:  Yes, but, again, I'll go back through the

22 statements.  I don't recall specific statements that said, We're

23 coordinating with Stop the Steal in Nevada to send poll watchers

24 there to stop, you know, a rigged election or anything like

25 that.  I don't know that there is a specific reference to both

—— 2:16-cv-2415-RFB-NJK ——

1    Nevada and coordination with Stop the Steal from the Trump

2    Campaign or from the candidate himself that says there's

3    coordination.  Are there such statements that I've somehow

4    missed in this record?

5            MR. SPIVA:  No, Your Honor, but I think we actually

6    would be prepared to supplement the record on this as well.  So

7    the direct answer to Your Honor's question, no, there's not a

8    direct statement that we are -- from the Trump Campaign, We are

9    coordinating with Mr. Stone.  I again would point, though, to

10   Mr. Trump calling for that type of activity.

11           We are prepared to supplement the record with public

12   statements from, again, from Mr. Stone, but that he's a former

13   campaign staffer who was for some time in 2015 on the campaign

14   payroll, and that even though he no longer holds a formal role

15   with the campaign, Stone has stated publicly that he and Trump,

16   Mr. Trump, quote, talk on a semiregular basis.  That's not in

17   the record, Your Honor, but we are prepared to supplement that

18   right away.

19           Stone was quoted in the Daily Beast as stating that he

20   had met with Paul Manafort who was the campaign chair.

21           THE COURT:  Well, Mr. Spiva, let me interrupt you for

22   just a second.  We're talking about the specific activity of

23   poll watching and potential voter intimidation and sort of an

24   allegation of the pretext of exit polling or poll watching,

25   right?

——— 2:16-cv-2415-RFB-NJK ———

1          MR. SPIVA:  Yes.

2          THE COURT:  And so what I am looking for is some

3  indication of coordination as it relates to those specific

4  activities.  As you well know, there are a large universe of

5  activities across a campaign in which there can be coordination

6  which may or may not impact the specific targeted alleged

7  activity here.

8          MR. SPIVA:  Right.

9          THE COURT:  And so I'm saying that because to the

10  extent you supplement your record it would be helpful if it

11  focussed on what's alleged here.  What's alleged in your

12  complaint and your motion is a specific allegation about either

13  a conspiracy or concerted action as it relates to voter

14  intimidation in particular areas targeting particular groups.

15          MR. SPIVA:  Right.

16          THE COURT:  And it seems to me to establish that you

17  would first have to establish that there is in fact potential --

18  a program with poll watchers and in fact coordination between

19  the poll watchers and the defendants and that in fact then the

20  watchers were at the behest or direction of the defendants

21  engaged in voter intimidation.  And we're just at the first

22  step, which is trying to figure out whether or not there's in

23  fact coordination or not between the defendants and the

24  connection to what may or may not be activities of poll

25  watchers, which we haven't actually gotten to yet.

────────── 2:16-cv-2415-RFB-NJK ──────────

1          But there has to be it seems to me a logical

2    progression of your client establishing those connections in

3    order to receive or in order for this Court to be able to issue

4    injunctive relief.

5          MR. SPIVA:  Can I respond, Your Honor?  I guess just

6    two things, and point understood, Your Honor.  One, I think the

7    allegations we're making are broader than exit polling.  I think

8    the point we're making with respect to the allegations for

9    Mr. Stone and Stop the Steal is that this is essentially fake

10   exit polling in which he's engaging in the very type of activity

11   that Mr. Trump has called for around the country.

12         THE COURT:  Well, and I get that.

13         MR. SPIVA:  Yeah.

14         THE COURT:  But we haven't even established that

15   Mr. Stone or Stop the Steal have actually specifically sent

16   anyone to polls, right, in Las Vegas, unless I'm missing again

17   something in the record.  I have two affidavits that relate to

18   different activities that occurred at very specific polling

19   sites here in Nevada, but it would seem to me that there still

20   needs to be a connection between that alleged activity and these

21   entities and then connecting that up with an intent to send

22   these individuals from the defendant -- by the defendants into

23   those specific voting locations for the purpose of voter

24   intimidation or coercion.

25         But my questions are really meant to sort of lay out

1   for you the concerns that the Court has about sort of

2   fundamental aspects of establishing a basis for this type of

3   fairly significant injunctive relief as it relates to the

4   defendants.  And as I said, I'm concerned with being able to

5   identify which defendants have allegedly done which acts of

6   voter intimidation or not, of whether or not there is any

7   evidence of coordination between them, and what is the

8   connection between their alleged programs or statements, and

9   specific acts that either are planned or have actually occurred.

10          And, again, just to lay out specifically for you the

11  Court's concerns in reviewing the motion in terms of what's been

12  submitted because it's not clear to me on the record that I have

13  before me that I would be able to issue any kind of relief at

14  this point in time.  Now, it is also true that you all have not

15  had the benefit of seeing the response from the defendants until

16  recently, and this is a fast-moving litigation as it would be

17  given the nature of the litigation, but I did want to give you

18  the benefit of the Court's questions and concerns as it relates

19  to your motion.

20          So let me ask you this question then, stepping back a

21  moment, Mr. Spiva, because I think part of this is you're at

22  this point reacting to information that you've only recently

23  received.  And I'm going to have some questions for the

24  defendants as well, but in the context of discovery which the

25  Court may permit in a very short period of time, is there any

—————————2:16-cv-2415-RFB-NJK—————————

 1  discovery that you think would be appropriate to request from

 2  the defendants in terms of this litigation?

 3          And I say that because if we don't consider that today

 4  or early tomorrow, the possibility of the Court being able to

 5  consider arguments and the evidence in the time frame allotted

 6  is just not feasible.

 7          So why don't you turn your attention to that issue,

 8  because I will tell you my concern really relates to more

 9  detailed connections, evidentiary connections, between specific

10  instances of alleged voter intimidation and the defendants in

11  terms of either coordination or direction or any type of

12  relationship, right.  Because certainly individuals can, even if

13  they support a candidate, go to a poll and act inappropriately.

14  That doesn't create necessarily an evidentiary basis for this

15  Court to issue injunction against defendants without them being

16  specifically tied to that.

17          And so can you tell me how you might be able to through

18  the course of whatever limited discovery the Court would permit

19  make that more specific connection?

20          MR. SPIVA:  Yes, Your Honor.  Can I just say very

21  briefly?  I just want to mention the VRA 11(b) claim of course

22  doesn't require the type of conspiracy-type evidence I think

23  that --

24          THE COURT:  No, I'm not talking about conspiracy, but

25  it does require, for me to enjoin them, they have to actually be

————— 2:16-cv-2415-RFB-NJK —————

 1   involved.

 2          MR. SPIVA:  Yes.  Correct.

 3          THE COURT:  Right.  The VRA doesn't require a

 4   conspiracy, but it actually has to involve them actually engaged

 5   in that.  And what I am saying to you is that in terms of the

 6   allegations with respect to those specific affidavits, my

 7   concern really is about connecting up what was documented in

 8   those affidavits with the defendants who are named who would be

 9   the target of any injunctive relief.

10          MR. SPIVA:  Right.

11          THE COURT:  And shoring up, to the extent that it could

12   be, or not, that evidentiary connection, if you are going to ask

13   me to issue injunctive relief, it seems to me that that would be

14   part of whatever discovery request to the extent you had one

15   would occur in the course of this very quick litigation.

16          MR. SPIVA:  Right.  Yes, Your Honor.  And I think we

17   would benefit from some very limited discovery on any potential

18   coordination communications, funding.

19          THE COURT:  So tell me about that because it seems to

20   me -- again, I will hear from the parties and I'll review what's

21   been sort of recently submitted, but at this point in time it

22   seems to me that the record might need some supplementing on

23   various points to even make a threshold showing for the Court to

24   consider certain injunctive relief that's as broad reaching as

25   you suggest.  So why don't you tell me what types of discovery

———— 2:16-cv-2415-RFB-NJK ————

1  you think would be appropriate and could feasibly be provided in

2  the short period of time that we're talking about.

3        And at most what I would be willing to do is push the

4  hearing back to Friday.  If it's not done before then, then it's

5  just not going to probably happen.  So that would mean that the

6  defendants to the extent that they could would have a day to

7  respond.

8        Now, it does seem to me that some of these issues in

9  terms of the discovery are not that complicated and wouldn't

10 necessarily require extensive responses, but why don't you tell

11 me what you think would be appropriate and feasible in the

12 context of this litigation.

13        MR. SPIVA:  Right, Your Honor.  And I think some

14 discovery, document discovery, concerning funding, coordination

15 in terms of funding and shared funds for these types of

16 activities.

17        THE COURT:  Okay.  You have to be a little more

18 specific.

19        MR. SPIVA:  Right.  And I can give you the specific

20 wording probably as soon as, you know, this afternoon.  We

21 actually have some similar --

22        THE COURT:  Well, it's already the afternoon, right.

23        MR. SPIVA:  Yes, that's true.

24        THE COURT:  It's already 4 o'clock.  And, again, I

25 understand this is fast moving, but in order for me to be able

──────── 2:16-cv-2415-RFB-NJK ────────

 1  to consider this, I need to actually have wording and they need
 2  to be able to respond.  They need to be able to say to me -- so
 3  if you're saying to me, Look, you know, we want to know whether
 4  or not they specifically paid the Nevada Republican Party,
 5  right, to engage in poll watching, okay.  I'm not saying I'd
 6  approve that, but it needs to be that specific.
 7          MR. SPIVA:  Right.
 8          THE COURT:  So they can specifically respond, and then
 9  I can specifically rule one way or another on that.
10          Now, if you want to take some time and for us to take a
11  recess after your arguments to come back, I'm willing to do
12  that.  We may take -- and we may be here a little bit of time
13  this afternoon to go through some of these issues, but I'd like
14  to be able to resolve them, as many of them as possible, today.
15          MR. SPIVA:  I appreciate that, Your Honor, yes.
16          THE COURT:  So that we don't have this back and forth.
17          MR. SPIVA:  Yes, I appreciate that.  And that would be
18  helpful.  It wouldn't take me much time, I can tell you that.
19          THE COURT:  Okay.  So let me ask you this.  Right now
20  it sounds to me like you're not prepared to be able to
21  specifically list out that discovery to me, but you could be
22  prepared to do that in short order.
23          MR. SPIVA:  I could.  I can describe it, Your Honor,
24  but I don't think it's at the level of specificity that Your
25  Honor needs.

─────────── 2:16-cv-2415-RFB-NJK ───────────

1          THE COURT:  I don't think so either, but I don't know

2    if it would be productive until you give me specific requests

3    that they can specifically respond to.

4          MR. SPIVA:  Yes.

5          THE COURT:  So is there something else you wanted to

6    add?  I'm going to bring them back up -- I'm going to bring them

7    up here to ask them some questions about the motion.  But is

8    there something else you wanted to respond to in the context--

9    in the course of this argument at this point in time?

10          MR. SPIVA:  Yes, Your Honor.  I think just two things.

11    Kind of going back to Your Honor's earlier questions, and I

12    think Your Honor made an observation that there needs to be some

13    proof that they are doing these things or that it's threatened.

14    I don't have the exact words, but I wanted to emphasize that

15    point, the threat of doing these things, because on -- we have

16    submitted evidence that, for instance, Stop the Steal has, you

17    know, asked for volunteers to come in and do this type of

18    aggressive intimidation of voters in Nevada.  So we've submitted

19    that type of evidence.

20          In addition, lots of evidence from the campaign itself

21    and from Mr. Trump himself calling for that kind of activity.

22          THE COURT:  Well, okay, but calling for what exactly?

23    Because that's -- I mean, part of the rub here it seems to me,

24    Mr. Spiva, is many of the statements you cite to me sort of

25    vaguely suggest some sort of aggressive poll watching, but he

——— 2:16-cv-2415-RFB-NJK ———

1    certainly hasn't said and the campaign as far as I can see

2    hasn't said, We're going to put people in certain polls in

3    Nevada to challenge them based upon their appearance, to

4    challenge them based upon their ethnicity.

5            There are at most these somewhat ambiguous statements

6    about elections being sort of rigged and possibly certain

7    populations may be a part of that rigging, but, again, the

8    injunctive relief given this Court's equitable jurisdiction has

9    to be specifically tied to specific conduct.

10           So what I need you to help me get to is how do I have

11   narrowly -- narrowly tailored injunctive relief when I have

12   broad statements and general statements about conduct that are

13   not specific in the context of this case?

14           MR. SPIVA:  Well, and the relief we're asking for, Your

15   Honor, is not to stop Mr. Trump from threatening to call out law

16   enforcement or encouraging his supporters to call out law

17   enforcement or to act as law enforcement themselves, even though

18   I think that's very clear evidence of promoting vigilantism, of

19   promoting voter intimidation.  And even though he has made very

20   specific statements, and I know Your Honor has read the papers,

21   about the inner cities and about going into certain areas --

22   Don't just go to your own communities, he says to his supports.

23   Go into certain areas, you know what I mean, where the elections

24   are rigged.  I would submit to Your Honor that that is code, and

25   it's not even very thinly disguised code at that.

─────────────── 2:16-cv-2415-RFB-NJK ───────────────

1          And people have acted upon it already.  So they know

2   what -- in one of his statements he says, You know what I mean.

3   And, in fact, there's evidence that people in fact do know what

4   he means because even here in Nevada they have -- we've

5   submitted specific instances of people acting on that and in

6   other places as well.  I mean, this is a nationwide effort that

7   he's making and so it's not just Nevada.

8          THE COURT:  Right, but here's the issue, Mr. Spiva.

9   It's not that that language may or may not encourage people to

10  engage in inappropriate conduct.  The question is how is an

11  injunction with respect to these specific defendants going to

12  stop that from happening, right.  Certainly, vague or suggestive

13  statements about rigged elections, right, and going into certain

14  neighborhoods might encourage people potentially, right, to

15  engage in inappropriate behavior without it being specific.

16         Now, to a certain extent a campaign can't completely

17  control how people respond to innuendo.  On the other hand,

18  certainly the Court can look at to what extent that language was

19  meant to encourage people to do those things.

20         My question to you is that if the language -- taking

21  your argument, if the language in fact was intended on some

22  level to encourage people to go to polling locations, right,

23  what is the injunctive relief that would be appropriate?

24  Because then it seems to me what you're suggesting to the Court

25  is that I somehow issue some sort of injunctive relief which

──────── 2:16-cv-2415-RFB-NJK ────────

1  would restrain Mr. Trump from saying those things.

2          MR. SPIVA:  No, Your Honor.

3          THE COURT:  All right.  So if I'm not doing that,

4  right, which I don't know that there would be any support for

5  that, if I'm not doing that, if the incidents that you say are

6  connected are connected to that speech rather than to

7  coordinated efforts on the part of the campaign of the Nevada

8  Republican Party, why would an injunction be appropriate?

9          MR. SPIVA:  Well, first of all, they are --

10         THE COURT:  But you understand my distinction?

11         MR. SPIVA:  Yes.

12         THE COURT:  If your -- if these specific incidents are

13  linked to the speech and the encouragement to act, but they're

14  unconnected to specific coordination efforts of the campaign or

15  the Nevada Republican Party, why would it be appropriate for me

16  to enjoin them from poll watching?

17         MR. SPIVA:  Well, first, Your Honor, I don't want us to

18  forget that Trump for President, Inc. is a defendant at that

19  table.  And so, clearly, even if Your Honor didn't -- wasn't

20  persuaded ultimately that the Nevada Republican Party should be

21  enjoined, I think we've presented overwhelming evidence, Your

22  Honor, I don't want to overstate things, but I think it's pretty

23  strong evidence that there's a basis for an injunction against

24  the Trump Campaign.  And what would that look like?  I think

25  that's one of Your Honor's questions.

1    THE COURT:  Well, but it's also something separate.  I

2 want to analytically separate it.

3    What if we have a circumstance -- you know, again,

4 we'll look at the discovery to find that out.  What if we have a

5 circumstance in which a candidate is making various statements,

6 but in which the campaign itself when people come to volunteer

7 are telling them specifically to follow the law.  Would that be

8 then a basis for me to issue an injunction against a campaign

9 operations based upon the statements of the candidate

10 notwithstanding the fact that the campaign's training itself is

11 consistent with the law?

12    MR. SPIVA:  Right.  Well, and the training is not -- we

13 can get to that, but --

14    THE COURT:  But you would agree that if that is the way

15 that things turned out, there wouldn't be a basis to enjoin

16 them?  If all of the evidence indicated that their specific

17 training and what they indicated in their training to

18 individuals was the appropriate training, there wouldn't be a

19 basis to enjoin the campaign's operations here, would there?

20    MR. SPIVA:  I would respectfully disagree, Your Honor.

21    THE COURT:  Okay.  Well, tell me why.

22    MR. SPIVA:  Because, first of all, he's the head of his

23 campaign.  And so it's kind of like you have the CEO of a

24 company who says discriminate, and then maybe the H.R.

25 department is smart enough to paper over the files and says, you

──────────────── 2:16-cv-2415-RFB-NJK ────────────────

1    know, Oh, we're -- you know, we support diversity and you should

2    always judge people by the merits.  But if you have the head of

3    the ship, to mix my metaphors, saying discriminate, here

4    intimidate --

5            THE COURT:  So you're saying that in fact you can't

6    draw this distinction within the organization because as the

7    head of the organization the watchers are not only going to

8    receive the training, they're going to hear what the candidate

9    says and incorporate that into what they think they should do.

10           MR. SPIVA:  Absolutely, Your Honor.  And we see

11   evidence of that already that they are doing that in fact.  And

12   so then what would the injunction look like I think, Your Honor,

13   is something like our proposed order, which again doesn't try to

14   restrain core political speech.  It doesn't try to restrain

15   political speech at all.  It really puts some very basic

16   restraints on what poll watchers and poll observers do.  It

17   basically requires them to conduct themselves in accordance with

18   Nevada law.

19           THE COURT:  So let me ask you a question.  How would

20   that actually work?  First, as far as I can see, I don't have

21   jurisdiction over the poll locations myself, right, do I?  I

22   mean, the entities which control the poll locations are not

23   parties to this litigation.

24           MR. SPIVA:  We're not asking for an order against the

25   poll locations.

─────── 2:16-cv-2415-RFB-NJK ───────

1           THE COURT:  Right, that's true.  So could I post

2    anything, my order, in those locations?

3           MR. SPIVA:  Well, you could order the campaign, for

4    instance, who admittedly -- I mean, he said --

5           THE COURT:  Let's start with my question first.

6           MR. SPIVA:  Yes.

7           THE COURT:  Could I order those locations to post

8    anything at this point based upon what we have in front of us in

9    terms of the parties who are involved in this litigation?

10          MR. SPIVA:  You probably could, Your Honor.  You

11   probably have the authority to do that.  This isn't what we've

12   asked for, but --

13          THE COURT:  You think that there would be jurisdiction,

14   even though the State of Nevada and the registrars are not part

15   of this and haven't been named in this litigation, that the

16   Court would have the authority to order them to post certain

17   information about poll watching?

18          MR. SPIVA:  Well, that is not what we've asked for,

19   Your Honor.

20          THE COURT:  Okay.

21          MR. SPIVA:  But asking me that question about

22   jurisdiction, I believe that if you felt that a violation of

23   federal law, which is what we are here under, 11(b) and the Klan

24   Act, were going on at those locations and one way to effectuate

25   Your Honor's order was to require a posting there, I think you

—— 2:16-cv-2415-RFB-NJK ——

1  probably would have the authority to do that.

2          THE COURT:  Okay.  Well, all right.  And we can talk

3  about that.  Okay.  Because I wanted to again understand what

4  you think are the parameters of the Court's authority.

5          MR. SPIVA:  But that's not what -- you know.

6          THE COURT:  Okay.  But, again, because it may very well

7  be that if I were to order injunctive relief, and I'm not saying

8  that I would, that it may not be what you wanted.  It may be

9  something -- a variation of what would address whatever harm the

10 Court would find, if the Court were to find that.  Again, I'm

11 not saying that I would, but I want to understand what you think

12 are the parameters of the Court's authority as it relates to

13 these locations.

14         So you would ask that the Court specifically enjoin

15 them from doing what?  Sending any poll watchers to the poll

16 locations?

17         MR. SPIVA:  No, Your Honor.  And this is from our

18 proposed order first funding, encouraging, or supporting

19 individuals to go to poll locations to challenge voters,

20 investigate, interfere with voters, or confront potential

21 voters, unless they do so in a manner that's explicitly

22 authorized by Nevada law.  And some of the examples we gave of

23 violations that have occurred already, Your Honor, are not in

24 compliance with Nevada law because you can't do --

25         THE COURT:  No, I understand that, but it sounds like

PATRICIA L. GANCI, RMR, CRR   (702) 385-0670

1  you're saying -- partly you're asking me to issue an injunction

2  for them to tell their poll watchers to follow the law.

3        MR. SPIVA:  They need to come into compliance with the

4  law, yes, Your Honor.

5        THE COURT:  But, no, the injunction would say to them,

6  Tell your poll watchers that they have to follow the law.  That

7  would be one of the things it would say?

8        MR. SPIVA:  Yes, it would, Your Honor.

9        THE COURT:  And what else would it do in terms of

10  restraining or enjoining activity?  What specific activity would

11  be enjoined that is legal, but nonetheless you deem to be voter

12  intimidation?  Because, okay, if I issue an order that says,

13  Follow the law, they say, Fine.  We're following the law.  But

14  you're not actually just limiting the order there.  You also

15  have this aspect of the request which relates to particularly

16  the issue about challenges and allegedly using challenges as a

17  means of voter intimidation, right?

18        MR. SPIVA:  Right.  Well --

19        THE COURT:  So what would that order specifically say

20  as it relates to how they would tell their poll workers to

21  assert challenges?

22        MR. SPIVA:  Well, let me give an example, Your Honor,

23  and that may be the best way to answer Your Honor's question.

24  You know, the document that they attached to their brief today,

25  the Trump Campaign, and I guess there may be some dispute as to

1  whether the Nevada Republican Party is jointly supporting that

2  document, but clearly it's at least the Trump/Pence campaign.

3  That document purports to train poll workers on how you can

4  legally challenge individuals under Nevada law.

5          THE COURT:  Right.

6          MR. SPIVA:  And it only provides the two bases for

7  challenging, but it doesn't provide the very significant

8  qualification on how you can --

9          THE COURT:  Personal knowledge.

10          MR. SPIVA:  Personal knowledge, Your Honor, yes.  And

11  that directly links with the type of evidence that we've

12  presented because what we are alleging is that they're using

13  these challenges as a means of harassment and intimidation.

14          THE COURT:  So let's assume for the moment, and I'm not

15  saying that I find that, that I were to find that the failure to

16  include that information and sending a poll watcher to

17  potentially challenge voters with intentionally incomplete

18  information might constitute a basis for an injunction.  Again,

19  I'm not saying that I would do that.  What would then the remedy

20  then be?

21          MR. SPIVA:  Well, I think again along the lines of our

22  proposed order, which is pretty specific, and, you know, it

23  would say, You can't do those types of activities unless you do

24  them in compliance with Nevada law.  And in that example, Your

25  Honor, of course Nevada law does not permit those types of

--- 2:16-cv-2415-RFB-NJK ---

1   challenges except --

2          THE COURT:  Okay.  But that's the part of the order

3   that is not as clear to me.  I think it sounds like what you

4   would say what you would require is that for the Court to

5   basically send out a revised version of what they're saying,

6   because in other respects it seems to me that that material is

7   actually fairly consistent with Nevada law.  I mean, there is I

8   think that one glaring omission as it relates to who has the

9   standing to challenge, and the fact that you're supposed to fill

10  out a form when you make this challenge.  That's a form that

11  could subject you to significant potentially civil and possibly

12  criminal liability.

13         The question is what would that look like in terms of

14  what the Court would order if I were to find that to be

15  sufficient.  Would it be an order that they had to give to their

16  poll workers that said, The Court has found that this training

17  didn't provide all of the information.  You should also be aware

18  of the fact that if you make a challenge, it has to be based

19  upon personal knowledge, and you also have to submit this form

20  and make an affirmation as it relates to the worker, right.  Is

21  that what you're asking?

22         MR. SPIVA:  Well, that's not how we've set forth the

23  relief we are asking for, Your Honor, because I don't think that

24  would hurt.  Certainly, I think that would help, but I don't

25  think it needs to be so narrow because these laws were intended

─────── 2:16-cv-2415-RFB-NJK ───────

1   to catch the various machinations that parties use whether in

2   conspiracy or whether by themselves.

3           THE COURT:  But how do I do that without interfering

4   with their ability under Nevada law to in fact challenge voters?

5   Right.  Nevada law clearly lays out a process by which voters

6   can challenge -- a registered voter can challenge another

7   registered voter in the context of an election.  Right.  That's

8   an established right here.  And I don't know that I could find

9   that a person's invoking that right, per se, can be found to be

10  engaged in voter intimidation.

11          The question becomes how do I stop all challenges or

12  what challenges would I potentially stop and what would be sort

13  of the evidentiary basis for doing that in the context of this

14  case?

15          MR. SPIVA:  Well, and with respect to that specific

16  issue, Your Honor, I do think -- I mean, I can -- actually, I

17  don't want to -- I know Your Honor --

18          THE COURT:  I'm asking this because I don't find your

19  language to be specific enough.

20          MR. SPIVA:  Right.

21          THE COURT:  And that's why we're going through this

22  because I think it's too general, right.  To the extent that I

23  would find what you say to be sufficient to warrant an

24  injunction, injunctions are supposed to be very narrowly

25  tailored.  Your order, I understand because it was written by

1   lawyers and being one myself, is very broad and difficult to

2   understand.  It wouldn't -- in the Court's view, it wouldn't

3   actually address even the alleged harm that you claim actually

4   occurs because it would be too hard to understand what it

5   actually means.  Right.

6        If the harm that you say is occurring is that there is

7   a pretextual use of challenges to intimidate voters in certain

8   locations, it seems to me that the narrow remedy that you might

9   seek would be a specific direction to poll workers about what

10  they can and cannot do.

11       MR. SPIVA:  Right, Your Honor.

12       THE COURT:  And given what has been provided, it seems

13  to me, along those lines, one of the specific directions would

14  relate to what's missing from what was allegedly provided.

15       MR. SPIVA:  I think that's fair enough, Your Honor.

16  There are other aspects of the relief that we are asking for,

17  though, that go I think to the issue Your Honor is raising,

18  which is things like questioning, interrogating, interfering

19  with, or verbally harassing voters or prospective voters, or

20  training others to do that.  And so it's not narrow, I'll grant

21  you that, but it is specific enough for somebody to understand.

22       THE COURT:  But what would that look like?  What does

23  that look like?  In the context of this case in the context of

24  Nevada law which permits challenges --

25       MR. SPIVA:  But not directly to the voter, Your Honor.

———— 2:16-cv-2415-RFB-NJK ————

1           THE COURT:  No, I understand that, right.  So, again,

2   that can be clarified.  You can't go up to people and say -- you

3   can't point at them and say, I'm a registered voter.  You can't

4   vote.  I'm challenge -- right.  There are limits on how that

5   happens.  I'm not talking about that, right.  It seems to me --

6   again, this goes back to the earlier discussion we had about

7   what language would be provided to a worker about what they

8   could and couldn't do in terms of exercising that.

9           But you're expanding it beyond that in terms of talking

10  about training people to challenge.  My question to you is that,

11  why do we need to expand beyond what the Court is describing --

12  again, to the extent the Court would accept the harm that you've

13  described as being sufficient and established, and I'm not

14  saying that I have, why would we need to go beyond simply

15  telling individuals, You were misinformed.  Here's what the law

16  is, and you can be subject to some penalty, civil or criminal,

17  if you violate it.  Why wouldn't I need to say -- why would we

18  need to say anything more than that?

19          MR. SPIVA:  Well, I don't think there's anything wrong

20  with that, Your Honor.  I think that would help, but I think

21  there are other issues that need to be addressed.  For instance,

22  the reason I raised the example of questioning, interrogating,

23  or interfering with the voters, you're not supposed do any of

24  that, right.  You're not supposed to --

25          THE COURT:  But that would be included in this

--- 2:16-cv-2415-RFB-NJK ---

1  discussion.  So I'm not saying that it wouldn't necessarily be

2  included.  And, again, assuming that I give you that relief, and

3  I'm not saying that I would.

4          MR. SPIVA:  Sure.

5          THE COURT:  But focusing on the order in part because

6  that establishes what you need to establish from an evidentiary

7  standpoint to get it.  That's why I want to talk a little bit

8  about the order at this point.  You're saying that there are

9  these other aspects of what you claim are occurring which are

10 contrary to Nevada law and which fall into the category of voter

11 intimidation.  Directly confronting voters before and even

12 outside of polling locations such that prospective voters could

13 see that confrontation and, perhaps, be intimidated, right,

14 that's one of the concerns you have?

15         MR. SPIVA:  Yes, Your Honor.

16         THE COURT:  Right.  Inappropriate use of challenges not

17 based upon personal knowledge, but for purposes of intimidation

18 in particularly targeted districts based upon alleged statements

19 made by the campaign, that's your other -- those seem to be your

20 two main concerns.

21         MR. SPIVA:  Yes, Your Honor.  I mean, we have some

22 other specificity in the order -- proposed order such as

23 taking -- you know, following, taking photos.  I mean, I think

24 these are other varieties of I think what Your Honor is asking

25 about.

1          THE COURT:  Right.  What it looks like, though, in

2    terms of what you have identified as even occurring, right, we

3    don't have something similar to what's been in other cases with,

4    you know, individuals being followed and photographed or things

5    of that nature, right.  There's not even anything in the record

6    that would say any of that's happened at this point, is there?

7          MR. SPIVA:  Well, I'm not sure if I would go that far,

8    Your Honor, but we certainly have evidence in the record of the

9    threat of that happening, of people saying that they're going to

10   do exactly that in response to Mr. Trump's call for, you know,

11   checking out these certain areas, that they're going to follow

12   people.  What we do have here in Nevada in our specific examples

13   so far -- and we haven't hit election day as Your Honor knows.

14   You know, our concern is we hit election day and it will be too

15   late.  You can't get a do-over.

16          But we do have instances of people actually directly

17   harassing the voter.

18          THE COURT:  And why wouldn't a specific directive that

19   said, Here are things you can and can't do, and if you don't do

20   this properly, you're subject to civil and possible criminal

21   penalties, why wouldn't that address all of those concerns?

22          MR. SPIVA:  That's exactly what we want, Your Honor.

23          THE COURT:  Okay.  All right.  Thank you.  Is it again

24   Mr. Spiva?

25          MR. SPIVA:  Spiva.  It's okay.  Yeah.  No problem.

——— 2:16-cv-2415-RFB-NJK ———

1  Thank you, Your Honor.

2          THE COURT:  Okay.

3          Mr. Hardy.

4          MR. HARDY:  Your Honor, I'm happy to address those

5  things today if you'd like me to, although we have a pending --

6          THE COURT:  And I've ruled on this, right.  There is a

7  very specific issue as it relates to a pro hac vice.  Is it

8  Mr. Langhofer?  We have very clear rules about attaching certain

9  things to the pro hac vice application.  I understand the timing

10 of that.  I don't know if you have since attached all of those

11 and they've been filed, but --

12         MR. HARDY:  We've attached two of the three.  We've got

13 New York trying to be overnighted, Your Honor, because they

14 require an original signature.  That's the only other issue.

15         THE COURT:  I understand that, but the rule is fairly

16 clear, Mr. Hardy.  I mean, you appear in this court regularly.

17 You understand that this is a regular practice.  You can consult

18 back and forth.  I'm not saying that he can't be part of your

19 team, but unfortunately he can't appear until -- until those --

20 that application is completed consistent with my order.

21         MR. HARDY:  I understand.

22         THE COURT:  Again, if you want to take some time to

23 talk with him and consult on issues you want to raise, that's

24 fine, but unfortunately until that issue is resolved,

25 Mr. Langhofer is not going to be able to appear pro hac until we

1  get that resolved.

2          MR. HARDY:  Understood, Your Honor.  We'll go ahead and

3  I'll take care of that.  Is it all right if I argue from here?

4  Can you hear me okay?

5          THE COURT:  That's fine.  That's helpful.  Sure.

6  That's fine.

7          MR. HARDY:  That will be great.

8          THE COURT:  So, first, let me ask you -- I have

9  different questions for you, Mr. Hardy.  One of the things that

10  I asked for, I'm not sure that I received.  And in terms of the

11  order I said, what information do people receive when they

12  respond to that application form?  What the declaration says is,

13  I'm in charge of the poll watchers and this is what I do.  It

14  doesn't tell me what information is sent to them when they fill

15  that form out on the website.  It doesn't say that.  I went

16  through the declaration.  And that might be what is done.  It

17  may be that they're told, for example, Come to a poll training

18  and at the poll training this is what's done, but it doesn't

19  actually say that.

20          And so, you know, part of the concern I have is that if

21  there is this sort of solicitation for volunteers, it is not

22  clear about what they're going to do.  There is some of this

23  rigged election language there, but, again, the bigger issue is

24  that it's not clear what information they're sent in connection

25  with that.

—————— 2:16-cv-2415-RFB-NJK ——————

1        So can you tell me what happens -- and you can consult

2   with your client -- what happens in this case?  The reason why I

3   say that is it would seem to me to be able to clear quite a bit

4   in this case if we knew what the information was that was sent

5   out in response to that specific solicitation.

6        MR. HARDY:  Perfect, Your Honor.  And to help out with

7   that, I mean, we tried to put those declarations together as

8   soon as possible.  I wasn't served until 4 o'clock yesterday.

9   I've been working all night to make sure we can get as much of

10  this out to you.  So I'm happy to explain to you what happens

11  with the process because I think that's what you're focussing on

12  is what is our process that we follow with the Trump Campaign.

13  Because the Nevada Republican Party doesn't do any poll

14  watching.  It designates that out to the campaigns, but let's

15  talk specifically about the Trump Campaign.

16        THE COURT:  But you're representing both.  So I just

17  want --

18        MR. HARDY:  Correct.  And I am general -- I am the

19  local counsel that handles the Nevada Republican Party and then

20  outside counsel handles a lot of stuff in the Trump Campaign,

21  but I represent both of them here today.

22        THE COURT:  No, I'm just saying so that way also when

23  you're speaking on behalf of the one versus the other, if you

24  could just make sure that you're clear about for whom you speak

25  and what argument you're making.  But it seems to me, and you

1  can tell from my questions, that the Nevada Republican Party at

2  least on the record that I have so far doesn't appear to have

3  any established connection with any poll watching; not to say

4  that, again, Mr. Spiva can't seek discovery that would make that

5  connection.  And as I said to him, I'm going to allow for some

6  very limited discovery.

7         But it seems to me that the focus of their argument and

8  in fact for this Court at this point in time based upon the

9  evidentiary record is the organized poll watching which appears

10 to be clearly happening with the campaign, which is of course

11 normal for campaigns.  And the question is what's happening in

12 the context of that.

13        MR. HARDY:  And we've identified two witnesses that we

14 will put on whenever you're ready to have a hearing on that.

15 One of them being Mr. Jesse Law himself that we brought today,

16 and whenever you're ready for that, if you'd like to do that

17 today or we can do that another time.  But he can tell you the

18 exact process they follow.

19        I'm aware of what that process is.  Okay.  Somebody

20 wants to be able to be a poll watcher, they feel like this is

21 something they want to do to help serve inside of their

22 community.  They then are invited -- and for the last couple of

23 weeks there have been nightly meetings where they're invited to

24 come down to campaign headquarters, and while they're there,

25 they will then sign that sheet that you saw as Exhibit 3 to his

─────────────2:16-cv-2415-RFB-NJK─────────────

1  affidavit.  Okay.  They will fill that sheet out saying what

2  their name, their e-mail address, the days that they're

3  available.  And then they sit through a training.  And that

4  training that they sit through is what we saw as Exhibit 1 to

5  both our motion, which is the same thing that is Exhibit 1 to

6  the affidavit.  The affidavit --

7          THE COURT:  So let me just stop you just for a moment,

8  Mr. Hardy.  So when someone sends back that information on the

9  website saying I want to volunteer, what do they receive in an

10 e-mail in return when that's completed?

11         MR. HARDY:  They're directed to come in and do a

12 training, and they're given on -- they're told that they can

13 come in I think it's 6 or 6:30 in the evening on one of the

14 particular nights to go through poll watcher training.

15         THE COURT:  Okay.

16         MR. HARDY:  Then they come in, and once they come in to

17 do that poll watcher training, just like I said, they fill out

18 that Exhibit 3 to the affidavit of Mr. Jesse Law.  And they also

19 listen to the training.  This training is a power point

20 presentation.  So I know that we've heard just a lot of

21 questions today by the Court regarding whether we wanted to

22 implement certain language inside of there that would be more

23 thorough talking about what powers you need to have and the

24 personal knowledge.

25         THE COURT:  But we'll get to that.  I first want to --

——— 2:16-cv-2415-RFB-NJK ———

 1  I wanted to connect up --

 2          MR. HARDY:  Yeah.

 3          THE COURT:  -- the power point to that -- what was

 4  Exhibit 3 to their motion, which was the solicitation form on

 5  the campaign website.

 6          So what you're proffering to me is that when someone

 7  sends in that e-mail, they receive basically a standard e-mail

 8  back depending upon their location inviting them to campaign

 9  headquarters or some other place to receive poll watching

10  training?

11          MR. HARDY:  Correct.

12          THE COURT:  Okay.

13          MR. HARDY:  And we actually have a supplement that's

14  being filed soon, if not right now.

15          THE COURT:  That contains that I would imagine that

16  standard e-mail.

17          MR. HARDY:  That standard e-mail.

18          THE COURT:  Okay.  So they receive that, they're

19  directed to that information, and then they go to a training.

20          MR. HARDY:  Correct.

21          THE COURT:  And then I would imagine after that they

22  are then directed to a particular poll location, and that's

23  organized by the campaign.

24          MR. HARDY:  And Mr. Law is the individual who organizes

25  that.  That's why we want to make sure -- he would be the person

1  that has all of the knowledge regarding poll watching with

2  respect to the campaign.  And since there's nobody that does it

3  for the Nevada Republican Party, we have nobody to put on the

4  stand for you.

5         THE COURT:  That's fine.  No, again, it seems to me

6  based upon the record that I have at least that it's the

7  campaign that coordinates and organizes the poll observers.  And

8  so it would be information about the campaign's process that

9  would be important for the Court to consider.  And, again, I

10  want to make sure I'm understanding you is that if a person

11  calls or e-mails the campaign to volunteer as a poll worker,

12  they are then directed to come into a meeting where they receive

13  the training and fill out these forms, right?

14         MR. HARDY:  Correct.

15         THE COURT:  And then after that they are given, I would

16  imagine, some form of a schedule or directions as to which polls

17  to go and observe at which time.  Is that right?

18         MR. HARDY:  Not that night.  What happens is they --

19         THE COURT:  Well, not that night, but at some point in

20  the future.

21         MR. HARDY:  At some point in time, correct.  Correct,

22  because we have to coordinate with, you know, who's available at

23  different times and different locations and stuff in the future.

24         THE COURT:  So that's the general process, and you'll

25  be able to provide a supplement to the declaration that lays out

———— 2:16-cv-2415-RFB-NJK ————

 1   some of the missing parts of that in the declaration you have.

 2          MR. HARDY:  Absolutely, I will.

 3          THE COURT:  Okay.  So let's move on then to this other

 4   issue, which is the training is missing information about

 5   Nevada.  It clearly is.

 6          MR. HARDY:  Okay.

 7          THE COURT:  Right.  And to what extent should I draw

 8   any inference about that?  Because it's a significant part of

 9   challenging other things in terms of what you have to submit in

10   your personal knowledge, right.  And I think you will admit that

11   it doesn't have that information in here.

12          MR. HARDY:  This is a power point presentation.  You as

13   well as I as well as a number of people that are in this

14   courtroom have all given power point presentations.  They're

15   bullet points that you then use in speaking to then go off and

16   talk about particular issues.  Mr. Law, when he's -- I'll give

17   him an opportunity to testify.  He'll tell you that when he sees

18   that bullet point that comes up about what you can and can't do,

19   he specifically goes over them and tells them about the personal

20   knowledge requirements.  He tells them about what their

21   obligations are, what the risks are associated with that, and

22   we've even -- even if you would like today, I'm happy to go send

23   an e-mail to all of those people telling them, Hey, as a

24   reiteration of what you heard orally during your presentation,

25   remember this point.  We have no objection to doing that.

1              What we have right here --

2              THE COURT:  Okay.  Well, let's focus on -- okay.  You

3    don't need to address the general language.  You can see that

4    the Court has looked at the general language.

5              MR. HARDY:  Yes.

6              THE COURT:  So let's not focus on arguments that right

7    now I'm actually not focussed on.  What I'm focussed on really

8    is what I do think is a deficiency in how it describes -- at

9    least the power point describes what's required.  You don't

10   dispute the fact that at least the points on the power point are

11   missing key parts of what is part of the challenging in Nevada.

12             MR. HARDY:  I am not disputing that the power point is

13   not an extensive treatise on how to go ahead and take care of

14   things.

15             THE COURT:  Well, not only is it not an extensive

16   treatise.  It's missing certain key points, talking about

17   personal knowledge in terms of challenging.  Unless I missed it,

18   it doesn't say that, right?

19             MR. HARDY:  It does not, but we're not --

20             THE COURT:  Okay.  Mr. Hardy, I'm just trying to

21   establish again -- as I did with Mr. Spiva, I'm trying to

22   establish what's in and not in the record.  I'm not saying you

23   can't supplement.  I'm not saying those are not issues, but it

24   helps me to at least clarify what is and isn't there, and then

25   we can talk about what you might be able to offer to clarify

─────────── 2:16-cv-2415-RFB-NJK ───────────

1   that.  But let's first focus on what is and isn't there, right.

2           Right.  It doesn't talk about personal knowledge as it

3   relates to making challenges.

4           MR. HARDY:  Correct, it does not say that.

5           THE COURT:  And I don't think it talks about the forms

6   that you need to fill out when you make a challenge potentially

7   under Nevada law.

8           MR. HARDY:  Does not specifically identify the form.

9           THE COURT:  And it doesn't -- I think the power point

10  doesn't talk about civil or potential criminal penalties as it

11  relates to improperly -- knowingly challenging someone in an

12  improper way.

13          MR. HARDY:  It does not give them the exact statutory

14  obligations and implications of that.

15          THE COURT:  Okay.  So, again, I'm not saying that that

16  can't be addressed, but I want to -- as I said, as with

17  plaintiffs, I want to start off with what's in and not in the

18  record.

19          MR. HARDY:  Yep.

20          THE COURT:  And it's not to say that you can't come

21  forward and say, Well, Mr. Law will say, in fact, he emphasizes

22  that, but it is to say in what I have before me it doesn't

23  indicate that.  And so what you're now going to say to me, based

24  upon what you have just argued, is that while it doesn't say

25  that, that's communicated in the training.

1          MR. HARDY:  It is.  Absolutely.

2          THE COURT:  And that, you know, at the evidentiary

3   hearing which we would proceed to tomorrow that Mr. Law could

4   testify to that, and in addition to that, he could provide some

5   additional documentary evidence or he could provide other

6   witnesses who would say that's in fact what happened at the

7   training.

8          MR. HARDY:  Correct.

9          THE COURT:  Based upon what you've represented, right?

10          MR. HARDY:  Correct.

11          THE COURT:  Okay.  Because I will tell you that is the

12   only part -- well, not the only part, but that is a significant

13   part of the concern the Court has about that.

14          Now, let me ask you another question as it relates to

15   that particular issue.  To what extent based upon the law as you

16   see it could the Court not fashion certain relief as it relates

17   to that omission?  And, first, I know you said you volunteered,

18   but let me tell you specifically what the Court would

19   contemplate in the context of a remedy.  And, again, I'm not

20   saying that I would find an evidentiary basis for that, but I

21   like to work back from a remedy to see whether or not there's

22   even an evidentiary basis for a narrow remedy.

23          In this case if the Court were to order the campaign to

24   contact or e-mail all of the workers to remind them or to

25   provide a supplement specifically to them that said, In order to

——— 2:16-cv-2415-RFB-NJK ———

1  challenge a voter, you must have personal knowledge of the

2  alleged problem with the voter and you have to fill out a

3  particular form from the Secretary of State.  And if you

4  intentionally challenge someone without this personal knowledge,

5  you could be subject to civil or criminal penalties.  What would

6  be the problem with that potential injunctive relief?

7          And in some sense you said you guys -- you had said

8  your clients would volunteer to provide that, but to the extent

9  the Court were to order that, would there be issues with respect

10  to that narrow issue?

11          MR. HARDY:  Well, I think two problems.  One is whether

12  you have the authority to issue that injunction because they

13  haven't alleged any specific conduct that would really give rise

14  to that being an issue.

15          THE COURT:  Okay.  Let me stop you there.  That's an

16  important point.  To what extent can I in the context of the

17  law, and the law is actually fairly sparse here, consider the

18  extent to which that would create a very likely possibility of

19  voter intimidation because of the omission?  Again, assuming

20  Mr. Law doesn't supplement, right, because that's a separate

21  issue.  If I find that that's actually not what happens, then

22  there's no injunction, obviously.

23          But that's easier for all of us than if we look at the

24  more difficult question to the extent that, you know, I think of

25  it that way in terms of laying out the reasoning.  What happens

──────── 2:16-cv-2415-RFB-NJK ────────

1  and how the Court should consider the threat of or the likely
2  possibility of improper challenges based upon that affidavit
3  -- based upon the power point?
4        And the other question I have for you is to what extent
5  should the Court consider whether or not it was an intentional
6  omission given the fact that there is a great deal of detail
7  about other aspects of the law?  How should I evaluate those two
8  things?  Because I think the intentionality of the omission
9  would be a factor in the Court determining whether or not there
10 was an intention to create confusion and as a result voter
11 intimidation.
12        MR. HARDY:  Well, I think it goes to two -- because
13 there's a couple of questions there, and I want to make sure I
14 catch them along the way.  One of those issues is and I think
15 the first key critical point in this is that there has been no
16 instances.  We've had early voter going on for a while now, over
17 a week.  And there's not been an incident.  So I think that's
18 evidence of the fact that we are providing that training.
19        THE COURT:  Well, let me ask you a question about that.
20 Do I as a matter of law have to find that there have been
21 documented incidents related to this type of challenge in order
22 to fashion a relief or can I find that the training itself is
23 likely enough to lead to voter intimidation that I fashion
24 relief?  Is there a legal basis for me issuing an injunction
25 based upon the latter?

───────────── 2:16-cv-2415-RFB-NJK ─────────────

1          MR. HARDY:  I think what you're -- the fact that there

2    has been no incidents to date weighs heavily against whether you

3    can or cannot do this.

4          THE COURT:  Well, I don't know that there's going to be

5    no -- I mean, it hasn't been provided to me.  But, no, the

6    question is and I think what you're saying to me is that absent

7    a showing that this type of mistake will, in fact, lead to

8    improper challenges, the Court can't look at the training, even

9    if it's not supplemented, and make a finding that there will be

10   improper challenges and, therefore, there would be a basis for

11   injunctive relief.

12         MR. HARDY:  I think the fact that there hasn't been is

13   a clear indication that there won't be.  Because we can't look

14   at this in a vacuum and say, you know, We don't know what's

15   going to happen because we've never had voters out at the

16   precincts yet.  There are, every day.  And so because of that,

17   we have a history that we can look at, and I think looking at

18   that history is going to be critical.  If we look at that

19   history, we find that there are no incidents.  And so we can say

20   with reasonable certainty that the training that has been done

21   so far appears to be working.

22         THE COURT:  Well, let me ask you a question.  Do we

23   have any evidence of whether or not there have been challenges

24   to date and whether or not the proper forms have been submitted

25   in connection with those challenges?

———— 2:16-cv-2415-RFB-NJK ————

1          MR. HARDY:  I'm not aware of any challenges that have

2     been submitted, Your Honor.

3          THE COURT:  Is there -- and I don't know anything about

4     this.  Is there a way to actually track that?  Would that be

5     publicly-available information or would the Court have to issue

6     an order to obtain that information?  Because that would

7     certainly be one way of figuring that out.  I mean, if in fact

8     there were challenges in these areas and there were not the

9     proper forms submitted, that might in fact suggest that there

10    were -- that there were challenges occurring.  Right.  Again,

11    I'm not familiar as I sit here with how publicly available that

12    challenge information is.

13         MR. HARDY:  One of the things that we would know,

14    because it's required of every poll worker, is if they do submit

15    a challenge -- and that's in the training.  If they do submit a

16    challenge, they've got to notify the attorneys that are involved

17    with it as well as all the way up to Mr. Law himself.

18         THE COURT:  Right.

19         MR. HARDY:  So if a challenge had been done, it would

20    have to, by its own -- by their own training, been given to us.

21    But we've not received one.  Inherent in that fact is not a

22    challenge has been submitted.

23         THE COURT:  Right, because actually your flowchart

24    actually I think requires people to go through Mr. Law before

25    they raise certain types of challenges, if I remember the

------ 2:16-cv-2415-RFB-NJK ------

1  flowchart that's attached to the training.

2         Or at least in terms of issues that are the poll

3  location.

4         So you're saying, Mr. Hardy, if I understand you, that

5  absent a showing that in fact improper challenges have occurred,

6  this Court shouldn't engage in speculation as to whether or not

7  there will be such improper challenges on election day, and in

8  fact given the fact that we are now, what, almost --

9         MR. HARDY:  Six days.

10        THE COURT:  I don't know how many days into -- maybe 10

11 days into -- I don't know how many days we are into early voting

12 that if there were going to be problems, they would have already

13 been observed.  But you don't know whether or not that's

14 publicly-available information, and that's I think the one

15 wrinkle in your argument.

16        MR. HARDY:  Yeah.  I mean, whether those actual filed

17 contests are available or not, I'm not sure, but what I do know

18 is is that any of our ballot watchers would have been required

19 to report that, underneath their own training would have been

20 required to report any of that up through the ranks.  And we

21 have none of that.  We don't have any indication --

22        THE COURT:  So I just want to be clear.  So are you

23 saying to date there have been no challenges by the Trump

24 Campaign to any voters?

25        MR. HARDY:  No, not a single one.

—— 2:16-cv-2415-RFB-NJK ——

1          THE COURT:  So in terms of what's been reported to you.

2    Okay.  All right.  Thank you, Mr. Hardy.

3          MR. HARDY:  Thank you, Your Honor.

4          THE COURT:  Do you have anything else you wish to add?

5          MR. HARDY:  I just want to make sure, we have nothing

6    to do with Mr. Stone, neither the Nevada Republican Party or

7    anything, Mr. Stone or Stop the Steal.

8          THE COURT:  Well, again --

9          MR. HARDY:  I don't want that to be --

10         THE COURT:  I think that you could probably glean from

11   the Court's questions that at this point I don't know that there

12   is a sufficient record of coordination.  And, again, it's not to

13   say that I may not permit discovery as relates to that

14   coordination, but it seems to me that's fairly straightforward.

15   I mean, in the context of these types of coordinating efforts,

16   it seems to me that either someone is getting paid to do

17   something or they're not and there is evidence of that or there

18   isn't.  So I haven't asked you questions about that because that

19   has not been really my focus.

20         You want to take a moment?

21         MR. HARDY:  Can I just take a quick moment to make sure

22   I've covered everything?

23         THE COURT:  Sure.  Of course.

24         (Defense counsel conferring.)

25         MR. HARDY:  Your Honor?

------- 2:16-cv-2415-RFB-NJK -------

1          THE COURT:  Just a moment.

2          (Court conferring with law clerk.)

3          THE COURT:  Mr. Hardy.

4          MR. HARDY:  Yes.  Your Honor, two issues just related

5    to -- I know that you're talking about some potential for

6    discovery.  I am aware of the First Amendment privilege, which

7    is a doctrine that is perpetuated in the Ninth Circuit that

8    requires certain elements that are required if discovery is to

9    be permitted in these type of cases.  And it requires a prime

10   facie showing that discovery is needed, a showing that there --

11   a showing of necessity as well as some balancing test this Court

12   is even required to go through before they can even have

13   discovery.

14          So this whole notion that they're going to immediately

15   get to conduct a bunch of discovery without meeting the

16   requirements of that First Amendment privilege and overcoming

17   that, which is their burden to overcome that privilege to

18   require us to be able to engage in discovery at this point in

19   time, is something that I think we have an objection to.

20          THE COURT:  Okay.  Well, I'm not sure we talked about

21   what the primaries are of the First Amendment privilege.  It

22   doesn't seem to cover all conduct, but it would also be -- I

23   will tell you it seems to me that in the context of the specific

24   training, I will just say this, that the Court has concerns

25   about this training as is.

─────── 2:16-cv-2415-RFB-NJK ───────

1            Now, as it relates to sort of a general sort of

2    exploratory request for all connections between all entities,

3    first, there's no time for that.  Second, I don't know there

4    would be a basis for that, but if they have a specific inquiry

5    based upon a specific connection, obviously, I think that that

6    would address the potential First Amendment privilege issues.  I

7    think that that privilege really applies to prohibitions against

8    general searching through of in this instance a campaign's sort

9    of work efforts, which is part of the reason why, you know, I

10   said that there is certain information you all could file under

11   seal if you wanted to as related to this if you wanted to

12   provide it to the Court in a way that you thought would be still

13   protecting that privilege.  And that was the reason why I

14   included that in my initial order.

15           But I think that in the context of the training, I'm

16   not sure the privilege would fully extend to that specific

17   inquiry as it relates to Mr. Law's testimony and what was or not

18   provided in the context of the poll watcher training, but we'll

19   have to hear from them about what else they want before I could

20   actually discuss that in terms of its application to anything

21   else.

22           But you're right.  I don't find that they're

23   automatically going to be entitled to that discovery, but it

24   would simply -- I think the comment was related to having some

25   sense of what they wanted to seek so that the Court could even

—— 2:16-cv-2415-RFB-NJK ——

1  evaluate whether it would be appropriate to approve that.  And

2  your objection is noted, and now of course I'll consider that in

3  the context of whatever's raised as potential discovery in this

4  case.

5           MR. HARDY:  Perfect.  And the second issue was I know

6  you were looking to maybe have this hearing tomorrow.  I am

7  advised that there's going to be some scheduling issues with

8  respect to that.  If we could do it on Friday, that would be

9  perfect, especially if we're going to do discovery, at least

10  then we get more than, you know, 10 hours to go try to find all

11  this information or whatever they --

12           THE COURT:  Well, let's see where we end up today.

13           MR. HARDY:  Okay.

14           THE COURT:  And we may do some today, some tomorrow.  I

15  understand that there may be some challenges with that, but the

16  later we push it, the more uncertainty I think it creates in the

17  context of what would need to be done or not.  Obviously in the

18  case where the Court were to decide that there would be no

19  relief, then it wouldn't really matter, but if for some portion

20  of the motion I were to grant relief, then pushing it back

21  further creates more logistical problems.

22           So let's do this.  Let's figure out where we are based

23  upon what the discovery requests are, what you all are going to

24  proffer to me about what the testimony would be, evidence would

25  be, and then we can talk about what the scheduling will be after

1  that.

2          MR. HARDY:  Sounds great.  Thank you, Your Honor.

3          MR. SPIVA:  Your Honor, may I just briefly address

4  three things that came up in the argument and then --

5          THE COURT:  Sure.

6          MR. SPIVA:  -- if we could -- if we could have 10

7  minutes, I could get you our proposed request.  I think we can

8  work it out very quickly.  We can work out what we would like.

9          THE COURT:  Right.

10         MR. SPIVA:  So, Your Honor, I knew I was thinking of

11  something, and it was when I said that there was something in

12  their brief that suggested coordination between the Nevada

13  Republican Party and the campaign.  On page 14 --

14         THE COURT:  Hold on just a moment.  Let me get there.

15         MR. SPIVA:  Okay.  Sorry.

16         THE COURT:  That's all right.  Page 14 of their

17  response?

18         MR. SPIVA:  Yeah, on page 14 of their response under --

19         THE COURT:  Wait just a second.

20         MR. SPIVA:  Sure.

21         THE COURT:  Okay.  Which line are we talking about?

22         MR. SPIVA:  It starts around line 15 where it begins

23  *precisely*.  It says:  *Precisely to avoid confusion or*

24  *misunderstandings of the law's demands, the NRP and the campaign*

25  *have hosted training classes for Nevada supporters who have*

—— 2:16-cv-2415-RFB-NJK ——

1   *volunteered to serve as polling place observers.  The slide deck*
2   *presented at each class attached hereto as Exhibit 1*
3   *unequivocally informed their observers*, and it goes onto quote
4   from the slide deck.  So their own brief actually states that
5   there is coordination on --

6          THE COURT:  Well, it actually doesn't say they
7   coordinate.  It says they've hosted.  And the reason why I say
8   that is, as you may be familiar with in these sorts of cases,
9   there certainly can be a use by a campaign of a local party's
10  headquarters.  Would that constitute sufficient coordination
11  such that the Nevada Republican Party would be subject to
12  litigation, Mr. Spiva?

13         MR. SPIVA:  Absolutely, Your Honor.  I mean, the way
14  that these things normally work, and I'm very familiar from the
15  Democratic side, the state parties and the national party and
16  the campaign work hand in glove, I mean, on these types of
17  things.

18         THE COURT:  So when you say they work hand in glove,
19  what does that mean?  Does that mean that they're both
20  coteaching the classes or -- again, my question is if the Nevada
21  Republican Party has simply lent out space, but didn't actually
22  teach, would that be sufficient coordination in the context of
23  them being potentially enjoined?  In part because it's not clear
24  to me that the Nevada Republican Party has an established
25  connection to or authority over the poll observers that you

—— 2:16-cv-2415-RFB-NJK ——

1  would want to receive some information.  So it's not even clear

2  to me that to the extent there would be an injunction issued

3  related to poll observers that it would have any impact on them,

4  except to the extent they may have members who are volunteering

5  for the campaign.  Why would I issue an injunction against them

6  if they don't have any control over the poll observers?

7       MR. SPIVA:  Well, I mean, they say they host -- they

8  cohost the training classes.  I mean, they say the NRP and the

9  campaign have hosted.  So, I mean, it seems like that's an

10  admission that they cohost it.  And so I think they would have

11  equal responsibility with the campaign.

12       The other thing I wanted to address, Your Honor, is

13  this notion of why haven't there been any challenges yet.  And I

14  wanted to just say two things about that.  First, the threat of

15  these challenges, especially based on the improper training, is

16  really most severe on election day.  You can go anywhere to vote

17  in early voting.  There really isn't the same basis generally

18  for challenging -- for lodging a formal challenge based on

19  personal knowledge.

20       THE COURT:  Well, in part because in Nevada, right,

21  anyone can go to any polling location.  So unless the person

22  happened to know, which you wouldn't --

23       MR. SPIVA:  Yeah.

24       THE COURT:  -- the person's actually precinct, right, I

25  don't know that you could even have a basis for saying you have

———— 2:16-cv-2415-RFB-NJK ————

1  personal knowledge because you would have to have some

2  confidential or --

3          MR. SPIVA:  Right.

4          THE COURT:  -- particular information about that person

5  to be able to know what to challenge.  If I remember correctly

6  Nevada law, you have to be within I think that same registered

7  voter's polling location.

8          MR. SPIVA:  That's right, Your Honor.  That's right.

9  And so the danger here in addition to, you know, general

10 harassment is of course gumming up the lines on early voting.  I

11 mean, we've now seen in this country in several states, you

12 know, very long lines caused in part by this type of thing.

13         The other thing I wanted to say about that is we have

14 actually --

15         THE COURT:  So let me just understand you.  What you're

16 saying is actually the harm doesn't really ripen until election

17 day.

18         MR. SPIVA:  Well, I think it -- I don't know --

19         THE COURT:  Well, I mean, it's basically lying in wait,

20 as it were, for election day when observers from those same

21 locations can specifically challenge individuals in a way that

22 they can't really in early voting.

23         MR. SPIVA:  I mean, I wouldn't say that it's not ripe,

24 Your Honor.  What I would say, though, is that it's not

25 surprising that you don't have a bunch of formal challenges

—2:16-cv-2415-RFB-NJK—

1   under Nevada law in the early voting period, but what we have

2   pointed to that you have already is these incidents of

3   harassment by people who say they are Trump supporters.  And I

4   know they want to say, Look, that's not connected to us, but I

5   think we've put forward evidence that Mr. Trump and the campaign

6   totally owns those incidents.  That's exactly what they have put

7   out the call for people to do.  And we've pointed to three

8   instances already in Nevada of that happening and many others

9   across the country.

10          And so that would provide a basis, I think, as well for

11  injunctive relief in addition to the training.

12          THE COURT:  Okay.  And are you saying that the clear

13  and likely threat of or, in fact, eventuality of challenges on

14  election day is sufficient to warrant the issuance of an

15  injunction on that day?

16          MR. SPIVA:  Yes, Your Honor.

17          THE COURT:  For that day?

18          MR. SPIVA:  Yes.  Yes, Your Honor.  And it goes beyond

19  challenges, the formal kind of challenges under Nevada law, but

20  yes, Your Honor.

21          THE COURT:  Well, I have to say it seems to me that

22  that's the area based upon what you've represented and based

23  upon the Court's view of the law which at least creates the

24  greatest potential and possibility for misuse, particularly as

25  it relates to holding up election voting in a particular

——— 2:16-cv-2415-RFB-NJK ———

1   location through what would be allegedly improper challenges

2   repeatedly made against individuals at those locations.  Okay.

3          So I am going to have Mr. Hardy come back up just for a

4   brief moment to address that argument you just raised, and then

5   what we're going to do is we're going to take a little recess.

6   And then we're going to talk to me about -- you're going to come

7   back and tell me about discovery.  And, Mr. Hardy, you will also

8   tell me about what you intend to put on for tomorrow in terms of

9   evidentiary issues because I do think it would be important to

10  clear up this issue about this training, to the extent that it

11  can be cleared up or not, and then the Court would have to

12  consider that.  But thank you, Mr. Spiva.

13         MR. SPIVA:  Thank you, Your Honor.

14         THE COURT:  Mr. Hardy, why don't you address this issue

15  about the challenges really not being available logistically

16  speaking because of the nature of early voting in Nevada, which

17  is again, if I remember the law correctly, and I'll go back

18  because I want to read the different cases, you have to be from

19  that same polling location.

20         MR. HARDY:  That's actually in our training.  Good job.

21         THE COURT:  But -- okay.  Right?  But what I am saying

22  is that in early voting a person wouldn't necessarily be told or

23  know the voter's precinct, right?

24         MR. HARDY:  Right.

25         THE COURT:  And so there wouldn't logistically,

─────── 2:16-cv-2415-RFB-NJK ───────

1  practical speaking, be an ability to challenge the voter because
2  you wouldn't have personal knowledge of even the person's
3  precinct to challenge them.  So why should I not consider the
4  possibility of the impact of potentially inaccurate and
5  misleading training?  And, again, I'm not saying that that's
6  intentional.  I'm just saying that assuming that that's their
7  argument, why should I not consider that and its possible impact
8  on voters on election day in determining whether or not there
9  should be appropriate injunctive relief, specifically relating
10 to emphasizing the information that's not identified in the
11 power points?
12        MR. HARDY:  Couple of things, Your Honor.  One, in our
13 training it specifically says --
14        THE COURT:  Hold on just a moment, Mr. Hardy.  Let me
15 get there.  And can you tell me which slide or page it is?
16        MR. HARDY:  Yeah, it would be page 35 of 44 in our
17 motion, Your Honor.  It would be --
18        THE COURT:  In your response -- I'm sorry.  In your
19 response or in the declaration?
20        MR. HARDY:  In the -- to the response, Your Honor.
21        THE COURT:  And it would be again?  I'm sorry.
22        MR. HARDY:  It would be page 35 of 44.  It's the Poll
23 Watcher Training Voter Challenge.  This is the slide that I
24 think we've been discussing up to this point.
25        THE COURT:  Hold on.  Okay.  I'm there.

——— 2:16-cv-2415-RFB-NJK ———

1           MR. HARDY:  This is the subpart where Mr. Law then

2     talks about -- where we're talking about voter challenges.  It

3     says:  Voter watchers generally are not permitted to challenge

4     the qualifications of a voter.  Then Mr. Law talks about things

5     orally.  And then he gets another subpoint:  A poll watcher may,

6     however, challenge a voter if the poll watcher is a registered

7     voter in the precinct where he is serving as an observer.  Then

8     he talks about what are the permissible challenges and those

9     types of things.  So even within the training, it says unless

10    you're in your own precinct, you can't even do this.

11          THE COURT:  Right.

12          MR. HARDY:  And so one of the things that Mr. Law does,

13    and he's very good about it, and he can testify on the stand, is

14    he tries to send people outside of the precincts.  So it's not

15    even an issue to begin with.  Okay.

16          And so because we send people outside of their precinct

17    and we've told them, Unless you're in your own precinct, you

18    can't challenge, and they're serving in a different precinct, it

19    obviates the need for that.  You know, they can't do it.  You

20    can't do it anymore.

21          And so if it's -- and we are -- from what I am

22    understanding from the scheduling and those types of things,

23    people don't -- it is a rare occasion, if any, and I'm not

24    saying that it hasn't happened, but I don't think there has been

25    any at all.  They're not serving within their own precinct.  So

1   it's not an issue because they can't do it, and it is specific

2   in our training.  You can't do it.

3           THE COURT:  Okay.  Well, that's a separate question,

4   right, than whether or not the Court should consider the

5   potential harm that could be created on election day versus

6   early voting, because you had raised this point about there not

7   being challenges now.  But that point certainly takes on less

8   significance in the context of no challenges as evidence of

9   potential misuse of the challenging process because of the

10  nature of early voting in Nevada.

11          So my question to you is, to what extent should I

12  consider how this could play out differently based upon the

13  deficiencies that I have noted in this training on election day?

14          MR. HARDY:  And to the extent that you want -- you're

15  concerned about election day, Your Honor, specifically election

16  day and that's what we're targeting, I think it would be

17  extremely helpful to listen to what Mr. Law does as a part of

18  his training.  And I can proffer some of that, what he's going

19  to testify to.  He's going --

20          THE COURT:  But let's assume for the moment, because

21  again if I credit that testimony fully, right, then we might be

22  in a situation where I wouldn't issue any relief.  But let's

23  assume for the moment that I were not to credit it or I were to

24  find that even with his best of intentions people could be

25  misinformed.  My question to you is then two fold.  One is can I

—————————— 2:16-cv-2415-RFB-NJK ——————————

1  consider the potential on election day of confusing or

2  misleading information, even despite Mr. Law's best intentions?

3  And, two, in the context of that could I order on that basis

4  that these poll observers be informed about those aspects of the

5  law that were not explicitly typed out on the slide for poll

6  watching and voter challenges?

7       MR. HARDY:  If the Court is concerned and it finds

8  insufficient evidence that there wasn't sufficient training,

9  which it hasn't done yet, but if it does, if that happens, if

10  you find that the training just was insufficient -- it was done.

11  It wasn't done.  You want to make sure it's very clear.  And so

12  you decide it just wasn't sufficient at the time it was given,

13  then this Court I think in a limited fashion may have the

14  authority, assuming that they have proven all of the other

15  elements necessary to get an injunction, which they haven't.

16  Okay.

17       THE COURT:  And I'm not saying you're conceding that,

18  but, again, part of the reason why we're playing this is out is

19  because we don't have weeks and months to work these things out.

20       MR. HARDY:  And -- yeah, one of the requirements is

21  that they have to have an intent to deprive.  And we've talked

22  -- there's going to be a lot of things that are going to be out

23  there.

24       THE COURT:  Right.  And I understand that aspect, but

25  some of those are things that I would simply have to decide

1  based upon the testimony.  You've argued then they have to have

2  the intent, right, and there has to be a conspiracy in the

3  context of the Klan Act and the different aspects to that

4  requirement.  Putting that aside, I'm asking about the parts

5  where I think your input would be helpful as it relates to this

6  issue about what that injunction would be because, you know,

7  there are two aspects of this.

8          Even if I were to find, and again I'm not saying that I

9  would, that an injunction might lie, there's an entirely

10 separate question of what would be the nature of that injunction

11 in the context of the election and what would be appropriate

12 given the nature of the harm.  Now, given that I've tried to

13 focus on what I think could potentially be an area where they

14 might be able to establish some harm, and again I'm not saying I

15 would find that, but I think it's helpful to focus on that

16 issue, I wanted to hear your response to the potential remedy

17 that the Court has laid out.

18          MR. HARDY:  All of the assumptions that we've said,

19 taking that and moving towards the answer to your question, Your

20 Honor, a carefully crafted, which you have the jurisdiction to

21 possibly do, a carefully crafted injunction that requires that

22 all poll watchers -- and I would assume that you'd do it for

23 everybody, Democrats, Republicans.  You would want it sent to

24 every poll watcher in this state, not just us, but everybody,

25 making sure they're completely informed what their obligations

─────────── 2:16-cv-2415-RFB-NJK ───────────

1    are if they make a challenge.

2         I would assume that you would have the jurisdiction to

3    say, Absolutely, all poll watchers because of the concern that's

4    been raised for challenges, Democrats, Republicans, it doesn't

5    matter, if you're going to poll watch, then you need to be

6    notified that these are your obligations if you are going to

7    issue a challenge.  I think you can probably craft something

8    along those lines.

9         THE COURT:  Okay.  And, again, not saying that you are

10   conceding in any way that it would have to satisfy the different

11   requirements for obtaining an injunction in this case, which are

12   in fact substantial and, you know, and the -- I've raised the

13   concerns I have about the record in this case.  But it seems to

14   me that there are issues which again you all should be prepared

15   to talk more about tomorrow.  One of them is related to this

16   issue about anticipated harm based upon potentially confusing or

17   misleading training.  That seems to me to be the area where

18   there can be at least a more robust conversation about that.

19        And, again, I am saying that to you both so that we can

20   have a productive conversation not just later today, but

21   tomorrow more importantly in terms of what evidence you think

22   you can provide that would shore up the Court's concerns about

23   that or address that and how they may want to request

24   information related to discovery regarding that.  And then the

25   legal issue which is if there's been no evidence specifically of

——————— 2:16-cv-2415-RFB-NJK ———————

1  harm at this point, can I take into consideration what the

2  impact might be of instructions that I find to be deficient.

3          Now, there's a secondary question to that which is to

4  what extent the Court would still need to find, which I think

5  that I would, that that omission was intentional.  And the law

6  doesn't seem to me to be clear about whether or not there's even

7  the possibility of a sort of recklessness that rises to the

8  level of intentionality.  I don't know that it's there, but

9  certainly that's an issue I think that it would be worthwhile

10  for both parties to think about legally in terms of making

11  arguments to the Court.

12          Because it seems to me that the argument that the

13  plaintiffs would make in this context, and I'm not putting words

14  in their mouth, would be this was a deliberate and conscious

15  attempt to minimize the standard.  I don't comment on that.

16  That's not my role, but I have to at least consider what their

17  arguments might be.  Or their argument is it was reckless and it

18  was so reckless as to cross the line as it relates to

19  intentionality as was understood by the legislature, the

20  Congress, when they enacted it.

21          Now, there's even some issue, which you all know about,

22  what the intentionality requirement is, particularly as it

23  relates to the Voting Rights Act.  There is the House Report

24  that seems to suggest that there's no subjective intent.

25  There's a Ninth Circuit decision that's moot.  That's vacated.

—— 2:16-cv-2415-RFB-NJK ——

1   That's moot for other reasons.  And so I'm left with this

2   possibility of trying to ascertain what intentionality is here.

3   But so you all understand, the Court is looking at either an

4   argument about intentional omission of this information or

5   reckless omission and what impact that might have.

6         And so you should be prepared to talk about that,

7   particularly tomorrow, because at that point -- I don't expect

8   to take Mr. Law's testimony today, but I would expect to take it

9   tomorrow or whatever else you would have.  And then I would have

10  to make a determination based upon that, whether or not I

11  credited the testimony, and then based upon how I credited it

12  whether I would find that it was either intentional or reckless

13  and what the implications of that would be.

14        So I don't know if you have anything else to add to

15  that, Mr. Hardy, or not.

16        MR. HARDY:  What we're talking about is a power point

17  presentation, not the entire training.  So if it's going to be

18  reckless or intentional to just use bullet points in a power

19  point presentation, that's going to have huge implications for

20  everybody doing power points going forward, Your Honor.

21        THE COURT:  Okay.  Well, again, we'll see what the

22  evidence is and the context of that.

23        Mr. Spiva, do you have any comments as it relates to,

24  first, discovery?  Because what I was going to do is take a

25  short recess.  Let you all come back with requests.  I would be

—— 2:16-cv-2415-RFB-NJK ——

1   curious to hear about your response to Mr. Hardy's claim that

2   the Court could issue an injunction that would apply to all poll

3   watchers and that the Court would have essentially the authority

4   to direct potentially either that the poll watchers be given a

5   form that you all agreed upon potentially that said, Look, if

6   you're going to make a challenge, here's what the rules are and

7   that they be given that form before they make a challenge; but

8   also to the extent that that would just occur in all precincts

9   or whether or not it would occur in certain precincts.

10          But you may want to think about that response because I

11  do think there's a real issue about how I would choose which

12  precincts to do that in and whether or not it would be focussed

13  on their poll workers or whether or not it would be focussed on

14  the locations.  And then going back to this issue which I raised

15  earlier, which is what authority, because I think you need to

16  you provide it to me, I would be able to say to the State of

17  Nevada and the Secretary of State, You must do these things.

18  Because I'm not sure that I would be able to do that, but it may

19  mean that I could only do that within the context of those

20  individuals who work with the Trump Campaign.

21          So why don't we take a few-minute recess.  And, again,

22  Mr. Hardy, you're obviously not limited in your requests for

23  discovery.  This is not a one-way process in terms of discovery.

24  Now, I'm not sure what you would want, necessarily, but I did

25  want to be clear about if you wanted to seek information, I'm

1  not limiting you from seeking the information if it were

2  appropriate.  Again, I'm going to rule upon those determinations

3  probably tonight.

4          So I'll give you a few minutes, and then we will

5  reconvene in about 10 minutes and talk about discovery.

6          MR. SPIVA:  Thank you, Your Honor.

7          THE COURT:  I'm going to stay on the bench.  So you all

8  can remain seated.  Thank you.

9          (Recess taken at 5:25 p.m.)

10          (Resumed at 5:43 p.m.)

11          THE COURT:  You all still here?  Take your seats,

12  please.

13          Okay.  Mr. Spiva, am I saying -- I keep --

14          MR. SPIVA:  You're saying it absolutely right.

15          THE COURT:  Mr. Spiva, every time I say that I think

16  I'm saying it the wrong way.

17          Mr. Spiva, why don't you tell me what you think you're

18  going to want, and then I'm going to hear all of their

19  objections as to why you shouldn't get it.  And then we'll talk

20  about that.

21          MR. SPIVA:  Okay.  Thank you, Your Honor.  And we tried

22  to be very narrow.

23          THE COURT:  You know, with all the lawyers who have

24  said that to me, I now know it's going to be a list of 50

25  things.  No, go ahead.

1          MR. SPIVA:  Only 50 or 60.  Just I think -- so this is

2    what we propose.  All prior drafts of the training deck that we

3    saw and any memoranda that informed its creation, so that would

4    be one document request.  Second would be all field guidance

5    given to poll watchers mentioning challenges, including memos,

6    e-mails, text messages from Mr. Law.  So it would be limited to

7    Mr. Law's guidance, not --

8          THE COURT:  I'm sorry.  Let's be clear.  The first one

9    is all prior drafts of the training power point and

10   correspondence regarding that?

11         MR. SPIVA:  And any memoranda that informed its

12   creation.

13         THE COURT:  Legal memoranda?

14         MR. SPIVA:  We're not entitled to that, Your Honor.

15         THE COURT:  Well, I was going to say.  So what kind of

16   memoranda are we talking about?

17         MR. SPIVA:  Well --

18         THE COURT:  Because the only kind I could imagine would

19   be legal memoranda.  Mr. Law is an attorney.  So how would you

20   be entitled to that?

21         MR. SPIVA:  I don't think he was acting in a legal

22   capacity when he -- at that point, Your Honor.

23         THE COURT:  But how would he not be?

24         MR. SPIVA:  Frequently, you know, you have somebody

25   who's working in a business advisory capacity.  And businesses,

───── 2:16-cv-2415-RFB-NJK ─────

 1   you know, as Your Honor knows --

 2           THE COURT:  No, I'm saying that this is on a specific

 3   legal issue.  It's hard for me to imagine that they didn't

 4   consider him in terms of his legal background in terms of him

 5   drafting it, right.

 6           MR. SPIVA:  Let me suggest this, Your Honor.  If there

 7   was a memo that said -- to the trainers saying, This is what we

 8   should tell them.  You don't need to emphasize the fact that you

 9   have to have personal knowledge.

10           THE COURT:  Okay.  Well, that's different.  Okay.

11   That's different.  If you're saying was there an accompanying

12   memo for the trainers, okay, that's a different requirement.

13   I'm not saying I agree with it, but that's different than

14   memoranda informing the creation of the power point.

15           So you're saying prior drafts of the training power

16   point, and then I guess what would be sort of any sort of

17   accompanying instructions.

18           MR. SPIVA:  Yes, Your Honor, memoranda that reflect

19   instructions to the trainers.

20           THE COURT:  Memos to trainers.

21           MR. SPIVA:  And then the second one, I think I stated

22   it, Your Honor, but I can give it to you again if you need it.

23   This is the one with all field guidance given to poll watchers

24   mentioning challenges, including memos, e-mails, and text

25   messages.

—— 2:16-cv-2415-RFB-NJK ——

1          THE COURT:  You mean other than what they already gave

2  us?

3          MR. SPIVA:  Yes, Your Honor.

4          THE COURT:  Do you have any reason to believe that they

5  didn't give us everything?

6          MR. SPIVA:  Oh, I think the only -- we only had like,

7  you know, the deck itself.

8          THE COURT:  Right.  And do you have any reason to

9  believe there's anything besides that?

10          MR. SPIVA:  Well, you know.

11          THE COURT:  I'm not saying there isn't.  I'm just

12  saying that --

13          MR. SPIVA:  If there isn't, I mean, they could state --

14  they could so state.  They could say, No, this is what we give

15  them.  That would be significant in and of itself, Your Honor.

16          THE COURT:  So you're saying any other training

17  material --

18          MR. SPIVA:  Any other field guidance I called it, but

19  training material is also good.

20          THE COURT:  Okay.  Field guidance.

21          MR. SPIVA:  Given to poll watchers.

22          THE COURT:  Of training material.

23          MR. SPIVA:  That mention challenges, and this would be

24  from Mr. Law.  The third and I believe final document request

25  which requires a little bit of explanation, but let me state it

——2:16-cv-2415-RFB-NJK——

1    first is documents showing the scope of work between the Nevada

2    Republican Party and Stampede Consulting, LLC.  We have

3    submitted evidence, Your Honor, that one of the poll watchers,

4    Ms. Holland, this is in the Lindsay declaration, works for

5    Stampede.  The RNC in the New Jersey case that we're litigating

6    about the consent order between the DNC and the RNC had

7    submitted a declaration stating that Ms. Holland works for

8    Stampede.  And their -- Exhibit 39 of our filings has evidence

9    that the Nevada Republican Party has paid money to Stampede, and

10   we also have seen that in SEC filings.  We haven't submitted the

11   SEC filings because --

12          THE COURT:  Has paid money to Stampede for what?

13          MR. SPIVA:  Well, that's the question, Your Honor.  We

14   know that she was a poll watcher in Nevada.  That's from the

15   Lindsay declaration.  We know from the RNC declaration that

16   Ms. Holland works for Stampede.  The RNC --

17          THE COURT:  And then your argument would be what

18   exactly?  That --

19          MR. SPIVA:  Well, that if Ms. Holland -- if Stampede --

20   if they essentially outsourced their poll watching by paying a

21   third party, Stampede, then that's their agent.  Essentially

22   that's them doing the poll watching.

23          THE COURT:  Let me ask -- Mr. Hardy, let me ask you

24   this question.  Do you have a witness from the Republican Party

25   who can come here and basically say, or not, This is the extent

—— 2:16-cv-2415-RFB-NJK ——

1  of our poll watching activities?  And the reason why I say that,

2  I'm not saying you put that person on or you are intending to

3  put that person on because, again, it seems to me at least on

4  the record that I have that more or less the campaign has been

5  doing this and there isn't anyone else doing it.  And if you

6  were going to put someone like that on, that might address some

7  of these issues in terms of the discovery one way or another.

8       So I don't know if you were intending to do that or

9  not.  Again, I'm not saying you have to acquiesce on that, but

10  if you are going to do that, that might address some of this

11  issue.

12       MR. HARDY:  A couple of problems with this whole realm

13  of stuff that they're going into, this whole thing about --

14       THE COURT:  Okay.  But focus first on my question,

15  please.  I'm going to let you respond, but in the context of

16  what you would expect to present tomorrow, would you expect to

17  present someone from Nevada Republican Party who would talk

18  about the extent of its activities in terms of poll watching or

19  not?

20       MR. HARDY:  Mr. Law can testify, but we can also bring

21  in -- if I need to, I can bring in the chairman or somebody from

22  the Republican Party if this is going to be an issue.  And he

23  can tell you that the Nevada Republican Party does nothing other

24  than exactly what is stated in Mr. Law's affidavit, does nothing

25  other than allows its offices to be utilized by campaigns who

—2:16-cv-2415-RFB-NJK—

1   pay for their own poll watching.  And the Nevada Republican

2   Party does not do any poll watching and allows the campaigns

3   exclusively to handle that.

4         If that testimony is necessary or if a declaration --

5   because I know that tomorrow there's a number of individuals

6   coming in, into town, that are still running campaigns, and they

7   usually require the chairman of the party to be there for those

8   things and to be at those different events.  If I can get a

9   declaration to that effect from the chairman, I'm happy to do

10  so.  But there is no affiliation whatsoever.

11        THE COURT:  And based upon your proffer that the

12  chairman's declaration would say, We're also not paying other

13  entities to do poll watching for us?

14        MR. HARDY:  What this talks about -- their Exhibit 39

15  is that tweet that calls up a Ralston report.

16        THE COURT:  But again, Mr. Hardy, just focus on again

17  the proffered testimony because I think we can eliminate this.

18        You're saying to me that based upon your understanding

19  from your client that there is no paid agents who are doing poll

20  watching for the Nevada Republican Party?

21        MR. HARDY:  From my understanding, and this is --

22  again, my understanding is this, is that Stampede, anything that

23  they do, is related to walkers that go out and canvass

24  neighborhoods and do that kind of stuff.  That's what their

25  extent of their relationship was with them.  We do nothing, and

—— 2:16-cv-2415-RFB-NJK ——

1  I -- my understanding, it comes directly from the chairman.

2  They do nothing with respect to poll watching.

3            THE COURT:  Well --

4            MR. HARDY:  They allow other offices --

5            THE COURT:  And, Mr. Spiva, this goes to a problem I

6  think we are going to consistently have which is that someone

7  may work in one area of the campaign.  It doesn't prevent them,

8  for example, from being a poll watcher, right.  So I can work

9  for Stampede.  It doesn't mean that when I'm at the poll, I'm

10 doing that on behalf of Stampede at the behest of the matter of

11 the Nevada Republican Party.

12            So do you have any evidence or any information to

13 suggest that Stampede was engaged in poll watching/observing on

14 behalf of the Nevada Republican Party?

15            MR. SPIVA:  Well, the Nevada Republican Party has paid

16 Stampede quite a substantial amount of money.

17            THE COURT:  All right.  But --

18            MR. SPIVA:  Not just a tweet, Your Honor.  We can --

19            THE COURT:  But they can be paid for lots of things,

20 right, that don't have anything to do with poll watching.

21            MR. SPIVA:  Sure.

22            THE COURT:  So do you have any information that

23 suggests that they were paid in connection with poll watching?

24            MR. SPIVA:  This is the connection I have, Your Honor.

25 And so Ms. Holland was poll watching.  She actually said she

—— 2:16-cv-2415-RFB-NJK ——

1   worked for the RNC, which would be a big problem for the RNC

2   concerning its consent order in New Jersey.  The RNC submitted a

3   declaration saying she worked for Stampede.  And she was a poll

4   watcher here in Nevada, and there are SEC filings --

5          THE COURT:  But who said that?  She said that or

6   they -- I mean, who's saying that she actually works -- she

7   worked for Stampede on behalf of the Nevada Republican Party?

8   Because I still don't see a connection between anything that

9   you've just said and how that connects to Stampede doing poll

10  watching at the direction of the Nevada Republican Party.

11         MR. SPIVA:  Well, she definitely was a poll watcher

12  here.  And so we have --

13         THE COURT:  But, again, that doesn't necessarily

14  establish a relationship.

15         MR. SPIVA:  It doesn't, Your Honor.

16         THE COURT:  She could be there on her own.  I mean, she

17  could be doing -- there are lots of ways she could be there.

18         MR. SPIVA:  Yes, that's true, Your Honor.

19         THE COURT:  So, again -- well, here's what I am going

20  to say to you.  I'm not really -- and on some of these issues I

21  may rule on the fly.  I'm not inclined to allow that discovery

22  at this point in time.  If for some reason it becomes relevant,

23  that's fine, but let's move onto the next request.

24         MR. SPIVA:  Okay.  Thank you, Your Honor.

25         So then I think the other request, there would be -- we

——— 2:16-cv-2415-RFB-NJK ———

1  suggest three interrogatories and I think one more document

2  request.  One interrogatory would be a list of all persons who

3  have ever provided the training reflected in the power point.

4  The second one, which is related, would be a list of dates of

5  that training and the people who provided the training on those

6  dates.  And I guess I should be a little more precise, people

7  and their role or title and who they worked for.  And then the

8  origin of the training -- the training, excuse me, document, who

9  created it, and when would be the three interrogatories that I

10  would suggest.

11        THE COURT:  I'm sorry.  List of the people who did

12  training --

13        MR. SPIVA:  List of persons who provided the training.

14        THE COURT:  Right.

15        MR. SPIVA:  List of dates on which the training was

16  provided and the people who did it on those dates.  Really, I

17  guess that's really one interrogatory, Your Honor, with maybe a

18  couple subparts.

19        THE COURT:  Right.

20        MR. SPIVA:  And then to state the origin of the

21  training document, who created it, and when.  And then the last

22  request would be a document request, and this would be limited

23  to the last 60 days, Your Honor, so time limited, any and all

24  communications regarding voter challenges between the Trump

25  Campaign and representatives of the Nevada Republican Party.

———— 2:16-cv-2415-RFB-NJK ————

1  It's limited in a couple of different ways.  It's time limited

2  and it's limited by subject.

3          THE COURT:  How would they figure that out exactly?  So

4  last 60 days --

5          MR. SPIVA:  Well, they've represented that it is a null

6  set.

7          THE COURT:  -- any correspondence between the Nevada

8  Republican Party and the Trump Campaign regarding challenges.

9          MR. SPIVA:  Voter challenges, yes.  And they've

10  represented I think essentially, Your Honor, that it should be a

11  null set.  If there is a whole lot of communication, then that

12  suggests that there is more coordination and participation by

13  the Nevada Republican Party than they're saying.

14          THE COURT:  Okay.  All right.  Is there anything else?

15          MR. SPIVA:  That's it, Your Honor.

16          THE COURT:  Okay.  Why do you need the origin of the

17  document?  What difference does that make?  Isn't it more

18  important how it's used than where it came from?  Why does that

19  matter?

20          MR. SPIVA:  Well --

21          THE COURT:  If the person who originated it isn't the

22  one who used it to train, why does that matter?

23          MR. SPIVA:  Well, I guess also who created it, Your

24  Honor, because it depends on, you know, whether it's somebody

25  within the organization, when, whether it was recently, or

─────── 2:16-cv-2415-RFB-NJK ───────

1  whether --

2          THE COURT:  Okay.  How is that relevant?  Right.  I

3  mean, isn't it really about this very narrow issue of how the

4  training document was actually used or not used, right?  I mean,

5  isn't that really the issue?

6          MR. SPIVA:  I think that's the most important issue,

7  Your Honor, but I think this is calculated to potentially

8  uncover relevant evidence which is the, you know, the discovery

9  standard, Your Honor.  Because if it was recently created, if it

10 was created, you know, by somebody, say, from the Nevada

11 Republican Party, I mean, all of those things may bear on issues

12 in this case in terms of either coordination or intent, to the

13 extent that intent is an issue.

14         THE COURT:  Well, again, let's distinguish between

15 things that -- I assume Mr. Law is going to testify tomorrow

16 which I think would be appropriate for him to do so, and that's

17 what they've represented.  What's the significance between

18 things that you may want in discovery and things you may just

19 ask him?  Because it seems to me that you may not have a basis

20 for asking for it unless he provides certain answers.  Because

21 it's not clear to me that the timing of the creation of the

22 document has particular relevance to its use; that the

23 implementation of the document seems to me what's most important

24 in terms of training.  So I'm not sure how that -- how that is

25 relevant to the Court's inquiry here.

1          MR. SPIVA:  And it may or may not be, Your Honor.  I do

2    think, though, that it has a strong possibility of producing

3    relevant evidence in the sense that if it was created recently,

4    that might suggest something different in terms of either

5    motive.  Whether it was created 10 years ago and this is just

6    what they've always used, that might suggest something

7    different.  But I will say this, Your Honor, because I

8    understand Your Honor's skepticism, that is the reason that

9    wasn't the first thing that I asked for.

10          THE COURT:  No, that's probably a good choice.  I'm not

11    inclined to allow that at this point in time.  So here's what I

12    will tell you.  As it relates to the poll trainers, I'll hear

13    from Mr. Hardy about the testimony, but it seems to me that that

14    might be premature in terms of who else may have conducted the

15    training.  So I will say this.  I'm not going to at this point

16    in time permit the interrogatories, but I might permit them

17    based upon what the representations are for Mr. Hardy and then

18    potentially the testimony of Mr. Law tomorrow.

19          Mr. Hardy?  Thank you, Mr. Spiva.

20          MR. SPIVA:  Thank you.

21          MR. HARDY:  Can I take it in reverse?  Because I think

22    it's real easy to identify.  If they want this -- who the origin

23    of the document is, the bottom of every page says:  Paid for by

24    Donald Trump for President, Inc.  I think that's pretty obvious

25    who paid for it and where it came.  It came from --

——— 2:16-cv-2415-RFB-NJK ———

1          THE COURT:  Well, I think that they want a little bit

2   more than that, Mr. Hardy, but I think that they wanted -- I

3   understand they want to know who drafted it.  And, again, I'm

4   not sure how relevant that is in the context of how it may be

5   used.

6          But why don't you talk to me a little bit about this

7   issue potentially of the last 60 days as relates to any

8   potential coordination or correspondence regarding coordination

9   between the campaign -- Trump Campaign and the Nevada Republican

10  Party about voter challenges.

11         MR. HARDY:  Well, I think what they're asking for is

12  for us to somehow scour every server for the Nevada Republican

13  Party and every server for the Trump Campaign looking for any

14  and all correspondence that could potentially have the words,

15  what, voter challenges inside of it.

16         THE COURT:  So what if it was limited to this.  Mr. Law

17  is going to testify.  It seems that given his testimony his

18  non-privileged correspondence could potentially be relevant.

19  Otherwise, they'd have to accept everything that he says, which

20  I think wouldn't be appropriate.  If he's going to testify based

21  upon his recollection or information that he has in relationship

22  to the training, I think it would be appropriate for him to

23  produce material that would serve as the basis for that.  Would

24  you agree?

25         MR. HARDY:  I have no problem producing whatever he's

───────── 2:16-cv-2415-RFB-NJK ─────────

1  utilized in any of his trainings, Your Honor.  That would be not

2  a problem.  I think we've produced all of that, but I'll

3  double-check with Mr. Law and make sure we bring all of that in.

4           THE COURT:  Okay.  What about this follow-up issue

5  which relates to whether or not Mr. Law has had communication,

6  just Mr. Law, with the Nevada Republican Party about voter

7  challenges?  What would be your position on that?  Because I

8  imagine he's going to testify about how he hasn't had that

9  communication with them based upon your representation.  It

10  would seem to me, that's fine, that they would at least be

11  permitted to issue that request, and then his response would be,

12  There is nothing or here's what the limited coordination would

13  be.

14           But it does seem to me that that might be a fair

15  request given his testimony about what the nature of that

16  relationship is, but I want to hear your comments on that.

17           MR. HARDY:  In anticipation, because you saw me look

18  back at Mr. Law when he was here previously on a couple of those

19  things, and I was questioning whether there had been any voter

20  challenges today.  So any communications between him and the

21  Republican Party would necessarily be none because he's told me

22  there have been no voter challenges.  So what would he be

23  communicating to the party?  Would he be saying, Hey, telling

24  you for another day that there's still not been any voter

25  challenges?  Okay.  Here's another update.  No more voter

——— 2:16-cv-2415-RFB-NJK ———

1   challenges.  There's not been any -- that communication just

2   doesn't happen.

3          THE COURT:  Well, let's step back, though.  First, it's

4   just your position on the request because I do think if he's

5   going to testify, which it sounds like you are going to proffer

6   him, that they're entitled to information that would relate to

7   his communication with the Nevada Republican Party about

8   challenges.  Now, it may be that there's nothing there.  And

9   then you make that representation and he does that he's made the

10  search and there's nothing there.  But are you saying you would

11  object to having to even respond to such a request?

12         MR. HARDY:  I think that they can ask that question of

13  him tomorrow or whenever they want to in cross-examination, and

14  they can get whatever fodder they can of any communications that

15  are not privileged communications.  Now, there's a big

16  difference if there's privileged communications.  Obviously if

17  he's consulting with an attorney or something like that, there

18  may be some privileged communications, but if he's communicating

19  with somebody over at the Republican Party, they can ask him

20  about that.  And that may be admissible for them to go ahead and

21  ask those questions.

22         But at this point in time asking for us to go through

23  or asking him to go through and provide all of these documents,

24  I don't know that -- I think it's unreasonable, particularly for

25  the last 60 days.  If we're going to even limit it closer to

1    that, we've only been doing early voter training I think for

2    about a week before the early voting.  So we're looking like the

3    last 20 days at best, I mean.

4              THE COURT:  So what if the request were to be this from

5    the Court?  30 -- the past 30 days Mr. Law would be required to

6    produce any communications he had with the Nevada Republican

7    Party regarding voter challenges.  It seems to me, one,

8    Mr. Hardy, that's going to be the basis of his testimony anyway

9    and that they would, therefore, be entitled to it in some shape

10   or form.  It also seems to me that's fairly limited.  That he

11   would know who those people are that he's communicated with,

12   that that's not an extensive search of his e-mail.  That's

13   basically the past, what did I say, 30 days in the context of

14   that.  What's your position on that particular narrow discovery?

15             MR. HARDY:  I anticipate that it's probably going to be

16   -- the answer is going there is nothing, but given the narrow

17   scope of it and where it sits right now, despite my other

18   objections, I think we can probably get that together, that

19   information together, if it's just limited in that fashion of

20   what we just talked about, last 30 days Jesse Law corresponding

21   with the Nevada Republican Party, if at all, regarding

22   specifically voter challenges that they've received.

23             THE COURT:  Okay.  Mr. Spiva, you want to comment on

24   that particular limited discovery directive?  Because it seems

25   to me, absent something more from him, them sort of trolling

———— 2:16-cv-2415-RFB-NJK ————

1  through their e-mail to find out who else may have coordinated

2  between the campaign and the Nevada Republican Party is

3  unnecessarily burdensome.  And there's not really a basis for

4  the Court ordering it at this point in time.

5        Now, if he says, I had regular conversations with the

6  chairman of the party about these issues and three other people,

7  okay, but I don't see any basis for ordering more than his

8  particular correspondence with the Nevada Republican party as it

9  relates to voter challenges.

10        MR. SPIVA:  Right.  And I just -- I just wanted to

11  clarify, Your Honor, that that is not limited to conversations

12  about a specific challenge because there probably haven't been

13  many or any, but it's about the strategy for dealing with them

14  and the coordination and that type of thing.  You know, I think

15  as Your Honor knows, we were not limiting it to Mr. Law, but I

16  think that -- you know, I think in terms of a limitation, we

17  could live with and probably have to live with it being limited

18  to Mr. Law.

19        But I just want to clarify because I think part of what

20  I was hearing on the other side maybe was, Oh, he wouldn't have

21  had any communications about a specific voter challenge because

22  there haven't been any voter challenges, and that wasn't our

23  request.  Our request was about communications about voter

24  challenges, in other words, the strategy, how to deal with, how

25  to train about, that type of thing.

—————— 2:16-cv-2415-RFB-NJK ——————

1          THE COURT:  Well, I think you have to be careful about

2     what strategy and advice because I think that we may get into

3     other privileged areas, right, I mean.  So, in other words,

4     let's say Mr. Law were to say, I think we can adopt -- based

5     upon my review of the law, and he's coordinating with the

6     campaign, I think we can use this strategy, but we couldn't use

7     this strategy because it might run afoul of the law.  Would you

8     be entitled?

9          MR. SPIVA:  Well, if he's communicating with the Nevada

10    Republican Party, then he would have waived the privilege if

11    he's claiming a legal privilege.

12          THE COURT:  Well, well...

13          MR. SPIVA:  He's operating in a business capacity here.

14          THE COURT:  Okay.  And so you're saying if he says in a

15    communication with the Nevada Republican Party, This is what we

16    think we can and can't do and he's not providing legal advice,

17    then as far as we know at this point he isn't operating as an

18    attorney for the Nevada Republican Party.  And that may be a

19    separate issue that comes up, but you're saying to the extent

20    that he makes that kind of communication then the privilege

21    would be waived.  That there isn't some basis for establishing

22    that he also worked as an attorney for the Nevada Republican

23    Party.

24          MR. SPIVA:  For the Trump Campaign, Your Honor, at this

25    point.

—— 2:16-cv-2415-RFB-NJK ——

1          THE COURT:  I'm sorry.

2          MR. SPIVA:  Yeah, Mr. Law is with the Trump Campaign.

3          THE COURT:  No.

4          MR. SPIVA:  He was with the Nevada Republican Party at

5    one time.

6          MR. HARDY:  He was previously with the Nevada

7    Republican Party.  When the poll watching came in, he got hired

8    by the campaign.  As you know, in this -- people get paid in

9    different --

10         THE COURT:  No, but what I am saying is right now what

11   he has said is he's working for the campaign.  The training's

12   for the campaign, right.  He is not currently and hasn't been,

13   at least as far as I understand it from the declaration, been

14   employed by the Nevada Republican Party.

15         MR. HARDY:  He has not been employed by the Nevada

16   Republican Party.  I don't know if he's ever been paid by the

17   Nevada Republican Party.

18         THE COURT:  But even if he were retained, I mean, he's

19   a lawyer.

20         MR. HARDY:  He's a volunteer with the Nevada Republican

21   Party for years, but that doesn't surprise anybody that somebody

22   who is a Republican would volunteer or work for the campaign.

23         THE COURT:  I'm really trying to focus on to the extent

24   that there would be privilege issues.  I mean, if he's working

25   for the campaign and he sends an e-mail then to the Nevada

—— 2:16-cv-2415-RFB-NJK ——

1  Republican Party saying, Here's what I think we can do in terms

2  of our strategies for voter challenges, then that's not covered

3  by a privilege, obviously.

4       MR. HARDY:  Here's the problem that we've got is we've

5  got the Nevada Democrats wanting to figure out what the

6  strategies are of the Nevada Republicans.

7       MR. SPIVA:  That's a whole other issue.

8       THE COURT:  That's a separate issue.  First we're

9  talking about the privilege in terms of who he represented, and

10  I wanted to figure that part out first.

11      MR. SPIVA:  Your Honor, can I address one issue?

12      THE COURT:  Hold on.  Just let me finish.

13      There's a separate issue about if there's discussion

14  about campaign strategy and to what extent they're permitted to

15  know that.  And, again, as I indicate in my order, I'm not

16  saying you have to provide that information necessarily.  Part

17  of the issue really relates to what extent the privilege extends

18  in terms of strategy to communications to the Nevada Republican

19  Party.  So if the campaign communicates to the Nevada Republican

20  Party, This is our strategy on voter challenges, is it your

21  position, Mr. Hardy, that that's privileged?

22      MR. HARDY:  A couple of things, Your Honor.  Just so I

23  understand, the question is if the Nevada Republican Party

24  corresponds with somebody from the Trump Campaign and they're

25  discussing strategy, the question is whether that is privileged

——— 2:16-cv-2415-RFB-NJK ———

1  or am I --

2        THE COURT:  As it relates again voter challenges.  I'm

3  not talking about general strategy, right.  If there is a

4  discussion between, and I'm focussed right now on Mr. Law,

5  between Mr. Law and members of the Nevada Republican Party that

6  says, Here's what the campaign strategy is as it relates to

7  voter challenges, is that communication privileged and why?

8        MR. HARDY:  I think that it's internal strategies, and

9  the internal communications that are talking strategies are

10 completely inappropriate, if they exist.  We're just assuming.

11 But if they even exist, it would be completely inappropriate.  I

12 think the less onerous thing to do would be for you to require

13 me to have Mr. Law prepare to testify on these issues tomorrow,

14 and I can have him prepared to testify.

15        THE COURT:  Well, here's my concern about that.

16        MR. HARDY:  Rather than get a bunch of documents --

17        THE COURT:  What I don't want to have happen is he gets

18 up there and he testifies about certain relationships.  Then

19 what happens is they say, Well, based upon his testimony I want

20 this information.  When this information could have been

21 collected in anticipation of certain testimony.  So it may very

22 well be that I might order you to collect certain information,

23 but not necessarily produce it based upon what happens with the

24 testimony.  But I don't want us to be delayed yet another day

25 collecting information that could be collected now.

1        I mean, a basic search as to the nature of

2   communications as relates to voter challenges between the

3   campaign and the Nevada Republican Party specifically focussed

4   on Mr. Law does not seem to me to be particularly onerous and

5   something that couldn't be done.

6        MR. HARDY:  And here's the other issue, Your Honor, is

7   the fact --

8        THE COURT:  Okay.  Let me just finish -- focus on that.

9   So right now what I'm focussed on is the issue of whether or not

10  those communications, if they exist, between Mr. Law and the

11  Nevada Republican Party about voter challenges, whether or not

12  those communications would in fact be privileged in some way.

13       MR. HARDY:  I think that they would under a common

14  interest privilege, Your Honor.  I think that they have a common

15  interest.  The Nevada Republican Party and the Trump Campaign

16  have a common interest.  Interestingly enough, we now know the

17  law firm from D.C. is also the same law firm that is working

18  with the Clinton Campaign.  Okay.  And now they're out here

19  filing on behalf of the Nevada Democrats.  Okay.  Which is fine.

20  They can do that.

21       But I'm not going to be asking, or maybe I should ask

22  as a part of what I want because I want to know their campaign

23  strategies as well, Tell me what the Hillary Campaign is talking

24  about with respect to voter stuff related to -- between the

25  Hillary Campaign and the Nevada Democratic.  They would

—— 2:16-cv-2415-RFB-NJK ——

1  absolutely say, That's a common interest privilege.  We're not

2  going to disclose strategies.  We won't want to talk about that.

3  Even if we put an attorney's eyes provision on that because,

4  they are the attorneys for the same party, it's going to become

5  a problem.  And so there is no way --

6          THE COURT:  So, first of all, you're saying that it

7  is privileged and it is covered by the common interest

8  privilege.

9          MR. HARDY:  Absolutely.

10          MR. SPIVA:  May I be heard on that, Your Honor?

11          MR. HARDY:  And the First Amendment.

12          THE COURT:  Okay.

13          MR. SPIVA:  Yeah, I think there are a couple different

14  privileges that may be getting mixed up here.  I mean, on the

15  one hand, to the extent there's any discussion of

16  attorney/client privilege involved in this, he was not acting as

17  an attorney either for the Nevada Republican Party when he

18  worked for them or for the Trump Campaign when he works for

19  them.  And if he -- even if he were, if he communicated with an

20  outside party about legal issues, that waives the privilege.

21          Now, if they are going to assert that, they'd of course

22  have to put it on a privilege log and provide the basis.

23  Therefore, maybe they could establish it.  The other I think

24  privilege that he's alluding to, which I'm familiar with, is the

25  First Amendment privilege against certain internal

1  communications.  But, here, we're talking about something --

2  we've come full circle because we were told that there's no

3  coordination, that there -- that essentially this should be a

4  null set, but now it's like, Well, there's all this

5  coordination, but it's privileged.

6         THE COURT:  Well, I don't know if he's saying all of

7  this coordination.  I think what they said is they have a common

8  interest and that that common interest may cover it.  I mean, it

9  is true that they took the position and they take the position,

10  the defendants do, that they're separate and that they're not

11  coordinating.  That wouldn't prevent them from having a common

12  interest.  Because you have a common interest privilege doesn't

13  mean that you are necessarily found by the Court to be even an

14  alter ego of the entity with which you have a common interest or

15  even necessarily coordinating, but it would mean that the Court

16  would have to look at the extent to which communications were

17  covered by a common interest privilege.  But that doesn't

18  establish a unitary organization, right?

19         MR. SPIVA:  No, not necessarily, but we're a long way I

20  think from them being able to establish all of the things they'd

21  have to establish to get there, Your Honor, in terms of a common

22  interest privilege.  You know, first, they'd have to establish

23  there was an attorney/client privilege.  Then they would have to

24  established that he was acting in an attorney capacity, and then

25  they'd have to establish that this communication was somehow

———— 2:16-cv-2415-RFB-NJK ————

1    protected by a common interest and meet that test.

2          I think he's actually moving to the First Amendment,

3    Your Honor, and here what all we're asking for is communications

4    regarding strategy for voter challenges.  It doesn't go to the

5    type of core First Amendment speech that he's talking about and

6    the right to association and all of that.  I get all of that.

7          THE COURT:  We don't know that because we haven't seen

8    it.  I don't know that.  I mean, voter challenges may be part of

9    that strategy.  I don't know that.

10         MR. SPIVA:  Well, I think it is, actually.  That's part

11   of our lawsuit is that we actually think the Trump Campaign is.

12   But, Your Honor, they would need to do a privilege log.

13         THE COURT:  Well, let me stop you here.  Let's do this.

14   I do think that it would be appropriate, Mr. Hardy, for this

15   information to be collected and gathered.  Mr. Law's going to

16   testify.  There has to be some ability on their part to be able

17   to obtain information that might not be privileged.  So what I

18   am going to direct you to do is to gather any correspondence

19   that Mr. Law may have had with the Nevada Republican Party

20   specifically about the issue of voter challenges.  Okay?  You

21   are then to submit to the Court under seal before his testimony

22   your position as to whether or not the information that you've

23   gathered is privileged, why it would be privileged, what the

24   extent of the communications are, how many communications there

25   are, and what the nature of them is.  And then you're to provide

———————— 2:16-cv-2415-RFB-NJK ————————

1  those communications to the Court in camera.

2      If you think that there's some reason why the Court

3  shouldn't view them in camera, you can provide a basis for that,

4  but it seems to me that you are going to have a pretty high

5  standard to meet to do that.  However, I'm going to allow you to

6  make that argument as well, but you need to make sure you have

7  the documents ready.

8      My biggest concern, Mr. Hardy, quite honestly is just

9  any delay from having to gather them.  Again, it seems to me

10 this is a fairly straightforward search in the context of

11 correspondence or e-mail, that the documents be gathered, and

12 then we can have arguments back and forth about whether or not

13 they're privileged, what should or shouldn't be produced partly

14 based upon what he says on the stand or not, but at least have

15 that information ready.

16     So you will -- for the past 30 days you will gather the

17 information as relates to correspondence, any correspondence

18 between Mr. Law and the Nevada Republican Party regarding voter

19 challenges generally, voter challenges in terms of training, and

20 voter challenges in terms of the strategy.  And then you will

21 provide to the Court in camera -- I will give you until 10

22 o'clock tomorrow to provide in camera the response to that.

23     I will give you an opportunity before he testifies to

24 give you a sense of whether or not the Court thinks that they

25 are in fact privileged or not.  So that may help you in terms of

———— 2:16-cv-2415-RFB-NJK ————

1   what you would --

2           MR. HARDY:  And all of this is under the assumption,

3   despite the misrepresentation of counsel, I don't even know if

4   there's any documents.

5           THE COURT:  No.  Again, this may be the easiest

6   document request that you've ever done as a lawyer.

7           MR. HARDY:  It potentially could be.

8           THE COURT:  Right.  So, again, part of this is just to

9   avoid unnecessary delay to try to resolve all of these issues at

10  one time.

11          So that's on that issue which is 30 days, the past 30

12  days.

13          Mr. Hardy, talk to me about your position on drafts,

14  previous drafts of the training.  And it seems to me that this

15  may have similar issues as it relates to privilege or not and

16  comments, and it may be that you submit that to me also under

17  seal or at least collect it and submit it under seal and subject

18  it to the same type of log and then submission to the Court

19  because I can see where you would have the same challenges.  But

20  why don't you talk to me about that.

21          I know -- I'm not asking you to comment on whether or

22  not they exist or not, but to the extent that there were drafts

23  and there were comments on the drafts, what's your position on

24  whether or not they would be produced or not?

25          MR. HARDY:  First of all, any comments on any drafts,

1   they would have been done by attorneys and would be attorney

2   work product.  Those would not be -- if they were drafted by

3   attorneys, if these things were put together by attorneys and

4   there were comments back and forth between them and their

5   attorneys, that would all be work product covered by the

6   attorney/client privilege.

7           THE COURT:  Well, but here's one issue with that.  If

8   Mr. Law gets up and says, I was never informed about or no one

9   told me that this would be a significant issue in terms of the

10  legal implications of this or if he says, In terms of my

11  approach to the training, it was not my intention to omit it,

12  but there are in fact communications back and forth that relate

13  to that as to what he thought or didn't think, I don't know the

14  privilege would extend to that, would it?

15          MR. HARDY:  Absolutely it would.

16          THE COURT:  Why is that?  So you're saying that he

17  would be able to say that he had never thought about the

18  potential implications of the impact of omitting material.  If

19  he had had conversations about that with lawyers on the stance

20  that he never had thought about that, would he be able to say

21  that?

22          MR. HARDY:  If he corresponds with the attorney for the

23  Trump Campaign and he goes back and forth on what they're going

24  to do, all of those correspondence as he's seeking advice and

25  he's seeking on how he needs to move forward, that advice is

1  attorney/client privilege.  And any work product that's provided

2  by the attorney inputting into that is the attorney's work

3  product.  All of that is protected.

4        THE COURT:  Okay.  Because it seems to me that there

5  may be some aspect -- go ahead.

6        (Defense counsel conferring.)

7        MR. HARDY:  The other issue is that I don't know how --

8  and I want to make sure because we can track a document.  I

9  don't know how this document would be tracked, but I can tell

10  you how something may have happened in my office on other

11  things.  Okay.  I may have an associate draft it for me.  He

12  sends it to me.  We go back and forth on some things, and then I

13  get a draft that I then send out to my client of whatever the

14  document is.  And then after that the client and I communicate

15  on how we want to revise things.  That's kind of the normal

16  process of attorneys.  Not saying it happened here.  I'm just

17  saying that's kind of the normal process, right.

18        Obviously all of that communication between the partner

19  and the associate or whatever that internal stuff was, that's

20  attorney/client privilege.  That's work product.  That's

21  clearly, clearly protected information.  Okay.

22        And none of that -- those drafts that went back and

23  forth there are not discoverable under any circumstances under

24  the law.  And that's kind of the vertical, right.

25        Now, let's go to the horizontal side of the thing or

—2:16-cv-2415-RFB-NJK—

1  maybe it's the horizontal and now we go to the vertical is where
2  we go from the attorney to the client.  And that is also
3  protected by the attorney/client privilege.  What you're -- what
4  we're hypothesizing about -- and that's really what we're doing
5  here because we have no idea what is going to be said.  But if
6  Mr. Law tomorrow says, I never had any communications with an
7  attorney regarding this and in fact there are communications to
8  that, I still think those are privileged communications because
9  at that point -- because they are privileged.  By their very
10 nature they're privileged communications.

11        THE COURT:  But what if Mr. Law says, There were no
12 earlier versions of this training that included information
13 about voter challenges as it relates to personal knowledge and
14 the form and the consequences, can he get on the stand and say,
15 No earlier drafts included this information if an earlier draft
16 in fact did and he received advice from a lawyer that he didn't
17 need to include it?

18        MR. HARDY:  What I anticipate is --

19        THE COURT:  No.  Again, answer the question first
20 because again I'm trying to figure out the parameters of this.
21 I know what you anticipate.  You anticipate, Mr. Hardy, that
22 none of this is going to be necessary.  And in some ways, you
23 know, that would make things easier, but what I have to
24 anticipate is if it isn't.  And if it doesn't turn out that
25 these hypotheticals are relevant, then they're not relevant.

——— 2:16-cv-2415-RFB-NJK ———

1   But I do want to be able to be prepared for that and allow them

2   to be able to at least make arguments about that if they think

3   that's appropriate.

4        MR. HARDY:  Unless there's a crime or fraud that's

5   perpetuated, Your Honor, I don't think there's any way to waive

6   that privilege.

7        THE COURT:  Well, if he got on the stand and said he'd

8   never seen it, what I am saying to you is would that create the

9   possibility of that information -- that privilege being waived

10  as related to an earlier draft?  Which your position is that

11  even if there was an earlier draft that contained this voter --

12  other voter challenges information that we discussed earlier,

13  and he were -- he requested clarification about whether or not

14  they thought it would be necessary or appropriate to include it

15  and he was told, Yes, there are issues with this, but you don't

16  have to include it in our legal opinion in terms of it being

17  appropriate for identifying what the law is; your position is

18  that if he were to get on the stand and say, I have never been

19  informed about the potential implications of not including this

20  or I didn't intentionally withhold it or even consider it in the

21  context of training, that that still wouldn't waive the

22  privilege as it relates to a communication about the structure

23  of that training?

24        MR. HARDY:  Well, I think what you're talking about is

25  if he perjures himself on the stand, can it be utilized.  I

—— 2:16-cv-2415-RFB-NJK ——

1  mean, that's what we're coming down to.

2          THE COURT:  Yes.

3          MR. HARDY:  It's simple, right?  If he's committing a

4  crime of fraud or other types of things like that, I think there

5  are certain privileges that can be waived at that point in time.

6  What we're talking about, though, is I want to make sure we're

7  very clear on the word "drafts" because this is I think what is

8  going to be the confusing issue on this is the specific word

9  "drafts," right.  Mr. Law gets up there, and he can testify --

10  because what we're talking about specifically is the trainings

11  that were issued to people in Nevada.  Okay.  That's what we're

12  talking about.  We're not talking about what trainings went out

13  anywhere else.

14          THE COURT:  Right, and I'm not focussed on that.

15          MR. HARDY:  We're talking about Nevada and what

16  happened with Mr. Law.  Mr. Law can testify through his own

17  personal knowledge that, Hey, I got this draft.  This was what

18  was -- this was the approved version that the Trump Campaign

19  gave me, and I've operated off of that the whole time, and I've

20  never seen any other drafts.  This is it.  Or he can testify,

21  This is what I got, and because there was an issue that was

22  raised, I added something to the power point.  So that's what

23  the next draft looks like.  Those are the drafts we are talking

24  about.

25          What happens or who the original guy who put the color

```
──────── 2:16-cv-2415-RFB-NJK ────────
```

1  behind it or whoever else did these different types of things,

2  Mr. Law may have no knowledge of who did this original thing

3  because it may have been prepared generally across states and

4  then tailored specifically for this state and he had no

5  involvement in that until he got it to do the presentation.  So

6  the drafts that we are talking about are the drafts that Mr. Law

7  has seen that he can testify about, and that's it.

8          THE COURT:  Right.  No.  And those were the only drafts

9  that the Court would be focussed on, drafts related to voter

10  challenges and poll watcher training here.  The only tricky part

11  about this, Mr. Hardy, is it's not clear to me whether Mr. Law's

12  operating as an attorney for the campaign or operating as simply

13  a layperson who happens to be an attorney because that's an

14  important distinction.

15          MR. HARDY:  Mr. Law is not an attorney.  How about

16  that?

17          THE COURT:  Oh, I thought he was an attorney.

18          MR. HARDY:  No, he's not an attorney.

19          THE COURT:  Oh.  Well, that clarifies that.

20          MR. HARDY:  Just because his last name is Law doesn't

21  make him one.

22          THE COURT:  Maybe that's what it was, the subliminal

23  message.  Okay.  Perfect.  That makes this much easier.  I

24  thought that he was, and again maybe it's because his last name

25  is Law.

———— 2:16-cv-2415-RFB-NJK ————

1        But okay.  So he's not an attorney.  So that makes

2   things easier.  So if, for example, he circulated, though,

3   drafts between himself and other members of the campaign who are

4   not lawyers, would that be privileged?

5        MR. HARDY:  Just circulating them within other members

6   of the office or something like that?

7        THE COURT:  Right.  Exactly.

8        MR. HARDY:  Other than the common interest privilege

9   that we previously talked about, those would be protected

10  underneath that, but under attorney-client privilege, absolutely

11  not.

12        THE COURT:  Because what I am going to do is I'm going

13  to order you to collect those particular drafts.  Again, you can

14  include in your submission to the Court what they actually are.

15  I'm not saying you have to produce them, but to the extent that

16  they exist, I want you to collect them.  You don't have to

17  produce them, but it would only be drafts that Mr. Law may have

18  circulated with other members of the campaign regarding training

19  here in Nevada.

20        MR. HARDY:  Okay.  That's perfect.

21        THE COURT:  Okay.  And that would again be for the last

22  30 days.

23        MR. HARDY:  And what we're talking about is what is

24  Exhibit 1, what materials that we're talking about that may be

25  deficient with respect to the training issue?

—— 2:16-cv-2415-RFB-NJK ——

1          THE COURT:  Well, it would be -- let's make it a little

2  broader than that because I don't want to be too technical.

3  Let's just talk about different drafts of that power point.

4          MR. HARDY:  Of that power point, yes.  Okay.

5          THE COURT:  Or if it's also -- he also I think had that

6  poll watcher's guide.  I don't know to what extent he worked on

7  that or not.  It's not clear to me from his declaration, but the

8  exhibits attached to his declaration for training, for the past

9  30 days, collect the drafts that were circulated within the

10  campaign or to the Nevada Republican Party.  And then you can

11  submit them in the context of the in-camera submission that

12  would contain the same information, identifying to the extent

13  they existed how voluminous they are and what privilege may

14  extend to them.

15          MR. HARDY:  You are just looking for -- just want to

16  make sure, any drafts that he circulated internally within the

17  office there, that's what we're looking for.

18          THE COURT:  Yes.

19          MR. HARDY:  Okay.  Gotcha.

20          THE COURT:  Why are you --

21          MR. HARDY:  Because he doesn't work on the national

22  level.  He's just here at the headquarters over off of the

23  airport.

24          THE COURT:  Right.  So I don't know if the concern is

25  about whether or not he sent them to lawyers in the national

1    office or not, and I don't know if you're asking me about that.

2    If that occurred, that would have to be included, but you would

3    just have to list that as being privileged.  So if he sent

4    something back for consideration to the national campaign, it's

5    still part of the campaign, right, that should be included as it

6    related to strategy in Nevada.

7            So if, for example, he were sent something that related

8    to voter challenges or training elsewhere, I'm not talking about

9    that, but if he sent a draft of the poll watcher training for

10   Nevada to the national headquarters or national officials and

11   they sent something back about Nevada training, you should

12   include that in your list.

13           MR. HARDY:  Irrespective -- and your position is

14   irrespective of whether that communication was with an attorney

15   for the party or not, and then I can mark that attorney/client

16   privilege in camera.

17           THE COURT:  Yes.  I don't want to do a two-stage

18   process.  That's what I'm worried about.  He gets up there.  He

19   mentions something.  Then we're scrambling to try to figure out

20   what that means.  Let's do it all in one fell swoop,

21   particularly given the fact it doesn't seem to me that this is

22   going to be a voluminous set of documents.  I mean, if it gets

23   to the point where it is voluminous, we can have a conversation

24   about that.

25           My biggest conversation, Mr. Hardy, is he takes the

1    stand and he makes statements that are ambiguous enough that

2    they would require you to go back and then you're on a tighter

3    time frame.  I want to be able to decide these issues.  They

4    seem fairly straightforward again to decide them based upon his

5    testimony after I've heard it and based upon their arguments.

6             MR. HARDY:  Okay.

7             MR. SPIVA:  Your Honor, with respect to the previous

8    versions, if I might.  I mean, could we go back further than 30

9    days?  I mean, the early voting started October 22nd and, you

10   know, if there was a training in place for the last election

11   cycle, a comparable power point, it seems like --

12            THE COURT:  Well, I don't know that that's relevant,

13   training -- training for the last election cycle.  If for some

14   reason in the training for the last 30 days there's some

15   indication of prior drafts that are integral to understanding

16   the current drafts, obviously, Mr. Hardy, you should include

17   them.  So, in other words, if there's a reference to a draft of

18   like, We're operating off of a draft 60 days ago and I'm only

19   adding this one section, you need to include that.  But absent

20   something like that, we're just talking about the past 30 days.

21   Absent something that is in effect incorporated by reference

22   within that time frame, it wouldn't be necessary.

23            I don't think, Mr. Spiva, that we need to have anything

24   beyond the 30 days, unless there's something that would indicate

25   there's something relevant beyond that, but I'm going to limit

——————— 2:16-cv-2415-RFB-NJK ———————

 1  it to 30 days.

 2          MR. HARDY:  Okay.  Thank you.

 3          THE COURT:  All right.  What else do we have?  And that

 4  would include, Mr. Hardy, any accompanying instructions or memos

 5  for the training.  I don't think that that's a particularly

 6  controversial request in terms of privilege.  In terms of what

 7  trainers were provided doing the power point, I believe that

 8  they would be entitled to that.  So if Mr. Law received as part

 9  of...

10          MR. HARDY:  His training to be a trainer.

11          THE COURT:  Part of his instruction or other trainers

12  received like a memo about this is how you present this power

13  point, that is something that should be produced and should be

14  produced -- that memo or memos should be produced tomorrow by 10

15  a.m.  I don't see how that would be privileged unless you can

16  tell me how that would be privileged.  I mean, if it is a memo

17  from a lawyer, then maybe you should include it in your

18  privilege log, but I think what we're really talking about --

19  Mr. Spiva is really talking about is basically a memo that says,

20  This is how you should present this information.  And that I

21  think would be appropriate for production because it's going to

22  probably bear upon his testimony.

23          And so I don't think that needs to be included in any

24  sort of privileged submission to the Court.  I think that can be

25  directly produced to the plaintiffs, and that would again be for

—— 2:16-cv-2415-RFB-NJK ——

1  that same period of time, that same 30 days or from whenever --

2  30 days or if it's less than that in terms of when they started

3  producing those memos to the extent they exist.

4      That would include to the extent that it's separate,

5  Mr. Hardy, any other training material.  I think you've

6  suggested, consistent with what the Court ordered, that this is

7  in fact the training material for poll watchers, what's attached

8  to his declaration, but to the extent in terms of your

9  preparations with Mr. Law that there's other material, you

10  should obviously provide that as well.  Okay.  So --

11      MR. HARDY:  Any training he received and any training

12  that he provided?

13      THE COURT:  Yes.  In terms of materials, right.  And so

14  that should be provided tomorrow by 10, and that goes back 30

15  days for all of these requests.  The correspondence between

16  Mr. Law and the Nevada Republican Party and the Trump

17  headquarters about drafts can be submitted to the Court under

18  seal by 10 a.m. tomorrow with accompanying information about

19  what they contained and what privilege applies.  And that would

20  apply as well to any correspondence about voter challenge

21  strategy between Mr. Law, the Nevada Republican Party, and the

22  Trump Campaign.  Again, that would be in that category of

23  privileged information that you should submit under seal with a

24  similar at least sealed submission as relates to that

25  information.

—— 2:16-cv-2415-RFB-NJK ——

1          MR. HARDY:  Okay.

2          THE COURT:  Are we clear about that?

3          MR. HARDY:  Yes.  So what I have is I'm going to

4    respond to you by 10 a.m. tomorrow with essentially -- to three

5    questions is what I'm kind of looking at right now.  One, were

6    there any communications between Mr. Law and the Nevada

7    Republican Party regarding voter challenges?

8          THE COURT:  Yes.

9          MR. HARDY:  And that goes back 30 days on that one.

10   And if there's anything on that, I'll list it out.  If there's

11   none, I'm just going to write the word "none."

12         THE COURT:  If there is none, what you should provide

13   to them -- which I don't know that it would be privileged.  You

14   can tell me if you think it would be.  If there's none, I don't

15   think that's privileged.  I think that you can provide them,

16   even if you think it's privileged, what the volume of the

17   documents are.  I don't know that page numbers, per se, are

18   privileged.  I have to go back and look at the law, but I think

19   that saying there are five documents without saying -- that

20   consist of 40 pages, I don't know that that's privileged.  You

21   don't have to say more than that, but I think providing them

22   with basic information about what is there would not be covered

23   by the privilege.

24         MR. HARDY:  What I envision is a document to you that's

25   going to have a document request response to the Court and then

———— 2:16-cv-2415-RFB-NJK ————

 1  -- to the Court inquiries.  And then it will say the questions,

 2  you know, the 30 days, and then I'll say none or I'll say five

 3  documents.  Three of which submitted in camera.  Whatever of

 4  those are not privileged are attached, something like that.

 5          THE COURT:  Right.  That would be their version and my

 6  version would have --

 7          MR. HARDY:  Your version would have all of the in

 8  camera stuff.

 9          THE COURT:  Right.

10          MR. HARDY:  And then the same way I will have the next

11  question down will be the three exhibits attached to their --

12  any versions beyond those that were attached to the exhibits to

13  his affidavit.

14          THE COURT:  Right.

15          MR. HARDY:  And then if there's any additional

16  versions, I would attach those there.  If there's some type of

17  privilege, I would submit those in camera, and that's for the

18  last 30 days.  And any training of the trainer that he received,

19  any training he received as a trainer, any documents related to

20  that, I would attach those to that question and then -- or

21  submit them in camera one way or another.  So I'll have those

22  three responses out to you by 10 o'clock tomorrow.

23          THE COURT:  Right.

24          MR. HARDY:  On those three issues.

25          THE COURT:  Yes.

——— 2:16-cv-2415-RFB-NJK ———

1          MR. SPIVA:  Would that include a privileged log, Your

2   Honor, for any of that he's submitting in camera so that we

3   can --

4          THE COURT:  Well, what else would you want the log to

5   say?  He's going to tell you there are five documents that are

6   this many pages, and you should include -- I assume that he was

7   going to include the basis for the privilege, what the privilege

8   would be.

9          MR. SPIVA:  That's all, Your Honor.  That was the one

10  part I hadn't heard was I heard he was going to say the number

11  that he is asserting a privilege over, but I hadn't heard that

12  he was --

13         THE COURT:  Well, okay.  That's a good question to

14  clarify.  I assume that you were at least going to identify the

15  privilege to the opposing party.

16         MR. HARDY:  I'm familiar with how a privilege log

17  works.  I appreciate that.

18         THE COURT:  It's late, just trying to be clear.

19         MR. SPIVA:  I'm not trying to press counsel.  If we can

20  have it by 10 a.m., I'm not suggesting that it has to be --

21         THE COURT:  Look, it's 6:30 on a Wednesday so I

22  appreciate that, that we want to clarify things.  So is there

23  anything else then that we need to discuss tonight?

24         MR. HARDY:  The time period, Your Honor.  We discussed

25  whether we want to do this tomorrow or there was going to be --

—— 2:16-cv-2415-RFB-NJK ——

 1  they wanted to file some other pleadings and things like that

 2  and we have -- I mean.

 3          THE COURT:  So what are the -- I would like to have

 4  Mr. Law tomorrow, Mr. Hardy.

 5          MR. HARDY:  Okay.

 6          THE COURT:  I think it would prevent some further

 7  issues.  Now, if you have timing issues about that, what time

 8  would he be available or not?  We could move it later in the

 9  afternoon if that's necessary, but I think that Mr. Law in

10  particular is significant enough in this process and your

11  representations depend in large -- to large extent on his

12  testimony that we should at least have his testimony tomorrow.

13  And I'm not sure who else you anticipated you would call as a

14  witness because it may be that everything could come in through

15  him in the context of the relationships between the campaign and

16  the Nevada Republican Party.  But I think we need to have him

17  tomorrow.  So can you tell me about what the scheduling issues

18  would be?

19          MR. HARDY:  And I think I can do the rest of it through

20  affidavits.  So I think probably just Jesse would be the person

21  we want to do.

22          There's a hearing in a companion case in Arizona

23  tomorrow at 1:30 is the issue that we're running into.

24          THE COURT:  And Mr. Law is necessary for that case as

25  well?

——— 2:16-cv-2415-RFB-NJK ———

1          MR. HARDY:  No, that would be Mr. Langhofer.

2          THE COURT:  Oh.  So he can't be in two places at once?

3          MR. HARDY:  Yes.

4          THE COURT:  Okay.  Well...

5          MR. HARDY:  I mean, if we want to just do 30 minutes of

6   direct on Friday morning at 8 a.m. or whenever you want to be

7   here, we're happy to do that.  You know, that will give you time

8   to read whatever affidavits come in tomorrow and review the

9   documents that come in and we can do it first thing Friday

10  morning.  If you want to do that, we're happy to do that.

11         THE COURT:  Yeah, I'm just not sure that -- how long

12  would you anticipate that the hearing would go in Arizona?

13         (Defense counsel conferring.)

14         MR. HARDY:  If this hearing today is any indicator, it

15  may go till 5, but --

16         THE COURT:  We have the ability -- we might have the

17  ability to allow Mr. Langhofer to participate if it's in Federal

18  Court in Arizona in the way -- and I would allow you potentially

19  to have a cell phone and use it with him so that he can at least

20  hear the testimony.  I really want the testimony tomorrow.  So I

21  want us to try to figure out a way to make that happen.  I

22  understand he's a part of your team, so I don't want to deny you

23  the opportunity to be able to include him in that.  So we'd have

24  to handle it logistically.  Also, telephonically he can appear,

25  and then I would allow you to be able to potentially so he can

1    hear the testimony use your cell phone to talk to him to raise

2    issues and that may be cumbersome, but I think that that would

3    allow that process to move forward.

4           And then what we could do is potentially move up

5    Mr. Law's testimony tomorrow based upon what would happen in

6    Arizona, but I do think we need to have Mr. Law's testimony

7    tomorrow.  I just think that it's just going to be too

8    challenging to try to do everything at least from the Court's

9    perspective because then I have to try to figure out what I'm

10   going to write in terms of a decision, right, tomorrow evening

11   and Friday morning because that's when I would anticipate

12   issuing a ruling, or over the weekend.  But it becomes too much

13   I think in terms of the feasibility of handling this for it to

14   be pushed back to Friday.

15          So you have a hearing tomorrow at 1:30 on similar

16   issues, and so let me look.  Hold on.  Let me look at the

17   Court's calendar.

18          MR. HARDY:  I don't anticipate Mr. Law's testimony to

19   go very long, I mean, 30 minutes, 45 minutes.

20          THE COURT:  I don't anticipate it to be long for you,

21   but I anticipate they may be a little bit longer than you would

22   be.  I agree with you.  I think yours 15 minutes, but I think

23   that their questions may push it into an hour.  I think that I

24   am anticipating that his whole testimony may take an hour, and

25   that's what I would try to allow for.  And based upon that

—— 2:16-cv-2415-RFB-NJK ——

1  schedule, what if we moved up the hearing to 11?  Actually, I

2  think -- is Arizona an hour ahead?  That's the other issue.  I

3  think they are an hour ahead.

4       MR. LANGHOFER:  We're on Pacific time.  I think it's

5  the same.

6       THE COURT:  Well, they switch.

7       MR. SCHRAGER:  Not until next week.

8       THE COURT:  Not until next week?

9       MR. SCHRAGER:  Next weekend.

10      THE COURT:  Oh.  Perfect time.  So we're on the same

11  time then for now.  Okay.  That's great.  Okay.  So if we did it

12  at 11, now what that would mean, Mr. Hardy, because of your

13  cocounsel you're going to have to work a little harder to get

14  this stuff in a little bit earlier.  But look at it this way,

15  we'll get a resolution one way or another earlier, too.

16      Because, again, I want to be clear, I don't really

17  anticipate doing this in serial hearings.  I would expect, and

18  this is for the plaintiff's benefit -- Mr. Hardy, thank you.

19  You can take a seat -- that I don't want to get some last-minute

20  filing on Friday that has additional information in it, right.

21  If you are going to present information, tomorrow's hearing is

22  the time to do that.

23      And we will try, Mr. Langhofer, to accommodate your

24  schedule, but if we run later, we just will run later.  But I

25  want to try to do all of the hearing tomorrow, and we do at

────────── 2:16-cv-2415-RFB-NJK ──────────

1    least Mr. Law's testimony when you are available.  We'll try to

2    do that, and I'll try to accommodate your schedule to do that.

3         MR. HARDY:  What's good for the goose is good for the

4    gander, Your Honor.  If I have to have all of my stuff in by 10

5    o'clock tomorrow, could they have any supplemental information

6    before the hearing that they want to provide, can they have

7    their stuff in by tomorrow at 10?

8         THE COURT:  Sure.  Well, I am going to push you back a

9    little bit earlier than 10 because I need to be able to look at

10   it before the testimony starts at 11.  So it most likely would

11   be 9.  So what that would mean, Mr. Spiva, is you would have to

12   have all of your supplemental submissions in by 9.  If you are

13   going to present evidence that hasn't previously been mentioned

14   or attached or submitted, you need to provide it to them also by

15   9; not saying that you would, but you said you are going provide

16   some supplemental information.  They need to have time to be

17   able to receive that, review it, and prepare for the hearing at

18   11.  So any supplement with respect to the information would

19   need to be provided by 9 o'clock.  So all of the parties'

20   submissions will have to be submitted to me by 9 o'clock

21   tomorrow.

22        MR. HARDY:  And the only witness is going to be Mr. Law

23   so I don't have to prepare a bunch of cross-examinations or are

24   they going to be calling witnesses or how do we need --

25        THE COURT:  Well, let's find out about that.

1          MR. SPIVA:  We don't intend to call live witnesses,

2   Your Honor.  We are going to rest on the declarations.

3          THE COURT:  Okay.  The other issue, again not to give

4   you additional work, but I am curious about the parties'

5   position as it relates to this issue of the potential

6   recklessness as -- two issues, actually.  One is the issue of

7   recklessness in the context of the training and whether or not

8   that's sufficient to satisfy the intentionality aspect,

9   particularly of the Voting Rights Act because it seems to me

10  that that's a broader -- quite honestly, a broader statute that

11  does not have the same threshold requirements as it relates to

12  what would need to be met for an injunction in this case.  Not

13  saying you can't argue, Mr. Spiva, under the Klan Act, but I

14  think that it would seem to me that you have a greater

15  opportunity to be able to make your arguments as relates to the

16  Voting Rights Act only because of the breadth of the language

17  there.

18          Again, not restricting you, but just so you all know

19  where to focus your energy since we are on a tight time frame.

20  The issue of anticipated harm and the issue of potential

21  reckless exclusion of the information.  And we have to think

22  about the fact that if Mr. Law testifies that I received this

23  information from the campaign, I'm not a lawyer, I didn't know

24  that it didn't include all of the information, what are the

25  implications of that in terms of the Court's determination about

——— 2:16-cv-2415-RFB-NJK ———

1  whether or not this was deliberate or not.

2          And I say that, Mr. Hardy, because it may at that point

3  become an issue about someone from the campaign testifying on

4  Friday about the origin of the document.  I didn't find the

5  origin of the document to be relevant now, but if Mr. Law gets

6  up there and says, Hey.  You know what?  I have nothing to do

7  with this document.  This thing was just sent to me.  That has

8  some implication about this issue about intentionality, because

9  I'm going to have to find out who sent it to him and what were

10 the circumstance of that.

11         Again, I don't know what he's going to say, but again

12 in anticipation, given the coordination across this country

13 about that, you should be prepared at least for that

14 possibility.  I'm not telling you who you would have to present,

15 but there is a possibility depending upon how his testimony goes

16 the Court might order that someone from the campaign who drafted

17 the document, if it's not him, potentially talk about that.

18 And, again, I'm giving you notice so that you can potentially

19 raise issues about privilege or other things that may come up in

20 the context of that.  But be prepared at least, both sides, for

21 that as an issue in the context of the testimony here.

22         And I don't know if you have any comments you have

23 about that now, Mr. Hardy, or not, but I did want to at least

24 alert you to that as a potential issue because the Court has to

25 look at this issue of whether or not if the Court were to find

—————— 2:16-cv-2415-RFB-NJK ——————

1   that that's a substantial omission -- and, again, we haven't

2   reached that point.  If I don't find that, then we are not even

3   going to go onto the other questions, but I like to anticipate

4   things and not have things drip out slowly.

5          If the Court were to find that that was a substantial

6   enough omission that it warranted analysis as it relates to

7   intentionality or not with respect to the omission, the question

8   is who has to intend to omit it, right.  If Mr. Law doesn't

9   know, but he receives the document from the campaign, is that

10  enough for the Court to do that?  And you should be prepared for

11  that particular argument, Mr. Hardy and Mr. Spiva, because that

12  seems to me to be a potential issue that comes up in this case.

13         And to that end, Mr. Hardy, you should be prepared to

14  have someone potentially available to talk about the origin of

15  the document if it comes to that.  And, again, I don't know

16  about how the testimony is going to come in, but I don't want us

17  to be in a situation where now we're stuck again because we

18  don't know where the document came from.  And that's information

19  you may not have now, but I think you will at least have an

20  opportunity to be able to explore that and come back to me and

21  talk to me about why you think they are or not entitled to it,

22  what is the feasibility of obtaining information about that, and

23  then as a legal matter to what degree I should consider the

24  omission in terms of the significance of it and as it relates to

25  recklessness and intentionality.

—————— 2:16-cv-2415-RFB-NJK ——————

1          Do we need any clarity as it relates to the Court's

2     orders for tomorrow?

3          MR. SPIVA:  Not for plaintiffs, Your Honor.  Thank you.

4          Your Honor, we actually have a different position on

5     whether intentionality is required under either statute, but I

6     think we can address that in our reply brief.

7          THE COURT:  Well, again, part of it is there is a

8     two-step part of this process, which is first the analysis which

9     again is not clear in the law.  If I were to find that the

10    information would likely lead to confusion, is that enough?  I

11    haven't made a ruling about that.  Is that enough?

12         Let's assume that there was a mistake.  I find that the

13    mistake is significant in the context that it might mislead a

14    poll worker about challenges, and in conjunction with

15    allegations about encouraging people to go to polls to stop,

16    quote, unquote, rigging or cheating or stealing of elections, is

17    that combination of the encouragement, clear public statements

18    by the head of the campaign, Mr. Trump, in connection with

19    potentially misleading information enough that that would lead

20    to voter intimidation?  But that's only one part of it because

21    then there's the other part which is that that has to have been

22    intended, right.

23         But I would first have to find that that combination of

24    things would in fact lead to voter intimidation or coercion, and

25    then I would have to find in addition that that that was either

 1   intended, or if it's not intended, it falls within the purview

 2   of the statute as it relates to a violation that is meant to be

 3   addressed regarding the conduct.

 4        All right.  And, again, I'm not saying that you have to

 5   make those legal arguments in submissions to me by 9 a.m.

 6   tomorrow.  What I am saying is that we would need to be prepared

 7   to discuss them.

 8        Is there anything else that we need to discuss at this

 9   point?

10        MR. HARDY:  One other question, Your Honor.  I guess

11   you asked me if I was going to be able to have any discovery

12   that I would like to get from them as well?

13        THE COURT:  Yes.

14        MR. HARDY:  We'd like to see their training materials,

15   drafts.  The same requirements that you are requiring of us, we

16   would like to see from them.

17        THE COURT:  And what would be the basis of that?

18   That's not really in the context of me issuing an injunction on

19   behalf of that.  You haven't filed a counter motion for anything

20   that would suggest that.

21        MR. HARDY:  One of the things that we have put inside

22   of our reply, Your Honor, at the very end of our reply because

23   again we didn't do all -- we haven't filed a responsive pleading

24   yet either, but -- because we're all dealing on this issue.  It

25   says:  Should the Court grant any relief of the relief plaintiff

1   seeks, it should enter an injunction as to both plaintiff and

2   defendants.  The same rules apply to everyone and plaintiffs

3   should not be given the unfair political advantage of being free

4   from the traditional decree requiring that federal and state law

5   be followed.

6          And so what the issue here is, Your Honor, we go back

7   to the same thing and say, Look, if you're going to issue an

8   injunction, not saying you are, but let's assume that they prove

9   everything, that there's an injunction out there, that needs to

10  be issued to all poll watchers, whether they're Republican or

11  Democratic, on the training issue.

12         THE COURT:  Okay.  But they've gone through the process

13  of filing a motion and making representations and attaching

14  documentation.  I'm not saying that I wouldn't necessarily issue

15  the injunction against them, but why wouldn't I require you to

16  do the same?  I mean, if you want to add some more work for

17  yourself and you want to seek, you know, a counter motion for an

18  injunction, right, I'm not saying you couldn't do that.  But as

19  you know, I mean, there is a specific rule that governs seeking

20  an injunction.  And in order to be entitled to some discovery,

21  you would have to have some pending motion that would be

22  relevant to the discovery that I'm seeking -- that you are

23  seeking.

24         So why wouldn't I first require you to do that because

25  you haven't done that.  They've done that, and there are burdens

—————— 2:16-cv-2415-RFB-NJK ——————

1    as relates to that.  So, again, I'm not saying that there is any

2    necessary legal barrier to that, other than the fact that you

3    haven't actually filed procedurally the motion.

4         MR. HARDY:  Correct, Your Honor.  We also are the

5    defendants in this case.  We have equitable defenses.  One of

6    the equitable defenses is that of unclean hands and other issues

7    that go along with that, and we are asserting those defenses of

8    unclean hands.  They can't come in to call this on us if they're

9    doing the same exact conduct.

10        THE COURT:  So what I am going to say to you is this.

11   If you think that you have a basis for that, a good faith basis,

12   then you can file by 9 o'clock tomorrow a request for that.  And

13   I wouldn't necessarily require you, Mr. Hardy, to file

14   everything that's possibly in your possession, but you have to

15   at least give the Court some procedural showing.  I understand

16   why you're doing what you are doing, but in order to get some

17   basis for relief as it relates to that, and I will look at that,

18   you have to present some information about why you think that

19   they don't have clean hands.  I mean, you've attacked the level

20   of the information provided, but you are asking me to provide

21   information having not provided anything other than a

22   representation, which you are entitled to do.  But you are going

23   to have to file something that presents some information that

24   would suggest that that has occurred.

25        I mean, as far as I know, I don't even have any

1    information in the record that even indicates that they have

2    poll watchers.  I mean, there has to be some basic threshold

3    showing for you to be entitled to that.

4         MR. HARDY:  So you want me to just file a motion that

5    would say they have poll watchers.  Therefore, we assume they

6    have training --

7         THE COURT:  No, I want you to file --

8         MR. HARDY:  I got you.

9         THE COURT:  That's a nice try.

10         MR. HARDY:  That's the issue here is that we all know

11    that they have poll watchers.  If they're saying that we have

12    deficiency in our training, then let's see what they have in

13    their training that makes their training so much better and so

14    much cleaner than ours.  And normal discovery --

15         THE COURT:  Mr. Hardy, as you well know, right, it has

16    to be in the record before me.  I grilled them fairly

17    extensively about what is and isn't in the record that they can

18    assert.  And you were I think fairly clear in your brief about

19    what they couldn't show based upon what's in the record.  And

20    certainly you can make representations to me about the fact that

21    they have poll watchers, and I don't have any reason to dispute

22    that given the nature of this, but I can only decide things

23    based upon what's actually in the record.  And if you want some

24    relief, and I will consider that if you file a motion by

25    tomorrow seeking some relief.  It's a cross motion for

—— 2:16-cv-2415-RFB-NJK ——

1  injunctive relief.  The Court will in fact consider that, but it

2  has to be filed consistent with the rules of the court in terms

3  of civil procedure.  And I know you're familiar with those.

4       MR. HARDY:  And there's nothing that's -- there was

5  nothing that would prohibit you anyway, I mean, even without a

6  motion, for making an injunctive relief tailored to all poll

7  watchers.  There's nothing -- we had that discussion earlier.

8  So, I mean --

9       THE COURT:  Well, it is an equitable -- it is an

10 equitable form of relief from the Court, and the Court based

11 upon its equity jurisdiction could fashion something that it

12 thinks is fair.  That's what equity jurisdiction is.  We haven't

13 reached that point.  I haven't even made that finding.

14      So what I will say is I don't find that I categorically

15 could not include information that might address all poll

16 observers.  And I'm not saying that you would be prohibited from

17 making that argument to me if I were to find that relief would

18 be warranted.  What I am saying is that if you want discovery,

19 you have to file a motion.

20      MR. HARDY:  That sounds good.  Thank you, Your Honor.

21      THE COURT:  All right.  Okay.

22      Mr. Spiva, were you going say something?

23      MR. SPIVA:  No, I think -- nothing further, Your Honor.

24      THE COURT:  Oh, thank goodness because it's getting a

25 little late.  We all have a little work to do tonight.  Hold on

─────────── 2:16-cv-2415-RFB-NJK ───────────

1   just a moment.

2           (Court conferring with law clerk.)

3           THE COURT:  Okay.  I think we all -- we've stayed here

4   long enough.  I thank the Court staff and the CSOs for staying

5   later.  Thank you, and my staff, for all of you.  We're

6   adjourned.  I'm going to stay on the bench for a few moments.

7   Thank you.

8           MR. SPIVA:  Thank you, Your Honor.

9           MR. HARDY:  Thank you, Your Honor.

10          (Whereupon the proceedings concluded at 6:58 p.m.)

11                          --oOo--

12                  COURT REPORTER'S CERTIFICATE

13

14      I, PATRICIA L. GANCI, Official Court Reporter, United

15   States District Court, District of Nevada, Las Vegas, Nevada,

16   certify that the foregoing is a correct transcript from the

17   record of proceedings in the above-entitled matter.

18

19   Date:  November 4, 2016.

20                          /s/ **Patricia L. Ganci**

21                          Patricia L. Ganci, RMR, CRR

22                          CCR #937

23

24

25