―――2:16-cv-2415-RFB-NJK―――

1                    UNITED STATES DISTRICT COURT

2                         DISTRICT OF NEVADA

3

4  NEVADA STATE DEMOCRATIC        )
   PARTY,                         )  Case No. 2:16-cv-2415-RFB-NJK
5                                 )
                  Plaintiff,      )  Las Vegas, Nevada
6                                 )  Thursday, November 3, 2016
          vs.                     )  1:00 p.m.
7                                 )
   NEVADA REPUBLICAN PARTY,       )  MOTION HEARING
8  DONALD J. TRUMP FOR            )
   PRESIDENT, INC., ROGER J.      )
9  STONE, JR., and STOP THE       )
   STEAL, INC.,                   )
10                                )
                  Defendants.     )
11  _____

12

13

14
                 REPORTER'S TRANSCRIPT OF PROCEEDINGS
15
              THE HONORABLE RICHARD F. BOULWARE, II,
16                 UNITED STATES DISTRICT JUDGE

17

18

19  APPEARANCES:            See the next page

20

21  COURT REPORTER:         Patricia L. Ganci, RMR, CRR
                            United States District Court
22                          333 Las Vegas Boulevard South, Room 1334
                            Las Vegas, Nevada  89101
23
    Proceedings reported by machine shorthand, transcript produced
24  by computer-aided transcription.

25

```
───────────── 2:16-cv-2415-RFB-NJK ─────────────
```

1   APPEARANCES:

2   For the Plaintiff:
            **DON SPRINGMEYER, ESQ.**
3           **BRADLEY SCOTT SCHRAGER, ESQ.**
            WOLF, RIFKIN, SHAPIRO, SCHULMAN & RABKIN
4           3556 E. Russell Road, Second Floor
            Las Vegas, Nevada 89120
5           (702)341-5200

6           **MICHAEL JULIAN GOTTLIEB, ESQ.**
            BOIES, SCHILLER & FLEXNER, LLP
7           5301 Wisconsin Ave., Suite 800
            Washington, DC 20015
8           (202)237-9617

9           **BRUCE V. SPIVA, ESQ.**
            PERKINS COIE LLP
10          700 13th Street, Suite 600
            Washington, DC 20005
11          (202)654-6203

12
    For Defendants Nevada Republican Party and Donald J. Trump for
13  President, Inc.:
            **BRIAN R. HARDY, ESQ.**
14          MARQUIS AURBACH COFFING
            10001 Park Run Drive
15          Las Vegas, Nevada 89145
            (702)382-0711

16

17

18

19

20

21

22

23

24

25

```

─────2:16-cv-2415-RFB-NJK─────

1          INDEX OF EXAMINATIONS

2  For the Defendant:

3  Witness Name          Direct      Cross    RD     RX      Voir Dire
   Jesse R. Law             23         48
4

5                  DEFENDANT'S EXHIBIT INDEX
   Exhibit No.                                  Admitted
6  1                                                29
   2                                                29
7

8       LAS VEGAS, NEVADA; THURSDAY, NOVEMBER 3, 2016; 1:00 P.M.

9                        --oOo--

10               P R O C E E D I N G S

11          THE COURT:  Please be seated.

12          (Whereupon, courtroom is sealed and an ex parte

13  conference was recorded, but not transcribed.)

14          (Whereupon, courtroom is unsealed.)

15          THE COURT:  Okay.  We are back on the record in this

16  case, which is Docket No. 16-cv-2514, in the public portion of

17  this hearing.

18          I had an ex parte portion of this hearing related to a

19  document that was submitted to me in camera by the defendants.

20  I don't find there to be a basis for disclosing that document at

21  this time.  And I'm not even sure that there would be a

22  foreseeable reason to disclose it, but I do want to make a note

23  of that generally.

24          So let's talk a little bit about where we are.

25  Mr. Spiva, I really want you to comment, actually, on the e-mail

———— 2:16-cv-2415-RFB-NJK ————

1  that was sent out to the poll watchers in terms of what else do

2  we need to do?  Right.  As you all know, the Court had a concern

3  about this particular aspect of the PowerPoint.  Again, I hadn't

4  heard Mr. Law's testimony yet, but had a concern about that.  An

5  e-mail apparently was sent out, and I would imagine Mr. Law --

6  and we will receive testimony about the fact that it was sent

7  out and he would confirm that under oath.  But assuming that he

8  does that, where are we after that?  Because it seems to me that

9  addresses a great deal of what is the substance of this case.

10         Now, I know that you had said that you were going to

11  supplement with some additional connections to poll watchers

12  and, perhaps, the other defendants.  And the Court's going to

13  issue this afternoon a separate scheduling order and hearing

14  date for the Stone defendants for tomorrow.  So we're not

15  talking about the Stone defendants in the context of what I'm

16  asking you.  I'm talking about the defendants who are here now,

17  which would be the Nevada Republican Party and the Donald Trump

18  Campaign.

19         It doesn't seem to me that there are significant

20  substantive issues remaining, but I'll hear from you as it

21  relates to the nature of your concerns for that -- for these

22  entities.  Because, again, I looked at that particular

23  communication and, in fact, it goes beyond what's required in

24  some respects.  It's actually not required of a campaign that

25  they confer with a particular person before making the

——— 2:16-cv-2415-RFB-NJK ———

1  challenge, but that's what actually the directions are in the

2  context of this.  And it wasn't compelled by the Court.  And

3  there is a discussion about, in fact, many of the poll workers

4  or observers not even being placed in their own precincts, such

5  that it would create an issue.

6       And we haven't even discussed the fact that the Court

7  doesn't assume that the actual individuals working at the sites

8  themselves wouldn't nonetheless still have told the poll

9  observer for a particular campaign, You have to fill out this

10 form and here are the requirements for filling out the form.

11 Because our conversation occurred in the context of them not

12 having been trained on that law.  But the fact is that there was

13 still the other part of that conversation, which is that there

14 are also trained employees of the various registrars who know

15 about the form and who would presumably require it.  And I

16 haven't been presented with any information that would suggest

17 that they wouldn't do that or that they don't routinely do that.

18       So in light of that, Mr. Spiva, where are we in the

19 context of these particular defendants?

20       MR. SPIVA:  Sure.  And I can address it, Your Honor, I

21 just want to consult for a second to make sure I have clarity on

22 one factual point before I --

23       THE COURT:  Sure.  Take your time.  Take your time.

24 Sure.  Absolutely.

25       (Plaintiff's counsel conferring.)

1          MR. SPIVA:  Okay.  Thank you, Your Honor, for giving me

2  a moment.  I just wanted to make sure I had something straight

3  in terms of which e-mails, and as I --

4          THE COURT:  So, I'm sorry, I forgot to actually have

5  you all state your names for the record for the public portion

6  of this hearing.  So if you could just state your names for the

7  record.

8          MR. SPIVA:  Yes, Your Honor.  My name is Bruce Spiva

9  from Perkins Coie for the plaintiffs and...

10          MR. SCHRAGER:  Bradley Schrager of Wolf Rifkin, also

11  for the plaintiffs, Your Honor.

12          MR. HARDY:  Brian Hardy with the law firm of Marquis

13  Aurbach Coffing on behalf of the Nevada Republican Party and

14  Donald J. Trump Campaign for President, Inc.

15          THE COURT:  Okay.  Thank you.  Mr. Spiva, so...

16          MR. SPIVA:  I can address your question now, Your

17  Honor.  There are a lot of moving parts so I wanted to make sure

18  I was focusing on the right thing.

19          THE COURT:  Absolutely.

20          MR. SPIVA:  So I guess there are two e-mails, one that

21  was sent to we don't know exactly know who because it's redacted

22  this morning.

23          THE COURT:  Well, what I would imagine Mr. Law is going

24  to say is that he sent it to all of the poll watchers who they

25  have listed as volunteers.  I think you would agree that people

─────── 2:16-cv-2415-RFB-NJK ───────

1  who sign up for a campaign, that association is in fact

2  protected by the First Amendment privilege.  I think that's a

3  fairly clear exercise of that privilege that you don't get to

4  know the names of people who volunteered for the campaign,

5  right?  I mean, you're not saying --

6          MR. SPIVA:  That's not -- I'm not trying to do that.

7          THE COURT:  Again, we're working through it step by

8  step, so I'm not saying that you are.

9          MR. SPIVA:  Yeah.  I'm saying --

10          THE COURT:  Let me just finish for a second.  What I

11  presume is that what's going to happen is -- and, again, this is

12  partly something that I want to make sure that we work through,

13  but I presume that Mr. Law will testify that that was sent to

14  the poll watchers that they have listed.  And then my question

15  to you is, if that is the case and we have a declaration from

16  different individuals, Mr. Munoz, Mr. McDonald, about the Nevada

17  Republican Party, what else would we need to do in the context

18  of the hearing?

19          I'm still think it's going to be appropriate for

20  Mr. Law to actually take the stand to verify the information.

21  But assuming that he does, what else are we doing at this

22  hearing?  Because I want to have some sense of what to expect

23  and what issues to be focussed on.

24          MR. SPIVA:  Right.  And I'll have a few questions for

25  Mr. Law based on the materials that were produced, but I think

―――――2:16-cv-2415-RFB-NJK―――――

1  going -- I think specifically to the question Your Honor was

2  asking what else is to be done in terms of this issue of not

3  properly advising poll observers about the need for personal

4  knowledge, etc., that this is clearly voluntary cessation and

5  it's obviously in reaction to the very lawsuit that we brought.

6         THE COURT:  Okay.  Let me say this.  I haven't --

7  you're saying that.  And I want to be clear about the fact that

8  I haven't made that finding.

9         MR. SPIVA:  Right.

10        THE COURT:  And I don't know that I would need to reach

11  that finding.  And so, I will say that part of the issue is if

12  Mr. Law gets up there and says what I expect he's going to say,

13  I don't know that I need to reach that issue.  And I'm asking

14  that because I don't know -- I don't want to spend extra time

15  for me simply to find something when I may find that the issue

16  is in fact moot.

17        Now, you have questions.  You'll ask Mr. Law.  This

18  will get teased out.  But I think it's important for us to

19  understand the parameter of what may be left for what you think

20  would be appropriate injunctive relief.  That's the question I'm

21  asking you, not so much what I would find in relation to this

22  document.  But you can continue.  I'm just saying that me asking

23  you that doesn't mean I'm going to find that necessarily, but it

24  does mean that I would probably find that it moots whatever

25  concerns that I had if it's verified in a way that we would

—— 2:16-cv-2415-RFB-NJK ——

1  expect it to be.

2          So why don't you go forward from there.

3          MR. SPIVA:  Okay.  And I think it would still be

4  appropriate for Your Honor to enter an injunction, even if it

5  were the narrow injunction that I think is of the type -- I'm

6  not saying that Your Honor has found that you would enter it,

7  but you might conceivably enter or potentially enter regarding

8  this particular issue.

9          THE COURT:  Okay.  Well, so tell me about that because

10  why would I do that?  If this information goes out, and it did

11  go out, my injunction would be based upon what?  Because there

12  still would have to be a likelihood of success on the merits or

13  a serious question going to the issue, which is that other

14  standard in the context of the Ninth Circuit.

15          MR. SPIVA:  To -- sorry, I didn't mean to interrupt.

16          THE COURT:  I'm just saying that the Ninth Circuit has

17  these two different standards as it relates potentially to

18  obtaining an injunction, right.  But the question remains is if

19  I were to find that this had gone out, is your argument that

20  there would still be irreparable harm that had been created

21  because it hadn't gone out initially?  I'm not sure why -- or I

22  would be issuing an injunction and what would be the basis for

23  it if this plays out as we've discussed.  And, again, I'm saying

24  that because I want to be able to focus the testimony or

25  whatever evidence we receive on those issues.

———— 2:16-cv-2415-RFB-NJK ————

1          So what would be the basis for an injunction?  If I --

2    if this notice went out to the poll watchers and I were to

3    credit that, right, and it appears to on the face of it clearly

4    comport with the law and indicate and highlight, in fact, the

5    issues that the Court was concerned about in terms of what might

6    have arisen by not including the PowerPoint -- and, again, I

7    didn't even find that it wasn't part of the training, but based

8    upon an initial review of the PowerPoint it wasn't included,

9    what else am I issuing the injunction about?

10          MR. SPIVA:  Well, even for that, Your Honor, though,

11   there is a basis to do that to hold their feet to the fire.

12   Because when a party voluntary -- voluntarily stops illegal

13   conduct as a result of a lawsuit, I think it's still appropriate

14   to enter the junction to make sure that their feet are held to

15   the fire on Election Day in terms of the communications they

16   have with their poll workers.  You know, beyond that, Your

17   Honor --

18          THE COURT:  Okay.  Well, hold on.  Let's stop there for

19   a moment because I want to understand what that actually means.

20   You say hold their feet to the fire in the form of an injunction

21   that says what?

22          MR. SPIVA:  Well, I mean, I would go back to our

23   proposed order, Your Honor, but, you know, they need to make

24   sure that people are only making these challenges, you know,

25   based on personal knowledge, that they are -- that they're doing

——— 2:16-cv-2415-RFB-NJK ———

1  exactly what this letter says they're doing.

2       THE COURT:  Okay.  But, Mr. Spiva, I wanted you to be

3  specific.

4       MR. SPIVA:  Yes.

5       THE COURT:  I wouldn't enjoin them or direct them to do

6  what?

7       MR. SPIVA:  I mean, Your Honor, I could read from the

8  language of the proposed order, but that's what we're asking

9  for.

10      THE COURT:  No, but I've already -- we've discussed

11 previously that order is very broadly crafted.  I don't find

12 that to be appropriate, right.  And I focussed on particular

13 issues based upon the record that is before me, right.  I don't

14 know that it's appropriate to simply issue an injunction that

15 says follow the law, unless there are specific findings about

16 how they're not following the law.  And then injunctions are

17 narrowly tailored to address the ways in which the Court might

18 find that there are issues and focus on those issues.

19      So if you want me to then issue an injunction based

20 upon your belief that there is still the possibility of a voter

21 challenge misuse resulting in voter intimidation, what is it

22 that you would suggest an injunction would look like to address

23 whatever residual issues may be left over even after this notice

24 may have been sent?  What exactly would I enjoin them from doing

25 or require them to do?

2:16-cv-2415-RFB-NJK

1          MR. SPIVA:  And even with respect to this narrow issue,

2    Your Honor, leaving aside that, you know, of course we feel like

3    we have laid enough of a foundation for Your Honor to provide

4    the broader relief we've asked for.  I understand Your Honor

5    disagrees with that and you're -- Your Honor is the fact finder

6    and the finder of the law here, but I'm just -- I just want to

7    make sure I'm not -- it's understood that I'm not conceding

8    that.  We believe we have a record, and that's what we're asking

9    for.

10         But even with respect to this narrow issue, I think it

11    would be appropriate for Your Honor to issue an injunction that

12    says, still says, you know, You must make sure that your poll

13    workers, poll observers, challengers are following the law in

14    these respects in terms of, you know, only making challenges

15    based on personal knowledge --

16         THE COURT:  Okay.  So what I am asking you, though,

17    Mr. Spiva, is you know for an injunction to issue, it must be

18    manageable by the Court.  So for me to say, Make sure they're

19    following that, I would have to give them some specific

20    directions about what that would mean, right.  Because what they

21    will say is, We sent the e-mail.  That's our compliance with

22    whatever concerns the Court had.  So I need you to tell me what

23    else I would be directing them to do, right, in the course of

24    this case.

25         Now, you know, it may be that you say, Well, I want

—— 2:16-cv-2415-RFB-NJK ——

1   something else sent out, I don't know that you do or you don't,

2   or I want some log kept.  I don't know what it is, but what I'm

3   saying to you is it has to be specific.  It can't simply be make

4   sure they follow the law as it relates to challenges because

5   that -- I don't know how I would manage that.  That doesn't give

6   them specific direction because they're going to say, That's

7   what we're doing, right.  We've done that.  That's what we're

8   doing.  What else could they do?  So I think you have to give me

9   more than that.  And that also would allow, you know, when

10  Mr. Law testifies for the Court to be able to ask him questions

11  about the process.

12          MR. SPIVA:  Right.

13          THE COURT:  And that's why we're doing this now before

14  he testifies because I don't want to have this conversation

15  after he testifies, and then we have to put him back on the

16  stand --

17          MR. SPIVA:  Right.

18          THE COURT:  -- to ask him about procedures.  So if

19  there's something else that you want that you think would be

20  appropriate to address this particular remedy or this particular

21  issue, which the Court has identified as the main one that I

22  think would be appropriate at least for consideration, what

23  specifically would that be?

24          MR. SPIVA:  Yeah.  And part of this may depend, Your

25  Honor, once we hear the testimony of what -- who did this go to,

—————— 2:16-cv-2415-RFB-NJK ——————

 1   who had been at these trainings that got the wrong information,

 2   that may inform that discussion.  I also think that, you know,

 3   if you have a situation in any context where people who are

 4   slated to do an endeavor like poll watching or challenging and

 5   they're given wrong information, simply sending out an e-mail to

 6   them saying, Oops, don't -- actually, you know, there are a

 7   couple of things we missed, make sure to do this, is probably

 8   not sufficient to ensure that these folks who are not -- you

 9   know, this is not their -- presumably, their professional job

10   that they do on a -- you know, day-in-day-out basis.  Even if it

11   were, that probably would not be sufficient.

12          And so, you know, there should be more in terms of, you

13   know, monitoring the polls, monitoring the poll watchers,

14   following up, and making sure that they're doing what they're

15   doing.  But I guess part of my answer to Your Honor, though, is

16   I think that the -- given the record I think that we've put in

17   here about what has gone wrong, somewhat -- some of the risk

18   really needs to fall on them because -- in terms of -- you know,

19   I do think it would be appropriate to have an injunction which

20   says, you know, Make sure nobody acts on the wrong guidance you

21   gave them before.  And it's up to them to figure out how they

22   ensure that because --

23          THE COURT:  But that's not the way injunctive relief

24   works, right.  It has to be something that they actually can

25   clearly understand what the direction is; and if they don't

——— 2:16-cv-2415-RFB-NJK ———

 1  follow the Court's direction, that I could find that they hadn't

 2  followed it, right.  Because they're going to say, We took the

 3  steps that we thought were appropriate, right.  And that's why,

 4  again, injunctions are specific so that if there is conduct that

 5  violates the injunction, we have a specific record for that.

 6          So, perhaps -- and we may just need to wait to hear

 7  what Mr. Law says about the operation and that may give us

 8  better information.  I was hoping to be able to tease some of

 9  that out beforehand, but why don't we have Mr. Law testify.

10          I will say this.  On the record before me now, it

11  doesn't appear that there's sufficient information to find that

12  the Nevada Republican Party itself has independent poll

13  watchers.  It doesn't appear to me that the Nevada Republican

14  Party is involved with poll watching/observing other than

15  providing at most supporting services.  There's no indication

16  that they themselves created their own training program or that

17  they had their own training outline.

18          Do you have any evidence of any of that, Mr. Spiva?

19          MR. SPIVA:  Well, I mean, there's some of it I think in

20  these documents that we've gotten, but --

21          THE COURT:  Well, but the e-mails show things being

22  shared with them.  Do you have anything that would suggest that

23  they crafted their own training program or had their own

24  parallel program with the Trump Campaign?

25          MR. SPIVA:  Well, they hosted the training program.

1          THE COURT:  I understand that.  I'm not disputing that,

2  right.

3          MR. SPIVA:  No.  And the Trump Campaign is a defendant

4  here.  So, I mean, that's --

5          THE COURT:  I understand that, but the Nevada

6  Republican Party is also a defendant.  What I am trying to do is

7  figure out which defendants -- to the extent that I would issue

8  an injunction -- we're focussed on and to the extent Mr. Law

9  testifies who we're talking about, right.

10          Absolutely the Trump Campaign is the defendant here as

11  is the Nevada Republican Party as are on the Stone entities, but

12  remember injunctions issue to a specific party and can impact

13  other parties.  But if it's involving a specific party's

14  conduct, it has to address that party's conduct.  And what I'm

15  saying to you is that it's not clear to me that there's anything

16  specifically involving the Nevada Republican Party doing

17  anything other than supporting what would appear to be the Trump

18  Campaign's program or process for poll observers.

19          But why don't we do this, why don't we just move to

20  Mr. Law's testimony.  But before we do that, one thing is I

21  wanted to note that the Stone entities, as I understand, have

22  been served.  Is that correct?

23          MR. SPIVA:  Yes, Your Honor.

24          THE COURT:  Mr. Hardy, you don't know whether or not

25  you're going to be representing them or not, do you?

--------------------- 2:16-cv-2415-RFB-NJK ---------------------

1           MR. HARDY:  I will not.

2           THE COURT:  You will not be.

3           MR. HARDY:  I would believe no and --

4           THE COURT:  The reason why I ask that is just for

5    scheduling I'm going to be issuing an order setting scheduling,

6    so I was going to ask you for your convenience, Mr. Hardy, about

7    the timing of that.

8           MR. HARDY:  I have no interest in representing them on

9    anything.  They'll have their own counsel.  They'll do their own

10   thing.  They have no affiliations.  We are not any part of that.

11          THE COURT:  All right.  Again, mostly that was just as

12   a scheduling convenience to you.  If I was going to issue that

13   order, I wanted to make sure that you would be available.  And

14   hopefully if Mr. Langhofer was going to be available, we'd have

15   him there, too, but he seems to be much in demand across this

16   country.

17          So, in any event, what I am going to do is I'm going to

18   set a time for the hearing tomorrow.

19          MR. SPIVA:  Your Honor, we haven't had any

20   communications from the -- anybody who says that they're counsel

21   for either Mr. Stone or --

22          THE COURT:  Well, and that may have separate

23   implications because there may be potential injunction that

24   issues against them.  If they're not going to respond at some

25   point having been served, that's -- that could be an issue and

─────────── 2:16-cv-2415-RFB-NJK ───────────

1    concern.  I just want to put that out there.  And also you

2    should be prepared, Mr. Spiva, and your clients and counsel to

3    be able to serve the order that I'm going to -- scheduling order

4    that I am going to be finalizing in the next hour or so while

5    we're doing also this testimony so that can be sent out for

6    possible hearing tomorrow with the Stone entities.

7            MR. HARDY:  Am I going to be required to be a part of

8    that hearing tomorrow?  I mean, that's my question because I've

9    got -- I've got clients that are flying in to town from out of

10   the country tomorrow, and I was hoping --

11           THE COURT:  You mean you're a little busy at this

12   period of time, is that what you're telling me, Mr. Hardy?

13           So I wouldn't require you.  What I will say is this.  I

14   can't say, Mr. Hardy, that if something comes up that it might

15   not impact your clients.  That's -- obviously you understand

16   that.  That while injunctions are directed to specific parties

17   in terms of conduct, the injunctions can actually incorporate

18   other related entities who would be impacted and can nonetheless

19   be required to comply with an injunction, right.

20           So I can't promise you that if something came up, for

21   example, they come forward and say, We're working very closely

22   with the Trump Campaign.  In fact, they've hired us to -- I'm

23   not saying that.

24           MR. HARDY:  Yeah.

25           THE COURT:  But if that happened and you weren't here,

─────── 2:16-cv-2415-RFB-NJK ───────

1  right, that would have implications in the context of something

2  I might have to order based upon the record that I had.  And so,

3  again, I'm not saying you have to be here.  What I am saying is

4  I can't say that if something were to arise in the course of

5  evidence that the Court received, that it might not impact your

6  clients.

7           MR. HARDY:  Well, can we set the hearing towards the

8  afternoon then?  So I can -- I have meetings with them in the

9  morning.  If we can do it in the afternoon, like after 1 or 2

10 o'clock, that would be perfect.

11          THE COURT:  Sure, that's fine.  So how about around 2

12 or 3 o'clock?

13          MR. HARDY:  That would be perfect because I just

14 need -- I've got meetings in the morning.

15          THE COURT:  That's fine.  You don't have to explain

16 your schedule.  But, again, part of the reason why I asked you

17 that is because, as you know, I can't promise that if something

18 came up that your client wouldn't be impact -- your clients

19 wouldn't be impacted by that.  And I wanted to give you the

20 opportunity to be present if you wanted to.

21          MR. HARDY:  And I will be present.  I just need it

22 later in the afternoon then.

23          THE COURT:  So how about 3 o'clock then?

24          MR. HARDY:  Three o'clock will work.

25          THE COURT:  Mr. Spiva?

─────────── 2:16-cv-2415-RFB-NJK ───────────

1           MR. SPIVA:  I'm sorry, Your Honor.

2           THE COURT:  Three o'clock tomorrow afternoon?

3           MR. SPIVA:  Yes.  Yes, Your Honor.

4           THE COURT:  This is for the Stone defendants.  We'll

5   have a hearing as it relates to the Stone defendants.  I mean,

6   all defendants can be present at that hearing.  But this is

7   basically a similar order to what I had issued earlier as it

8   relates to this particular issue about poll observers or

9   watchers and training related to them, so...

10          MR. SPIVA:  The only thing I would say, Your Honor, is

11  we made Herculean efforts to get a hold of them.  And Mr. Stone

12  himself obviously knew.  He had actual knowledge of this lawsuit

13  and has chosen not to appear at either of the hearings Your

14  Honor has set.  We didn't -- we didn't actually formally get to

15  serve him, we've made several attempts beforehand, until

16  yesterday, but --

17          THE COURT:  Well, I understand that, but once he has

18  been -- these entities have been served, which they have been,

19  then there are different implications for them not responding

20  and there may be different implications in the context of an

21  injunction.  So that's what we'll discuss tomorrow as it relates

22  to those entities.  And if they choose not to show up and you

23  think that an injunction should issue based upon the record that

24  we have, that's something that we can discuss tomorrow.

25          And I think it would be important for you, Mr. Hardy,

—— 2:16-cv-2415-RFB-NJK ——

1  to think about how that might impact your client in the context

2  of what the injunction would look like in terms of identifying

3  at a particular, for example, poll or precinct location who is

4  working for what entity because it could end up being a fairly

5  crowded --

6         MR. HARDY:  We're following the law.

7         THE COURT:  No, it's not that.  But, for example, if I

8  were to say I'm going to enjoin the Stone entities -- and I'm

9  not saying that I would -- from participating at all in poll

10 watching, it would helpful obviously for you to participate in

11 how that order might be crafted such that it didn't interfere

12 with what your clients were doing or with what the Nevada

13 Democratic Party was doing.

14        So I say that again now so that -- that's an issue

15 where it seems to me that your input might actually have some

16 impact on a potential order that the Court would issue.

17        MR. HARDY:  I'll be prepared for that, Your Honor.

18 Thank you.

19        THE COURT:  Okay.

20        MR. SPIVA:  Your Honor, we will obviously make every

21 effort to serve them with the order Your Honor is getting ready

22 to issue setting the hearing, but given how difficult it was to

23 actually serve the first set of papers, I can't guarantee that

24 we'll be able to --

25        THE COURT:  Well, I'm not asking you to guarantee it.

——— 2:16-cv-2415-RFB-NJK ———

1  I'm obviously -- the level of service and the attempts impact, I
2  believe, the arguments you can make about whether or not relief
3  should issue.  So I certainly would urge you to make exhaustive
4  efforts because that's something the Court can consider in the
5  context of whether or not injunctive relief should in fact issue
6  based upon a potential evasion of service or other types of
7  issues that come up with respect to relief and the Court's
8  exercise of its equity jurisdiction.

9          So with that, why don't we bring up the young man who
10 has Law in his name who is not a lawyer to testify.  And this is
11 an evidentiary hearing, but what I will say is this, Mr. Law.
12 You're going to be sworn in.  I'm going to allow the lawyers to
13 ask leading questions because it will save time.  And so the
14 rules of evidence will be followed, but they'll be lax.

15         So, Mr. Law, why don't you come forward and take the
16 stand.

17         COURTROOM ADMINISTRATOR:  Please raise your right hand.

18         JESSE REED LAW, having duly been sworn, was examined
19 and testified as follows:

20         COURTROOM ADMINISTRATOR:  Thank you.

21         THE COURT:  Why don't you have a seat there and state
22 your full name for the record, please.

23         THE WITNESS:  Jesse Reed Law.

24         THE COURT:  Can you spell that, please?

25         THE WITNESS:  J-E-S-S-E, R-E-E-D, L-A-W.

─────────────── 2:16-cv-2415-RFB-NJK ───────────────

1          THE COURT:  Thank you.  Mr. Hardy, you may proceed.

2          MR. HARDY:  Thank you, Your Honor.

3                      DIRECT EXAMINATION

4   BY MR. HARDY:

5   *Q.*  Mr. Law, can you tell us a bit of your background?

6   **A.**  Sure.  I'm a proud father of three.  Studying classical

7   voice opera at the UNLV School of Music, intending to graduate

8   in two years.  I've worked in politics.  I started as an

9   activist and like a grassroots guy in 2008.  And eventually I

10  started working professionally in 2010.  I've held all of the

11  titles from field organizer to campaign manager.  I was the

12  political director at the Nevada Republican Party for a spell in

13  2013 to general consultant.  And as it is right now, I'm the

14  Director -- Election -- EDO Director, sorry, of the Election Day

15  Operations for the Trump Campaign here in this state.

16  *Q.*  If I just refer to it as "the campaign," do you understand

17  what I'm talking about?

18  **A.**  Yes, sir.

19          THE COURT:  Excuse me, Mr. Hardy.  Mr. Law, what does

20  Election Day operations actually mean?  I know campaigns have

21  lots of titles, and I just want to make sure I understand what

22  that involves in terms of your regular activities.

23          THE WITNESS:  Sure.

24          THE COURT:  If there are any.

25          THE WITNESS:  EDO is the fancy term.

——— 2:16-cv-2415-RFB-NJK ———

1          THE COURT:  Right.

2          THE WITNESS:  And so that's the acronym.  Essentially,

3    it is just the process by which a campaign is going to observe

4    the vote, make sure that there's integrity in the process.  And

5    by "make sure," there's lawyers or those, you know, who are

6    familiar with that part of challenging through the system in a

7    war room, also on the ground, and then poll watchers.

8              In our situation, we have different lawyers from other

9    parts of the country also here that are local.  We're going to

10   have them in our command center.  Those who are familiar with

11   Las Vegas and how to navigate it are going to be out.  And then

12   we have a volunteer program, which is our poll watchers.  All

13   recruited from those who have expressed the interest to

14   participate.  So it was a hurry up and do this in the last two

15   weeks.

16             Pretty proud of the results.  You know, we've trained

17   over 100 in just this county and we've been deploying them.

18   We've been receiving feedback.  And ultimately the goal is just

19   to observe the integrity of the process.  But the nature of it

20   is that if we're observing the integrity, we must have that

21   integrity.  And so it's been very important to me and I do my

22   best to hammer that point that we're the ones who follow the

23   law.  And that's sort of the nature of the training.

24         THE COURT:  So you supervise then sort of those two

25   groups.  One would be the sort of lawyers who may get involved

—— 2:16-cv-2415-RFB-NJK ——

1   in legal issues, like for things like machines aren't working

2   properly and we need to figure out how to fix that or we don't

3   have enough machines or the poll locations are closed down, what

4   are the legal implications, things like that, right.  That's one

5   side of your team.  And the other side is simply volunteers who

6   are just watching as lay people who are trained, but who are

7   watching just for general issues and integrity that were raised,

8   for example, in the context of the PowerPoint that you have

9   submitted?

10          THE WITNESS:  Well, that's correct.  And the only

11   proviso to that is of course while I'm supervising those who

12   are -- there is attorneys in a war room capacity.  There are

13   certain things outside of my knowledge base.

14          THE COURT:  Right.  You're not a lawyer, right?

15          THE WITNESS:  Right.

16          THE COURT:  So, in other words, you don't supervise

17   them on legal matters you're saying?

18          THE WITNESS:  But the logistics of the process.  I

19   mean, if, you know, we have a phone system or something, I need

20   to make sure all of the train is moving on time, so...

21          THE COURT:  Perfect.  Thank you.  Thank you, Mr. Hardy.

22   BY MR. HARDY:

23   Q.  Couple of things.  Were you trained -- let's go back.

24   You've got your experience that you just kind of testified

25   about.  And I appreciate that Your Honor laying all of that

——— 2:16-cv-2415-RFB-NJK ———

1  foundation for me.

2        Tell me about how you were trained after you -- or what

3  training was necessary for you after you came to work for the

4  campaign.

5  **A.**  Well, I'm -- a lot of my experience has been grassroots.  I

6  mean, I like it.  I like meeting people at the door even.  And

7  in all of the process of campaigning the amount of time I've

8  spent at polls and getting to know the county workers and their

9  process, whether it's Election Day or early voting, I am

10  familiar with the nature of the whole process, and I've poll

11  watched.

12        So when I was brought on, what was important to the

13  Trump Campaign was not that they just have a room full of

14  lawyers waiting for people to hopefully call, because if there

15  were no eyes and ears observing the process should there heaven

16  forbid be some kind of an issue, we would never know about it.

17  So I was instructed to take the volunteers that existed when --

18  they were people who signed up on the website or people who

19  volunteered regularly and said, I want to poll watch, I

20  communicated with them to bring them in for training.

21        And as soon as I had the training that was sent to me

22  by the gentleman who hired me, the National Director is Mike

23  Roman, and also sent simultaneously to Ms. Ann Browning who was

24  visiting from the Republican National Lawyers Association.  Ann

25  was able to go through the slides.  And a lot of it was review

—————— 2:16-cv-2415-RFB-NJK ——————

1   with me, but when I'm brought on, I have an expertise in being

2   able to move people, large amounts of people -- motivating

3   people is a skill.  But then also the history that I have in

4   terms of symposiums or trainings of people, there are fine

5   points that must be adhered to.

6          So Ms. Ann Browning is teaching me the slide, making

7   sure I understand the fine points and what is appropriate, what

8   is not appropriate, what we must drill down, and then I observed

9   her conduct the first training.

10         After that I was ready, especially due to the fact that

11  at times some of the Trump supporters would have lots of big

12  questions.  I mean, I'm -- you know, I'm tailor made for that.

13         THE COURT:  I'm sorry, Mr. Hardy, let me ask one thing.

14  Mr. Hardy, I'll let you finish now.  You'll probably end up

15  getting my questions answered so why don't you go ahead then.

16         MR. HARDY:  I'd like to have marked as exhibits, Your

17  Honor, this is the Exhibit 1 and Exhibit 2 to Document 39 that

18  was filed so that way he can utilize those to discuss.

19         THE COURT:  Sure.  You can utilize them.  Do you have

20  physical copies you are going to give to the Court or do you

21  want the Court to use the copies that are on the...

22         MR. HARDY:  I can give physical copies to the Court as

23  well if you like, Your Honor.

24         THE COURT:  And we can try to set up the actually ELMO,

25  and then you can actually show him different sections of that.

—— 2:16-cv-2415-RFB-NJK ——

1          MR. HARDY:  However you want to do it.  We can do

2   whatever.

3          THE COURT:  Why don't we see if we can't turn that on.

4   But for now why don't you hand me the physical copy.

5          MR. HARDY:  Okay.

6          THE COURT:  And then we'll have that -- see if that can

7   just turn on.

8          MR. HARDY:  Perfect.

9          THE COURT:  Give us a second here.

10          MR. SPIVA:  And I've got a copy, Your Honor, so it's no

11   problem from my part.

12          THE COURT:  I think setting it up just may be easier to

13   review it with Mr. Law than having to sort of go back and forth.

14   So, you can, Mr. Hardy, simply put the page there and then he

15   can review that.

16          So is there any objection to admission of those

17   documents, Mr. Spiva?

18          MR. SPIVA:  No objection, Your Honor.

19          THE COURT:  Okay.  So those will be admitted as

20   Defendant's Exhibit 1.  And 1 would be which one?

21          MR. HARDY:  One wouldn't be Exhibit 1 and two would be

22   Exhibit 2.  How about that?

23          THE COURT:  Okay.  But can you describe them for me?

24          MR. HARDY:  Sure.  Exhibit 1 is the document that was

25   attached to our filing Document 39 in the docket.  And Exhibit 2

—2:16-cv-2415-RFB-NJK—

1   would be our Exhibit 2 to Document 39 in the docket.

2        THE COURT:  Okay.  So those will be admitted and are as

3   described in the record.  Thank you.

4        (Defendant Exhibit 1 and 2 are admitted.)

5        MR. HARDY:  Turn this --

6   BY MR. HARDY:

7   *Q.*  Mr. Law, are you familiar -- the Court ordered you to go

8   ahead and do a diligent search and look for certain documents.

9   Did you conduct that search?

10  *A.*  I did.

11  *Q.*  And in doing so, did you recover certain documents?

12  *A.*  Yes.

13  *Q.*  And are those documents the ones -- have you had an

14  opportunity to review Exhibit 1 and Exhibit 2?

15  *A.*  I have.

16  *Q.*  And does that accurately reflect the documents that you were

17  able to recover?

18  *A.*  Yes.

19  *Q.*  The first document in Exhibit 1 at the top is an e-mail that

20  was sent to you by Mike Roman.  Who is Mr. Mike Roman?

21  *A.*  He's the national EDO director for the Trump Campaign.

22  *Q.*  And what did he send you?

23  *A.*  He sent me a PowerPoint presentation tailored to Nevada as

24  well as a guide for the poll watchers that the -- those who take

25  the training would have a quick reference.

—— 2:16-cv-2415-RFB-NJK ——

1  Q.  Did you utilize that poll watcher training slide and the

2  poll watcher guide that was provided you by Mr. Mike Roman?

3  A.  I did.  It was what I was trained on as well.

4  Q.  And I believe attached to that exhibit are copies of that

5  slide that you provided to the Court.  Is that correct?

6  A.  That's correct.

7  Q.  And those are Exhibit 1A.  Those are a part of Exhibit 1A.

8           THE COURT:  I'm sorry?

9           MR. HARDY:  That is the Court's Exhibit 1A.  Now I want

10  to look at Exhibit 1B, because inside of Exhibit 1 there is a

11  number of levels, Your Honor.  So I want to make sure everybody

12  can see it as we're going through the docket.

13           THE COURT:  I understand that.

14           MR. HARDY:  I want to make a clear record.

15           THE COURT:  I understand that e-mail you just talked

16  about as being Exhibit 1A.

17  BY MR. HARDY:

18  Q.  Okay.  And 1B, you also produced this e-mail that had on it

19  an e-mail from you which is dated October 31st to Mr. Jon Staab.

20  Do you see that?

21  A.  Yes.

22  Q.  What was the purpose of this e-mail?

23  A.  I was going to conduct some training remotely into Reno.  I

24  have a few supporters that are up there that are poll watchers

25  from the website or they're known supporters.  And I needed to

1  conduct that training remotely.  So what I had done is I know

2  Jon is a pretty responsible guy.  I've known him from years of

3  volunteerism, those kinds of things, and I asked him to

4  facilitate that by attending and basically turning on the slide

5  projector.

6  *Q.*  And in particular, and this is important for me, is have you

7  attended or been a participant or done the training in nearly --

8  in every single instance where poll watching training has been

9  done?

10  *A.*  Yes.

11  *Q.*  In the campaign?

12  *A.*  I have.

13       THE COURT:  Has anyone else done the training besides

14  you?

15       THE WITNESS:  Ann Browning was the first training, but

16  I will say I was a participant in that as part of that.

17       THE COURT:  So there's no training that's occurred that

18  you either haven't done yourself or been present for?

19       THE WITNESS:  Correct.

20       THE COURT:  Okay.

21  BY MR. HARDY:

22  *Q.*  And during every one of those trainings, were those slides

23  that we have seen before, were those utilized?

24  *A.*  Yes.  There was slight changes made as we moved forward,

25  though.

—— 2:16-cv-2415-RFB-NJK ——

1   Q.  Okay.  And I want to take a look at some of those different

2   slides because one of the things the Court asked you to do is to

3   provide all of the versions that you had -- you may have used.

4   The first version you'll see is Exhibit -- is to Exhibit 2A.

5   That -- this is the initial version.  Do you recall seeing that

6   version before?

7   A.  Yes.

8   Q.  Okay.  In this version, did you ever utilize this version or

9   when was this version used?

10  A.  That was used the first day of training, Monday, the 24th.

11  Sorry about the date.  I think that's it.  And that was when Ann

12  was actually going slide by slide, and in that one there was no

13  contact information on the last slide so that had not been

14  updated.

15  Q.  So the last slide we just see that it says, Insert your name

16  and contact info?

17  A.  Right.  So verbally we said, Hey, we don't have our hotline

18  up yet.  Please, you know, talk to Mr. Law.  And then they gave

19  us the -- we gave the phone number for me.

20       MR. SPIVA:  I have an objection, Your Honor.  I'm a

21  little lost in terms of which of these he's referring to because

22  they're a couple of these in the deck, and I wasn't following.

23       MR. HARDY:  Exhibit 2A.

24       THE COURT:  And so when you say "2A," you're using the

25  same numbering system that's for the exhibits themselves when

───── 2:16-cv-2415-RFB-NJK ─────

 1 they were filed in the record?

 2          MR. HARDY:  Correct.

 3          MR. SPIVA:  2A to his declaration or to the response to

 4 the documents?

 5          MR. HARDY:  2A to Document 39.

 6          THE COURT:  Thirty-nine is the response, I believe.

 7          MR. HARDY:  Thirty-nine is the response.

 8          MR. SPIVA:  Yes.  Okay.  Thank you.

 9          THE COURT:  I'm sorry.  Mr. Law, just to be clear, when

10 did the poll watching -- watcher/observer training start?

11          THE WITNESS:  The recruitment started on Sunday, the

12 23rd.  The actual training began the night of Monday, the 24th,

13 at 6 p.m.

14 BY MR. HARDY:

15 *Q.*  And prior to that, had there been any poll watchers that had

16 been sent out by the campaign?

17 *A.*  None.

18 *Q.*  Exhibit --

19          THE COURT:  Even on Monday, excuse, the 24th?

20          THE WITNESS:  The 24th, unless I'm off, of October.

21          THE COURT:  Okay.  I just wanted to make sure I had

22 that.

23          Sorry, Mr. Hardy, go ahead.

24 BY MR. HARDY:

25 *Q.*  Exhibit 2B shows another variation to that same poll watcher

 1   training.  Was it changed from the original that you had

 2   received to this particular variation?

 3   *A.*  I added, of course, my name and my contact information.

 4   Also, by that time we had the Nevada hotline, the number that we

 5   would need for receiving incidents and then triaging them

 6   through a protocol.

 7   *Q.*  Is that this last page that's before you right now?

 8   *A.*  That's correct.

 9           THE COURT:  And that was the only change?

10           THE WITNESS:  Correct.

11           THE COURT:  Okay.

12   BY MR. HARDY:

13   *Q.*  So now I want to talk how it evolved from what we saw as 2B

14   to what we have as 2C.  And I'll put 2C up so that you have it

15   in front of you, at least the beginning there.  What changed in

16   this particular variation?

17   *A.*  Well, we only added the line on the cover there, which is,

18   We are not the Republican National Committee.

19   *Q.*  Why did you do that?

20   *A.*  You know, working with grassroots guys for a long time, you

21   get kind of used to it.  And, first of all, the passion's there

22   and the man hours is always impressive.  But sometimes, you

23   know, they're going to get to a location -- in fact, in this

24   instance what I'd gotten was a nice old lady.  Her name was

25   Onada.  She'd gone to a location and explained that she was from

1    the Republican Party instead of Trump.  And I'd gotten that

2    report back I believe because there were now issues coming up as

3    to what brought us here today.

4            And when I found that out, and it was Onada's name,

5    she's a very nice lady, I called her and I said, Well, what's

6    going on?  And she says, Well, you know, I said -- I didn't want

7    to say I was from the Trump Campaign because I'd seen some

8    people on the news getting harassed and, really, I just -- I

9    just was trying to say I was, you know, a Republican.

10           There was another instance, though.  I had another

11   lady.  She was -- she lives down in Sun City in Henderson, a

12   senior community.  It was the same situation.  Her name is Joann

13   Mongerrelli, a very nice lady.  She just simply said, Well, I

14   was just saying I was a Republican.  And I had a conversation

15   while I was at dinner.  She finally called back.  And it was the

16   same kind of thing, you know, Well, how am I supposed to say I'm

17   Republican?  I said, Listen, you can say that you're a

18   Republican.  But the problem is you were trained by the Trump

19   Campaign and if you don't want to say Trump, you can say public

20   observer, but, you know, in no way have you been trained by the

21   Republican National Committee.

22   *Q.*  So just a couple of people that were scared to announce that

23   they were with Trump because they were afraid of intimidation by

24   others?

25   **A.**  Truly.  And --

─────── 2:16-cv-2415-RFB-NJK ───────

1          MR. SPIVA:  That, I object to, Your Honor.  I mean, I

2    know you said leading questions, but that was testifying.

3          THE COURT:  I mean, he can -- Mr. Spiva, he can offer

4    his opinion, right.  I'm not sure how relevant it is, Mr. Hardy.

5    And I appreciate the testimony, Mr. Law.  I'm not sure how

6    relevant it is to the issue that we're talking about, which is

7    this issue about the poll watchers.  It may be an interesting

8    story, but I'm not sure how relevant it is.  So, I'd overrule

9    the objection, but I would ask you to move on.

10         MR. HARDY:  We'll move forward.

11   BY MR. HARDY:

12   Q.  So is that the only change that you made from variation B to

13   now C?

14   A.  Yes.

15   Q.  And the reason you did that was just to make sure -- the RNC

16   clarification, correct?

17   A.  Correct.

18   Q.  Let's go from the final variation that you have here.  And

19   by the way, when did that variation from B to C occur?

20   A.  I want to say it was Monday.  And the reason why I'm fuzzy

21   on it is because I don't remember exactly when I spoke to Onada,

22   but I want to say it was Halloween night.

23   Q.  Halloween night.  Okay?

24   A.  Yeah.

25   Q.  Now, on the final variation that you submitted is this

—— 2:16-cv-2415-RFB-NJK ——

1  variation right here.  What difference --

2          THE COURT:  What number is that again?

3          MR. HARDY:  This is 2D.

4          THE COURT:  2D okay.

5  BY MR. HARDY:

6  *Q.*  In 2D how does that vary from what you had in 2C?

7  *A.*  Well, I left the hearing yesterday having to beat the

8  traffic to up to 40 people waiting for me.  And I made it pretty

9  much on time.  The concern I had was the Court's concern.  There

10 were some, you know, rightful concerns over the process by which

11 we're talking about voter challenges and in our training.  And

12 unilaterally I decided to make this change because I couldn't

13 consult counsel.  I arrived with five minutes to go.  It's not

14 like I can reach the national guys on a dime.  Also, you -- any

15 counsel that I could have counseled with was in court.

16          So what I did was I interpreted the intention that was

17 expressed and I didn't want to repeat what -- while I don't

18 think that we were doing that, I know we weren't doing that, but

19 any perception of impropriety I wanted to put to rest.

20 Therefore, I had taken notes while we were back there and I

21 added three items.  And so I made the change, it was Slide 12

22 about voter challenges.  I had, you know, probably 20 attorneys

23 in the room from different, you know, recruitment processes, and

24 they were being trained now what the poll watchers were being

25 trained.  That's why they were there.  And so I just hammered

——— 2:16-cv-2415-RFB-NJK ———

1  this slide.

2       And I said, you know, What we normally talk about with

3  this slide is that you're not going to see this problem.  It is

4  the rarest thing in the world, let alone in Las Vegas where we

5  barely know our neighbors.  We're not even putting our

6  volunteers in their own precincts, generally speaking.  Maybe,

7  maybe.

8       But the fact is they have to have personal knowledge of

9  who they see, that they're misrepresenting their identity, or

10 personal knowledge that that person actually voted.  And since

11 it's so rare, the comment I've always made is that this is not

12 something they're going to run across.  Should they, they need

13 to call our command center.  But I put it up on the screen and I

14 put things underlined.  I put things in bold.  And I said, Hey,

15 any willful violation -- and I didn't have all of the legal --

16 legalese I needed, but any willful violation of this is serious.

17 And I just drove the point home.

18 *Q.*  Now, I appreciate that you put it on the slide, but had you

19 been discussing this particular issue in every training that

20 you'd given up to this point in time?

21 **A.**  I had, yeah.

22 *Q.*  Tell us what you were describing to those people when you

23 saw that -- when this slide would come up during your trainings

24 that predated this slide, what was your discussion?

25 **A.**  Sure.  Well, I mean, you know, if you think of the slide

1  presentation, it is an instruction of what you don't do, what an

2  observer is able to do, but also of voter's rights, what the

3  process is to a degree in the county.  In fact, generally the

4  nature of the presentation is don't forget these county workers

5  are like you and me.  They're basically volunteers in the

6  community trying to do the right thing, and they're going to be

7  busy.  And at the point that you're real bossy, you're not going

8  to make them happy.

9          On this, this was informational.  I've never been

10 instructed to actually have this be part of our program.  In

11 fact, it was an informational slide.  So even though the

12 language was never on the screen, I would say, Listen.  In this

13 instance if you are in your own neighborhood, if, and you have

14 personal knowledge on that person's identity, if, and if you

15 have knowledge that they've already voted, if, fine.  You can go

16 ahead and do that.  But you're not going to be in that situation

17 99.9 percent of the time.  What we're training you to look for

18 is not this.  We're training you to look for all of the other

19 things.

20          And so, I -- oh.  And, you know, one of the major

21 points ultimately is, Hey, we're looking for integrity in our

22 process.  Keep integrity in the process yourself.  Any

23 violations result in civil and criminal penalty.

24 Q.  And they were fully informed of that in every presentation

25 that you were part of?

——————— 2:16-cv-2415-RFB-NJK ———————

1   *A.*   Absolutely.  Yeah.

2   *Q.*   The presentations which predated this?

3   *A.*   Yes.

4   *Q.*   And you intend to continue with that same process in all

5   those that postdate this?

6   *A.*   Well, the answer is yes.  But as an addendum, I had always

7   intended to have all of our volunteers back over the weekend.

8   Mostly because I've had -- well, you know, I'm not going to say

9   how many every day.  I don't have that exact figure, but dozens

10  of people out every day having new incidents.  I need to

11  basically compile that.  And when it comes to Election Day, I

12  really want a honed incident process where we're not bothering

13  those who are busy with poll workers.  We've got hundreds of

14  thousands of vote expected Tuesday.

15  *Q.*   Are you confident that the individuals that you were

16  training understood?

17  *A.*   Absolutely.  You know, the only comment back is I got a

18  return e-mail this morning which was, Oh, that slide, I thought

19  you said we weren't doing anything with it, so...  And that's

20  about it.

21  *Q.*   The -- one of the other documents that you've produced --

22          MR. HARDY:  And I'll go back now to Exhibit 1, Your

23  Honor.  It's going to be Exhibit 1E.

24  BY MR. HARDY:

25  *Q.*   After hearing yesterday in court that there were allegations

─────── 2:16-cv-2415-RFB-NJK ───────

1  that you may be incorrectly doing some type of training, and

2  these are allegations that came from the plaintiffs, somehow

3  maybe what you were doing was inappropriate.  How did that make

4  you feel?

5  *A.*  You know, I take pride in my work in politics.  In fact, I

6  gave it up for art, but you never really leave politics.  But I

7  have a lot of conviction about how I approach things.  I have

8  friends on both side of the aisle.  One of my biggest issues in

9  politics is when you have some sort of dishonesty toward an

10  electorate or if you have volunteers and you're taking advantage

11  of them.  And so what this was was an implication and accusation

12  that I've got hundreds of people that I didn't give all of the

13  facts to.  I'm taking advantage of their man hours.  And these

14  are decent people.  And so the issue is I have agency over them,

15  and, you know, it's a -- the accusation betrays my intention, it

16  betrays all of my work, and it betrays my pride.

17  *Q.*  Did you in turn send something out to them as a reminder to

18  reiterate what you taught?

19  *A.*  Well, before I left the court yesterday, it was the first

20  thing I said.  Yeah, I want to send something out because I

21  don't want this issue.  I of course had to go and do the

22  training, and then we had to finish talking about everything,

23  you know, last night with the issues of the day and preparing

24  for Election Day.  I didn't get an opportunity to fully send

25  that until this morning.  I sent that.  The intention was that

─────────── 2:16-cv-2415-RFB-NJK ───────────

1   I -- these guys need to know -- if there is a potential for an

2   issue, I certainly want to head it off.  I feel like the e-mail

3   did that.  I am inviting everyone back already for the incident

4   training.  This will be a main point.  Further, I don't just

5   put -- send out an e-mail --

6          THE COURT:  Mr. Law, let me just stop you there for a

7   moment because I want to make sure I understand that.

8          THE WITNESS:  Sure.

9          THE COURT:  So when you say bring everyone back for the

10  incident training, are you saying that there is a -- before

11  Election Day on the 8th you are going to bring all of the poll

12  watchers back for additional training or refresher training?

13  You said "incident training."  I wasn't sure what that meant.

14         THE WITNESS:  Sure.  You know, it's a bit overkill, I

15  must say, because if you're moving a lot of people, it's

16  difficult to get them just to show up for meetings.  They all

17  hate it, which is part of why I like to honor volunteers.

18         THE COURT:  Right.

19         THE WITNESS:  What I want is a process that is well

20  oiled.  If there is an issue where they cannot report incidents

21  clearly, we're not honoring the time they're there, we're not

22  honoring the attorneys who have volunteered and come here, and

23  the system is breaking down.  It's important enough for me that

24  I review the issues that we've observed, and then we implement

25  an appropriate process so when they're spending six or eight

——— 2:16-cv-2415-RFB-NJK ———

 1  hours on Election Day themselves, it's not a waste.

 2          So that was always going to happen.  And we would

 3  then --

 4          THE COURT:  Can you describe for me what this

 5  practically means?  Does that mean you have a series of training

 6  sessions where you bring in everyone who is signed up to be a

 7  poll watcher and they have to sort of go through this incident

 8  training or final training before they go out?

 9          THE WITNESS:  Logistically, I don't see how that's --

10  how it's reasonable that I mandate it if they've got a job, but

11  they have said -- but, yes, there are all invited.

12          THE COURT:  So the goal is to get as many people who

13  are going to go out who are volunteers as possible to come back

14  through for this final training?

15          THE WITNESS:  Yes.  And in that process a secondary

16  notification via e-mail over all that we covered, so that's

17  updated.

18          But the final process is if I just told people where

19  they were going via e-mail, they wouldn't show up.  They

20  wouldn't show up in droves.  So we have a text process and we

21  have a phone call process to make sure people are showing up,

22  and we're going to do that all day Monday.

23          So, as part of that, it's going to be informational as

24  a main point, especially due to the gravity of the hearing, that

25  we pay attention to following the law.  And, you know, of course

—————— 2:16-cv-2415-RFB-NJK ——————

1   I'll make sure it's as concise and well crafted as possible to

2   maybe fit in a text, but that we're able to inform these guys on

3   following the law.

4           THE COURT:  And, Mr. Law, what percentage would you say

5   of your volunteers actually have e-mail?

6           THE WITNESS:  I'm only aware of two that don't.

7           THE COURT:  Okay.

8           THE WITNESS:  Yeah.

9           THE COURT:  Okay.  So a very small percentage?

10          THE WITNESS:  Very small percentage.

11          THE COURT:  All right.  Thank you.  Mr. Hardy.

12  BY MR. HARDY:

13  *Q.*  Mr. Law, did you actually send this e-mail out to all poll

14  watchers other than the two you just referenced?

15  *A.*   Correct.

16  *Q.*  And those two that you've referenced --

17          THE COURT:  I'm sorry, excuse me.  Can you scroll down?

18  All I have is the blacked-out version of that, so if you want

19  to --

20          MR. HARDY:  I can zoom that out.

21          THE COURT:  So I have some text or something if

22  there's...

23          MR. HARDY:  Yeah.  What we've got is kind of the top

24  here.  And I'll bring the next page, which has the text on it.

25          THE COURT:  Okay.

─── 2:16-cv-2415-RFB-NJK ───

1          MR. HARDY:  I just want to focus real quick on this

2    date and time, if I can do that first?

3          THE COURT:  Okay.  Sure.

4    BY MR. HARDY:

5    *Q.*  Mr. Law, did you actually send this e-mail out on November

6    3rd, 2016, at 7:51?

7    **A.**  I did.

8    *Q.*  And you sent it to all poll workers that you utilize?

9    **A.**  I did, yes.

10   *Q.*  And except for the two that you talked about, have you tried

11   to reach out to those two?

12   **A.**  Correct.  I've had instructions, but I've been busy with

13   this.  But the instruction was I have some administrative

14   support and they've reached out.

15   *Q.*  Now, the e-mail that you crafted, is this a fair and

16   accurate copy of that e-mail?

17   **A.**  It is.

18   *Q.*  Okay.  I want to read this e-mail -- or if we can say -- why

19   don't you go ahead and read this e-mail to us so we can make

20   sure we get it clear.

21   **A.**  As you may have heard, the Nevada State Democratic Party is

22   accusing the Nevada State Republican Party and the Trump

23   Campaign of voter intimidation.  One of their main arguments is

24   that you may have been misled or confused during the poll

25   watcher training session and that on Election Day you might

1  challenge voters without justification.  This is a very serious

2  accusation, which, as you know, is totally untrue.  But because

3  they are making it, we wanted to reiterate something that all of

4  you already know about, the legal requirements for orally

5  challenging voters in Nevada and the need for you to call the

6  legal hotline before attempting to challenge anyone's

7  eligibility to vote.

8          As you will recall from your poll watcher training,

9  there are three legal requirements for oral challenges in

10  Nevada.  No. 1, the challenger must reside in the same precinct

11  as the challenged voter.  No. 2, the challenger must base his or

12  her challenge on personal knowledge that the challenged voter

13  either is not entitled to vote as claimed or has already voted

14  in the same election.  And, 3, the challenger must submit an

15  affirmation concerning the challenge under penalty of perjury

16  and in the form prescribed by the Secretary of State.  See

17  N.R.S. 293.303(1)(a), A frivolous or knowingly false challenge

18  may give rise to civil and/or criminal liability for the

19  challenger.

20          Because this process is technical and carries

21  significant risks for both the challenger and the challenged

22  voter, we reiterate that all poll watchers must confer with the

23  legal hotline before initiating any challenge.  In almost all

24  instances, we will advise against challenging someone who is

25  trying to cast a vote.

—— 2:16-cv-2415-RFB-NJK ——

1          For the most -- for the vast majority of you, this

2    won't come up at all and it won't be necessary to memorize the

3    details of the challenge procedures because you won't be

4    assigned to watch polls in your own precinct.  So, you are not

5    eligible to challenge voters in the first place.  But for the

6    few of you who may be watching polls in your own precinct, I

7    trust this message is sufficient to remind you of the legal

8    requirements for an oral voter challenge.  Your job as poll

9    watchers is to quietly and respectfully observe the democratic

10   process in action.  As we have explained to all of you, if you

11   see anything that causes concern, please let our legal hotline

12   know rather than try to correct the situation yourself.

13          If you have any questions on this topic, please do not

14   hesitate to call me at 702-715-1401 any time.

15          Best wishes, Jesse Law.

16   *Q.*  In sending this -- this wasn't any type of acknowledgment

17   that you hadn't done training, correct?

18   *A.*  That's correct.

19   *Q.*  In fact, it specifically says that you want to give them

20   reminder of training they've already received?

21   *A.*  That's correct.

22   *Q.*  And with respect to this particular e-mail, do you intend to

23   send this off to any future trainees before they go ahead and

24   initiate any -- before they begin poll watching again?

25   *A.*  I am going to hammer this point all the way through Tuesday.

PATRICIA L. GANCI, RMR, CRR     (702) 385-0670

──────── 2:16-cv-2415-RFB-NJK ────────

 1  I...

 2        This is the last thing we're going to see from the

 3  Trump Campaign.  We have not trained our people to do this.  We

 4  will not train our people -- I'm sorry.  We have not trained our

 5  people to improperly violate these -- this voter challenge rule.

 6  We will not.  In fact, we will train them to follow the law and

 7  also train them there are ramifications if they do not.

 8  Q.  When you say you will, you have, correct?

 9  A.  I have.

10        MR. HARDY:  At this point in time, Your Honor, I don't

11  think I have anything further.

12        THE COURT:  Thank you, Mr. Hardy.

13        Mr. Spiva.

14                    CROSS-EXAMINATION

15  BY MR. SPIVA:

16  Q.  Good morning, Mr. Law.

17  A.  Good morning, sir.

18  Q.  How are you doing?

19  A.  Feel great.

20  Q.  Good.

21        Mr. Law, you previously worked for the Nevada

22  Republican Party?

23  A.  That's correct.

24  Q.  What time period was that?

25  A.  You know, I've been volunteering in the Republican Party,

 1  whether it's the county or state, since 2008.

 2  *Q.*  You were the executive director of the Nevada Republican

 3  Party for a period of time.  Is that correct?

 4  **A.**  The official paid position was political director.

 5  Executive director was more honorary during the period, but not

 6  paid.

 7          THE COURT:  I'm sorry.  So you were not a paid employee

 8  of the Nevada Republican Party?

 9          THE WITNESS:  I was as a political director for about

10  eight months.

11          THE COURT:  And that was what period of time?

12          THE WITNESS:  2013.

13          THE COURT:  Just within that year?

14          THE WITNESS:  Correct.

15          THE COURT:  Okay.

16  BY MR. SPIVA:

17  *Q.*  Did you hold a position with the Nevada Republican Party

18  within the last year?

19  **A.**  You know, as a volunteer only.

20  *Q.*  So you were no longer the political director within the last

21  year?

22  **A.**  No.

23  *Q.*  Okay.  And when did you start working for the Trump

24  Campaign?

25  **A.**  October the 21st.

───────── 2:16-cv-2415-RFB-NJK ─────────

1  Q.  And did you hold any position with the Trump Campaign prior

2  to October 21st?

3  A.  No.

4  Q.  And I apologize if you answered this before, but what is

5  your title with the Trump Campaign?

6  A.  Sure.  Nevada EDO director, which is Election Day

7  Operations.

8  Q.  Okay.  And what kind of training did you receive to be the

9  Nevada Election Day training operations director?

10  A.  Sure.  Well, of course, you know, years in the field and

11  familiarity with the polls qualified me in terms of could I have

12  the capacity to understand and then further train and the social

13  interactions that are going to be necessary in a very tense and

14  busy time.  But beyond that, specific direction was from the man

15  that hired me, Mike Roman.  We had a conference call that

16  Friday, the 21st of October.  I believe that's the date.  And

17  then we circled back on Sunday when he sent the training

18  materials, and then again I sat for two hours with Ann Browning

19  from the Republican National Lawyers Association going over the

20  slides and making sure the points were there.  And then finally

21  I observed her and participated in her training for the first

22  night and have carried forward since.

23  Q.  And you -- in your years of working in the field, did you

24  gain familiarity with Nevada law concerning challenges to

25  voters?

─────── 2:16-cv-2415-RFB-NJK ───────

1   *A.*  Actually, that has never been something I've done.  None of

2   my campaigns were interested.  Essentially that is, you know,

3   that's something that's never come up.

4   *Q.*  And so whatever instruction that you got, you got from the

5   Trump Campaign?

6   *A.*  Correct.

7   *Q.*  Let me ask you -- I want to ask you about one of the

8   documents that you were just talking about with counsel.  And if

9   I could ask you to turn -- do you have a paper copy in front of

10  you of the response?

11  *A.*  No, sir.

12          MR. SPIVA:  It's on the ECF, Your Honor.  I could

13  approach with a paper copy or I don't know if we can put it back

14  on the screen.

15          THE COURT:  Well, if you have it, you can put it the

16  ELMO right there and it will show on his screen.

17          MR. SPIVA:  Okay.

18          THE COURT:  So if you want to do that, he can --

19  Mr. Law would be able to see it from there.

20          MR. SPIVA:  Let me try to -- I apologize for juggling

21  the papers here.

22          THE COURT:  That's all right.

23          MR. SPIVA:  Thank you very much.  I appreciate that.

24  Sorry.  It's going to take me a minute.

25  BY MR. SPIVA:

—— 2:16-cv-2415-RFB-NJK ——

1    *Q.*  So I think this is Exhibit 1A or the first page of Exhibit

2    1A from the document responses that were filed this morning.

3    And I think you were asked some questions about this on your

4    direct examination.  Do you remember that?

5    *A.*  Yes.

6    *Q.*  And this is something that you received -- you and other

7    people received on Sunday, October 23rd, from Mike Roman.  Is

8    that correct?

9    *A.*  Correct.

10   *Q.*  And that -- what he was transmitting to you on the 23rd was

11   the PowerPoint presentation to be used in these trainings,

12   correct?

13   *A.*  Correct.

14   *Q.*  And who is -- I think you testified before about Ann

15   Browning.  Does she have a position with the campaign?

16   *A.*  She does not.  She's a volunteer.  So she's with the

17   Republican National Lawyers Association and they assist.

18   *Q.*  Okay.  And Heather Flick, it appears to be is also on here,

19   what organization is she with?

20   *A.*  Also with the RNLA and she hadn't been to Las Vegas until --

21          THE COURT:  Where in LA?

22          THE WITNESS:  I'm sorry, she's from the RNLA.  San

23   Francisco is where she's out of.

24   BY MR. SPIVA:

25   *Q.*  Is that the Republican National Lawyers Association?

——— 2:16-cv-2415-RFB-NJK ———

1 **A.**  Yes.

2          THE COURT:  Okay.

3          THE WITNESS:  Apologies.

4 BY MR. SPIVA:

5 *Q.*  And then, of course, you are also on this the e-mail?

6 **A.**  Correct.

7 *Q.*  And let me ask you -- it may be easier if I use a different

8 copy.  Sorry.

9          And let me just ask you.  I'll represent to you that

10 this is a page from that initial -- the document that was

11 attached to that e-mail.

12          THE COURT:  This is the earlier version of the training

13 session -- the earlier version of the training session on poll

14 watcher challenges that didn't include the amendments.

15          MR. SPIVA:  Yes.  And let me get -- I'll ask him a

16 question to get clarification on that.

17          THE COURT:  I'm just saying that because it seemed like

18 all of the earlier versions that we discussed, they all didn't

19 have the change, and there was only one, I think, if I'm

20 correct, Mr. Law, that you recently amended that had the change.

21 So all of the other earlier ones didn't have that change.  Is

22 that right?

23          THE WITNESS:  Correct.

24          THE COURT:  Okay.  Go ahead, Mr. Spiva.

25 BY MR. SPIVA:

--- 2:16-cv-2415-RFB-NJK ---

1   *Q.*  And I just want to verify, this is a page from the one that

2   you received on October 23rd, correct?

3   *A.*  Correct.

4   *Q.*  And this -- on the slide it informs the voter that poll

5   watchers generally are not permitted to the challenge the

6   qualifications of a voter, correct?

7   *A.*  Correct.

8   *Q.*  But it goes on to say that a poll watcher may, however,

9   challenge the voter if a poll watcher is a registered voter in

10  the precinct where he is serving as an observer, correct?

11  *A.*  Correct.

12  *Q.*  And it provides two permissible reasons for challenging the

13  voter?

14  *A.*  Yes.

15  *Q.*  Okay.  But this page doesn't say anything about the need to

16  make those challenges based on personal knowledge, correct?

17  *A.*  It does not appear that, no.

18  *Q.*  Okay.  And there's nothing in this version that you received

19  on October 23rd that says that the challenge must be based on

20  personal knowledge, correct?

21  *A.*  There is not.

22  *Q.*  And there's nothing on this page that says that a challenger

23  has to fill out an affidavit if they make a challenge, correct?

24  *A.*  Correct.

25  *Q.*  And there's nothing in this document that you received on

———— 2:16-cv-2415-RFB-NJK ————

1    October 23rd that informs the poll observer that they have to

2    fill out this affidavit, correct?

3    *A.*  Right.

4    *Q.*  And this was produced by the Trump Campaign?

5    *A.*  It was.

6    *Q.*  Okay.  And in the e-mail that you were sent on October

7    23rd -- let me just put it back up for a second.  It says:

8    Created by HQ.  I assume that stands for headquarters.  Is that

9    right?

10   *A.*  I assume so.

11   *Q.*  Okay.  Is that what you understood it to mean?

12   *A.*  Of course, yes.

13   *Q.*  And then it says, Please review, amend, and use as needed.

14           Did you do any amending or -- of the document after you

15   got that?

16   *A.*  Only what Mr. Hardy and I have discussed.

17   *Q.*  Okay.  And then how many trainings have you had since

18   October 23rd?

19   *A.*  If you'll grant me a moment to think?

20   *Q.*  Well, let me ask you this --

21           THE COURT:  Well, let him finish.

22           MR. SPIVA:  Sure.  Didn't mean to interrupt.

23           THE WITNESS:  I'd say a dozen.

24   BY MR. SPIVA:

25   *Q.*  A dozen?  Do you hold them every day or...

─────── 2:16-cv-2415-RFB-NJK ───────

1  *A.*  Well, not Sunday, but some were twice a day, yeah.

2  *Q.*  Twice a day.

3         Okay.  And about how many people have you had at each

4  training?

5  *A.*  We've had as many as 40.

6  *Q.*  Ever have more than 40?

7  *A.*  Probably.

8  *Q.*  And so up through yesterday roughly you've trained about 400

9  people.  Is that fair to say?

10 *A.*  I think that's an overestimation, but, you know, definitely

11 over 100.  We've had as many as 40.  We've had few as two, but

12 that was a one-off, you know.

13 *Q.*  Now, did you have an approximation of about how many people

14 you've trained through yesterday?

15 *A.*  It's certainly over 100.

16 *Q.*  And the deck that we were just reviewing, that was the

17 PowerPoint that you were using when you were training those

18 individuals?

19 *A.*  What Mr. Hardy and I discussed and the changes on the dates

20 that we made, that was what I used to train all of them, yes.

21 *Q.*  Okay.  So that was the second one that was put up, you mean?

22 *A.*  The second one was used all the way through, I believe,

23 Monday, the 31st.

24        And the third one was the 1st through the 2nd.  And

25 then, of course, yesterday I made one change for the two

─────── 2:16-cv-2415-RFB-NJK ───────

 1  trainings I had yesterday.

 2  *Q.*  Okay.  Thank you.

 3       Do you hand out copies of the training after it's over?

 4  **A.**  No.  What we provide is the training guide, and we treat

 5  that as something as a bit of a review.  And then of course we

 6  say, Before you're interacting with the site managers or doing

 7  any kind of action, we need you to talk to the command center.

 8  *Q.*  Okay.  And let me ask you, have you -- I think you testified

 9  on direct that you had dealt with a person named Onada Peterson.

10  Did I get that right?

11  **A.**  Yes.

12  *Q.*  And have you had reports that Ms. Peterson has been giving

13  out inaccurate information to people at certain polling

14  locations?

15  **A.**  I had received a call from actually Mike Roman and he said,

16  Do you know Onada Peterson?  And I said, Yeah.  And I said, What

17  did she do?  And.

18       It was that she was representing herself as a

19  Republican Party person.  And I said, you know, Obviously all of

20  our stuff is branded Trump.  So it was evening.  I figured her

21  being older, getting up early, I would call the next morning.

22  Called the next morning.  And, you know, she just said, Gosh,

23  you know, I thought that we were all Republicans and I didn't

24  want to say Trump, so...

25  *Q.*  Was she one of the people who had gone through one of your

--- 2:16-cv-2415-RFB-NJK ---

1  trainings?

2  *A.*  She is.

3  *Q.*  I should have asked you this before.  Were there -- were

4  there any trainings before you came on board this election cycle

5  for poll watching?

6  *A.*  In the State of Nevada, none.

7  *Q.*  So the first ones that happened here happened under your

8  watch?

9  *A.*  Correct.

10       MR. SPIVA:  Excuse me one second.

11  BY MR. SPIVA:

12  *Q.*  Now, I know you testified that you had heard that Onada

13  Peterson had been representing that she was with the Republican

14  Party.  Did you hear reports that she told voters that they

15  couldn't early vote at an Albertsons, which was an early vote

16  location, if that was not in their precinct?

17  *A.*  That would be something that I didn't hear until, you know,

18  these proceedings.

19  *Q.*  Okay.  And you would agree with me that that would be

20  incorrect, right, if somebody were to --

21  *A.*  Incorrect.

22  *Q.*  Sorry, let me get the whole question out.  I appreciate you

23  answering.

24       But if somebody were to tell somebody at an early vote

25  center that they had been voting in their own precinct, that

———— 2:16-cv-2415-RFB-NJK ————

1 would be incorrect information?

2 **A.**   Totally incorrect.

3 *Q.*   Okay.   Did you get any reports that Ms. Peterson had told a

4 voter that he would need an I.D. to vote?

5 **A.**   I had not, no.

6 *Q.*   And you would agree with me that that also would be a

7 misinformation if -- if someone were told that they needed an

8 I.D. to vote in an early voting center?

9 **A.**   There's only one instance that you're required to provide an

10 I.D. in Nevada, and that's if you an absentee ballot holder who

11 has never voted in person.   And if you attend the location, you

12 must present I.D.   And that is a pretty clear slide as well in

13 our training.   So any representation beyond that doesn't add up,

14 no.

15 *Q.*   Right.   So if somebody were not in that particular

16 circumstance where it was a first-time voter presenting

17 themselves for the first time, they wouldn't need an I.D.,

18 right?

19 **A.**   Correct.

20 *Q.*   Have you also trained an individual named Kishana Holland?

21 **A.**   No.

22 *Q.*   Have you ever heard that name?

23 **A.**   You know, I had somebody tell me about a Kishana.   And I say

24 "somebody," one of our poll workers, our watchers.   Also one of

25 the attorneys who's driven around had met Kishana.

─────────2:16-cv-2415-RFB-NJK─────────

1  *Q.*  Okay.  And does -- do you know whether Kishana Holland

2  volunteers for the Trump Campaign?

3  *A.*  I know she does not.  But I don't know who she is.

4  *Q.*  And so if she were holding herself out as a volunteer for

5  the Trump Campaign, that would be an inaccurate representation

6  on her part?

7  *A.*  Completely false.

8  *Q.*  Do you require everybody who volunteers for the Trump

9  Campaign to go through one of your trainings?

10  *A.*  There's no mechanism by which I could even assign them a

11  location if I don't have a form that they filled out.  Because

12  what I do, I don't just take a list of names who are volunteers

13  and send them.  They turn in a sheet and I do data entry or the

14  administrative support does.  And it's that list based on that

15  data entry that gets told where to go.

16  *Q.*  Okay.

17         THE COURT:  Because you assigned them based upon them

18  being put into the system?

19         THE WITNESS:  Correct.

20  BY MR. SPIVA:

21  *Q.*  Do you make any -- as the -- sorry.  Remind me of your title

22  again.  I want to get it right.

23         THE COURT:  EDO.

24         THE WITNESS:  EDO director.

25  BY MR. SPIVA:

─────── 2:16-cv-2415-RFB-NJK ───────

1  *Q.*  Do you ever make out any kind of public calls for the public

2  at large to come go to polling sites and watch the polls to make

3  sure there's no fraud going on?

4  **A.**  No.  What I -- I'll tell you all of the activities that I've

5  done.  You know, again, my directive was get as many in,

6  trained, and out as possible to have a successful EDO operation.

7  So we sent to those who expressed interest, either in person or

8  through the Donald Trump website.  Beyond this, in recent days,

9  I've reached out to a few grassroots leaders myself just saying,

10  Hey, listen I know you have a seniors group or a women's group.

11  And then I've requested that they come in for training.

12        Now, I have requested that the campaign send out a mass

13  e-mail.  And the response was, Listen, We have Get Out The Vote,

14  too.  I'm not letting you take all of our volunteers.  So there

15  is a balance.  Unfortunately, if I was to do mass communication,

16  I could also detract from other operations within the campaign

17  and that's not what I should be doing.

18  *Q.*  Would you have any concerns about a mass call for

19  individuals who hadn't been trained to go to the polls and

20  watch?

21        THE COURT:  When you say "a mass call," I want to

22  clarify what that means.  What does that mean to you, Mr. Law?

23        THE WITNESS:  Well, what I hear is like maybe, you

24  know, an announcement.  Maybe somebody took out an ad or on the

25  radio or in a YouTube video.

──────── 2:16-cv-2415-RFB-NJK ────────

1           THE COURT:  Do you have a mechanism to do sort of a

2   mass call, other than sort of an e-mail or like a robocall?

3   What are the ways that you can sort of logistically reach out to

4   volunteers?

5           THE WITNESS:  Sure.  Mr. Trump gets so much attention

6   that people go to his website and sign up.  I can imagine that

7   database is vast.  And they're going to, of course, in a state

8   boundary have access to who they want to communicate with

9   through e-mail.  Beyond this, there are very sophisticated tools

10  using IP addresses that are tied to different zip codes.

11          THE COURT:  I meant for you in terms of what you do,

12  not in terms of what the campaign does generally.

13          THE WITNESS:  No.

14          THE COURT:  But in terms of how you, for example, reach

15  out to your volunteers is e-mail, as you used in this instance,

16  a typical way that you would do that?

17          THE WITNESS:  Yes.  There's really no other way for me

18  to do, unless I was just to call in a radio station and hope

19  they put me on the air, which I've not done.  So it's just

20  e-mail to the captive audience that exists.

21          THE COURT:  Do you have the ability to do a global text

22  based upon cell phones?

23          THE WITNESS:  If people in our program -- the only time

24  I've done texts is the people in our program who have signed up

25  and I needed to text a group in an area and explain, Look for

─────── 2:16-cv-2415-RFB-NJK ───────

1   this.  So I've not done anything outside of that or hired

2   anybody, just those who have signed up.  And it's more

3   logistics.

4           THE COURT:  Okay.  Thank you.

5           MR. SPIVA:  Thank you, Your Honor.  I was just looking

6   for a clean copy of a document.  I'll be right with you.

7   BY MR. SPIVA:

8   Q.  Let me ask you, this is an e-mail from you to Jon Staab --

9   is that how you pronounce his name?

10  A.  Staab.

11  Q.  And this is from yesterday at 6:01 p.m., correct?

12  A.  Yes.

13  Q.  And Mr. Staab is with the Nevada Republican Party, I take

14  it?

15  A.  Uh-hmm.

16  Q.  And why were you sending him this e-mail which, as you may

17  recall from your direct, has the PowerPoint attached?  Why did

18  you send him the PowerPoint last night?

19  A.  I had asked Mr. Staab to be present for our training that

20  I'd be holding up in Reno, and since I couldn't be in Reno, to

21  basically turn on the lights, unlock the door, and project the

22  information on the screen, provide me logistical support while I

23  conduct training.

24  Q.  And was that training done -- and I realize you weren't

25  physically there, but it was done at the Offices of the Nevada

—— 2:16-cv-2415-RFB-NJK ——

1   Republican Party?

2   *A.*   No.

3   *Q.*   In Reno?

4   *A.*   No, it was the Washoe County Republican Party.  And there is

5   an SEC distinction and a Secretary State distinction between the

6   two.

7   *Q.*   The Washoe County Republican Party is not a member of the

8   Nevada State Republican Party?

9   *A.*   They're a member for sure and they make up that, but it

10  is -- they're not the same.

11  *Q.*   Okay.  And -- but Mr. Staab, he is an employee of the Nevada

12  Republican Party?

13  *A.*   He is.

14  *Q.*   Okay.

15          THE COURT:  Mr. Spiva, how much more do you think you

16  have?

17          MR. SPIVA:  I think no more than about, I would say 10

18  minutes, Your Honor.

19          THE COURT:  Because I'm not really sure what the

20  relevance of some of these questions are and so I'm a little

21  concerned about where we're going with some of these questions.

22  I've given you a fair amount of latitude on the questions, but I

23  don't really know what else we need to have clarified as it

24  relates to the relationship.

25          I'm just going to tell you I just don't find there to

—2:16-cv-2415-RFB-NJK—

1  be a substantial degree of evidence connecting the Nevada

2  Republican Party to in any way directing or organizing the poll

3  watching training.  I don't think there's evidence in the record

4  before me that supports that.  I don't think that the e-mails

5  that I have are sufficient to establish that.  And I don't know

6  that it really matters in the context of the injunctive relief

7  sought since it's clear that the Trump Campaign, which is

8  actually organizing logistically the poll watchers anyway.

9        So if I was going to order injunctive relief, to the

10  extent that I would order it, and I'm not saying I would, the

11  injunction would be directed at the Trump Campaign because they

12  would be the only defendant who could actually, at this point,

13  based upon the record before me, do anything as it relates to

14  whatever concerns might be raised.

15        So I think we should try to bring this to a close here.

16        MR. SPIVA:  Yeah.  I was going to -- most of my

17  questions were not directed at that issue, Your Honor, except

18  for the last one, obviously.  But I was going to move into a

19  different area.

20        THE COURT:  Okay.  All right.

21  BY MR. SPIVA:

22  Q.  Mr. Law -- actually, that should be very easy to remember,

23  right.  Are you familiar with Stampede Consulting, LLC?

24  A.  No.  Except that I read the filings.

25  Q.  Right.  But prior to that, you had no knowledge of them?

——— 2:16-cv-2415-RFB-NJK ———

1  *A.*  I had not.

2  *Q.*  Okay.  And when you were the political director of the

3  Nevada Republican Party, I think this is probably obvious from

4  your last answer, but you never retained Stampede to do any work

5  for the Nevada Republican Party?

6  *A.*  We didn't --

7       MR. HARDY:  Your Honor, I think this is -- I just want

8  to make the objection that it's completely irrelevant at this

9  point in time and beyond the scope of anything I did in my

10  direct.

11       THE COURT:  I think that's true.  I'm going to sustain

12  it.

13       Let me ask this question, Mr. Law.  Is the Trump

14  Campaign working with either as a paid vendor or as providing

15  some sort of services any other organization or entity in the

16  context of poll watching or observing?

17       THE WITNESS:  We have no paid EDO program that exists

18  in our state except for me.

19       Now, we do receive support from the Republican Party

20  National Lawyers Association where they've just sent volunteer

21  lawyers.  It is -- our program is managed --

22       THE COURT:  Besides that -- I think you've already

23  mentioned that.  Besides the lawyers from the Republican

24  national program, are there any other entities or organizations

25  or nonprofits with whom the Trump Campaign is working as it

—————— 2:16-cv-2415-RFB-NJK ——————

1  relates to poll watching or observers?

2          THE WITNESS:  None.

3          THE COURT:  Okay.

4          MR. SPIVA:  And my question, Your Honor, since there

5  was the objection and I think it was sustained is there's

6  evidence that we've put into the record that Stampede has

7  received funds from the Nevada Republican Party and that

8  Stampede is engaging in poll watching.

9          THE COURT:  Right.  But I don't know that he has --

10 Mr. Law has indicated in any way that he has been involved in

11 that.

12         MR. SPIVA:  Understood.  Understood.  I got the answer.

13         THE COURT:  And I don't think he said he was connected

14 to the Nevada Republican Party in the relevant time period.

15         MR. SPIVA:  Right.  And I understood that.  I was

16 planning to move on, but that was the reason I was asking those

17 questions.

18 BY MR. SPIVA:

19 Q.  Are you familiar with the Great America PAC?

20         MR. HARDY:  Objection, Your Honor.  I'm going to go

21 ahead and object again on relevance as well --

22         THE COURT:  Again, Mr. Spiva, I'm not sure I

23 understand.  He answered my question, which is to say that they

24 are not working with anyone else.  So, why do we need to have

25 these questions?

─── 2:16-cv-2415-RFB-NJK ───

1          MR. SPIVA:  Well, this is a different question about

2   whether he's familiar with the Great America PAC.

3          THE COURT:  Why is that relevant?

4          MR. SPIVA:  Well, the reason it would be relevant is

5   there's been payment from them to Stampede.

6          THE COURT:  From --

7          MR. SPIVA:  From the Great America PAC.

8          THE COURT:  Right.  But he -- I asked him.  I said, Is

9   there anyone else involved?  Is there anyone that the campaign

10  is working with?  He said no.

11         MR. SPIVA:  That he knows of.

12         THE COURT:  Which would address I think the questions

13  you're asking him.

14         Now, if you have some specific information that would

15  suggest that Mr. Law had that connection, that would be one

16  thing.  But I asked him a very broad question to encompass these

17  smaller questions so we wouldn't have to go through a series of

18  questions.  So I'm not sure why we would have to have separate

19  questions for each of these entities, given the fact that

20  Mr. Law has said, other than the Republican National Lawyers

21  Organization, he is not working with either on a volunteer basis

22  or paid basis through the campaign or otherwise any other

23  entity.  Isn't that right, Mr. Law?

24         THE WITNESS:  That's correct.

25         MR. SPIVA:  I wasn't trying to suggest, Your Honor,

—— 2:16-cv-2415-RFB-NJK ——

1  that he was working with them.  But there is evidence, again

2  that we put in the record, that that organization has paid

3  Stampede.  And so if he knows --

4          THE COURT:  But he could only testify to what he has

5  personal knowledge of.

6          MR. SPIVA:  And I was just asking the foundational

7  question, Your Honor.

8          THE COURT:  Right.  But I am saying is he doesn't have

9  the foundation.  That was the purpose of my question was to find

10 out what foundation he would have for other -- answering

11 questions about other organizations.  And I am saying that he

12 doesn't and I find that he doesn't.  So I sustained the

13 objection and let's sort of move on from there.

14         MR. SPIVA:  Okay.

15 BY MR. SPIVA:

16 Q.  And then lastly, Mr. Law, are you familiar with statements

17 that Mr. Trump has made at various campaign rallies asking

18 people to go out and watch the polls?

19         MR. HARDY:  Objection, Your Honor.  That's outside --

20         THE COURT:  Sustained.

21         MR. SPIVA:  I don't have anything further, Your Honor.

22         THE COURT:  Thank you.

23         Mr. Hardy, any redirect?

24         MR. HARDY:  It's not necessary, Your Honor.  Thank you.

25         THE COURT:  All right.  Thank you, Mr. Law.

1            THE WITNESS:  Thank you, Your Honor.

2            THE COURT:  Is there any information or evidence that

3   either side wishes to present to the Court at this time?

4            Mr. Hardy?

5            MR. HARDY:  I think Your Honor is astute in what is

6   taking place here today and what you have heard today.  The only

7   thing that I would take objection on is there's been multiple

8   references to the fact that somehow by sending out the e-mail

9   earlier this morning it was some type of an admission that

10  there's been anything wrong or there was any wrongdoing

11  beforehand.  I think we heard that today that there was training

12  that was done.  That there were a number of things, including

13  even adding his name on a slide that wasn't there.  And so I

14  don't think that there's any basis for the injunction relief and

15  we'd ask for that, Your Honor.

16           THE COURT:  So let's move on then because I haven't

17  made any findings yet.  And so let's move onto a discussion of a

18  possible injunction one way or the other.  I find that the only

19  basis, at least that there might have been, for an injunction

20  potentially could have been this issue about the training.  But

21  to the extent there was an issue about whether or not the

22  training actually incorporated or involved those areas in Nevada

23  law that were not explicitly referenced by printed material in

24  the training, there has been a subsequent e-mail that has been

25  sent out to all of the poll watchers, except for two, that were

1  previously trained.

2          It seems to me, Mr. Hardy, the only potential issue

3  would be the issue of -- to the extent the Court would issue an

4  injunction related to this follow-up training, whether or not

5  that would be necessary.  I don't know that it is, but I

6  anticipate some discussion about that or at least an argument

7  about that.  So what would be your response if there was a

8  request for that?  Because I will say this.  In terms of a basis

9  for an injunction -- and I'm not even saying that I found one.

10 To the extent there would be one, it would really be about this

11 potential missing information.  And, again, I haven't even found

12 that in fact it was missing from the training.

13         But just so we can have a focussed conversation, what

14 would be your response to any potential injunction as it relates

15 to requiring that the incident training and the follow-up or

16 final training involve a reemphasis of this information?

17         MR. HARDY:  Your Honor -- the law on this, Your Honor,

18 is abundantly clear.  What they're asking for is an obey-the-law

19 injunction.  And that's what they're asking you to give, and

20 that would be what you're giving is, Hey, guys.  Obey the law.

21 Hey, go out and tell people obey the law.

22         THE COURT:  Let's move from there to the other possible

23 argument, and I'll let Mr. Spiva make it, which they would make

24 is that there was potentially irreparable harm created by the

25 initial training, right, and that this e-mail doesn't fix that.

2:16-cv-2415-RFB-NJK

1   To me, that's potentially the only theoretical argument that

2   they would have left.

3            MR. HARDY:  And it's nothing more than that,

4   theoretical, because we haven't seen and they've not provided a

5   single instance of a voter challenge that's happened up to this

6   point in time.  So if it's -- if there's been no -- there's been

7   no instances of that, then what can we do today to rectify

8   something that hasn't happened?

9            What we've done is we've put out an e-mail and it's

10  made everybody abundantly clear.  And we're going to follow the

11  law.  And for this Court to give an obey-the-law injunction is

12  just inappropriate.  Thank you.

13           THE COURT:  Thank you, Mr. Hardy.

14           Mr. Spiva, two questions.  One is to the extent that

15  there were concerns about the training that the Court had, even

16  if, for example, Mr. Law hadn't included discussion of the

17  requirements, which I'm not saying that I find, but let's just

18  say he had included them, the e-mail that was sent out based

19  upon the representation to all of the poll watchers -- and from

20  what we have in the record before us I have no reason to doubt

21  that the e-mail that was sent out to the poll watchers was

22  fairly clear about emphasizing what the requirements are for

23  making a challenge and, in fact, added a step not required under

24  Nevada law as it relates to calling the command center where

25  there are lawyers before making such a challenge.

—— 2:16-cv-2415-RFB-NJK ——

1          And it's very clear in terms of the type and the bold

2  and the underlining as the emphasis to potential consequences

3  for knowingly or falsely challenging a voter.  And so to the

4  extent that the Court may have had a concern or there may have

5  been a possibility for some harm, why has that not been

6  addressed by this e-mail?

7          MR. SPIVA:  Yeah, I think two things, Your Honor.  One,

8  I'm not actually sure that it went to everybody because we heard

9  testimony that there was over 100 people who went through this

10  training, and it didn't look like there was space enough there

11  to me for 100 e-mail addresses.  The other thing is we don't

12  know how many of them received that.  You know, there's nothing

13  that suggests that they had to do a read receipt or a response.

14  That could be a further issue, something -- further guidance

15  Your Honor could put forth through an injunction.

16          THE COURT:  Okay.  So you're saying that you think that

17  there isn't -- the e-mail is insufficient because we can't

18  establish that it actually may have corrected a misunderstanding

19  of the other workers who received it?

20          MR. SPIVA:  Well, that's one reason, Your Honor.  And

21  that --

22          THE COURT:  And because the other thing, which the

23  e-mails says, which you didn't challenge, was the fact that

24  Mr. Law represented that most of the poll observers aren't even

25  going to be going to their own precinct, right.  And,

——— 2:16-cv-2415-RFB-NJK ———

1  presumably, if they went to a different precinct -- first of

2  all, they'd have to have evidence when they challenged the

3  person to present to the actual election worker that they were

4  from the precinct, one.  Two, then they'd still have to sign the

5  form.  So why would that not address or mitigate any, again,

6  irreparable harm, which is what the Court would have to find for

7  there to be an injunction issued?

8         MR. SPIVA:  Right.  And I guess two things on that,

9  Your Honor.  First of all, I don't think, given that we have put

10  evidence into the record in the form of declarations, that a

11  particularly now-named individual, who was a trainee here, has

12  been making misrepresentations at these early vote centers that

13  actually are separate and apart from this whole issue of

14  challenges, I think shows that there's still a problem here in

15  terms of their training and in terms of the calls that Mr. Trump

16  has been making for people to aggressively challenge voters.  So

17  that's one.

18         Two, in terms of this specific issue and this specific

19  training, it came at 6 o'clock last night after, basically, all

20  of the people had been trained.  And an e-mail coming, you know,

21  you know, several days -- you know, after the fact when they've

22  actually done the bulk of the training.  And this is something

23  that was put out by the Trump Campaign, right.  And the

24  testimony was that the Trump Campaign developed this slide deck

25  tailored to Nevada law.  And they -- and they say it's rare, but

1  they have a whole slide in there about this issue.  And, yet,

2  they omit the critical element that you need in order to

3  challenge.

4      And so I think it's too late in the day to just say,

5  Well, we sent out an e-mail to correct it.  And I guess what I

6  would -- you know, in order to cure the harm or to ensure -- and

7  that's what we have to show, right, that there is some

8  likelihood that there would be further harms.  And I suggest to

9  you the fact that we've been able to point to two specific names

10  of people, one of whom has admittedly gone through this

11  training, who have been making misrepresentations to voters, and

12  the fact that this training had inaccuracies in it and it wasn't

13  corrected until most of the people had been trained --

14      THE COURT:  Right.  But the inaccuracy in that regard

15  wasn't actually with respect to what we're talking about, right.

16      MR. SPIVA:  Well, but one --

17      THE COURT:  It had to do with where you could early

18  vote, right.

19      MR. SPIVA:  Right.  Right.  Right.

20      THE COURT:  And that's not what -- I have in the record

21  before me where I had raised concerns was about what were

22  established materials that had been used in training, but that's

23  different from the Court taking one instance of someone who may

24  have at some point been affiliated with the campaign and

25  misinformed someone, and based upon that one instance making a

1   finding that the entire training was inappropriate.  Because,

2   first of all, they didn't even start the training until after

3   early voting had already started, right.

4          We don't know that this particular individual, when she

5   may or may not have been trained, how much she was trained, when

6   she left or didn't leave.  I mean, you're asking me to issue

7   injunctive relief on the basis of, one, an individual incident.

8   It's unconnected from the concern that I had as related to the

9   training.

10          MR. SPIVA:  But it's not just that, Your Honor.

11          THE COURT:  But it -- so it wouldn't establish that.

12   But -- so what other issues would you raise then to bring to my

13   attention?

14          MR. SPIVA:  Well, I guess what I'd say, first of all,

15   in terms of that -- that instance, I mean, admittedly someone

16   who went through this training, you know, I would again say

17   that, you know, given all of these calls from Mr. Trump himself

18   to people to go out and aggressively monitor polls in certain

19   areas, that that is sufficient to warrant a broader injunction.

20          With respect to this specific issue, I think again it's

21   in the backdrop of all of these other statements that we've put

22   into the record that at least, at the very least, there should

23   be an injunction to ensure that all previously and future

24   trained poll workers have been instructed in a manner that

25   corrects the faults we've identified.

─────────────────── 2:16-cv-2415-RFB-NJK ───────────────────

1          And so at the very least it seems like we ought to

2    demand some kind of receipt from the e-mail or a response from

3    the e-mail and some kind of follow-up.  I understand the

4    testimony is that they are going to be having people in for a

5    training over the weekend.  There was no assurance that it would

6    be everybody, but that they have to ensure that the word is

7    conveyed to everybody who's gone through the training and who's

8    going to be doing work at the polls on Election Day that they

9    understand the rules of the road here.

10          THE COURT:  And what would that injunction look like?

11    What would I order?  So you're saying that I issue an injunction

12    that says because there was a previous potential issue with the

13    training and even though this e-mail was sent out that may not

14    completely rectify the harm, and so therefore I should issue an

15    injunction which says there could be irreparable harm if Mr. Law

16    isn't instructed to remind poll watchers again about what are

17    the requirements for voter challenges.

18          MR. SPIVA:  Well, and ensure that they've actually

19    gotten the word.

20          THE COURT:  Let me ask you a question.  Is there any

21    evidence in the record before me that in fact there has been a

22    single improper voter challenge?

23          MR. SPIVA:  Well, in terms of a challenge because of

24    the two statutory reasons, no.  But that -- again, we're in the

25    early voting period and so you wouldn't expect that.  But there

───────── 2:16-cv-2415-RFB-NJK ─────────

1   has been -- there is evidence in the record of improper

2   statements to two voters by people affiliated with the Trump

3   Campaign.

4        THE COURT:  And let me ask you a question about that.

5   The fact that someone may have at one time volunteered for the

6   campaign, does that make this campaign or any other campaign

7   responsible for them in terms of what the established policy or

8   training set forth?  Right.  I mean, people can on their own go

9   off and say and do things that are inconsistent with what

10  they've been trained to do.  That happens not just in this

11  particular lecture; that happens frequently.

12       So how can that serve as a basis for an injunction

13  without some evidence that, in fact, they were directing people

14  to specifically do something?

15       So, for example, even if I looked at the statements you

16  asked me to look at from Mr. Trump, he doesn't say, as far as I

17  could see, I want you as my supporters to go to early voting

18  sites and misdirect people about where they should vote.  He

19  doesn't say that, right.  You don't have a statement that says

20  that?

21       MR. SPIVA:  No, but he has lots of statements that say

22  you should harass and intimidate voters.  And I don't think we

23  have to show that he --

24       THE COURT:  Well, if you are asking for a specific

25  injunctive relief, you have to show that there is a specific

1  harm that can be addressed by the injunctive relief.

2          MR. SPIVA:  The harm is improper intimidation of

3  voters, Your Honor.  And so I think the statements of Mr. Trump,

4  the head of the campaign, basically encouraging that type of

5  activity, encouraging people to bring law enforcement out, you

6  know, encouraging them to aggressively go to certain areas

7  warrants an injunction that says, You got to make sure that that

8  doesn't happen because that would -- that's wrongful behavior.

9          THE COURT:  Okay.  And we go back to this make-sure

10  type of injunction, I'm not sure what that actually is.  I mean,

11  your first -- so you're saying to me first the statements by

12  Mr. Trump that relate to the election being rigged or stolen and

13  the need for his supporters to stop this from happening, right,

14  and the sort of vague, yet suggestive nature of those statements

15  is sufficient for this Court to issue an injunction to the

16  campaign to say, You need to make sure that your poll watchers

17  follow the law or just the supporters?

18          Because I don't know that I have any evidence before me

19  that the poll watchers are actually engaging in any improper

20  conduct, right.  It sounds to me like what you are saying is

21  that he's issued this general call that you find has influenced

22  people, maybe not even necessarily people who work for the

23  campaign, but people who may volunteer for the campaign.  Has

24  influenced people to engage in improper and potentially unlawful

25  conduct that relates to voting.

—— 2:16-cv-2415-RFB-NJK ——

1          If the case is that his words may have encouraged
2 people to do that, I'm not saying that I've made that finding,
3 you're saying that the Court should issue an injunction to the
4 campaign saying that it should stop these people how?  I mean,
5 what would I say in an injunction?
6          MR. SPIVA:  Well --
7          THE COURT:  Because, again, I'm not sure what the
8 nature of that injunction would be.  I've focussed on the
9 specific areas of concern in part because injunctions have to be
10 specific, and that's what is mandated by the Ninth Circuit in
11 the context of a very sort of narrowly tailored injunctive
12 relief.  I'm just not sure what it is that you're asking in the
13 nature of an injunction other than an injunction that says
14 follow the law, right.  Injunctions that say follow the law are
15 not injunctions that are favored in this circuit.
16          And then you're, I think, asking me for something that
17 says, Well, ensure that they follow the law.  I'm not sure what
18 that actually means.  Now, if you're saying to me that what you
19 were requesting is an injunction that says they have to be
20 instructed to specifically reference this information in this
21 follow-up training and that then they have to provide some
22 confirmation to the Court that in fact there was receipt of this
23 information, okay.  I guess that's a specific injunction the
24 Court could at least consider.  I'm not saying I would issue it,
25 but that would be specific enough.

1          MR. SPIVA:  I think that would help, Your Honor.  And I

2   understand Your Honor disagrees and Your Honor has the final

3   word on this obviously.  I just want to make clear we think what

4   we have submitted would justify a much broader injunction and

5   would -- even if it could be characterized as a follow-the-law

6   injunction, it would be appropriate in this circumstance.  But I

7   think the injunction that Your Honor -- with respect to this

8   specific issue, I think that the injunction that Your Honor just

9   mentioned would be helpful, would be a significant step in the

10  right direction.

11          THE COURT:  Okay.  And so what would be the basis -- so

12  let's back just so the record is clear.  What would be the basis

13  for me issuing a broader injunction?  Is the basis you're saying

14  that there has been a subtle encouragement by --

15          MR. SPIVA:  Hasn't been subtle, Your Honor.

16          THE COURT:  Well, I say subtle from the standpoint he

17  hasn't said explicitly, and in the law that matters, right, I

18  want you to go out and disrupt election polls.  He hasn't

19  explicitly said that.  Now --

20          MR. SPIVA:  In the modern era you hardly ever get that.

21          THE COURT:  Let me finish.

22          MR. SPIVA:  Sorry, Your Honor.

23          THE COURT:  Now, I agree with you that you don't have

24  to explicitly say things to directly encourage people; that you

25  can use indirect language that is nonetheless fairly directive

—— 2:16-cv-2415-RFB-NJK ——

1   and encouraging.  But what I am saying is that the Court has to

2   apply a different standard to that type of language, the

3   language that fairly clearly says you should go out and do

4   certain things when those things are in violation of the law.

5         In this case what you're asking me to do is interpret

6   what you think is suggestive language as it relates to voter

7   intimidation for Mr. Trump.  And on the basis of that suggestive

8   language find that that suggestive language is going to lead his

9   supporters here in Nevada to improperly engage in voter

10  intimidation or coercion, right.

11        And so my question to you is, what evidence do you have

12  of the fact that that has been a significant or widespread

13  problem such that the Court should address it with injunctive

14  relief, apart from isolated incidents which could occur in any

15  context?  What evidence do you have of that?

16        MR. SPIVA:  Yeah, we don't have -- beyond the instances

17  we've pointed to, we don't have evidence of that having already

18  happened, Your Honor, but what we have shown is there is a

19  significance threat.  It's perfectly predictable that what --

20  it's not only, by the way, Mr. Trump.  It's also his Vice

21  Presidential candidate, Mr. Pence, and we cite those statements

22  in the record.  It's perfectly predictable that what they are

23  calling for is likely to happen.  And I don't think the

24  standard --

25        THE COURT:  Okay.  But, see, that's where the explicit

——————— 2:16-cv-2415-RFB-NJK ———————

1  aspect of what they say matters, right?

2          MR. SPIVA:  Yes.

3          THE COURT:  So what is it that you say they're calling

4  for and why is that linked to Election Day?

5          MR. SPIVA:  Can I just grab -- I have a note.

6          THE COURT:  Sure.  I mean, because the problem with

7  innuendo is that it can be equally misinterpreted by everyone

8  when you're using it, including the people you may or may not

9  encouraging to engage in some action.

10         So if you're saying that these words are sort of going

11 to lead to a sort of perfect storm of voter intimidation, tell

12 me what evidence do we have that in fact this is going to

13 happen --

14         MR. SPIVA:  Right.

15         THE COURT:  -- on Election Day.

16         MR. SPIVA:  And I would point Your Honor also to the

17 Nguyen case in the Ninth Circuit where you had a mailer sent out

18 saying if you commit -- to the Latino voters saying if you

19 commit fraud, you know, that's a felony.  Perfectly true

20 statement.  I mean, I don't have the words exactly right, but

21 there was a statement to that effect.  If you -- you know, voter

22 fraud is a felony and if you vote -- if you are an illegal

23 immigrant or if you're here illegally, you could be prosecuted

24 or deported for that.  True statement.  But also found to be

25 voter intimidation in that case.

1         So it doesn't have to be, and you would rarely expect

2   to find in the modern era -- and I think the Supreme Court

3   Arlington Heights case also recognizes this, a -- I mean, we've

4   heard some pretty outrageous things from Mr. Trump, but you

5   wouldn't expect even Mr. Trump to say, Go into black and Latino

6   neighborhoods and disrupt the vote.  But we've had things that

7   are pretty close.  We've had --

8         THE COURT:  Okay.  So let me ask you a question.  And

9   so part of this relates to again there are certain first

10  Amendment issues that the Court also has to take into the

11  context of a candidate speaking because he is the head of the

12  campaign which is one of the defendants here, but the Court has

13  to take that into consideration.

14        And so my question to you is in the case you cited

15  there was an explicit mailer that was directed at a particular

16  community with a specific threat of potential criminal sanction.

17  That actually was very specific.

18        And I'm trying to have you explain to me, do we have

19  anything like that in this case that the Court can rely upon and

20  if there's any other case law that would support in the context

21  of suggestive innuendo the issuance of an injunction?

22        MR. SPIVA:  Right.  And I think the language used in

23  Nguyen -- and I don't have it right in front of me, Your Honor,

24  but it is -- I don't know if suggestive is the word they used,

25  but it was subtle manipulation.  I can get that language for

———— 2:16-cv-2415-RFB-NJK ————

1   you.  I think we quoted it in our brief.

2          THE COURT:  Right.  But the subtle manipulation was in

3   the context of specific statements made, which is different,

4   right?

5          MR. SPIVA:  Right.

6          THE COURT:  It's not that they were telling people not

7   to vote.

8          MR. SPIVA:  Right.

9          THE COURT:  But they made an explicit statement that

10  could clearly be interrupted as a threat, right.  And so what I

11  am saying to you is that you're asking me to take one step

12  removed from that, which is that we don't have an explicit

13  statement from the campaign or from his representatives saying

14  something similar.

15         If you live in a high-crime neighborhood, the chances

16  are you're not going to be likely to vote because you associate

17  with felons, for example, if that was what was said.  That might

18  target certain types of communities.  There's nothing like that.

19         There is a -- the statements that you have referenced

20  -- these references that suggest people need to take some

21  action, they need to stop certain alleged rigging from

22  happening.

23         MR. SPIVA:  Right, but --

24         THE COURT:  But they don't really say how people are

25  supposed to do that and they don't provide a framework for how

1 people are supposed to do that.  And it seems to me your only

2 argument is is that encouraging people without a framework

3 encourages, essentially, lawlessness in the context of what they

4 are being asked to do and that that could lead to voter

5 intimidation.  That seems to me that's -- basically your

6 argument is that by telling people you should go do something to

7 stop this rigging, but not tell them that the legal way to do

8 that --

9            MR. SPIVA:  Right.

10            THE COURT:  -- that you are effectively encouraging

11 them to engage in illegal ways to do that because you're not

12 telling them how they are supposed to do that appropriately.

13            MR. SPIVA:  Well, here's an example that's very

14 similar --

15            THE COURT:  Hold on.  Is that your argument?

16            MR. SPIVA:  No, I don't think it is, Your Honor.  I

17 think my argument is that they are actually asking or

18 encouraging people to engage in vigilantism and voter

19 intimidation, and that although some of their statements are

20 coded, they are pretty thinly coded.  And certainly the Court

21 can, you know, as the fact finder could find that.  I think -- I

22 mean, I don't know if Your Honor wants me to go -- I mean, I

23 know it's in our brief and I want to --

24            THE COURT:  Why don't we do this.  Give me an example

25 -- and I'll let Mr. Hardy respond, too -- some of what you think

1 would be your best examples of that type of improper

2 encouragement that would require injunctive relief.

3          MR. SPIVA:  Sure.  I mean, for instance, Mr. Trump

4 stated, you know, we have to call up at a rally encouraging

5 people to go check in other neighborhoods for voter fraud.

6          THE COURT:  And the rally was where?

7          MR. SPIVA:  This specific one I believe was in Altoona,

8 Pennsylvania, but he's made these speeches all over the country.

9          THE COURT:  Okay.

10          MR. SPIVA:  And he said, We have to call up law

11 enforcement.  We have to have the sheriffs and the police chiefs

12 and everybody watching.  So it -- very similar, I think, to the

13 example that Your Honor was giving a minute ago, you know, kind

14 of, you know, let's get law enforcement in certain areas, as he

15 says, to come in and keep watch over people.  That's

16 intimidation.

17          He says at another rally -- and I don't have where this

18 one was.  It's in our brief but...  Watch other communities.

19 Everybody knows what I'm talking about.  We do not want this

20 election stolen from us.

21          Mr. Pence in a -- sorry, another one from Mr. Trump.

22 You know, some of these cities, horrendous things are happening.

23 We have to go watch what's going on.

24          Mr. Pence also similarly -- although he used less

25 freighted language -- and I don't have the specific language

1   here.  We did quote it in our brief.  But he first says, We have

2   to stop crooked Hillary from stealing the election.  And then

3   goes onto say, So we need to be -- we need to get involved in

4   our communities and watching the polls, etc.

5          THE COURT:  So how does that lead to voter

6   intimidation?  Why should I not interpret that as them saying

7   you should be using lawful means?  What from those statements

8   suggests unlawful or improper attempts to stop what he may or

9   may not believe is legitimately as a rigged election?  But he's

10  entitled to the belief, right, that it may be rigged or stolen.

11         MR. SPIVA:  Of course.

12         THE COURT:  Whether or not that's based upon facts or

13  not is not really for me to actually make a determination about.

14         The issue is he can make a claim that this is happening

15  and that it should be stopped.  Why should I believe that those

16  sort of calls to action are necessarily going to lead to an

17  improper means of challenging or protesting votes?  I mean,

18  there are legitimate ways in many states to do that, as in

19  Nevada.  Why should I understand that as an encouragement to

20  unlawful or improper conduct?

21         MR. SPIVA:  Right.  And I just want to be clear, you

22  don't have to find that it necessarily will.  It's just that

23  there's a likelihood.  And I think to answer Your Honor's

24  question, when he calls on people to call out law enforcement --

25  in fact, at another rally he called on law enforcement

———— 2:16-cv-2415-RFB-NJK ————

1  supporters to go and essentially intimidate people at the polls

2  and saying that, You should not just stay in your own

3  communities, but go and watch other communities.  You know what

4  I'm talking about.  Talking about cities and horrendous things

5  going on there.

6        I think as a fact finder it's pretty clear that that is

7  coded language for minority communities and going and

8  suppressing the vote in minority communities.  And, by the way,

9  the fact that there is no evidence of voter fraud of the type

10  he's talking about in the country is relevant here because --

11        THE COURT:  So let me ask you a question.  Why

12  shouldn't we just wait?  I mean, because the other thing that

13  could happen is we could wait.  Have a hearing Tuesday

14  afternoon, right, or Tuesday morning.  If these things start to

15  happen, you could ask for an injunction at that time directing

16  the Trump Campaign to cease all activities and withdraw all

17  workers from these sites.

18        MR. SPIVA:  Well, and we may be back here on Tuesday

19  morning, Your Honor.

20        THE COURT:  But my point is to the extent that it would

21  materialize, it's not clear to me that it has, and you're asking

22  me to speculate or at least to try to reach what you think is

23  actually not speculation, but a likely inclusion that it's going

24  to occur.

25        MR. SPIVA:  I don't think it's speculation -- I'm

—— 2:16-cv-2415-RFB-NJK ——

1  sorry, I didn't mean to interrupt.

2       THE COURT:  But my point is that the other alternative

3  is to see what happens.  Now, you're going to say there's going

4  to be irreparable harm because people will be intimidated when

5  that actually happens and may not go back and vote, and so then

6  it will be too late to address that.

7       MR. SPIVA:  It may be too late, Your Honor.

8       THE COURT:  But part of the issue is the Court

9  balancing that potentially with a very minimal evidentiary

10 showing of is there improper or illegal conduct in the context

11 of voter intimidation.

12       What you're basically asking me to find is that there's

13 likely to be voter intimidation based upon their statements,

14 although there has not been significant instances of that in

15 terms of number or duration at all during early voting in

16 Nevada.  But that because of the nature of voting on Election

17 Day that can and may likely occur, and as a result of that I'm

18 going to issue an injunction to them to tell them to follow the

19 law.

20       MR. SPIVA:  Well, I mean, it's interesting, Your Honor,

21 even during this early voting period where you wouldn't expect

22 as much of this to occur, we've been able to point to three

23 instances of people associated with the Trump Campaign, and one

24 of them they admit is associated with the Trump Campaign, who

25 have provided misinformation which if followed would have led to

1  the person losing their right to vote.

2          Now, I can't tell you that that was intentional, but I

3  can tell you that a lot of them are connected up with some of

4  the things that we hear Mr. Trump saying.  For instance, the

5  woman telling somebody that they needed an I.D. to vote because

6  that's the type of fraud that he's constantly claiming is

7  occurring in the inner cities in the country.

8          And so, you know, it would be impossible -- I think an

9  impossible evidentiary burden at this stage in the early voting

10  period to be able to show that this has already happened.  But I

11  guess all I can --

12          THE COURT:  Well, why would that be impossible, right?

13  I mean, your client certainly has, I would imagine, poll

14  observers in some of these precincts now.  The early voting

15  sites are actually -- are fewer than the actual precinct sites,

16  so they're easier to cover in terms of poll observers.  And you

17  haven't presented to me any information or evidence that would

18  suggest that anyone working on behalf of the Democratic Party

19  has observed someone who was an acknowledged poll worker

20  misdirecting people.  I think there may have been one instance

21  where someone -- where a poll observer was removed, and I think

22  that was sort of secondhand in terms of them observing officers

23  having to be called to a particular site and to remove a poll

24  worker, I think.  That wasn't actually an official poll

25  worker/observer, but I'm not sure it was from the Trump --

———— 2:16-cv-2415-RFB-NJK ————

1          MR. SPIVA:  But he was yelling at voters, yes, Your

2    Honor.

3          THE COURT:  Right.  Not from the Trump Campaign.

4          MR. SPIVA:  Yes.

5          THE COURT:  But that was the one instance of that.

6          MR. SPIVA:  Right.  And --

7          THE COURT:  And so I guess that's my concern is just

8    sort of the dearth of evidence in the record that this is a

9    problem because it could be a problem.  Now, the type of

10   intimidation that you're talking about could occur -- if it were

11   going to encourage people, it could occur during early voting.

12   If you're saying that it essentially is encouraging

13   intimidation, that's nothing unique to early voting that would

14   stop people from threatening or yelling at people if that's what

15   was encouraged.

16         MR. SPIVA:  And we've brought forward examples, Your

17   Honor, already, which that's remarkable that we've actually

18   already brought forward examples, even though there will be many

19   more people voting on Election Day.  And they're predictable --

20   I don't know that there's much more that I could say probably to

21   convince Your Honor.  But, you know, if you have a person

22   yelling fire in a crowded theater, I don't think you have to

23   wait until the stampede happens to do something about it, even

24   if what you would do is to say, You've got to stop doing that

25   and you got to make sure that anybody associated with you

─────────── 2:16-cv-2415-RFB-NJK ───────────

1  doesn't yell fire anymore.

2        THE COURT:  Well, let me ask you a question because I

3  want to make sure I have the record clear.  How many instances

4  do you have of -- that you provide in the record of alleged

5  voter intimidation of individuals who may have been affiliated

6  with as volunteers with the Trump Campaign?

7        MR. SPIVA:  We have three instances of either

8  intimidation or misinformation.

9        THE COURT:  Those were the three that you initially

10  provided, right?  And there's nothing else in your supplements

11  that's added --

12        MR. SPIVA:  The supplements didn't add, but they

13  corroborated, I think, one of them.  I don't think Ms. Peterson

14  was an addition.  I think she was --

15        THE COURT:  I think she was, too.  But, again, I'm

16  trying to make sure in terms of considering your argument about

17  what the evidentiary basis would be potentially for the Court to

18  make such a determination, I want to make sure that I hadn't

19  missed anything in this fairly fast-moving litigation.

20        Okay.  So your argument really, I think, comes down to

21  what you've talked to me about and then that the order would

22  somehow involve a directive to them to follow the law.  And,

23  again, I have to look at the order again because it's just

24  not -- doesn't seem to be very specific as to -- even if I were

25  to find that.  I mean, it seems to me that if I were to find

——— 2:16-cv-2415-RFB-NJK ———

1  that there was sufficient instances of this, it seems to me that

2  the true remedy would be to simply enjoin them from sending

3  anyone to the polls, but that's why I'm saying that --

4          MR. SPIVA:  We haven't gone that far in terms of --

5          THE COURT:  No, but my point is I don't know what the

6  intermediate step would be.  That's why I'm asking about the

7  level of the record.  I don't know what else the Court could

8  order in the context of an injunction as it relates to the harm

9  that you might envision happening or that could happen, right.

10 So if the harm is that people are simply going to go to the

11 polling locations and intimidate people, if it reached a certain

12 threshold, it would seem to me the Court legally certainly could

13 order the campaign to withdraw its poll workers if there was a

14 pattern or an established sort of evidentiary record of that

15 happening.

16          And that's why I said to you certainly the Court would

17 at least consider the possibility of holding a hearing on

18 Election Day, right, if you thought that was appropriate, to see

19 whether or not that was happening.  Because certainly the Court

20 could issue an injunction on that day early in the day to

21 prevent such things, if they actually happened, right.

22          So what about that as an approach to this circumstance?

23          MR. SPIVA:  To reserve until Election Day?

24          I mean, you know, obviously we would -- you know, that

25 would certainly be a helpful thing if Your Honor were open to

─────── 2:16-cv-2415-RFB-NJK ───────

1  being -- to us coming forward on Election Day to the extent that

2  this materializes, you know, and presenting evidence to that

3  you.  That certainly would be helpful.  You know, I've said -- I

4  don't want to be a broken record.  I'm maintaining that we feel

5  like an injunction is warranted now.  I understand Your Honor is

6  skeptical of that.

7          THE COURT:  I'm not saying that.  What I am saying

8  obviously is that voter intimidation in and of itself is a

9  serious harm.  I'm not saying that I found it here, but I'm

10 saying it's serious enough and that it could happen quickly

11 enough that I would consider the possibility of setting

12 something for the day of the election.

13         So, let me hear from Mr. Hardy on that point.

14         MR. SPIVA:  Thank you, Your Honor.

15         MR. HARDY:  Your Honor, this is -- couple of things.

16         THE COURT:  Well, first of all, let's break it down to

17 make it easier.

18         MR. HARDY:  I want to get down to the very basics.

19         THE COURT:  But let's focus on a few things.  You don't

20 need to address the issue of the injunction.  You've heard my

21 questions to the plaintiffs.  You don't need to focus on that.

22         MR. HARDY:  Okay.

23         THE COURT:  I want you to focus on this issue of

24 potentially the Court having a hearing on Election Day.

25         MR. HARDY:  Well --

——— 2:16-cv-2415-RFB-NJK ———

1      THE COURT:  And the reason why I say this, they could

2  file something anyway on Election Day.  There's actually nothing

3  to stop them from doing it.  The only reason why I might set a

4  hearing is to avoid scrambling at the last minute to do that.

5  But the fact of the matter is the Court could certainly set a

6  hearing on Election Day to the extent that the Court thought

7  that it might be appropriate to do so.  So I'm giving you an

8  opportunity to respond.

9      MR. HARDY:  And one of the things -- if you're going to

10  set that hearing or you're going to hold that, there needs to be

11  a basis for that.  And in order for you to --

12      THE COURT:  Let me stop you.  Why do I need to have a

13  basis to set a hearing?  I'm not making a finding, but why would

14  there need to be a basis for me to simply set a hearing?

15      MR. HARDY:  The reason for that, Your Honor, is that

16  you would need to have something before you that gives you

17  evidence necessary to hold that hearing.  And what we've got

18  here is they've got a preliminary injunction hearing that they

19  set to be heard.  It's going to be heard today, and there's just

20  absolutely no basis -- I mean, they got to have -- they have a

21  clear burden.  They have to have a clear showing.  They have to

22  have a likelihood of success on the merits.  You know all of the

23  elements of this.  They're not even close -- they are not even

24  in the ballpark of making any of those things to be able to --

25  necessary to get an injunction.

──────── 2:16-cv-2415-RFB-NJK ────────

1          And now they're saying, Hey, since we can't do it now,

2     let's punt it off a little bit.  And I don't think they have a

3     basis to punt it off either because they're still not able to

4     establish, even today, the fact that there is going to be a

5     likelihood of an issue on that day.

6          One of the -- what we're relying on, what they're

7     asking you to rely upon, are these vague campaign rhetoric.

8          THE COURT:  So let me -- let's differentiate between

9     two different things, Mr. Hardy.  I don't know that on this

10    record that I would -- that I would find, I think I pretty

11    clearly stated, that there would be a basis for an injunction at

12    this point in time.  And I've pressed them pretty hard.  I'll go

13    back and look at the record, but I'm not sure there is enough

14    here, particularly given the e-mail that was sent out by

15    Mr. Law.

16         That's different, right, from the Court, for scheduling

17    reasons, given the issues they've raised, setting a status

18    hearing as it relates to issues that might arise.  And I say

19    that, Mr. Hardy, not because I think they will arise.  I don't

20    know.  But to avoid a circumstance in which things are filed on

21    that day as it relates to this case and this issue and the Court

22    is unprepared to hear them in a timely fashion.  Not because I

23    think that there's a basis for it, but for the Court's

24    convenience in addressing what might be filed.

25         And I'm saying that because in setting that I'm not

————— 2:16-cv-2415-RFB-NJK —————

1   saying that I would find that there would in fact even be a

2   basis for it, but as you well know, things can be hectic on that

3   day.

4           MR. HARDY:  I know.

5           THE COURT:  Right.  And if I were to do that, I would

6   certainly require certain things to be filed in the record

7   before the Court would hold the hearing to even justify it.  But

8   what I don't want to have happen is we're all scrambling to do

9   something that they may think has arise and I have to address

10  and deal with on that day.  We have no schedule.  We have

11  nothing set, and then we're scrambling at the last minute for

12  something that isn't structured.  And that I have seen and I'm

13  sure you have seen happen on Election Day.  I want to avoid

14  that.

15          Without making a finding that in fact they're entitled

16  to relief, why couldn't I then set a schedule that said, You

17  have to file by noon, for example, on Election Day --

18          MR. HARDY:  I think that's different.

19          THE COURT:  Let me finish -- instances of what you

20  claim to be voter intimidation.  I would set a hearing 12:30, 1

21  o'clock, right, provide -- come forward with it, right, or not.

22  And at that point we would make a determination or not.  I mean,

23  we have -- we already have all of the law and everything that's

24  in the record.  We wouldn't need anything more.  To the extent

25  the Court would have to consider anything, it would be except

1  for these instances and just a determination as to whether or

2  not that would warrant any particular issue.  And it seems to me

3  that that would have to happen by noon or 1:00 because otherwise

4  after that it's irrelevant in terms of its effect.

5       MR. HARDY:  I think what the Court -- what you've just

6  described is that you would issue an order today that states,

7  There's no evidence for an injunction at this time, but if you

8  have more evidence that you would like to present on the day of

9  the election, you have to submit that evidence on or before 12

10  o'clock.  And if you do, we will have a prescheduled hearing at

11  1 o'clock, 2 o'clock.

12       THE COURT:  Right.

13       MR. HARDY:  And it needs to be new evidence because

14  we've considered this other evidence and it's not -- there's not

15  a basis for that at that point in time.  Give me new specific

16  instances, and if you can do it then at that time, then I may be

17  able to act.  Then we can do that in an abundance of caution to

18  be able to do that.  But, see, at that point --

19       THE COURT:  That's what I'm talking about.

20       MR. HARDY:  Yeah.  I don't have a problem with that

21  necessarily, Your Honor.  Because here's what I'm saying is that

22  that requires a new filing on their side.

23       THE COURT:  No.  Certainly.  No, I wouldn't -- it

24  wouldn't be based upon them simply coming forward and

25  anecdotally sharing that information with me.  Now, that being

——— 2:16-cv-2415-RFB-NJK ———

1  said, they wouldn't have to bring in the exact person, but we'd

2  have to have some sworn statements or something that would say,

3  Here are the instances that we have documented thus far as it

4  relates to this particular activity, right.  And then the Court

5  could make a determination based upon that one way or another.

6  And, again, in an abundance of caution.

7       I'm not saying that I find at this point in time that

8  there's a basis for issuing even a narrow injunction.  What I am

9  saying that I don't want us to be in a situation where we're

10  caught, sort of, unprepared for something that could actually

11  occur on a hectic day.  And that's my concern.

12       It isn't that in setting this I'm making some sort of

13  preliminary ruling that it's going to happen.  This is for,

14  quite honestly, my convenience and the convenience of the

15  parties in understanding what the schedule would be so that also

16  they don't come to me at 3:30 or 4:00 trying to ask me to do

17  something, right.  That we have to have time frames for things

18  that occur, otherwise it's a waste of everyone's time.

19       MR. HARDY:  And I think what you're proposing is

20  probably appropriate.  And I say appropriate because I can see

21  the inclination of where you're headed with this.  And so what

22  needs to happen is it needs to say -- there needs to be an order

23  that says, There is no basis for an injunction at this point in

24  time.  That needs to be abundantly clear.  The parties need to

25  go forward.  There is no basis for an injunction right now.

1          If there are instances, specific instances, that lead

2     to me to have a basis to do something on that day of the

3     election of November 8th and you file those before 12 o'clock,

4     we will have a prescheduled hearing set for 2 o'clock.  But if

5     there's nothing filed before 12 o'clock, all parties are

6     released.  You know, something along those lines because I'm

7     going to have to be -- I'm going to have to be with a bunch of

8     people.  There are going to be undoubtedly a bunch of things

9     going on that day.

10          THE COURT:  That's easy enough to accomplish.  We can

11     certainly send our own e-mails, right, that would say the

12     hearing is cancelled.  But I do think that in an election,

13     particularly this one, where there certainly has been a high

14     level of enthusiasm and a high degree of publicity around the

15     supporters for the various candidates, and then there can be

16     certain emotional things that might occur at the election that

17     it's worthwhile to at least have something preset that might --

18     that might be available in the context of something that could

19     occur.  And, again, I'm going to issue a ruling one way or

20     another by tomorrow as it relates to the current preliminary

21     injunction request.

22          MR. HARDY:  What I'm asking for is a ruling --

23          THE COURT:  And when I did that, it might include this

24     additional setting.  Even if I were to find that there wasn't a

25     basis for an injunction, I might nonetheless find that it would

——— 2:16-cv-2415-RFB-NJK ———

1   be appropriate to set this schedule for Tuesday in an abundance

2   of caution to have something scheduled and available should

3   something arise.

4          MR. HARDY:  I think it critical for the clarity of the

5   record that there is something that says there's no basis for an

6   injunction today.  It needs to be very clear.  I would also

7   advocate on behalf of the Nevada Republican Party that there

8   probably needs to be some basis to say that there's really no

9   basis for the Republican Party because it has no involvement in

10  a finding, has no involvement in the poll watching activities,

11  right.  But in -- and then you can go ahead -- once you've said

12  that there's no basis for the injunction today, the Republican

13  Party really has no involvement inside of this poll watching

14  activity, but nevertheless in abundance of caution you are going

15  to get ahead and set a hearing for noon or 1 o'clock.  And then

16  you're going to set a time on which specific instances, new,

17  because we've already reviewed all the rest of them, I don't

18  want to come to a hearing and rehash all that we just did, new

19  instances.  Then maybe we can go ahead and entertain that.

20         THE COURT:  Okay.  All right.  Because, again, that

21  seems to me something that may be appropriate in this

22  circumstance.

23         Thank you, Mr. Hardy.

24         So, well, let me ask you this question -- well, you

25  know what.  We're all going to be here tomorrow.  I've set the

———— 2:16-cv-2415-RFB-NJK ————

1    order I think for 3 o'clock tomorrow.  Is that right, Blanca?

2            And so we'll all be back tomorrow.  I anticipate having

3    my ruling at that time.  If not written, I'll read it into the

4    record and then file it at some point after that.  But I

5    anticipate having my ruling by that point in time.

6            MR. SPIVA:  Your Honor, may I -- I just -- Mr. Schrager

7    had some information I think that goes to what Your Honor was

8    proposing, which I think is an excellent idea.  But he's

9    particularly situated to address that briefly, if he could.  And

10   the other thing I just wanted to mention, I may not be able to

11   be the one here tomorrow, but obviously we will have someone

12   here.  But I didn't want -- I apologize in advance.

13           THE COURT:  That's all right.  I know that you all

14   specialize in these things and you all can't be in all places at

15   the same time.  So certainly.  Mr. Schrager.

16           MR. SPIVA:  But it's been a pleasure being in your

17   courtroom.  I thank you.

18           MR. SCHRAGER:  Thank you, Your Honor.  Bradley Schrager

19   for the plaintiffs.  I am in fact the general counsel for the

20   Nevada Democratic Party.  In other words, I am the guy in the

21   war room.  I will see every incident coming through as it's

22   reported on Tuesday.

23           THE COURT:  I see.

24           MR. SCHRAGER:  I would very much appreciate -- I would

25   be the best suited to be the contact person and to deal with it

—— 2:16-cv-2415-RFB-NJK ——

1   on Tuesday.  I would very much appreciate exactly what you're

2   talking about by perhaps 1 o'clock, you know, with the

3   submission.  That gives a little less than half of Election Day

4   gone and a little more than half of Election Day still to go.

5   But I think what Your Honor is getting at is that we all have an

6   understanding that no matter how many election cycles we've been

7   through, we've not seen something quite like the emotions

8   associated with this one.  That the risks of potential incidents

9   are objectively higher than they may have been previously.

10        And the worry is always that hours will be chewed up

11  trying to get to stand right here before someone like you to get

12  concerns addressed.  And so if the system is set up -- and I'm

13  not saying something is going to happen, but if a system is set

14  up to address that possibility, it would surely expedite the

15  meting out of justice on the day.  So I would appreciate that,

16  Your Honor.

17        THE COURT:  Okay.  Well, again, I haven't decided yet

18  how I'm going to rule.  I have to say that I'm not -- it doesn't

19  seem to me at this point that there is a sufficient record for

20  the Court to issue the broad relief that is being requested by

21  the plaintiffs.  And the Court, therefore, might issue an order

22  potentially on something very narrow, but I'm not even sure that

23  that would be warranted.  I have to go back and look at the

24  record.

25        But, in any event, in the context of this the Court

—— 2:16-cv-2415-RFB-NJK ——

 1  may -- and it's likely to set a hearing on that day for some

 2  time around 2:30, 3 o'clock with there being a filing.  And that

 3  would give the Court sufficient time to be able to review it,

 4  digest it, and then send out an e-mail or alert to say, We need

 5  to have a hearing or we don't need to have a hearing as it

 6  relates to this issue.

 7          And I do want to be clear, it will be clearer tomorrow,

 8  to the extent that I would set such a hearing if I -- if I did

 9  that after denying the injunction, it would be based upon the

10  possibility, but not a finding as to any potential improper

11  conduct on the part of the defendants.  I haven't at this point

12  certainly found that.  And in contemplating that, I want the

13  record to be clear that my contemplation of that is not based

14  upon a lesser degree of a finding that the defendants have

15  engaged in any improper conduct at this point.  It is simply I

16  think an acknowledgment of the unique and special enthusiasm for

17  this year's election and how that might raise issues that are

18  unforeseen at this time that relate to this issue.

19          But I wanted it to be clear that in discussing that and

20  that in entertaining that, it's not based upon a finding at this

21  point that the defendants have engaged in any wrongdoing or have

22  encouraged at this point voter intimidation.  And that's not to

23  comment on -- and the Court isn't in any way commenting on, and

24  I also want to be clear about this, the political speech that's

25  involved in the campaign generally, period, by anyone, right.

—————— 2:16-cv-2415-RFB-NJK ——————

1  It's not actually the Court's role to assess political speech

2  except in the context of how it might impact the particular

3  claims here.

4        So the Court isn't in any way sort of condoning or

5  rejecting or commenting on the various statements that have been

6  made or connected to various individuals here.  It is simply for

7  the Court to decide whether or not in the overall consideration

8  of the universe of evidence that it be appropriate for there to

9  be legal action.

10        So with that, is there anything else that we need to do

11  today?  We will be back here tomorrow at 3:00 primarily to

12  review the Court's decision, if I don't issue it before then,

13  and then to talk about what will happen in the context of the

14  Stone defendants.

15        Now, I do think it would be appropriate, Mr. Hardy, for

16  you to think about how the Court might differentiate, to the

17  extent that it would issue an injunction against the Stone

18  defendants.  Because that's a separate issue because if I were

19  to issue an injunction against, for example, the Stone

20  defendants, but not against your clients, I do want you to think

21  about how that might work in the context of poll locations.

22        And, obviously, Mr. Spiva, you and your colleagues will

23  be thinking about that.

24        But in the context of essentially what might be sort of

25  a split decision, Mr. Hardy, I think it's important for you to

```
——————— 2:16-cv-2415-RFB-NJK ———————
```

1   think about what that would look like to be able to potentially

2   have the Court effectuate an injunction that it might issue.

3   And, again, I'm not saying that I would, but that it might

4   issue, but that would not interfere with what you think would be

5   the appropriate and legitimate activities of the Trump Campaign

6   and the Nevada Republican Party -- in this case primarily the

7   Trump Campaign -- in terms of poll observers.

8        And, again, I'm not saying that I am going to issue an

9   injunction, but I do like to let the parties know, as you all

10  can see, what issues that I foresee so that the parties can be

11  prepared.  And that certainly seems to be one, Mr. Hardy, that

12  potentially may be something that you would want to think about.

13       MR. HARDY:  Absolutely.  I'll make sure that I have

14  some wording prepared for that, Your Honor.

15       THE COURT:  Okay.  And, Mr. Spiva, Mr. Schrager, I

16  think it would be appropriate, given the Court's guidance here,

17  for you all to think a little bit more about specific wording on

18  orders, particularly as it relates to the Stone defendants.  If

19  you anticipate, for example, that they are not going to

20  participate, but you think there would still be a basis for the

21  Court to issue an order, I think it would be appropriate for you

22  to think about what that order would look like and how specific

23  it would be and what would be the nature of it, you know, how

24  general or not it should be or to whom it should be directed.

25       And so that would be helpful to have that prepared

—— 2:16-cv-2415-RFB-NJK ——

1   tomorrow so that we're not scrambling late in the afternoon to

2   come up with some language.

3           MR. HARDY:  Would it be appropriate for them to

4   circulate that to me so I can see it ahead of time and provide

5   input, Your Honor, as to how --

6           THE COURT:  Certainly I think it would be helpful and

7   appropriate for that.  I mean, they have already circulated the

8   other proposed order, so it doesn't seem to me that there would

9   be any reason not to do that.  And it would certainly cut down

10  on time, to the extent the Court would issue the order, to be

11  able to issue it more quickly without having to also deal with

12  objections that could have been dealt with and resolved prior to

13  that.  So I think it would be appropriate, Mr. Spiva, to submit

14  a proposed order before the hearing tomorrow and to circulate a

15  draft of that to Mr. Hardy before the hearing tomorrow,

16  specifically as it relates to the Stone defendants in this case.

17  Okay?

18          Anything else we need to do today?

19          MR. HARDY:  Thank you so much for your time, Your

20  Honor.

21          MR. SPIVA:  Nothing further, Your Honor.  Thank you.

22          THE COURT:  Hold on just a moment.

23          (Court conferring with law clerk.)

24          THE COURT:  One thing, in talking with my staff, I

25  wanted to clarify as it related to the e-mails, Mr. Hardy -- and

——— 2:16-cv-2415-RFB-NJK ———

 1   you can certainly ask Mr. Law this question -- is my

 2   recollection is that Mr. Law said that he had sent the e-mails

 3   to all the people who they had in their system who were poll

 4   observers and all of the poll observers had e-mails except for

 5   the two that had to be contacted by other means.  Is that right?

 6          MR. HARDY:  Correct.  Yes.  And that those individuals

 7   had been contacted by his staff.

 8          THE COURT:  By other means, right.  And so that I --

 9   again, I just wanted the record to be clear.  So, as far as

10   Mr. Law is aware, everyone who received the training also

11   received that e-mail?

12          MR. HARDY:  All individuals who have been trained have

13   received that e-mail, and anybody who is -- nobody that will go

14   out as a poll worker will be somebody that's untrained.  Does

15   that make sense?

16          THE COURT:  No, that makes perfect sense.  In other

17   words, in order to be a poll observer, you have to go through

18   the training.

19          MR. HARDY:  Correct.

20          THE COURT:  Everyone who went through the training had

21   either that e-mail -- received either the e-mail this morning or

22   were contacted in person?

23          MR. HARDY:  Correct.

24          THE COURT:  Okay.

25          All right.  Then we are adjourned on this matter.

—————2:16-cv-2415-RFB-NJK—————

1    Thank you.

2            MR. SPIVA:  Thank you, Your Honor.

3            MR. HARDY:  Thank you, Your Honor.

4            (Whereupon the proceedings concluded at 3:37 p.m.)

5                        --oOo--

6              COURT REPORTER'S CERTIFICATE

7

8        I, PATRICIA L. GANCI, Official Court Reporter, United

9    States District Court, District of Nevada, Las Vegas, Nevada,

10   certify that the foregoing is a correct transcript from the

11   record of proceedings in the above-entitled matter.

12

13   Date:  November 5, 2016.

14                              /s/ **Patricia L. Ganci**

15                              Patricia L. Ganci, RMR, CRR

16                              CCR #937

17

18

19

20

21

22

23

24

25