Sarah R. Gonski (# 032567)
PERKINS COIE LLP
2901 North Central Avenue, Suite 2000
Phoenix, Arizona 85012-2788
Telephone: 602.351.8000
Facsimile: 602.648.7000
SGonski@perkinscoie.com

*Attorney of Record for Plaintiff*

**UNITED STATES DISTRICT COURT**

**DISTRICT OF ARIZONA**

| | |
|---|---|
| Arizona Democratic Party,<br><br>    Plaintiff,<br><br>v.<br><br>Arizona Republican Party, Donald J. Trump for President, Inc., Roger J. Stone, Jr., and Stop the Steal, Inc.,<br><br>    Defendants. | No. CV-16-03752-PHX-JJT<br><br>**PLAINTIFF'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION FOR A TEMPORARY RESTRAINING ORDER AND/OR PRELIMINARY INJUNCTION** |

A temporary restraining order (TRO) is urgently needed to protect the right of Arizona's minority voters to vote free from intimidation, harassment, and coercion. As explained below, the allegations in the accompanying Complaint and material presented with this motion justify immediate temporary relief in order to prevent irreparable harm. An injunction against Defendants' planned intimidation tactics is the only way to protect countless lawfully registered voters from harassment, threats, and intimidation that will interfere with their ability to vote in the rapidly approaching election.

Relief should be granted because: Plaintiff is likely to succeed on the merits of its claims under Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b), and the Ku Klux Klan Act of 1871, 42 U.S.C. § 1985(3); irreparable harm to Plaintiff, candidates, and voters will occur in the absence of immediate relief; the balance of equities tips in favor of barring Defendants from carrying out their plans to intimidate, harass, and suppress voters; and an injunction barring such flagrantly unlawful conduct is in the public interest.

*See Friends of the Wild Swan v. Weber*, 767 F.3d 936, 942 (9th Cir. 2014); *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir. 2011) (noting that an injunction may issue under a "sliding scale" approach "so that a stronger showing of one element may offset a weaker showing of another," for example where "serious questions going to the merits were raised and the balance of hardships tips sharply in [plaintiff's] favor").

## I. STATEMENT OF FACTS

Donald J. Trump for President, Inc., Trump's close adviser Roger J. Stone, Jr., Stone's organization Stop the Steal, Inc., and the Arizona Republican Party ("ARP") are conspiring to threaten, intimidate, and thereby prevent Democratic and minority voters in urban neighborhoods from voting in the 2016 election. The stated goal of the Trump Campaign, as explained by an unnamed official to Bloomberg News on October 27, is to depress voter turnout among constituencies likely to vote for Democrats, including minorities—in the official's words: "We have three major voter suppression operations under way." Declaration of Sarah R. Gonski, Esq. (hereinafter "Gonski Decl.") at Ex. 17. In recent weeks, Trump has sought to advance that goal by using the loudest microphone in the nation to implore his supporters to engage in unlawful intimidation at Arizona polling places. Trump's exhortations have been amplified by direct and tacit assistance from the ARP and from Stone, who helped pioneer similar tactics in the 1980s before those efforts were blocked by the federal courts. *See* Gonski Decl. at Ex. 24. All have sought to organize, fund, and assist Trump's supporters to carry out the conspiracy's goals. Trump's supporters have pledged to descend upon polling places in "certain areas" where many Democratic and minority voters live to inhibit their efforts to vote.

In the months leading up to the 2016 election, Trump has made an escalating series of statements, often racially tinged, suggesting that his supporters should intimidate voters—intimating that otherwise he will lose the election because of imagined voter fraud. Of course, voter fraud is practically nonexistent—but that has not stopped Trump from telling his supporters that certain people, in certain precincts, will vote "15 times" for Secretary Clinton. Gonski Decl. at Ex. 18. For example, Trump told a crowd in

Altoona, Pennsylvania in August that "I hope you people can … not just vote on the 8th, [but] go around and look and watch other polling places and make sure that it's 100-percent fine. . . . We're going to watch Pennsylvania—go down to certain areas and watch and study—[and] make sure other people don't come in and vote five times." Gonski Decl. at Ex. 19. Ten days later, at an Ohio speech, Trump explained that he did not just mean that supporters should "watch": "You've got to get everybody to go out and watch, and go out and vote," Trump said. "And when [I] say 'watch,' you know what I'm talking about, right?" Trump has explained that his "watchers" should act in a capacity similar to law enforcement (i.e., as vigilantes). *Id.* Trump and Trump Campaign surrogates like Rudy Giuliani have told supporters that voters of color should be suspected of fraud. Gonski Decl. at Ex. 21. Trump has suggested that Latino voters are undocumented immigrants whom the federal government has allowed to "pour into this country" specifically to vote in the election. Gonski Decl. at Ex. 22.

Meanwhile, the Trump campaign published a signup form on its website for supporters to be "Trump Election Observers" to stop "Crooked Hillary From Rigging This Election," further encouraging his supporters to join in a common plan to "watch" voters in "certain areas" of states like Arizona for voter fraud. Gonski Decl. at Ex. 3.

Trump now constantly repeats at rallies that the presence of fraud at the polls will prevent him from winning the November 8 election. His comments are consistently directed at Democratic-leaning communities in states like Arizona. At an October 29 rally in Phoenix, Trump repeated his claim that election is "rigged" against him and "the outcome is fixed." He later elaborated that the election is "rigged" because of "voter fraud," and instructed his supporters to "watch, watch, be careful, watch."[1] Trump has further made clear: "This is what I mean when I say that our system is rigged. Be careful, watch for voter fraud." Gonski Decl. at Ex. 12. Trump was introduced at the Phoenix by

---

[1] Full Speech: Donald Trump Rally in Phoenix on October 29, 2016 at 20:47-20:50, 35:25-35:35, *available at* https://www.youtube.com/watch?v=pf_2CGUSLHg (last accessed Nov. 1, 2016).

-3-

Joe Arpaio, the Sheriff of Maricopa County, who is under federal civil rights investigation for racial profiling of Latino Americans and has been charged with contempt of court for failing to comply with court orders in that case. *Id.*

Roger Stone, a key Trump advisor, has amplified Trump's message. Stone runs a website, through his organization, called "Stop The Steal" that is actively signing up Trump supporters to "volunteer" to fight "voter-fraud and election theft." Stop the Steal, https://stopthesteal.org/ (last visited Oct. 31, 2016). #StoptheSteal is a popular hashtag among Trump supporters on Twitter, and Stone's group maintains an active Facebook presence. Stone and his associates, including Stop the Steal Inc., have also widely disseminated messages via websites such as Stop the Steal and through social media under hashtags such as #stopthesteal. One image states: "HILLARY CLINTON CHEATED AND STOLE THE PRIMARY FROM BERNIE . . . WE THE PEOPLE CAN STOP HER FROM STEALING THE GENERAL." Gonski Decl. at Ex. 25. Through these and other messages, Mr. Stone has encouraged Trump supporters to engage in voter intimidation.

Stone and Stop the Steal Inc. are actively recruiting Trump supporters for "exit polling," specifically targeting Democratic-leaning cities with large minority populations. *See* Gonski Decl. at Ex. 4. Stone claimed in an appearance on the show "Info Wars" that the operation was necessary to stop Clinton from rigging the election, and that his plan was to present the results of his "exit polling" activities, conducted by his "army" of "Infowar Warriors" directly to Trump within hours of the election being over.[2] As of November 1, 2016, Stone's website claimed to have organized 2,603 volunteers to engage in this "exit polling" operation. That number includes at least 107 volunteers signed up to participate throughout Arizona. *See* https://stopthesteal.org/states/Arizona/. Stone's purported polling exercise serves no legitimate purpose. Stone does not run a polling

---

[2] Media Matters, "Trump Ally Roger Stone to Alex Jones: 'We Need An Army Of Infowar Warriors To Help Us' Conduct 'Exit Polls' At Polling Places," *available at* http://mediamatters.org/video/2016/10/25/trump-ally-roger-stone-alex-jones-we-need-army-infowar-warriors-help-us-conduct-exit-polls-polling/214105.

-4-

business, and legitimate "exit polling" cannot focus on Democratic-leaning or majority-minority districts—rather, legitimate exit polling by necessity must include monitoring contested and competitive districts rather than areas that vote overwhelmingly for one party. *See* Expert Report and Declaration of Mark S. Mellman at 1 ("The polling that [Stone] plans to conduct is unlikely to produce unbiased, reliable results, and, moreover, does not appear to be designed to meet such ends."). Stone's "exit polling" activities appear to be aimed chiefly at majority-minority communities, such as certain majority-minority communities in Arizona, with the purpose or effect of intimidating non-white persons from voting. *See id.* at 7 (Stone's "exit polling strategy appears only designed to intimidate voters in an attempt to influence the election and suppress the vote").

Stone has also recruited volunteers to watch polling places through a program called Vote Protectors. The Vote Protectors website permits any volunteer to download and print official-looking ID badges, and provides scripts for volunteers that instruct them on how to interrogate voters on Election Day. Gonski Decl. at Ex. 23. Stone's volunteers are permitted to tally up votes on the Stop the Steal website—for Trump or any other candidate—without any proof that they had spoken to voters or visited a polling site. *See* "Popular Vote (Citizen Exit Polls)," http://stopthesteal.org (last accessed Oct. 31, 2016). Vote Protectors and Stop the Steal discontinued some, but not all, of these practices after they were exposed by a national media outlet. Vote Protectors continues to encourage volunteers it styles "citizen journalists" to "approach voters at the polls," identify themselves as "reporting for Vote Protectors," and ask them about election fraud.

That voter fraud is a myth does not prevent many people—particularly those who are listening most closely to the Republican National Committee ("RNC"), Trump, and surrogates such as Stone—from believing it is real. As a recent poll showed, 69% of Trump's supporters (but less than half of all voters) believe individual voter fraud happens "very often" or "somewhat often." Gonski Decl. at Ex. 28. This widespread belief, despite a lack of supporting evidence, has been stoked for decades by certain elements of the Republican Party, including Stone and Trump's allies in the so-called "alt-right"

media ecosystem, such as the Breitbart website run until recently by Trump Campaign CEO Steve Bannon. Gonski Decl. at Ex. 26. Stone, Stop the Steal, and the Trump Campaign fan these flames by distributing messages via social media and elsewhere falsely claiming the election will be "rigged" by "illegals." Gonski Decl. at Ex. 5.

Trump's calls for unlawful vigilantism to stop purported voter fraud advance a coordinated effort to harass and intimidate voters at the polls. Voter intimidation efforts aimed at suppressing minority voters are often "ostensibly aimed at combatting voter fraud." *Ne. Ohio Coal. for the Homeless v. Husted*, No. 2:06-cv-896, 2016 WL 3166251, at *28 (S.D. Ohio June 7, 2016). Defendants are engaged in a concerted effort to engage in voter intimidation. As the Republican Party's nominee for President, Trump and his campaign coordinate closely with the RNC and ARP on a wide variety of matters, including overall campaign strategy, public messaging, voter outreach, and field operations. On May 17, 2016, the RNC created a joint fundraising committee with the Trump Campaign specifically to fund the Trump Campaign and its operations. Gonski Decl. at Ex. 1. The Trump Campaign has "relinquished control over many of its tactical decisions" to the RNC. Gonski Decl. at Ex. 17. Shortly after Trump became the Republican nominee, the RNC and the Trump Campaign met to discuss "the merger." *Id.* The Trump Campaign and RNC "negotiated a partnership" in which the RNC "buil[t] assets and infrastructure and the nominee gets to benefit from it." *Id.* The Trump Campaign has decided largely to refrain from setting up a parallel layer of offices and staff in Arizona and elsewhere, as past Republican Party nominees have done. Instead, the Trump Campaign is relying predominantly on the RNC and ARP to manage get-out-the vote operations in contested states such as Arizona. *See* Gonski Decl. at Ex. 20.

The Trump Campaign's coordination with the RNC and ARP extends to efforts to monitor polls for purported voter fraud. Trump's running mate, Governor Mike Pence, confirmed the Trump Campaign is working with the RNC and state Republican parties on ballot security measures. At an August 3, 2016 town hall rally in Denver, Colorado, Pence was asked "how is the Trump-Pence campaign going to . . . prevent" Hillary

1  Clinton from "steal[ing] this election." Pence responded: "the Trump campaign and the Republican National Committee are working very, very closely with state governments and secretaries of states all over the country to ensure ballot integrity. . . . We are working hard all over the country, the Republican National Committee is working all over the country, but I would encourage everyone within the sound of my voice, get involved, participate, be a poll worker on election day . . . be a part of that process, and uphold the integrity of one person one vote in America."[3]

The RNC has delegated "ballot security" initiatives to its agents in the state parties. For example, Robert Graham, the chair of the ARP, recently remarked that individuals who are designated as Republican poll watchers "will be the eyes and ears of the GOP" at polling places. Despite acknowledging that Arizona law limits what a party-designated observer can do—including restrictions on photography and talking to voters—Graham asserted that "they're still free to follow voters out into the parking lot, ask them questions, take their pictures and photograph their vehicles and license plate" as long as they are more than 75 feet outside a polling place.[4] Gonski Decl. at Ex. 2. The ARP's official spokesperson, Tim Sifert, has echoed that call, encouraging "good citizens" who suspect voter fraud "to do something about it," such as to approach voters outside the polls, question them, and take pictures and videos of them and their vehicles. *Id.*; Gonski Decl. at Ex. 29.

Just recently, Trump's campaign manager Kellyanne Conway confirmed that the Trump campaign is "actively working with" the RNC and other branches of the Republican Party apparatus, including the ARP, to "monitor precincts around the country." Gonski Decl. at Ex. 9. The RNC and ARP continued this close coordination

---

[3] *Pence Denver Rally Town Hall*, http://trumptube.tv/donald-trump-rally-speech-video/video/pence-live-stream-town-hall-8-3-16/, at 16:22-17:27 (last acc. Oct. 28, 2016).

[4] Robert Graham is an RNC member and its agent. On October 10, 2016, Graham issued a press release stating: "It is my responsibility, as a member of the Republican National Committee . . . to work with passion, integrity and restlessness to stop Hillary Clinton and elect Donald J. Trump." Gonski Decl. at Ex. 8.

-7-

after Trump's widespread and racially charged pleas to his supporters to engage in voter intimidation in areas like Phoenix, which contains large communities of racial minorities. The Trump Campaign also recently distributed talking points to Republican Party surrogates directing them to "make points on rigged system," and encouraging them to claim "an increase in unlawful voting by illegal immigrants." Gonski Decl. at Ex. 10.

Trump's supporters are responding to his calls to engage in voter intimidation. The *Boston Globe* has reported on Trump supporters who plan to engage in unlawful voter intimidation, and who understand themselves to be doing so at Trump's behest:

> "Trump said to watch your precincts. I'm going to go, for sure," said Steve Webb, a 61-year-old carpenter from Fairfield, Ohio. "I'll look for . . . well, it's called racial profiling. Mexicans. Syrians. People who can't speak American," he said. "I'm going to go right up behind them. I'll do everything legally. I want to see if they are accountable. I'm not going to do anything illegal. I'm going to make them a little bit nervous."

Gonski Decl. at Ex. 6. Similarly, Harry Miller, purportedly of Palm Beach, Florida, tweeted in response to Trump's calls for election observers that he would be "wear'n red at polls. . . . We gonna be watch'n fer shenanigans . . . haul ya away." Gonski Decl. at Ex. 7. The tweet included a picture of a pickup truck and a person-sized cage built into the bed, surrounded by American flags. *See id.* Miller has over 20,000 Twitter followers and tweets almost exclusively about Trump, Secretary Clinton, and racially-charged political themes such as deporting "Muzzys."

## II. PLAINTIFF IS LIKELY TO SUCCEED ON THE MERITS

### a. Defendants Have Violated Section 11(b) Of The Voting Rights Act.

Plaintiff is likely to prevail on its claim that Defendants have violated Section 11(b) of the Voting Rights Act, codified at 52 U.S.C. § 10307(b), which provides in relevant part: "No person, whether acting under color of law or otherwise, shall intimidate, threaten, or coerce, or attempt to intimidate, threaten, or coerce any person for voting or attempting to vote." 52 U.S.C. § 10307(b).[5] Section 11(b) was passed as part of

---

[5] Section 11(b) affords a private right of action. *See Allen v. State Bd. of Elections*,

the Voting Rights Act "to banish the plight of racial discrimination in voting," *South Carolina v. Katzenbach*, 383 U.S. 301, 308 (1966), but Congress intentionally drafted Section 11(b) "not [to] require proof that racial discrimination motivated the intimidation, threats, or coercion," *Willingham v. Cnty. of Albany*, 593 F. Supp. 2d 446, 462 (N.D.N.Y. 2006).[6] Section 11(b) "on its face prohibits *any* intimidation, threat, or coercion, whether done by a public official or by a private individual." *Whatley v. Vidalia*, 399 F.2d 521, 526 (5th Cir. 1968); *see Jackson v. Riddell*, 476 F. Supp. 849, 859 (N.D. Miss. 1979) (Section 11(b) "is to be given an expansive meaning").

The operative words of Section 11(b)—to "intimidate," "threaten," and "coerce," or to attempt to do so—should be given their commonly understood meaning. *See, e.g.*, Merriam Webster ("intimidate": "to make timid or fearful"; "to compel or deter by or as if by threats"); *id.* ("threaten": "to utter threats against"; "to hang over dangerously"; "to cause to feel insecure or anxious"); *id.* ("coerce": "to restrain or dominate by force"; "to compel to an act or choice"; "to achieve by force or threat").[7]

Section 11(b)'s reach is not restricted to overt acts of violence. Courts assessing comparable language in other civil rights statutes have held that "intimidating" and "threatening" includes subtler conduct. For instance, the Ninth Circuit found that it constituted "intimidation" to send a mass mailing to 14,000 newly registered voters with Hispanic surnames warning them that if they voted in the election, their personal information would be collected and made available to organizations that were "against immigration." *United States v. Nguyen*, 673 F.3d 1259, 1261 (9th Cir. 2012) (interpreting a criminal voter intimidation provision of the California election code). As the Ninth Circuit held, "intimidation" is "not limited to displays or applications of force, but *can be achieved through manipulation and suggestion*," including "through subtle, rather than

---

393 U.S. 544, 555-56 & n.18 (1969); *see also* 28 U.S.C. § 1343(a)(4).
  [6] *See Cameron v. Johnson*, 262 F. Supp. 873, 884 n.9 (S.D. Miss. 1966) (same); H.R. Rep. No. 89-439, at 30 (1965) ("The prohibited acts of intimidation need not be racially motivated."), *as reprinted in* 1965 U.S.C.C.A.N. 2437, 2462.
  [7] *Available* at http://www.merriam-webster.com/dictionary.

forcefully coercive means." *Id.* (emphasis added). Similarly, the Seventh Circuit found that conduct involving the writing of a racial slur on property was proscribed under the Fair Housing Act's provision prohibiting "intimida[tion]." *Halprin v. Prairie Single Family Homes of Dearborn Park Ass'n*, 388 F.3d 327, 330 (7th Cir. 2004) (Posner, J.).

Courts assessing voter intimidation claims have looked to whether the conduct contemplated by Defendants would reasonably intimidate, threaten, or coerce voters. For example, during the 2004 election cycle, Senator Daschle argued that certain conduct committed by Republican candidate John Thune, the South Dakota Republican Party, and their agents violated Section 11(b): "[f]ollowing Native American voters at [a] polling place . . . and standing two to three feet behind Native American voters, and ostentatiously making notes"; "[f]ollowing Native American voters out to their cars after they have voted, walking up to their vehicles, and writing down their license plate numbers"; and "[h]aving a loud conversation in a polling place, where Native Americans were voting, about Native Americans who were prosecuted for voting illegally in Minnesota." Gonski Decl. at Ex. 14 (*Daschle v. Thune*, Complaint at 5-6, Civ. 04-4177 (D.S.D., Nov. 1, 2004)). Daschle claimed that "[t]he persons carrying out these activities are part of a large group of Republican Thune supporters who have come to South Dakota from across the country, and who are poised to repeat the same conduct in Native American voting places across South Dakota . . . on Election Day." *Id.* at 6. The district court granted a temporary restraining order and found Daschle was "likely to succeed" on his Section 11(b) claim, "as the Court finds that there was intimidation particularly targeted at Native American voters . . . by persons who were acting on behalf of John Thune." Gonski Decl. at Ex. 13 (TRO at 2, Civ. 04-4177 (D.S.D., Nov. 2, 2004)). Although Daschle alleged intentional intimidation, the court explained that "[w]hether the intimidation was intended or simply the result of excessive zeal is not the issue, as the result was the intimidation of prospective Native American voters." *Id.*; *see United States v. Clark*, 249 F. Supp. 720, 728 (S.D. Ala. 1965) (the "inevitable effect" of challenged conduct would deter voters).

The allegations in the Complaint and material supplied with this motion show that

-10-

the Trump Campaign, Stone, and their agents are engaged in a concerted effort to intimidate, threaten, and coerce lawful voters from exercising their right to vote. The ARP has embraced these suppression efforts. The Chair of the ARP, Robert Graham has called on his fellow Trump supporters to be the ARP's "eyes and ears" at polling places, directing them to "follow voters out into the parking lot, ask them questions, take their pictures and photograph their vehicles and license plate." Gonski Decl. at Ex. 2. This is textbook voter intimidation that violates Section 11(b). *See Daschle*, TRO at 2.

Plaintiffs need not show that Defendants' voter suppression efforts have been successful in order to obtain injunctive relief. Even if those efforts have not yet achieved success, Defendants have already *attempted* to induce fear and anxiety among minority voters in Arizona, and likewise taken steps designed to prevent minority voters from voting. *See supra*, at 3-5; Gonski Decl. at Ex. 1, 4, 17, 19. As described, Trump supporters are already responding to the candidate's call to intimidate voters. *See supra* at 7-8. Such planned conduct is indistinguishable from the allegations that the *Daschle* court found more than sufficient to constitute intimidation and threats in violation of Section 11(b) and therefore support a TRO. Plaintiffs need not wait for intimidators to arrive at polling stations in Arizona on Election Day—Section 11(b) authorizes relief against Defendants for attempting to fund, organize, and support their arrival.

### b. Plaintiff Is Likely To Show Defendants Violated Klan Act.

For similar reasons, Plaintiff is likely to prevail on its claim that Defendants have violated the Ku Klux Klan Act of 1871 (the "Klan Act"). The relevant provision of the Klan Act, 42 U.S.C. § 1985, creates liability for several kinds of conspiracies. *Bretz v. Kelman*, 773 F.2d 1026, 1027 n.3 (9th Cir. 1985) (en banc); *United Bhd. of Carpenters & Joiners of Am., Local 610, AFL-CIO v. Scott*, 463 U.S. 825, 839 n.1 (1983) (Blackmun, J., dissenting). Plaintiff's claim arises under § 1985(3)'s provision barring conspiracies to suppress voters, which provides: "[I]f two or more persons conspire to prevent by force, intimidation or threat, any citizen who is lawfully entitled to vote, from giving his support

or advocacy in a legal manner, toward or in favor of the election of any lawfully qualified person as an elector for President or Vice President, or as a Member of Congress of the United States; or to injure any citizen in person or property on account of such support or advocacy," and "one or more persons engaged" in that conspiracy commit an act in furtherance of the conspiracy that injures a person or deprives that person of a federal right, "the party so injured or deprived may have an action . . . ." 42 U.S.C. § 1985(3).

The Ninth Circuit has referred to this type of § 1985(3) conspiracy as one "to interfere with federal elections." *Bretz v. Kelman*, 773 F.2d 1026, 1027 n.3 (9th Cir. 1985) (en banc). And the Supreme Court has explained that the correct interpretive approach to "Reconstruction civil rights statutes" is "to accord them a sweep as broad as their language." *Griffin*, 403 U.S. at 97. A straightforward reading of the statutory text, coupled with case law interpreting the Klan Act, makes clear that Plaintiff's claim in this case is likely to succeed.[8] In construing § 1985(3) conspiracy claims under the statute's first clause, the Supreme Court explained that:

> the plaintiff must allege and prove four elements: (1) a conspiracy; (2) for the purpose of depriving, either directly or indirectly, any person or class of persons of the equal protection of the laws, or of equal privileges and immunities under the laws; and (3) an act in furtherance of the conspiracy; (4) whereby a person is either injured in his person or property or deprived of any right or privilege of a citizen of the United States.

*Scott*, 463 at 828-29. It follows that to make out a violation of the latter part of § 1985(3) at issue here, a plaintiff must allege and prove: (1) a conspiracy; (2) to prevent a lawful voter from supporting a candidate in a federal election by force, intimidation, or threat; and (3) an act in furtherance of the conspiracy; (4) whereby a person is injured in his person or property or deprived of any right or privilege of a citizen of the United States.

---

[8] Plaintiff is not required to prove that Defendants are motivated by racial or other class-based animus, as is required for a claim for violations of the other two conspiracy bars in § 1985(3). *See Kush v. Rutledge*, 460 U.S. 719, 721 (1983) (analogizing the anti-voter suppression conspiracy bar to 42 U.S.C. § 1985(2), which does not require a racial or other class-based animus). But if it were required, the explicit targeting of minority areas and voters is sufficient to demonstrate a likelihood of success on that aspect as well.

-12-

First, Plaintiff is likely to succeed on the merits of its claim that Defendants have engaged in a conspiracy. "A civil conspiracy is a combination of two or more persons who, by some concerted action, intend to accomplish some unlawful objective for the purpose of harming another which results in damage." *Lacey v. Maricopa Cty.*, 693 F.3d 896, 935 (9th Cir. 2012). As the Ninth Circuit explained:

> To be liable, each participant in the conspiracy need not know the exact details of the plan, but each participant must at least share the common objective of the conspiracy. A defendant's knowledge of and participation in a conspiracy may be inferred from circumstantial evidence and from evidence of the defendant's actions.

*Id.* Plaintiff has alleged facts likely to prove that Defendants share the "common objective" to suppress voting by Democratic, and predominantly non-white, voters in the 2016 Election. *See supra*, at 2-8; Gonski Dec. at Ex. 4, 9; 17, 23. Trump's running mate, Indiana Governor Mike Pence, admitted in public that "the Trump Campaign and the Republican National Committee are working very very closely . . . all over the country to ensure ballot integrity." *See supra* at 6. Defendants have not only agreed on a common plan; they are boasting about it in public, and seeking to recruit others.[9]

Second, Plaintiff will likely prove the conspiracy is directed at preventing lawful voters from voting "by force, intimidation, or threat." For the reasons laid out above, Defendants' efforts are plainly designed to threaten, coerce, and intimidate minority and Democratic voters, and to encourage supporters to engage in activities barred in Arizona.

---

[9] Defendants cannot rely on the First Amendment for permission to intimidate and harass voters, as "poll watching is not a fundamental right which enjoys First Amendment protection." *Dailey v. Hands*, No. 14-cv-423-KD-M, 2015 WL 1293188, at *4 (S.D. Ala. Feb. 20, 2015) *adopted* Mar. 23, 2015; *see DNC v. RNC*, 671 F. Supp. 2d 575, 596 (D.N.J. 2009) (rejecting as "meritless" the argument that consent decree bar on RNC "ballot security activities" "infringes on activity protected by the First Amendment"), *aff'd*, 673 F.3d 192 (3d Cir. 2012); *Cotz v. Mastroeni*, 476 F. Supp. 2d 332, 364 (S.D.N.Y. 2007) ("poll watching . . . has no distinct First Amendment protection"); *Turner v. Cooper*, 583 F. Supp. 1160, 1162 (N.D. Ill. 1983) (same). The "position of poll-watcher," rather, is "a mere creature of state statute," *Cotz*, 476 F. Supp. 2d at 364, so any individual's supposed "right" to be a poll-watcher "derive[s] solely from state law," *Turner*, 583 F. Supp. at 1162. Moreover, any hypothetical First Amendment right to engage in poll watching must give way to the compelling state interest in preventing voter intimidation.

Third, each co-conspirator has performed an act in furtherance of that conspiracy. Trump regularly issues warnings of vote-rigging and calls to "watch" "certain areas" of the country. Gonski Decl. at Ex. 11. Defendant ARP has undertaken concrete steps to advance the objectives, including by organizing poll watchers, encouraging Trump supporters to "follow" and harass voters, and supplying the Trump Campaign with personnel and resources to further its efforts. *See supra* at 6-7. Defendants Stone and Stop the Steal, Inc. have similarly adopted the objective and have taken concrete steps to advance it, including organizing an "exit polling" operation targeted at minority voters in locations including Phoenix, and recruiting "vote protectors" to patrol polling places where they believe voters are likely to vote for Secretary Clinton. Gonski Decl. at Exs. 4, 27. Each of these acts, and many others, has furthered the conspiracy to intimidate voters.

Finally, each of those acts has injured Plaintiff in its capacity as the Democratic Party organization in the State of Arizona, by harming its prospects in the election, and by depriving the lawful voters whose interests it represents of their legal right to vote without intimidation. In the absence of immediate relief, thousands of voters, if not more, will be deprived of their right to vote on account of Defendants' intimidation.

### III. PLAINTIFF WILL SUFFER IRREPARABLE HARM IN THE ABSENCE OF PRELIMINARY RELIEF

In the absence of injunctive relief, Defendants' plans to intimidate Democratic and minority voters are likely to succeed, causing irreparable harm to Plaintiff. *See, e.g.*, *Crawford v. Marion County Election Bd.*, 553 U.S. 181, 189 n.7 (2008) (citing *Crawford v. Marion County Election Bd.*, 472 F.3d 949, 951 (7th Cir. 2007) ("The Democratic Party also has standing to assert the rights of those of its members who will be prevented from voting by the new law.")). U.S. political history suggests that Defendants' schemes are neither anomalous nor unthreatening—to the contrary, voter intimidation efforts have been known to compromise the integrity of both federal and state elections. *See, e.g.*, *Ne. Ohio Coal. for the Homeless*, 2016 WL 3166251, at *28 ("Poll watching, . . . although ostensibly aimed at combatting voter fraud, has a pernicious history of intimidation of

-14-

minority voters."); *DNC v. RNC*, 671 F. Supp. 2d 575, 578-79 (D.N.J. 2009) ("Voter intimidation presents an ongoing threat to the participation of minority individuals in the political process, and continues to pose a far greater threat to the integrity of that process than" alleged in-person "voter fraud"), *aff'd*, 673 F.3d 192 (3d Cir. 2012).

Defendants seek to intimidate and suppress Arizona voters, and "[i]t is clear that abridgment of the right to vote constitutes an irreparable injury." *Sanchez v. Cegavske*, No. 16-cv-00523 MMD WGC, 2016 WL 5936918, at *3 (D. Nev. Oct. 7, 2016); *see Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) ("It is well established that deprivation of constitutional rights unquestionably constitutes irreparable injury.").[10]

## IV. THE BALANCE OF EQUITIES FAVORS PLAINTIFF

### a. Preventing Voter Intimidation Is A Strong Federal Interest.

"[V]oter intimidation and coercion [are] . . . obvious harm[s] that federal law strongly and properly prohibits." *United States v. Madden*, 403 F.3d 347, 352 (6th Cir. 2005) (Boggs, C.J., concurring in part and dissenting in part). The constitutional interest at stake in this litigation is the voters' "most precious" "right . . . , regardless of their political persuasion, to cast their votes effectively" and free of intimidation. *Williams v. Rhodes*, 393 U.S. 23, 30-31 (1968). The interest in "protecting voters from confusion and undue influence" is "compelling," *Burson v. Freeman*, 504 U.S. 191, 199 (1992) (plurality op.), and laws that protect voters from intimidation safeguard the "fundamental political right . . . preservative of all rights," *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). The Constitution secures the "citizen's right to a vote free of arbitrary impairment by state action," including intimidation by poll-watchers. *Baker v. Carr*, 369 U.S. 186, 208 (1962).

The "right" to engage in poll-watching is a state-created interest, poll-watching in federal elections is permissible only insofar as it complies with federal laws proscribing

---

[10] Courts find irreparable harm where, as here, the right to vote is threatened, even if the impingement is not yet complete. *See, e.g.*, *Lucas v. Townsend*, 486 U.S. 1301, 1305 (1988) (granting injunction enjoining a bond referendum election because "[p]ermitting the election to go forward [without statutory protection] would place the burdens of inertia and litigation delay on those whom the statute was intended to protect.")

-15-

voter intimidation. *See* 42 U.S.C. § 1985(3); 52 U.S.C. § 10307(b); *Arizona v. Inter Tribal Council of Arizona, Inc.*, 133 S. Ct. 2247, 2257 (2013) ("the Elections Clause empowers Congress to regulate *how* federal elections are held"). And, as discussed, even activities that comply with state election procedures violate Section 11(b) where their purpose and effect is to interfere with the right to vote. *See Katzenbach*, 250 F. Supp. at 348 (noting that "acts otherwise lawful may become unlawful and be enjoined under [section 11(b)] if the purpose and effect of the acts is to interfere with the right to vote").

### b. Widespread Or Systemic Voter Fraud Is A Myth.

The claimed rationale for the conspiracy in which Defendants are engaged is to combat alleged "voter fraud." But widespread voter fraud is a myth. One recent study discovered only "31 credible incidents" of in-person voter fraud – out of *one billion* votes cast. Gonski Decl. at Ex. 16. The actual frequency of substantiated claims of voter fraud reveal that mass coordinated efforts to combat it are misguided at best and pretextual at worse, with the true purpose to suppress voter turnout. Courts that have examined the evidence have concluded that widespread voter fraud does not exist. In a challenge to Pennsylvania's voter ID law, for example, "[t]he parties [we]re not aware of any incidents of in-person voter fraud in Pennsylvania and d[id] not have direct personal knowledge of in person voter fraud elsewhere. *Applewhite v. Commonwealth*, No. 330 M.D. 2012, 2014 WL 184988, at *57 (Pa. Commw. Ct. Jan. 17, 2014). A federal judge in Wisconsin has similarly observed that "[t]he Wisconsin experience demonstrates that a preoccupation with mostly phantom election fraud leads to real incidents of disenfranchisement, which undermine rather than enhance confidence in elections, particularly in minority communities." *One Wis. Inst. v. Thomsen*, No. 15-civ-324 (JDP), 2016 WL 4059222, at *2 (W.D. Wis. July 29, 2016).[11]

---

[11] *See also, e.g.*, Gonski Decl. at Ex. 15 (*Brakebill v. Jaeger*, No. 16-civ-00008 (DLH), Dkt. No. 50, Aug. 1, 2016) ("The undisputed evidence before the Court reveals that voter fraud in North Dakota has been virtually non-existent."); *Veasey v. Abbott*, 830 F.3d 216, 238 (5th Cir. 2016) ("[T]he evidence before the Legislature was that in-person voting . . . yielded only two convictions for in-person voter impersonation fraud out of 20 million

-16-

## V. A PRELIMINARY INJUNCTION IS IN THE PUBLIC INTEREST

The preliminary relief that Plaintiff seeks would clearly advance the public interest by enforcing federal law. As explained above, voter intimidation is expressly prohibited by Section 11(b) of the Voting Rights Act, 52 U.S.C. § 10307(b), and the Klan Act, 42 U.S.C. § 1985(3). Plaintiff's requested injunctive relief does no more than to effectuate the mandate of federal law. Plaintiff's requested relief would also further compliance with Arizona laws that protect Arizona's voters from vigilante poll watchers' unlawful interference with their votes. *See* Ariz. Rev. Stat. § 16-1013(A).

"In the absence of legitimate, countervailing concerns, the public interest clearly favors the protection of constitutional rights, including the voting and associational rights of . . . candidates, and their potential supporters." *Hooks*, 121 F.3d at 883-84. "By definition, [t]he public interest . . . favors permitting as many qualified voters to vote as possible." *League of Women Voters*, 769 F.3d at 247; *see Purcell v. Gonzalez*, 549 U.S. 1, 4 (2006) (the public has a "strong interest in exercising the fundamental political right to vote"). Against a backdrop of widespread past and threatened future voter intimidation and minimal evidence of voter fraud, Defendants must be enjoined from engaging in conduct that threatens the most basic right in American democracy—the right of voters to cast their votes free of coercion and intimidation. "[O]ther rights, even the most basic, are illusory if the right to vote is undermined." *Wesberry v. Sanders*, 376 U.S. 1, 17 (1964).

## VI. CONCLUSION

This Court should grant Plaintiff's motion for preliminary relief.

---

votes cast in the decade leading up to SB 14's passage."); *League of Women Voters*, 769 F.3d at 246 ("North Carolina asserts goals of electoral integrity and fraud prevention. But nothing in the district court's portrayal of the facts suggests that those are anything other than merely imaginable."); *Crawford v. Marion Cty. Election Bd.*, 553 U.S. 181, 194 (2008) ("The only kind of voter fraud that SEA 483 addresses is in-person voter impersonation at polling places. The record contains no evidence of any such fraud actually occurring in Indiana at any time in its history."); *Frank v. Walker*, 17 F. Supp. 3d 837, 848 (E.D. Wis. 2014) ("there have been zero incidents of in-person voter-impersonation fraud in Wisconsin during recent elections."); *Lee v. Va. State Bd. of Elections*, No. 15-cv-357 (HEH), 2016 WL 2946181, at *23 (E.D. Va. May 19, 2016) ("evidence of actual voter impersonation-type fraud was scant").

-17-

| | |
|---|---|
| November 1, 2016 | Respectfully submitted, |
| | *s/ Sarah R. Gonski* |
| | Sarah R. Gonski (# 032567) |
| | PERKINS COIE LLP |
| | 2901 North Central Avenue, Suite 2000 |
| | Phoenix, Arizona 85012-2788 |
| | Tel: (602) 351-8000 |
| | Fax: (602) 648-7000 |
| | SGonski@perkinscoie.com |
| | |
| | Marc E. Elias* |
| | PERKINS COIE LLP |
| | 700 13th Street, Suite 600 |
| | Washington, DC 20005 |
| | Tel: (202) 434-1609 |
| | Fax: (202) 654-9126 |
| | melias@perkinscoie.com |
| | |
| | Michael J. Gottlieb* |
| | BOIES, SCHILLER & FLEXNER LLP |
| | 5301 Wisconsin Ave, N.W. |
| | Washington, DC 20015 |
| | Tel: (202) 237-2727 |
| | Fax: (202) 237-6131 |
| | mgottlieb@bsfllp.com |
| | |
| | Dawn L. Smalls* |
| | BOIES, SCHILLER & FLEXNER LLP |
| | 575 Lexington Avenue |
| | New York, NY 10022 |
| | Tel: (202) 754-4216 |
| | Fax: (212) 446-2350 |
| | dsmalls@bsfllp.com |
| | |
| | *Applications for Admission Pro Hac Vice Pending* |

-18-

**CERTIFICATE OF SERVICE**

I hereby certify that on November 1, 2016, I electronically transmitted the attached document to the Clerk's Office using the CM/ECF System for filing.

　　　　　　　　　　　　s/ *Sarah R. Gonski*

-19-